## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

FLORIDIANS PROTECTING
FREEDOM, INC.,

                *Plaintiff*,

     v.

JOSEPH A. LADAPO, in his official
capacity as State Surgeon General and
Head of the Florida Department of
Health, and JOHN WILSON, former
General Counsel to the Florida
Department of Health, in his individual
capacity,

                *Defendants*.

Civil Action No. _____

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.      Floridians Protecting Freedom, Inc. ("FPF") brings this First Amendment challenge to protect its rights in response to Defendants' coercive threat to prosecute media organizations that disseminate FPF's political advertisements in support of Amendment 4 in the homestretch of campaigning before the November 5 general election.

2.      Defendants' threat is an escalation of a broader State campaign to attack Amendment 4 using public resources and government authority to advance the State's preferred characterization of its anti-abortion laws as the "truth" and denigrate opposing viewpoints as "lies." The State's months-long crusade against Amendment 4 included litigating whether Amendment 4 could appear on the ballot, sending election police to question those who signed the petition supporting Amendment 4, misleading voters about the fiscal impacts of Amendment 4, running taxpayer-funded advertisements in opposition to Amendment 4, and launching a state-run taxpayer-funded website proclaiming that proponents of Amendment 4 are telling "lies" and only the State's characterizations are the "truth." Now, the State has gone one step further—attempting to silence FPF by threatening to criminally prosecute those who run FPF's political advertisements based on the State's disagreement with FPF's political position.

3.      This lawsuit is precipitated by the State's response to one such advertisement, "Caroline," which consists of a woman narrating her own firsthand

and tragic experience. As the advertisement describes, Caroline was diagnosed with stage-four terminal brain cancer when she was 20-weeks pregnant. Because her diagnosis is terminal, no available care could save her life. She could receive life-extending care to spend more time with her young daughter and her husband—but only if she ended her pregnancy. Current Florida law, however, allows only for an abortion after six weeks' gestation when the "termination of the pregnancy is necessary to save the pregnant woman's life or avert a serious risk of substantial and irreversible physical impairment of a major bodily function of the pregnant woman other than a psychological condition." Fla. Stat. § 390.0111(1)(a). None of these exceptions would have applied in Caroline's case. This is not just FPF's view, it is the view of physicians who must apply Florida's abortion ban in cases exactly like Caroline's.

4.      Shortly after the advertisement began airing, the Florida Department of Health sent a letter to multiple third-party media organizations, signed by Defendant Department General Counsel John Wilson, directing them to cease broadcasting FPF's advertisement within 24 hours. The State claimed that "Caroline" was a "sanitary nuisance" and that the State was authorized to criminally prosecute any media organizations that refused to comply with its demand. The State's threat, while unconstitutional, was effective: At least one station pulled the advertisement from the air.

5.      The State's letters were so egregious that they prompted the Chair of

the Federal Communications Commission to issue a statement on the "threats made by government officials in Florida against broadcast stations" reiterating that "[t]he right of broadcasters to speak freely is rooted in the First Amendment. Threats against broadcast stations for airing content that conflicts with the government's views are dangerous and undermine the fundamental principle of free speech." Press Release, FCC, *Chairwoman Rosenworcel on First Amendment Threats to Florida Broadcast Stations* (Oct. 8, 2024).[1]

6. Indeed, the U.S. Supreme Court has resoundingly held that "[g]overnment officials cannot to attempt to coerce private parties in order to punish or suppress views that the government disfavors." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024). FPF's advertisement is pure political speech at the very heart of the First Amendment's protections. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). "[T]he advocacy of a politically controversial viewpoint" is, in fact, "the essence of First Amendment expression." *Id.* The State's threatened sanctions against third-party media organizations that host the advertisement—in a heavy-handed effort to silence FPF's speech—is a classic and deeply disturbing example of unconstitutional coercion.

7. The election is just three weeks away, and FPF is running and intends to continue running television advertisements and to engage in other political

---

[1] Available at https://docs.fcc.gov/public/attachments/DOC-406321A1.pdf [https://perma.cc/2NEM-BEDH].

speech advocating for the passage of Amendment 4 and calling attention to the dangerous consequences of current Florida law on women's rights and health. It is intolerable that FPF do so with the State dangling a sword of Damocles over anyone who would facilitate that core political expression—threatening broadcasters with criminal prosecution if they air viewpoints the State disagrees with, and silencing FPF's speech in the process.

8.     The Court should declare that the State's October 3, 2024 letter amounts to unconstitutional coercion and viewpoint discrimination, enjoin Defendants from following through on their threats, and grant FPF the other relief to which it is entitled as a result of Defendants' egregious violation of FPF's constitutional rights.

## PARTIES

9.     Plaintiff Floridians Protecting Freedom, Inc. ("FPF") is a Florida corporation and political committee sponsoring the citizen initiative entitled "Amendment to Limit Government Interference with Abortion" ("Amendment 4").

10.     Defendant Joseph A. Ladapo is the State Surgeon General. In that capacity, he is the head of the Florida Department of Health and the State Health Officer, and thus has supervisory responsibility over the Department. Fla. Stat. § 20.43(2). The Department is an agency of the State of Florida. Among other things, it is the duty of the Department of Health—under the State Surgeon General's supervision—to "[a]dminister and enforce laws and rules relating to sanitation,

control of communicable diseases, illnesses and hazards to health among humans . . . and the general health of the people of the state." Fla. Stat. § 381.0011(2). Plaintiff sues Defendant Ladapo in his official capacity only.

11.    John Wilson, as of October 3, 2024, when he sent a letter to various television stations on behalf of the Department, was the General Counsel to the Department. He signed the letters sent to the stations. *See* Ex. A, Letter from Fla. Dep't of Health to WINK TV at 2. Upon information and belief, Defendant Wilson no longer serves as General Counsel of the Department. Plaintiff sues Defendant Wilson in his individual capacity.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the First and Fourteenth Amendments to the United States Constitution, and under 42 U.S.C. § 1983.

13.    Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(b) and 1391(e).

14.    This Court has authority to grant the requested declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

15.    This Court has authority to issue the requested injunctive relief pursuant to 42 U.S.C. § 1983 and Federal Rule of Civil Procedure 65.

## FACTUAL ALLEGATIONS

### Amendment to Limit Government Interference with Abortion ("Amendment 4")

16.     Article XI, section 3 of the Florida Constitution provides that "[t]he power to propose the revision or amendment of . . . this constitution by initiative is reserved to the people." The people may invoke this power by filing with the Secretary of State a petition signed by the constitutionally required number of voters. Fla. Const. art. XI, § 3.

17.     Amendment 4 proposes to amend the Florida Constitution to provide: "Except as provided in Article X, Section 22, no law shall prohibit, penalize, delay, or restrict abortion before viability or when necessary to protect the patient's health, as determined by the patient's healthcare provider."

### Florida's Campaign Against Amendment 4

18.     From the start, State officials have conducted a multi-front campaign in opposition to Amendment 4. This complaint summarizes the most egregious of the State's tactics to provide a further understanding of the context of the present dispute.

19.     On October 9, 2023, the Attorney General petitioned the Florida Supreme Court for an opinion regarding the validity of Amendment 4. The State's petition opposed Amendment 4, arguing it was misleading and should not be permitted to be on the ballot.

20.     On April 1, 2024, the Florida Supreme Court "approve[d] the proposed

[A]mendment [4] for placement on the ballot." *Advisory Op. to Att'y Gen. re Limiting Gov't Interference with Abortion*, 384 So. 3d 122, 127 (Fla. 2024) (per curiam).

21.    Once the Florida Supreme Court's decision made clear that the State could not block Amendment 4 from the ballot entirely, state officials turned to other tactics, including conduct that has intimidated voters supporting Amendment 4.

22.    As publicly reported, as part of an "investigation," law enforcement officers have targeted voters in their own homes—knocking on their doors and asking whether they signed a petition supporting Amendment 4. Romy Ellenbogen, et al., *DeSantis' election police questioned people who signed abortion petitions*, TAMPA BAY TIMES (Sept. 6, 2024).[2]

23.    One voter from Lee County recounted his interaction with law enforcement had left him "shaken," while another voter from the same county recalled feeling "intimidated by having a law enforcement officer come to her door." *Id.* Notably, not even the Lee County Sheriff was notified of the "state agency's independent investigation." *Id.*

24.    The State also manipulated the fiscal impact statement ("FIS") for Amendment 4, which appears on the ballot below the Amendment's ballot titles and summary. After the Leon County circuit court struck down the State's first FIS as misleading, the State replaced it with a new FIS that was even more misleading than the

---

[2] Available at https://www.tampabay.com/news/florida-politics/elections/2024/09/06/florida-abortion-amendment-petition-signature-fraud-voters/ [https://perma.cc/8JNY-AZV5].

first, over the objection of the state's top economist.

25.     The new FIS—which was drafted not by "professional staff of the House of Representatives" and "a person from the Executive Office of the Governor" (EOG) as Florida law requires, Fla. Stat. § 100.371(13)(c), but rather by an employee of the Heritage Foundation and a person who had left his EOG job to head a cabinet agency—included rank speculation about potential litigation challenging certain laws under the Amendment.

26.     When FPF sought to challenge the State's actions, the State took the position that its FIS was completely immune from any court review at all, no matter how admittedly unlawful it is, and successfully ran out the clock on further litigation.

27.     On October 11, 2024, the Department of State, Office of Election Crimes & Security ("OECS") released an interim report "to update the Governor and the Florida Legislature on investigations concerning initiative petition fraud." *Interim Report to Legislature on Initiative Petition Fraud Related to the Abortion Initiative (23-07)*, FLA. DEP'T OF STATE, (Oct. 11, 2024).[3] This report addressed purported fraud by individual petition circulators, and intimated wrongdoing by FPF using a capacious definition of "fraud" that included a circulator engaging in speech that was critical of the State. For example, OECS asserted a petition form was "obtained by fraud" if the circulator told signatories that the petition would "keep the State of Florida from taking away women's

_____

[3] Available at https://files.floridados.gov/media/708442/oecs-interim-report-10-11-2024.pdf [https://perma.cc/52E7-S729].

rights" without specifically referencing abortion. *Id.* at 5.

28.     At the same time, the State embarked on its own public relations campaign against Amendment 4, in which it purported to tell the public that the State's view of its current anti-abortion laws is the "truth" and those who support Amendment 4—or even disagree with the State's own (largely undefined) view of the scope of the state's abortion ban—are telling "lies."

29.     To that end, in September, the Florida Agency for Health Care Administration published a website entitled "Florida is Protecting Life." *Florida is Protecting Life*, FLA. AGENCY FOR HEALTH CARE ADMIN. (Sept. 2024).[4] This government website, contrary to the Florida Supreme Court's April 1 opinion, states that proponents of Amendment 4 are misleading Floridians.

30.     Among other things, the website screams: "DON'T LET THE FEARMONGERS LIE TO YOU," argues that "Current Florida Law **Protects Women**," whereas supposedly "Amendment 4 **Threatens Women's Safety**," and purports to set out a series of characterizations of the status quo in Florida as the "truth" and characterizes the positions of Amendment 4's supporters as "lies."

31.     The Florida Agency for Health Care Administration then proceeded to spend millions of taxpayer dollars running advertisements promoting this website and the State of Florida's official narratives regarding its existing abortion laws and

---

[4] Available at https://quality.healthfinder.fl.gov/floridacares/floridacares [https://perma.cc/M9X7-VLHD] (last accessed Oct. 15, 2024).

Amendment 4.

32.    One recent "public service announcement" asserts that viewers have "probably heard a lot of misinformation about our abortion laws," that these are "lies that could convince women to not seek necessary care and put themselves at risk and that's unacceptable," and that "abortions are always available at any time to protect the life and health of mothers." *Unacceptable*, FLA. AGENCY FOR HEALTH CARE ADMIN. (2024).[5]

33.    This government advertisement also threatens that any doctor with a different understanding of Florida law than the State "is committing malpractice and could lose their medical license." *Id.*

### FPF Advocates for the Passage of Amendment 4 and Sponsors the "Caroline" Advertisement

34.    Suffice to say, FPF disagrees with the State of Florida's narrative about its current law, which bans most abortions after six weeks' gestation. FPF sponsored Amendment 4 precisely because current Florida law does *not* protect women and instead runs roughshod over their rights and imperils their health by substituting the government's judgments for those of women and their healthcare providers.

35.    In that regard, the State campaign against Amendment 4 vividly illustrates the horns of the dilemma on which Florida doctors are currently hung: On the one hand, if the State disagrees with the decision *to* provide an abortion, it is a crime. On the other

---

[5] Available at https://host2.adimpact.com/admo/viewer/cea0900b-2cb8-43de-a96a-5a6d4be48fec [https://perma.cc/T7DS-Z2WY] (last accessed Oct. 15, 2024).

hand, the State is running "public service announcements" warning doctors that if the State disagrees with their decision to *not* provide an abortion, it is "malpractice." *Unacceptable*, FLA. AGENCY FOR HEALTH CARE ADMIN. (2024); *see* Ex. B, Declaration of Shelly Tien ¶ 10 ("Tien Decl.") ("The Department has provided only the most minimal of guidance on the exceptions, which guidance is woefully inadequate and medically nonsensical, leaving doctors and healthcare systems to interpret the laws themselves. . . . [T]he consequence of inaccurate interpretation of the law means disciplinary and criminal action.").

36.     As in any political campaign, FPF has sought to inform, energize, and persuade voters to support Amendment 4.

37.     Opponents of the measure are, of course, free to engage in their own oppositional speech, but the State cannot use its coercive powers as the State to attempt to chill or suppress the speech of FPF or others who would speak in support of the Amendment or facilitate that speech. That is precisely what Defendants have done here, by threatening criminal prosecution because they believe that their own views are the truth and opposing views are lies.

38.     As part of its advocacy in favor of Amendment 4, FPF has placed multiple paid political advertisements to "both . . . advocat[e] for Amendment 4 and advocat[e] against arguments and representations made by Amendment 4's opposition." Ex. C, Declaration of Sara Latshaw ¶ 17 ("Latshaw Decl.").

39.     On October 1, 2024, FPF began running, on various television stations

across the state, an advertisement titled, "Caroline." This advertisement is a first-hand account of Caroline Williams, a woman who was diagnosed with stage-four terminal brain cancer when she was 20-weeks pregnant. In the advertisement, Ms. Williams explains, "The doctors knew if I did not end my pregnancy, I would lose my baby, I would lose my life, and my daughter would lose her mom. Florida has now banned abortion even in cases like mine." Press Release, YES ON 4, *Yes on 4 Campaign Launches TV Ad Featuring "Caroline"* (Oct. 1, 2024).[6]

40.    Before running this advertisement, FPF spoke with Ms. Williams to understand what had happened to her and confirm her experience. The advertisement is Ms. Williams's firsthand account, as personally shared by her, and every part of Ms. Williams's recounting of what happened to her is true. Ex. D, Declaration of Caroline Williams ¶ 2 ("Williams Decl."). Indeed, Ms. Williams has attested to these same facts under penalty of perjury. *See id.* ¶¶ 1-7.

41.    In 2022, when she was about 17 weeks pregnant with her second child, doctors discovered that Ms. Williams had a brain tumor. *Id.* ¶ 2. When she was about 20-weeks pregnant, she was diagnosed with stage-four terminal brain cancer. *Id.* Although her diagnosis was terminal, there were available life-extending treatment options. *Id.* ¶ 3. But her doctors told her that they could not treat her with chemotherapy or radiation while she was pregnant. *Id.* In order to have more time with her daughter

---

[6] Available at https://floridiansprotectingfreedom.com/caroline/ [https://perma.cc/KY52-H9GQ].

and husband, she had an abortion in Florida in April 2022. *Id.* ¶ 4.

42. As Dr. Shelly Tien, a board-certified physician in obstetrics and gynecology, and maternal-fetal medicine, attested under penalty of perjury, Florida's current laws would prevent her from treating a patient in Ms. Williams's situation because it could be viewed as a crime. *See* Tien Decl. ¶¶ 1, 8.

43. Dr. Tien's view is consistent with that of countless physicians across Florida, who agree that Florida's existing abortion laws have "created an unworkable legal landscape that endangers both patients and clinicians." As those physicians have explained, Florida's laws "lead to preventable suffering, and compel[] clinicians to deviate from established standards of care and medical ethics." *Delayed and Denied: How Florida's Six-Week Abortion Ban Criminalizes Medical Care*, Physicians for Human Rights (Sept. 17, 2024).[7]

44. The purpose of the advertisement was to reflect FPF's views on the real life impacts that Florida's current six-week abortion ban may have on women in impossible situations, to better inform voters about what they can protect against if they support Amendment 4.

### The Florida Department of Health Responds to "Caroline" By Threatening to Pursue Criminal Charges Against Television Stations Airing the Ad

45. "Caroline" began running on October 1, 2024, in major markets across the State.

---

[7] Available at https://phr.org/our-work/resources/delayed-and-denied-floridas-six-week-abortion-ban/ [https://perma.cc/5B3C-HHT5].

46.     Two days after "Caroline" began running, Defendants threatened to prosecute the television stations running "Caroline." The threat came in the form of a letter signed by John Wilson, General Counsel of the Florida Department of Health. Ex. A at 2. The letter demanded that the stations remove the ad within 24 hours or face criminal charges. *See id.*

47.     The Department of Health's statutory purpose "is to protect and promote the health of all residents and visitors in the state through organized state and community efforts, including cooperative agreements with counties." Fla. Stat. § 20.43(1). Among its other powers, the Department has the authority to determine the existence of "things . . . declared to be nuisances by law," "notify the person or persons committing, creating, keeping, or maintaining the same, to remove or cause to be removed, the same within 24 hours." Fla. Stat. § 386.03. If the person fails to remove the "nuisance," the Department has the authority to do so itself, charge the removal costs, and institute criminal and/or administrative proceedings against the offender. *Id.* Any person guilty of creating "or maintaining a nuisance injurious to health" is guilty of a crime. Fla. Stat. § 386.051.

48.     A nuisance injurious to health includes such things as "[u]ntreated or improperly treated human waste, garbage, offal, dead animals, or dangerous waste materials," "noisome odors which are harmful to human or animal life," poorly built or maintained septic tanks, diseased animals, and other similar kinds of unsanitary conditions. Fla. Stat. § 386.041. The statutes do not include, as a listed nuisance, "political advertising that contradicts state officials' political beliefs and/or legal

interpretations."

49.     While the Department may not have the power to dub anything and everything as a "nuisance" at its say-so, the Department *does* have the power to initiate administrative, civil, and criminal proceedings against those responsible for activities that the Department views as nuisances injurious to health. *See* Fla. Stat. §§ 381.0012, 386.03(2)(b). Its threats have teeth—it is an enforcement agency.

50.     In the letter threatening the television stations, Defendants asserted, among other things, that "Caroline" is a "sanitary nuisance"—citing Section 386.01, Florida Statutes—that the receiving station was required to remove within 24 hours. Ex. A at 2.

51.     If the receiving station did not comply within 24 hours, Defendants made clear that the Department may not only "institute legal proceedings under section 381.0012, Florida Statutes, to obtain an injunction," but also "'[i]nstitute criminal proceedings in the county court in the jurisdiction of which the condition exists against all persons failing to comply with notices to correct sanitary nuisance conditions.' § 386.03(2)(b)." *Id.* (alteration in original). Defendants then cited to the section of the Florida statutes rendering failure to remove a nuisance a criminal offense.

52.     Defendants concluded that the television station did not have the right "to disseminate false advertisements which, if believed, would likely have a detrimental effect on the lives and health of pregnant women in Florida." *Id.*

53.     The State of Florida thus aggrandized to itself the power to determine what is true and to remove, from the airwaves, political advertisements it deems false and

16

criminally prosecute those who do not comply with its threats.

54.    FPF obtained a copy of one of the letters sent by Mr. Wilson on behalf of the Department to WFLA-TV, based in Tampa.

55.    On October 4, counsel for FPF sent a response letter to WCJB-TV. Latshaw Decl. ¶ 24. In the letter FPF emphasized that the Department letter raised serious First Amendment concerns and confirmed that "Caroline" is true. *Id.* FPF urged WCJB-TV to continue airing the advertisement.

### The Letter's Harmful Consequences for FPF

56.    Despite FPF's best efforts, Defendants' campaign of intimidation bore fruit.

57.    On October 8, FPF learned that WINK TV in Fort Myers decided to remove the advertisement from the airwaves after receiving Defendants' letter and refused to discuss the matter with FPF's counsel for several days. *Id.* ¶ 25.

58.    FPF is currently in discussions with WINK TV on the specifics of when and how "Caroline" will resume airing. Regardless of how those discussions resolve, FPF has lost critical time communicating with voters in the Fort Myers area. *Id.*

59.    At no point after sending the October 3 letter has Defendant Wilson, Defendant Surgeon General Ladapo, the Department, or any other state official provided any assurances—to FPF directly or publicly—that the State of Florida denounces the letter, will take none of the actions it threatens, or that it recognizes FPF's constitutional right to run advertisements supporting Amendment 4—whether the State agrees with

them or not.

60.     Beyond "Caroline," which FPF intends to continue publicizing, FPF intends to continue to put forth advertisements that educate voters about the lack of meaningful exceptions to Florida's extreme ban on abortion. *Id.* ¶ 27.

61.      For instance, "Deborah and Lee," is an FPF ad that began airing on October 3, 2024, and addresses a couple who learned that their child would not survive childbirth but who was forced to endure a painful pregnancy due to Florida's extreme abortion ban. *Id.* ¶ 28; Yes on 4 Florida, *Deborah and Lee*, YOUTUBE (Oct. 3, 2024).[8]

62.     FPF also intends to begin running an advertisement, "Anya," that will feature a Florida woman who was miscarrying but denied access to abortion care because she was not sufficiently on the brink of death to qualify for an abortion. Latshaw Decl. ¶ 29. When she left the hospital after being denied medical care, she was forced to carry a non-viable pregnancy until she began losing significant amounts of blood in a public restroom. Only then, when Anya was rushed to the hospital in an ambulance, bleeding out, was she finally provided abortion care. *Id.* This advertisement will, like "Caroline," tell a Florida woman's personal story and the dangerous and near-fatal consequences of Florida's current extreme abortion law. *Id.*

63.     The ability to educate voters on FPF's views on the current state of the law is essential to FPF's mission. Simply put, these advertisements reflect FPF's understanding—rooted in an undeniable reality and women's words about their own

---

[8] Available at https://www.youtube.com/watch?v=hoAVCFQlD28.

experiences—that the exceptions to the current law, a near-total ban on abortion, are not meaningfully accessible to many patients. *Id.* ¶ 30.

64.     FPF fears that Defendants' threats will deter television stations from running these advertisements, or that FPF will itself face prosecution by the Department if it continues to continue educating voters about its political views and the fact that Amendment 4 would make care more accessible to those who need it. *See id.* ¶¶ 31–32.

## CAUSES OF ACTION

### First Claim for Relief
### 42 U.S.C. § 1983 (First Amendment to the U.S. Constitution—Coercion)
### Against All Defendants

65.     FPF realleges and reincorporates by reference paragraphs 1 to 64 of this Complaint as fully set forth therein.

66.     FPF has a First Amendment right to run political advertisements in the midst of a political campaign in support of Amendment 4.

67.     The First Amendment binds the State of Florida and Defendants, as state actors, pursuant to the incorporation doctrine of the Fourteenth Amendment. In all paragraphs, references to the First Amendment include the First Amendment as applied to the State of Florida through the Fourteenth Amendment.

68.     The State of Florida could not lawfully adopt a statute to bar television stations from airing advertisements with which the State disagrees, as such a law would plainly not survive strict scrutiny under the First Amendment. As an extension, state actors cannot issue letters threatening criminal liability that coerce stations into silencing

FPF's advertisements in support of Amendment 4.

69.     Defendants' attempt to censor FPF through threats to deem its political speech a "sanitary nuisance" constitutes unconstitutional coercion of speech. As established by *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), and affirmed in *National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024), government officials cannot censor or chill speech through an informal process of coercive threats or insinuation—let alone through explicit threats of criminal prosecution. "A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Vullo*, 602 U.S. at 190.

70.     Because Defendants' actions "c[an] be reasonably understood to convey a threat of adverse government action in order to punish or suppress" FPF's speech, Defendants have violated the First Amendment. *Id.* at 191.

71.     In signing and sending the October 3 Letter to broadcast stations and seeking to compel stations to stop airing FPF's speech, Defendant Wilson acted willfully, deliberately, and with a deliberate or reckless indifference to FPF's federally protected First Amendment rights.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A.     Issue a declaratory judgment stating that Defendants' actions constitute unconstitutional government coercion under the First and Fourteenth Amendments to the United States Constitution;

B.     Issue a temporary restraining order and preliminary injunction

20

enjoining Defendants, their agents, and successors in office from taking any further actions to coerce, threaten, or intimate repercussions directly or indirectly to television stations, broadcasters, or other parties for airing FPF's speech, or undertaking enforcement action against FPF for running political advertisements or engaging in other speech protected under the First Amendment.

C.   Issue a permanent injunction to preclude Defendants, their agents, and successors in office from taking any further actions to coerce, threaten, or intimate repercussions directly or indirectly to television stations, broadcasters, or other parties for airing FPF's speech, or undertaking enforcement action against FPF for running political advertisements or engaging in other speech protected under the First Amendment.

D.   Issue an order directing Defendants to retract their "cease and desist" letters to WPLA-TV, WINK TV, and any and all similar communications to other television stations or other parties;

E.   Award Plaintiff's costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. § 1988;

F.   Award monetary damages in an amount to be determined by the Court to compensate for Defendant Wilson's actions, censorship, deprivation of constitutional rights and loss of airtime for "Caroline," and expenses;

G.      Award punitive damages in an amount to be determined by the
Court as punishment for Defendant Wilson's conduct and to deter
repetition;

H.      Grant such additional relief as the interests of justice may require.

**Second Claim for Relief**
**42 U.S.C. § 1983 (First Amendment to the U.S. Constitution—Viewpoint**
**Discrimination)**
**Against All Defendants**

72.     FPF realleges and reincorporates by reference paragraphs 1 to 64 of this
Complaint as fully set forth therein.

73.     Defendants' letter targets and censors FPF's speech based on its viewpoint
in support of Amendment 4.

74.     Viewpoint discrimination is "an egregious form" of content discrimination
that courts will not tolerate. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515
U.S. 819, 828–29 (1995). Content-based restrictions "are presumptively
unconstitutional" and subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155,
163 (2015). Viewpoint-based restrictions are per se invalid. *Honeyfund.com Inc. v.
Governor of Fla.*, 94 F.4th 1272, 1278 (11th Cir. 2024).

75.     Here, the State is attempting to censor core political speech with which it
disagrees. To the extent strict scrutiny applies, the State's blunderbuss threats of
prosecution are not narrowly tailored to serve compelling state interests.

76.     In signing and sending the October 3 Letter to broadcast stations and

seeking to censor FPF's speech because of its viewpoint, Defendant Wilson acted willfully, maliciously, and with a deliberate or reckless indifference to FPF's federally protected First Amendment rights.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A.    Issue a declaratory judgment stating that Defendants' actions constitute unconstitutional viewpoint discrimination, under the First and Fourteenth Amendments to the United States Constitution;

B.    Issue a temporary restraining order and preliminary injunction enjoining Defendants, their agents, and successors in office from taking any further actions to coerce, threaten, or intimate repercussions directly or indirectly to television stations, broadcasters, or other parties for airing FPF's speech, or undertaking enforcement action against FPF for running political advertisements or engaging in other speech protected under the First Amendment.

C.    Issue a permanent injunction to preclude Defendants, their agents, and successors in office from taking any further actions to coerce, threaten, or intimate repercussions directly or indirectly to television stations, broadcasters, or other parties for airing FPF's speech, or undertaking enforcement action against FPF for running political advertisements or engaging in other speech protected under the First Amendment;

D.    Issue an order directing Defendants to retract their "cease and

desist" letters to WPLA-TV, WINK TV, and any and all similar communications to other television stations or other parties;

E.     Award Plaintiff's costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. § 1988;

F.     Award monetary damages in an amount to be determined by the Court to compensate for Defendant Wilson's actions, censorship, deprivation of constitutional rights and loss of airtime for "Caroline," and expenses;

G.     Award punitive damages in an amount to be determined by the Court as punishment for Defendant Wilson's conduct and to deter repetition;

H.     Grant such additional relief as the interests of justice may require.


Dated: October 16, 2023

Respectfully submitted,

*/s/ Christina Ford*
Christina Ford, FL Bar. No 1011634


Ben Stafford*
**ELIAS LAW GROUP LLP**
1700 Seventh Ave., Suite 2100
Seattle, Washington 98101
Telephone: (206) 656-0177
bstafford@elias.law

Emma Olson Sharkey*

Christina Ford (FL Bar No. 1011634)
Renata O'Donnell*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, D.C., 20001
Telephone: (202) 968-4490
eolsonsharkey@elias.law
cford@elias.law
rodonnell@elias.law

**Motions to appear pro hac vice
forthcoming*

*Counsel for Plaintiff*

**VERIFICATION**

I, Sara Latshaw, declare as follows:

1.      I am Chair of Floridians for Protecting Freedom, Inc. ("FPF"), the plaintiff in this suit.

2.      I have personal knowledge of FPF's activities and intentions, including those set out in the foregoing Verified Complaint for Declaratory and Injunctive Relief, and if called on to testify I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America, *see* 28 U.S.C. § 1746, that the factual statements in this Complaint concerning FPF are true and correct.

Executed on October 15, 2024


*Sara Satshaw*

Sara Latshaw

Chair, Floridians for Protecting Freedom, Inc.