## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

---

FLORIDIANS PROTECTING
FREEDOM, INC.,

*Plaintiff,*

v.

JOSEPH A. LADAPO, in his official
capacity as State Surgeon General and
Head of the Florida Department of
Health, AND JOHN WILSON, former
General Counsel to the Florida
Department of Health, in his individual
capacity,

*Defendants.*

Civil Action No. 4:24-cv-00419

---

### DECLARATION OF CHRISTINA FORD IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

I, Christina Ford, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am over the age of 18 and competent to make this declaration. I am

an attorney with the law firm of Elias Law Group LLP and am admitted to practice

law in the state of Florida and the U.S. District Court for the Northern District of

Florida. I am an attorney for Plaintiff. I submit this declaration to aver to providing

notice of this motion to counsel and to provide the Court with true and correct copies

1

of certain documents submitted in connection with Plaintiff's Emergency Motion for Temporary Restraining Order.

2.     Plaintiff's counsel has provided notice of its intent to file this temporary restraining order to counsel for Defendant Ladapo via email, against whom Plaintiff seeks this temporary restraining order. Plaintiff is presently unaware of counsel for Defendant Wilson, who is sued in his individual capacity, but this motion for a temporary restraining order does not seek any relief against him.

3.     Plaintiff's counsel intends to provide this motion and all supporting documents to counsel for Defendant Ladapo via email upon filing.

4.     Exhibit A is a true and correct copy of the Florida Department of Health's letter dated October 3, 2024   to broadcast stations concerning the advertisement, "Caroline."

5.     Exhibit B is a true and correct copy of the declaration of Shelly Tien.

6.     Exhibit C is a true and correct copy of the declaration of Sara Latshaw.

7.     Exhibit D is a true and correct copy of the declaration of Caroline Williams.

8.     Exhibit E is a true and correct copy of Initial Brief of the Attorney General, *Advisory Opinion to the Attorney General Re: Limiting Government Interference with Abortion*, SC2023-1392, Filing # 185188996 (Oct. 31, 2023).

I declare under penalty of perjury that the foregoing is true and correct.


DATED: October 16, 2024


/s/ *Christina Ford*
Christina Ford (FL Bar No. 1011634)
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, D.C., 20001
Telephone: (202) 968-4490
cford@elias.law

# Exhibit A



**Mission:**
To protect, promote & improve the health of all people in Florida through integrated state, county & community efforts.

**Vision:** To be the **Healthiest State** in the Nation

October 3, 2024

Alan Chatman & Mike Jones
WCJB-TV
6220 NW 43rd Street
Gainesville FL 32653
alan.chatman@wcjb.com
mike.jones@graymedia.com

Dear Mr. Chatman & Mr. Jones:

The Florida Department of Health has been notified that your company is disseminating a political advertisement claiming that current Florida law does not allow physicians to perform abortions necessary to preserve the lives and health of pregnant women.[1]

This claim is categorically false. Florida's Heartbeat Protection Act does not prohibit abortion if a physician determines the gestational age of the fetus is less than 6 weeks. § 390.0111(1), Fla. Stat. After 6 weeks, an abortion may be performed if "[t]wo physicians certify in writing that, in reasonable medical judgment, the termination of the pregnancy is necessary to save the pregnant woman's life or avert a serious risk of substantial and irreversible physical impairment of a major bodily function of the pregnant woman other than a psychological condition." § 390.0111(1)(a), Fla. Stat. The two-physician requirement is waived in the case of an emergency medical procedure. § 390.0111(1)(b), Fla. Stat. And while physicians must exercise professional skill, care, and diligence to preserve the life and health of a fetus in the third trimester, "if preserving the life and health of the fetus conflicts with preserving the life and health of the pregnant woman, the physician must consider the woman's life and health the overriding and superior concern." § 390.0111(4), Fla. Stat.

The advertisement is not only false; it is dangerous. Women faced with pregnancy complications posing a serious risk of death or substantial and irreversible physical impairment may and should seek medical treatment in Florida. However, if they are led to believe that such treatment is unavailable under Florida law, such women could foreseeably travel out of state to seek emergency medical care, seek emergency medical care from unlicensed providers in Florida, or not seek emergency medical care at all. Such actions would threaten or impair the health and lives of these women.

Under section 386.01, Florida Statutes, "the commission of any act, by an individual, municipality, organization, or corporation . . . by which the health or life of an individual, or the health or lives of individuals, may be threatened or impaired" constitutes a "sanitary nuisance." The Department of Health,

---

[1] The advertisement is displayed on the home page of the Amendment sponsor's website under the title "Caroline." *See* https://floridiansprotectingfreedom.com/. The woman featured in the advertisement states: "The doctors knew if I did not end my pregnancy, I would lose my baby, I would lose my life, and my daughter would lose her mom. Florida has now banned abortion even in cases like mine."

**Florida Department of Health**
**Office of the General Counsel**
4052 Bald Cypress Way, Bin A-02 • Tallahassee, FL 32399-1701
PHONE: 850/245-4444 • FAX: 850/245-4790
FloridaHealth.gov



**Accredited Health Department**
Public Health Accreditation Board

**STATE OF FLORIDA**
**DEPARTMENT OF HEALTH**

upon determining the existence of such nuisance, must notify the person or persons committing the nuisance "to remove or cause to be removed the same within 24 hours." § 386.03(1), Fla. Stat. If the nuisance is not removed within the time prescribed, the Department is authorized to institute legal proceedings under section 381.0012, Florida Statutes, to obtain an injunction. § 386.03(2)(c), Fla. Stat. The Department is further authorized to "[i]nstitute criminal proceedings in the county court in the jurisdiction of which the condition exists against all persons failing to comply with notices to correct sanitary nuisance conditions." § 386.03(2)(b), Fla. Stat. Creating, keeping, or maintaining a nuisance injurious to health is a second-degree misdemeanor. § 386.051, Fla. Stat.

While your company enjoys the right to broadcast political advertisements under the First Amendment of the United States Constitution and Article I, section 4 of the Florida Constitution, that right does not include free rein to disseminate false advertisements which, if believed, would likely have a detrimental effect on the lives and health of pregnant women in Florida.


/s/ John Wilson
John Wilson
General Counsel
Florida Department of Health


2

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

FLORIDIANS PROTECTING
FREEDOM, INC.

                    *Plaintiff,*

         v.

JOSEPH A. LADAPO, in his official
capacity as State Surgeon General and
Head of the Florida Department of
Health, AND JOHN WILSON, in his
individual capacity and in his official
capacity as General Counsel to the
Florida Department of Health,

                  *Defendants.*

Civil Action No. _____

## <u>DECLARATION OF DR. SHELLY TIEN</u>

My name is Shelly Tien. I am over the age of 18 and fully competent to make

this declaration. Under penalty of perjury, pursuant to 28 U.S.C. § 1746, I declare:

    1.    I am a board-certified physician in obstetrics and gynecology, and

2

maternal-fetal medicine. I currently practice at Planned Parenthood of South, East and North Florida ("PPSENFL") and Genesis Maternal-Fetal Medicine in Tucson, Arizona. I also serve as a contract physician for Trust Women Wichita, Kansas and provide telehealth for Mitera.

2.      I provide the following opinions as an expert in obstetrics and gynecology and maternal-fetal medicine, including the provision of abortions. The opinions herein are based on my knowledge and experience in these areas, including my training, clinical experience, teaching, ongoing review of the relevant medical literature, and attendance at and participation in relevant conferences. A copy of my curriculum vitae is attached as **Exhibit A.**

3.      I also base this declaration on my experience with the unworkable exceptions in Florida's extreme abortion ban and my understanding of Caroline's circumstances as set out herein.

4.      I submit this declaration regarding the Department of Health's letter dated October 3, 2024 ("DOH letter") about the television ad "Caroline" which is currently airing in Florida. The DOH Letter is attached hereto as **Exhibit B.**

5.      It is my understanding that in March of 2022, Caroline was diagnosed with a mass in her brain. At the time, she was about 17 weeks pregnant with her second child. When she was about 20 weeks pregnant, she underwent surgery to

investigate the mass and was diagnosed with terminal brain cancer.

6.     Under Florida's extreme abortion ban, patients in factual circumstances similar to those set out above who need an abortion must find a doctor who will perform the abortion and two doctors must certify in writing that the termination of pregnancy is "necessary to save the pregnant woman's life or avert a serious risk of substantial and irreversible physical impairment of a major bodily function of the pregnant woman other than a psychological condition." Fla. Stat. s. 390.0111(1).

7.     In the setting of a terminal malignancy, Caroline needed medical interventions in order to treat the brain cancer to prolong her life. Ending the pregnancy allowed her to have the best treatment options to improve the quality of, and hopefully, prolong her life—and the treatment would have likely harmed the fetus—therefore, she needed an abortion to receive the optimal cancer treatment.

8.     Under Florida's current law, I would not have provided this abortion because it could be viewed as a crime to terminate Caroline's pregnancy because the termination itself would not have "save[d] the pregnant woman's life," and there are no exceptions in the law for palliative care, treatments to alleviate cancer-related suffering, or to prolong a patient's life. As the cancer was terminal, the abortion would not have saved the patient's life and therefore could be illegal under Florida law.

9.     As physicians we face these complex clinical scenarios every day and these dangerous bans prevent us from being able to provide the best science-based

care for our patients. The exceptions provided under Florida law are not adequate for many, many women who need medically necessary abortions. In my opinion, you cannot legislate medical complexity, and you cannot legislate individualized evidence-based clinical decision making.

10.      The Department of Health's actions in trying to silence patients' and doctors' experiences – and the extreme abortion ban itself – are dangerous for healthcare providers and their patients. The Department has provided only the most minimal of guidance on the exceptions, which guidance is woefully inadequate and medically nonsensical, leaving doctors and healthcare systems to interpret the laws themselves. Doctors are navigating providing medical care in a truly threatening environment where the consequence of inaccurate interpretation of the law means disciplinary and criminal action. This environment effectively prevents physicians from providing the standard of care out of fear of prosecution and egregiously harms our patients.

I, Shelly Tien, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.


Dated: 15/10/2024 _____

_____
**Shelly Tien**

5

# Exhibit A

**(DECLARATION OF DR. SHELLY TIEN)**

Shelly Hsiao-Ying Tien, M.D./M.P.H.
shtien@gmail.com
312-810-3833

**Genesis Maternal-Fetal Medicine, Tucson, Arizona**
04/2022 – current, physician

**Planned Parenthood – South, East and North Florida**
03/2021 – current, physician

**Trust Women, Oklahoma and Kansas**
02/2021 - current, physician

**Mitera Telehealth, California**
08/2024 – current, physician

**Planned Parenthood – Southeast, Alabama**
12/2021 – 5/2022, physician

**NorthShore University Health System/University of Chicago**
07/2015 – 12/2020, physician

**Fellowship, Maternal-Fetal Medicine**
University of Minnesota, Minneapolis
07/2012 – 06/2015

**Residency, Obstetrics and Gynecology**
Advocate Illinois Masonic Medical Center, Chicago, Illinois
07/2008 – 06/2012

**Medical Education**
Tufts University School of Medicine, Boston, Massachusetts
08/2003 - 05/2008
M.D./M.P.H.

**Education**
Undergraduate - University of Illinois, Champaign/Urbana
Biology
08/1999 - 06/2003
B.S.

**Board certification**
Maternal-Fetal Medicine 2018
Obstetrics and Gynecology 2013

**Memberships**
Society for Maternal-Fetal Medicine
2012 – current
American College of Obstetricians and Gynecologists
2008 – current
Society of Family Planning
2022 – current

**Medical Expert Witness cases**

Gainesville Woman Care, LLC, et al., vs. State of Florida, et al., in the 24 hour Mandated Delay
- January 2022 - Provided deposition as the medical expert witness on behalf of the ACLU.

Planned Parenthood of Southwest and Central Florida, et al., vs. State of Florida, et al., in the 15 week abortion ban
- June 2022 - Provided deposition and trial testimony as the medical expert witness and plaintiff on behalf of the ACLU and PPFA.

**Committees**

**Northshore University Health System Obstetric Practice Committee - Chair,** 2016 – 2020
- Educational committee that creates physician guidelines and nursing protocols for obstetric care for Evanston and Highland Park hospitals.

**Northshore University Health System Epic Physician builder,** 2018 – 2020
- Developed and implemented obstetric clinical workflows for our Epic electronic medical record system.

**Illinois Perinatal Quality Collaborative (ILPQC) - Clinical lead for the Immediate Postpartum Long-Acting Reversible Contraception initiative,** 2018 – 2020
- Implementation of immediate postpartum LARCs for patients at Evanston and Highland Park hospitals.
- Provision of educational support for other birthing hospitals in the state.

**Maternal-Fetal Medicine Clinical Competency Committee,** 2018 - 2020
- Biannual meeting and evaluation of educational progress for maternal-fetal medicine fellows.

**Volunteer Experience**

**Medical Students for Choice (MSFC), Massachusetts,** 09/2003-04/2008
Student coordinator
- Facilitated multiple lectures and workshops on reproductive education and contraception.
- Organized the 2005 regional student conference for MSFC.

**Cross Cultural Solutions, Ghana,** 06/2003-07/2003
Medical Volunteer
- Volunteered through the organization Cross Cultural Solutions.
- Provided immunizations to children, assisted in the local health center pharmacy, and taught women's health education in the maternity ward.

**Provena Mental Health, Illinois,** 04/2001-05/2002
Suicide Hotline Volunteer
- Volunteer counselor on the suicide hotline.
- Provided mental health interventions to clients in crisis, and general health resources and information for family members and support persons.

**Rape Crisis Services, Illinois,** 05/2000-05/2003
Medical Advocate and Hotline Volunteer
- Hotline volunteer providing counseling, support and resources to survivors of sexual violence.
- Medical advocate for patients – provided education and support during the emergency room visits for patients who presented after an assault.

**Publications**

Tien SH, Crabtree JN, Gray HL, Peterson EJ. Immunologic response to vaccine challenge in pregnant PTPN22 R620W carriers and non-carriers. PLoS One. 2017 Jul 19;12(7):e0181338.

Tien S and Yamamura Y. Cervical ectopic pregnancy: persistence despite a serologically negative ß-hCG. J Reprod Med 2015;60(5-6):257-60.

Tien S, Villines D, Parilla B. Gestational Weight Gain in Obese Patients and Adverse Pregnancy Events.  Health 2014;6:1420-1428.

Grimes K, Schulz M, Cohen S, Mullin B, Lehar S, Tien S. Pursuing Cost-Effectiveness in Mental Health Service Delivery for Youth with Complex Needs. J Ment Health Policy Econ 2011;14:73-86.

**Publications, non-peer reviewed**

Rugino A, Tien SH. Strip of the Month: Complete Heart Block Masquerading as a Reactive Nonstress Test. NeoReviews November 2018, Volume 19/Issue 11.

Rodriguez-Kovacs J, Tien SH, Plunkett BA. Selective Serotonin Reuptake Inhibitor Use in Pregnancy: Repercussions on the Oblivious Passenger. NeoReviews March 2018, Volume 19/Issue 3.

Cockrum RH, Tien SH. Strip of the Month: August 2016. NeoReviews August 2016, Volume 17/Issue 8.

Schneider P, Tien SH. Strip of the Month: February 2016. NeoReviews February 2016, Volume 17/Issue 2.

**Presentations**

Tien S, Crabtree J, Gray H, Peterson E. (2015, February). "Immunologic response to vaccine challenge in PTPN22 gene variants in pregnancy." Poster presentation at: the Society for Maternal-Fetal Medicine, San Diego, CA.

Tien S, Aguilera M. (2014, October). "Monochorionic Monoamniotic Twin Gestation: A review of antenatal management at three tertiary care centers." Poster presentation at: Central Association of Obstetricians and Gynecologists, Albuquerque, NM.

Tien S, Gray H, Jacobs K, Giacobbe L, Wagner W, Aguilera M. (2013, October). "A review of ten years' experience with placenta accreta at a single tertiary care center." Poster presentation at: Central Association of Obstetricians and Gynecologists, Napa Valley, CA.

Tien S, Gray H, Jacobs K, Giacobbe L, Swartout J, Aguilera M. (2013, October). "Spinal anesthesia converted to general anesthesia for cesarean hysterectomy is associated with improved neonatal Apgar scores versus general anesthesia alone." Poster presentation at: Central Association of Obstetricians and Gynecologists, Napa Valley, CA.

Tien S, Casserly K, Rauk P. (2013, April). "A right atrial thrombus in the setting of puerperal coagulopathy." Poster presentation at: Society for Obstetric Anesthesia and Perinatology, San Juan, Puerto Rico.

Tien S, Gray H, Jacobs K, Giacobbe L, Swartout J, Aguilera M. (2013, April). "Maternal obesity associated with clinically increased blood loss and postoperative hospital stay in patients undergoing peripartum hysterectomy." Poster presentation at: Society for Obstetric Anesthesia and Perinatology, San Juan, Puerto Rico.

Tien S, August C, Fernandez C, Dini M. (2012, October). "Metastatic colon cancer presenting as an adnexal mass." Poster presentation at: the Advocate Research Forum, Advocate Illinois Masonic Medical Center, Chicago, IL.

Tien S, Villines D, Parilla B. (2012, October). "Gestational Weight Gain in Obese Patients and Adverse Pregnancy Events." Oral presentation at: Central Association of Obstetricians and Gynecologists, Chicago, IL.

Tien S, Popper F. (2009, October). "A Retrospective Review of Misoprostol Efficacy for the Treatment of Early Pregnancy Failure." Poster presentation at: Central Association of Obstetricians and Gynecologists, Maui, HI.

Grimes K, Mullin B, Lehar S, Schulz M, Creeden M, Tien S. (2008, February). "Strength in Numbers: Using Concurrent Measurement to Guide Quality." Poster presentation at: Research and Training Center for Children's Mental Health, Tampa, FL.

# Exhibit B

**(DECLARATION OF DR. SHELLY TIEN)**



**Mission:**
To protect, promote & improve the health
of all people in Florida through integrated
state, county & community efforts.

**Ron DeSantis**
Governor

**Joseph A. Ladapo, MD, PhD**
State Surgeon General

**Vision:** To be the **Healthiest State** in the Nation

October 3, 2024

Alan Chatman & Mike Jones
WCJB-TV
6220 NW 43rd Street
Gainesville FL 32653
alan.chatman@wcjb.com
mike.jones@graymedia.com

Dear Mr. Chatman & Mr. Jones:

The Florida Department of Health has been notified that your company is disseminating a political advertisement claiming that current Florida law does not allow physicians to perform abortions necessary to preserve the lives and health of pregnant women.[1]

This claim is categorically false. Florida's Heartbeat Protection Act does not prohibit abortion if a physician determines the gestational age of the fetus is less than 6 weeks. § 390.0111(1), Fla. Stat. After 6 weeks, an abortion may be performed if "[t]wo physicians certify in writing that, in reasonable medical judgment, the termination of the pregnancy is necessary to save the pregnant woman's life or avert a serious risk of substantial and irreversible physical impairment of a major bodily function of the pregnant woman other than a psychological condition." § 390.0111(1)(a), Fla. Stat. The two-physician requirement is waived in the case of an emergency medical procedure. § 390.0111(1)(b), Fla. Stat. And while physicians must exercise professional skill, care, and diligence to preserve the life and health of a fetus in the third trimester, "if preserving the life and health of the fetus conflicts with preserving the life and health of the pregnant woman, the physician must consider the woman's life and health the overriding and superior concern." § 390.0111(4), Fla. Stat.

The advertisement is not only false; it is dangerous. Women faced with pregnancy complications posing a serious risk of death or substantial and irreversible physical impairment may and should seek medical treatment in Florida. However, if they are led to believe that such treatment is unavailable under Florida law, such women could foreseeably travel out of state to seek emergency medical care, seek emergency medical care from unlicensed providers in Florida, or not seek emergency medical care at all. Such actions would threaten or impair the health and lives of these women.

Under section 386.01, Florida Statutes, "the commission of any act, by an individual, municipality, organization, or corporation . . . by which the health or life of an individual, or the health or lives of individuals, may be threatened or impaired" constitutes a "sanitary nuisance." The Department of Health,

---

[1] The advertisement is displayed on the home page of the Amendment sponsor's website under the title "Caroline." *See* https://floridiansprotectingfreedom.com/. The woman featured in the advertisement states: "The doctors knew if I did not end my pregnancy, I would lose my baby, I would lose my life, and my daughter would lose her mom. Florida has now banned abortion even in cases like mine."

**Florida Department of Health**
**Office of the General Counsel**
4052 Bald Cypress Way, Bin A-02 • Tallahassee, FL 32399-1701
PHONE: 850/245-4444 • FAX: 850/245-4790
FloridaHealth.gov



**Accredited Health Department**
Public Health Accreditation Board

**STATE OF FLORIDA**
**DEPARTMENT OF HEALTH**

upon determining the existence of such nuisance, must notify the person or persons committing the nuisance "to remove or cause to be removed the same within 24 hours." § 386.03(1), Fla. Stat. If the nuisance is not removed within the time prescribed, the Department is authorized to institute legal proceedings under section 381.0012, Florida Statutes, to obtain an injunction. § 386.03(2)(c), Fla. Stat. The Department is further authorized to "[i]nstitute criminal proceedings in the county court in the jurisdiction of which the condition exists against all persons failing to comply with notices to correct sanitary nuisance conditions." § 386.03(2)(b), Fla. Stat. Creating, keeping, or maintaining a nuisance injurious to health is a second-degree misdemeanor. § 386.051, Fla. Stat.

While your company enjoys the right to broadcast political advertisements under the First Amendment of the United States Constitution and Article I, section 4 of the Florida Constitution, that right does not include free rein to disseminate false advertisements which, if believed, would likely have a detrimental effect on the lives and health of pregnant women in Florida.

/s/ John Wilson
John Wilson
General Counsel
Florida Department of Health

# Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | | |
|---|---|---|
| FLORIDIANS PROTECTING | : | |
| FREEDOM, INC., | : | |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | Case No. |
| | : | |
| JOSEPH A. LADAPO, in his | : | |
| official capacity as State Surgeon | : | |
| General, *et al.*, | : | |
| | : | |
| *Defendants*. | : | |

## <u>DECLARATION OF SARA LATSHAW</u>

My name is Sara Latshaw. I am over the age of 18 and fully competent to make this declaration. Under penalty of perjury, pursuant to 28 U.S.C. § 1746, I declare:

1.     I am the Chair of Floridians Protecting Freedom, Inc. ("FPF"), the plaintiff in this action.

2.     I have been the Chair of FPF since September 2023.

3.     FPF is a Florida nonprofit corporation, organized and operating under 501(c)(4) of the Internal Revenue Code, and a Florida political committee.

4.      FPF is the sponsor of the citizen initiative entitled "Amendment to Limit Government Interference with Abortion" ("Amendment 4").

5.      If adopted by voters, Amendment 4 would amend the Florida Constitution to provide: "Except as provided in Article X, Section 22, no law shall prohibit, penalize, delay, or restrict abortion before viability or when necessary to protect the patient's health, as determined by the patient's healthcare provider."

6.      To be eligible for placement on the general election ballot, a citizen initiative petition must be "signed by a number of electors in each of one half of the congressional districts of the state, and of the state as a whole, equal to eight percent of the votes cast in each of such districts respectively and in the state as a whole in the last preceding election in which presidential electors were chosen." Article XI, § 3, Fla. Const. Therefore, for FPF's purposes, the Amendment 4 petition needed to be signed by: (i) the number of voters equal to at least eight percent of the votes cast in at least half of Florida's 28 congressional districts, and (ii) at least 891,523 voters statewide. After months of circulating petitions, FPF submitted well over one million petition signatures and the state verified 997,035 petition signatures as valid. *See Amendment to Limit Government Interference with Abortion 23-07*, Fla. Div. of Elections, https://dos.elections.myflorida.com/initiatives/initdetail.asp?account=83927&seqnum=1.

2

7.      FPF spent approximately $20 million to collect these petitions and pay for the state to verify the petition signatures, as required by Florida law. On January 25, 2024, the Secretary of State confirmed that FPF secured more than the required number of certified petition signatures for placement on the 2024 General Election ballot. Cord Byrd, Fla. Dep't of State, Div. of Elections (Jan. 25, 2024), https://floridiansprotectingfreedom.com/wp-content/uploads/2024/01/DOC012524-01252024163359.pdf.

8.      On October 9, 2023, Attorney General Ashley Moody petitioned the Florida Supreme Court for an opinion regarding the validity of Amendment 4, chiefly arguing that Amendment 4 did not comply with Florida law's single-subject requirements or ballot title and language obligations.

9.      On April 1, 2024, the Florida Supreme Court approved Amendment 4 for placement on the ballot. *See Advisory Op. to Att'y Gen. Re: Limiting Gov't Interference with Abortion*, 384 So. 3d 122, 127, 136 (Fla. 2024).

10.     Since the Supreme Court approved Amendment 4 for placement on the ballot, the State of Florida has engaged in a long and multifaceted attack on FPF and Amendment 4 to undermine Amendment 4 with the public. The State is using government resources to push its version of the "truth" about Florida's anti-abortion laws and to assert that anyone expressing a different view is "lying." Below, I recount some examples that are most directly relevant to the State of Florida's

current efforts to interfere with FPF's advocacy for Amendment 4 and silence FFP's efforts to communicate with voters about Amendment 4.

11.     As publicly reported, law enforcement officers are targeting and intimidating voters in their own homes—knocking on their doors and asking whether they signed a petition supporting Amendment 4. One voter from Lee County recounted such an interaction with law enforcement had left him "shaken," while another voter from the same county recalled feeling "intimidated by having a law enforcement officer come to her door." Notably, not even the Lee County Sheriff was notified of the "state agency's independent investigation." Romy Ellenbogen, Justin Garcia & Lawrence Mower, *DeSantis' election police questioned people who signed abortion petitions*, TAMPA BAY TIMES (Sept. 6, 2024), https://www.tampabay.com/news/florida-politics/elections/2024/09/06/florida-abortion-amendment-petition-signature-fraud-voters/.

12.     According to Florida law, a citizen initiative's ballot title and summary must be accompanied by a financial impact statement ("FIS"). *See* Fla. Stat. § 100.371(13). On June 10, 2024, in a lawsuit filed by FPF challenging the adopted FIS, the Leon County circuit court granted FPF's motion for summary judgment: finding the FIS violated Article XI, Section 5 of the Florida Constitution and section 100.371 of the Florida Statutes and ordered adoption of a valid FIS. The new FIS was drafted not by "professional staff of the House of Representatives" and "a person

4

from the Executive Office of the Governor" ("EOG"), as Florida law requires, but rather by an employee of the Heritage Foundation and a person who had left his EOG job to head a cabinet agency, and was published over the objection of the state's top economist, the one dissenting member of the newly reconstituted Financial Impact Estimating Conference ("FIEC").   This new FIS reversed the FIEC's previous findings on financial impact and ignored the court's directive to not speculate on litigation by including rank speculation about not only potential litigation challenging certain laws under the amendment, but also the potential outcome of such litigation. Because of the extraordinarily tight timelines for obtaining court review, no further litigation on the new and equally unlawful FIS was feasible. Moreover, the State's position is that an FIS is completely immune from any court review at all, no matter how admittedly unlawful it is.

13.   On October 11, 2024, the Department of State, Office of Election Crimes & Security ("OECS") released an interim report "to update the Governor and the Florida Legislature on investigations concerning initiative petition fraud." *Office of Election Crimes & Security Interim Report*, FLORIDA DEPT. OF STATE (Oct. 11, 2024) files.floridados.gov/media/708442/oecs-interim-report-10-11-2024.pdf.  The interim report addresses purported fraud by individual petition circulators, and seems to intimate wrongdoing by FPF, using a capacious understanding of the term "fraud." For example, OECS asserted a petition form was "obtained by fraud" if the

circulator told signatories that the petition would "keep the State of Florida from taking away women's rights." *Id.* at 5.

14.    The State, through the Agency for Health Care Administration ("AHCA"), created a website, opposing Amendment 4.

15.    This government website states that proponents of Amendment 4 are misleading Floridians. It states: "DON'T LET THE FEARMONGERS <u>LIE TO YOU</u>", asserts that "Current Florida Law **Protects Women**," whereas supposedly "Amendment 4 **Threatens Women's Safety**," and purports to set out a series of characterizations of the status quo in Florida as the "truth" in contrast to the summary of the Amendment 4, which it casts as a lie.

16.    It is my understanding that AHCA has spent millions of dollars running television and radio advertisements promoting this website and the State of Florida's official narratives regarding its existing abortion laws and Amendment 4. For example, one "public service announcement" asserts that viewers have "probably heard a lot of misinformation about our abortion laws," that these are "lies that could convince women to not seek necessary care and put themselves at risk and that's unacceptable," and that "abortions are always available at any time to protect the life and health of mothers." *Unacceptable*, FLA. AGENCY FOR HEALTH CARE ADMIN., https://host2.adimpact.com/admo/viewer/cea0900b-2cb8-43de-a96a-5a6d4be48fec. This government advertisement also threatens that any doctor with a different

understanding of Florida law than the State "is committing malpractice and could lose their medical license."

17.     In order for Florida voters to make an informed decision by Election Day, it is imperative that FPF be able to speak—both by advocating for Amendment 4 and advocating against arguments and representations made by Amendment 4's opposition. It is all the more important that FPF run advertisements expressing its views about Amendment 4 in the face of the substantial public relations campaign against Amendment 4 that the State is waging, because communications from the government can carry particular weight as they bear the imprimatur of being official statements.

18.     As part of FPF's efforts, it is critical that FPF share the experiences and stories of individuals directly affected by Florida's extreme abortion ban. Sharing these experiences directly educates voters about why the State's characterizations of current law are not accurate in FPF's view. However, as explained below, in response to FPF highlighting one such individual's story, the State began threatening stations with criminal prosecution for airing an FPF television advertisement.

19.     On October 1, 2024, FPF began running a political advertisement titled, "Caroline." This advertisement is a first-hand account of Caroline Williams, a woman who was diagnosed with stage four terminal brain cancer when she was 20 weeks pregnant. In the advertisement, Caroline explains, "The doctors knew if I did

7

not end my pregnancy, I would lose my baby, I would lose my life, and my daughter would lose her mom. Florida has now banned abortion even in cases like mine." *Yes on 4 Campaign Launches TV Ad Featuring "Caroline"*, YES ON 4 (Oct. 1, 2024), https://floridiansprotectingfreedom.com/caroline/.[1]

20.   Before running this advertisement, FPF spoke with Ms. Williams to understand what had happened to her and confirm her experience. Because the advertisement is Ms. Williams's firsthand account, and she personally delivered her account in the advertisement, FPF's and my understanding is that every part of Ms. Williams's recounting of what happened to her is true.

21.   The purpose of the advertisement was to reflect FPF's views and urge voters to support Amendment 4 by demonstrating—through a tragic, real-world example—that Florida's current anti-abortion laws infringe on the liberty of women and their right to make medical decisions about their own bodies and health.

22.   On October 3, 2024, the Florida Department of Health (the "Department") sent a letter to media outlets across the state airing *Caroline*. FPF was initially provided with a copy of the letter by WCJB-TV in Gainesville. In this

---

[1] In full, the voiceover of the advertisement states: "*When I saw the tumor on the MRI, My first thought was… am I gonna be able to see my daughter again?  The doctors knew that if I did not end my pregnancy, I would lose my baby, I would lose my life, And my daughter would lose her mom.  Florida has now banned abortion… even in cases like mine.  Amendment Four is gonna protect women like me. We have to vote Yes.*" The advertisement concludes with an image of the language of Amendment 4 and indicates that it is a paid political advertisement.

letter, the Department claims that the *Caroline* "advertisement is not only false; it is dangerous."

23.   The Department letter goes on to assert that *Caroline* is a "sanitary nuisance"—citing section 386.01, Florida Statutes—and demands that the stations remove or cause the advertisement to be removed within 24 hours or face legal proceedings, including criminal proceedings.

24.   On October 4, 2024, counsel for FPF sent a response letter to WCJB-TV, and other stations, making clear that the Department letter raised serious First Amendment concerns and confirming that *Caroline* is true.

25.   On October 8, 2024, FPF learned that another station, WINK TV in Fort Myers, which received a similar demand letter from the Department, decided to remove the advertisement from their airwaves and refused to discuss the matter for several days. FPF is currently in discussions with WINK TV on the specifics of when and how Caroline will resume airing. Regardless of how these discussions resolve, FPF has lost critical time communicating with voters in the Fort Myers area.

26.   FPH has devoted substantial time, money, and resources—which it would have otherwise devoted to its efforts to advocate for Amendment 4—to addressing this issue, including contacting various stations to attempt to determine whether they had received the letter and whether they were taking action based on

it, conferring with legal counsel, and attempting to dissuade stations from acceding to the Department's demands.

27.   FPF fears that the Department will continue its efforts to deter television stations from running FPF advertisements. FPF will continue to put forth advertisements that educate voters about the lack of meaningful exceptions to Florida's extreme abortion ban.

28.   For instance, *Deborah and Lee* is an FPF advertisement that began airing on October 3, 2024, and addresses a couple who learned that their child would not survive childbirth but who were forced to endure a painful pregnancy due to Florida's extreme abortion ban. *See The Yes on 4 Campaign Releases New Campaign Video Featuring a Florida Couple Not Granted Exception for Fetal Abnormality*, YES ON 4 (Oct. 3, 2024), https://floridiansprotectingfreedom.com/deborah-and-lee/.

29.   FPF also intends to begin running an advertisement on digital platforms, *Anya*, that will feature a Florida woman who was miscarrying but denied access to abortion care because she was not sufficiently on the brink of death to qualify for an abortion. When she left the hospital after being denied medical care, she was forced to carry a non-viable pregnancy until she began losing significant amounts of blood in a public restroom. Only then, when Anya was rushed to the hospital in an ambulance, bleeding out, was she finally provided abortion care. This

10

advertisement will, like *Caroline*, tell a Florida woman's story and the dangerous and near-fatal consequences of Florida's extreme abortion ban.

30.    The ability to educate voters on FPF's views on the current state of the law is essential to FPF's mission. These advertisements reflect FPF's view—rooted in undeniable reality and women's own words about their own experiences—that the exceptions to the current law, a near-total ban on abortion, are not meaningfully accessible to many patients. However, FPF fears that the Department's threats will deter television stations and digital platforms from running these advertisements.

31.    I have read the Department's letter to television stations about *Caroline*. The letter states that "creating" a "nuisance injurious to health" is a second-degree misdemeanor, and suggests that *Caroline* is such a "sanitary nuisance." I understand this to mean that the Department of Health—which has enforcement authority to regulate sanitary nuisances—is officially asserting that FPF is responsible for creating a sanitary nuisance and therefore, it is asserting FPF has committed a crime. FPF fears that it will face prosecution by the Department, or other State agents, if it continues to educate voters about Amendment 4 and Florida's current law.

32.    FPF also fears that stations will refuse to air *Caroline* or FPF's other advertisements in light of the State's threat to prosecute stations for airing FPF's speech.

11

33.     As of this filing, FPF is not aware of any efforts by the Florida Department of Health, or any other state actor, to retract the letter about *Caroline* or assure broadcasters that they will not, in fact, face criminal penalties for airing FPF's advertisements.

I, Sara Latshaw, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Dated:  10/15/2024                              _____

**Sara Latshaw**

# Exhibit D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

FLORIDIANS PROTECTING
FREEDOM, INC.

*Plaintiff,*

v.

JOSEPH A. LADAPO, in his official
capacity as State Surgeon General and
Head of the Florida Department of
Health, AND JOHN WILSON, in his
individual capacity and in his official
capacity as General Counsel to the
Florida Department of Health,

*Defendants.*

Civil Action No. _____

## DECLARATION OF CAROLINE WILLIAMS

My name is Caroline Williams. I am over the age of 18 and fully competent to make this declaration. Under penalty of perjury, pursuant to 28 U.S.C. § 1746, I declare:

1.      I am the woman featured in an advertisement by Floridians Protecting Freedom. In the advertisement, I state the following: "When I saw the tumor on my MRI, my first thought was 'Am I going to going to be able to see my daughter again? The doctors knew if I did not end my pregnancy, I would lose my baby, I would lose my life, and my daughter would lose her mom. Florida has now banned abortion even in cases like mine. Amendment 4 is going to protect women like me. We have to vote yes.'"

2.      Every statement I made in this advertisement is true. In 2022, when I was about 17 weeks pregnant with my second child, I was diagnosed with a hemorrhagic mass on my brain. When I was about 20 weeks pregnant, I was diagnosed with grade four terminal brain cancer.

3.      I understood that while my diagnosis was terminal, there were available life-extending treatment options. However, my doctors told me that they could not treat me with chemotherapy or radiation while I was pregnant. They also told me that increased hormones from my pregnancy were supercharging my tumor, and that waiting until 36 weeks to begin treatment would be too late.

4.      So, instead, in order to have more time with my family, I had an abortion in Florida in April 2022.

2

5.      I needed the cancer treatment I received, but because my diagnosis is terminal, any cancer treatment could not be considered life-saving, and I did not face an immediate and emergent threat to my life in April 2022.

6.      It is my understanding that current Florida law would only allow for abortions after six weeks' gestation when the abortion is necessary to save a pregnant woman's life or avoid a serious risk of substantial and irreversible physical impairment of a major bodily function other than a psychological condition. Based on this understanding, I would not have been able to obtain an abortion under this law because my diagnosis was terminal – the abortion did not save my life, it only extended it.

7.      I also understand that if passed, Amendment 4 would protect women in circumstances like those I faced. I strongly believe that we have to vote yes on Amendment 4.

I, Caroline Williams, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Dated: 15/10/2024 _____

Caroline Williams (Oct 15, 2024 09:57 EDT)

**Caroline Williams**

3

# Exhibit E

SC2023-1392

# In the Supreme Court of Florida

ADVISORY OPINION TO THE ATTORNEY GENERAL RE:
LIMITING GOVERNMENT INTERFERENCE WITH ABORTION

ON PETITION FOR AN ADVISORY OPINION
TO THE ATTORNEY GENERAL

## ATTORNEY GENERAL'S INITIAL BRIEF

ASHLEY MOODY
  Attorney General

HENRY C. WHITAKER (FBN 1031175)
  Solicitor General
JEFFREY PAUL DeSOUSA (FBN 110951)
DANIEL W. BELL (FBN 1008587)
  Chief Deputy Solicitors General
NATHAN A. FORRESTER (FBN 1045107)
  Senior Deputy Solicitor General

JOHN M. GUARD (FBN 374600)
  Chief Deputy Attorney General
JAMES H. PERCIVAL (FBN 1016188)
  Chief of Staff

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300

*henry.whitaker@myfloridalegal.com*
October 31, 2023      *jenna.hodges@myfloridalegal.com*

*Counsel for the Attorney General*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................iii

STATEMENT OF THE CASE ......................................................... 1

SUMMARY OF ARGUMENT ......................................................... 1

LEGAL STANDARD ....................................................................... 8

ARGUMENT .................................................................................11

I.   The ballot summary vastly understates the potentially
     sweeping scope of the amendment, by failing to explain
     what "viability," "health," or "healthcare provider" means,
     and by not disclosing that a "healthcare provider" might
     have power to determine when a baby is viable....................14

     A.   The ballot summary does not explain whether
          "viability" refers to a baby healthy enough to come
          to term or to a baby able to survive outside the
          womb. ........................................................................16

     B.   The ballot summary does not explain whether the
          "patient's health" encompasses only physical health
          or mental health as well. ............................................24

     C.   The ballot summary suggests that only physicians
          will qualify as "healthcare providers."...........................27

     D.   The ballot summary does not explain that a
          "healthcare provider" might be able to decide both
          whether an abortion is "necessary to protect the
          patient's health" and whether a baby has reached
          "viability. ..................................................................28

II.  The ballot summary also overstates the scope of the
     amendment, by guaranteeing that "[n]o law" will restrict
     abortion in the circumstances stated, without mentioning
     the preemptive effect of federal law.....................................33

A.   The ballot summary does not explain that partial-birth abortions will continue to be illegal before viability.........................................................................34

B.   The ballot summary does not explain that partial-birth abortions will continue to be illegal after viability if they are unnecessary to protect the life of the mother..................................................................37

CONCLUSION .........................................................................39

CERTIFICATE OF COMPLIANCE ...................................................40

CERTIFICATE OF SERVICE .........................................................41

# TABLE OF AUTHORITIES

**Cases**

*Adv. Op. to Att'y Gen. re Adult Use of Marijuana*, 315
    So. 3d 1176 (Fla. 2021) ...............................................35, 36, 37

*Adv. Op. to Att'y Gen. re Fish & Wildlife Conserv.
    Comm'n*, 705 So. 2d 1351 (Fla. 1998) .......................................33

*Adv. Op. to Att'y Gen. re Referenda Required for
    Adoption & Amendment of Local Gov't
    Comprehensive Land Use Plans*, 902 So. 2d 763
    (Fla. 2005) ...............................................................................12

*Adv. Op. to Att'y Gen. re Right to Competitive Energy
    Mkt. for Customers of Inv'r-Owned Utils.*, 287 So.
    3d 1256 (Fla. 2020)....................................................................31

*Adv. Op. to Att'y Gen. re Tax Limitation*, 644 So. 2d
    486 (Fla. 1994) ..................................................................12, 33

*Adv. Op. to Att'y Gen. re Use of Marijuana for
    Debilitating Med. Conditions*, 181 So. 3d 471 (Fla.
    2015)........................................................................................36

*Adv. Op. to Att'y Gen. re: All Voters in Primary
    Elections for State Legislature, Governor, and
    Cabinet*, 291 So. 3d 901 (Fla. 2020) .........................................10

*Adv. Op. to Att'y Gen. re: Regulate Marijuana in a
    Manner Similar to Alcohol to Establish Age,
    Licensing, and Other Restrictions*, 320 So. 3d 657
    (Fla. 2021) ....................................................................passim

*Adv. Op. to Att'y Gen. re: Stop Early Release of
    Prisoners*, 642 So. 2d 724 (Fla. 1994) .................................29, 33

*Adv. Op. to Att'y Gen.—Fee on Everglades Sugar
    Production*, 681 So. 2d 1124 (Fla. 1996) .............................12, 14

*Advisory Opinion to the Attorney General re People's
    Property Rights Amendments*, 699 So. 2d 1304
    (Fla. 1997) ...........................................................21, 22, 26, 33

*Armstrong v. Harris*, 773 So.2d 7 (Fla. 2000) ............. 12, 13, 16, 23

iii

*Askew v. Firestone*, 421 So. 2d 151 (Fla. 1982)................. 13, 22, 23

*Detzner v. League of Women Voters*, 256 So. 3d 803
    (Fla. 2018) ................................................................ 11, 12, 14

*Dobbs v. Jackson Women's Health Organization*, 142
    S. Ct. 2228 (2022)...................................................................... 2

*Doe v. Bolton*, 410 U.S. 179 (1973) ............................................24

*Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021) ..........................28

*Fla. Educ. Ass'n v. Fla. Dep't of State*, 48 So. 3d 694
    (Fla. 2010) .............................................................................10

*In re Adv. Op. to Att'y Gen. re Additional Homestead
    Tax Exemption*, 880 So. 2d 646 (Fla. 2004) ................... 11, 12, 33

*In re Adv. Op. to Att'y Gen. re Use of Marijuana for
    Certain Medical Conditions*, 132 So. 3d 786 (Fla.
    2014)............................................................. 10, 33, 36, 37

*In re T.W.*, 551 So. 2d 1186 (Fla. 1989).....................................3, 15

*Kasischke v. State*, 991 So. 2d 803 (Fla. 2008) ............................28

*N. Fla. Women's Health & Counseling Servs., Inc. v.
    State*, 866 So. 2d 612 (2003) ................................................4, 15

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S.
    833 (1992) ......................................................................passim

*Planned Parenthood of Sw. & Cent. Fla. v. State*, No.
    SC2022-1050 (Fla.).................................................................2, 3

*Roe v. Wade*, 410 U.S. 113 (1973) .........................................passim

*Smathers v. Smith*, 338 So. 2d 825 (Fla. 1976)............................13

*United States v. Aquart*, 912 F.3d 1, 60 (2d Cir.
    2018)....................................................................................35

*United States v. Comstock*, 560 U.S. 126 (2010)...........................35

**Statutes**

§ 101.161, Fla. Stat. ............................................................passim

§ 146C.1(4)(d), Iowa Code...........................................................26

§ 16.061, Fla. Stat. ................................................................... 8

§ 16-34-2-1(a)(A)(ii), Ind. Code.....................................................26

§ 26-23H-3(6), Ala. Code ............................................................26

§ 390.0111, Fla. Stat. ........................................................24, 26

18 U.S.C. § 1531.............................................................7, 34, 38

Ch. 2022-69, Laws of Fla. (Apr. 14, 2022) ................................... 2

Heartbeat Protection Act, ch. 2023-21, Laws of Fla.
    (Apr. 13, 2023).......................................................................... 2

## Constitutional Provisions

Art. I, § 23, Fla. Const..........................................................3, 15

Art. II, § 8, Fla. Const................................................................22

Art. VI, ¶ 2, U.S. Const. ........................................................7, 35

Art. XI, § 3, Fla. Const. ............................................8, 11, 21, 33

Art. XI, § 5, Fla. Const. .......................................................11, 12

## Filings

Brief for Petitioner, *Planned Parenthood of Sw. &
    Cent. Fla. v. State*, No. SC2022-1050 (filed in this
    Court Feb. 27, 2023)................................................................. 2

Brief for Respondent, *Planned Parenthood of Sw. &
    Cent. Fla. v. State*, No. SC2022-1050 (filed in this
    Court Mar. 29, 2023) .............................................................. 3

## Other Sources

Am. Coll. of Obstetricians & Gynecologists, *Abortion
    Is Essential Health Care*, https://www.acog.org/
    advocacy/abortion-is-essential.................................................17

Am. Coll. of Obstetricians & Gynecologists, *Facts
    Are Important: Understanding and Navigating
    Viability*, https://tinyurl.com/2ks3yxcj...............................17, 18

Antonin Scalia & Bryan Garner, *Reading Law: The
    Interpretation of Legal Texts* (2012) ...........................................29

Cynthia Dailard, *Abortion Restrictions and the Derive for Mental Health Parity: A Conflict in Values?*, Guttmacher Report on Public Policy (June 1999), https://tinyurl.com/vxd7vjtt ..................................................25

E. Gkiougki et al., *Periviable Birth: A Review of Ethical Considerations*, 25 Hippokratia 1 (2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8877922/ ..........................................................................19

Elizabeth Chloe Romanis, *Is 'viability' viable? Abortion, conceptual confusion and the law in England and Wales and the United States*, 7 J. L. & Biosciences (Oct. 2020), https://doi.org/10.1093/jlb/lsaa059 ...................................................18

Gallup, *Where Do Americans Stand on Abortion?* (July 7, 2023), https://tinyurl.com/t9ejcyc2 ...........................20

Jill Kalman & Stacey E. Rosen, *Abortion Rights Get to the Heart of the Doctor-Patient Relationship*, MedPage Today (June 28, 2022), https://tinyurl.com/mvrp3epw...............................................27

Maria Serenella Pignotti, *The Definition of Human Viability: A Historical Perspective*, Acta Pædiatrica (Oct. 2009), https://tinyurl.com/5cj2tua3 ...............................18

Pew Research Ctr., *Americans' Views on Whether, and in What Circumstances, Abortion Should Be Legal* (May 6, 2022), https://tinyurl.com/mr39v6p2 ...............................................................................20

vi

## STATEMENT OF THE CASE

The text of the Amendment to Limit Government Interference with Abortion, Serial No. 23-07, states as follows:

> **Limiting government interference with abortion.**— Except as provided in Article X, Section 22, no law shall prohibit, penalize, delay, or restrict abortion before viability or when necessary to protect the patient's health, as determined by the patient's healthcare provider.

App. 5. It would be an entirely new section in Article I of the Florida Constitution.

The accompanying ballot summary, 49 words in length, would state as follows:

> No law shall prohibit, penalize, delay, or restrict abortion before viability or when necessary to protect the patient's health, as determined by the patient's healthcare provider. This amendment does not change the Legislature's constitutional authority to require notification to a parent or guardian before a minor has an abortion.

App. 5.

## SUMMARY OF ARGUMENT

In *Dobbs v. Jackson Women's Health Organization*, the U.S. Supreme Court overruled its "egregiously wrong" decisions in *Roe v. Wade*, 410 U.S. 113 (1973), and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), and returned the "profound moral issue" regarding the legality of abortion to the

1

place where it belongs: "the people's elected representatives." 142 S. Ct. 2228, 2240, 2243 (2022). Florida's legislature has taken up the mantle and enacted the Heartbeat Protection Act, which, with certain exceptions, would prohibit physicians from performing abortions on babies more than six weeks past gestation. § 4, ch. 2023-21, Laws of Fla. (Apr. 13, 2023). Pending the outcome of *Planned Parenthood of Southwest & Central Florida v. State*, No. SC2022-1050 (Fla.), in which this Court has already received briefing and heard oral argument, this law would amend another one passed a year earlier that drew the line at fifteen weeks. § 4, ch. 2022-69, Laws of Fla. (Apr. 14, 2022).

Abortion proponents have waged a war on two fronts to prevent either law from taking effect. First, they have urged this Court not to follow the U.S. Supreme Court's lead in *Dobbs* and instead to retain precedents that have interpreted the Florida Constitution in ways as egregiously wrong as were *Roe* and *Casey*. *See* Brief for Petitioner at 40, *Planned Parenthood of Sw. & Cent. Fla. v. State*, No. SC2022-1050 (filed in this Court Feb. 27, 2023). Second, they have proposed an amendment to the Florida Constitution using a misleading ballot summary to trick voters into freezing in place a legal

2

framework that conceals the amendment's potentially sweeping legal effects, thereby mooting the outcome of the *Planned Parenthood* appeal to this Court. *See* App. 5.

This effort to hoodwink the Florida electorate should be rebuffed, lest Florida proceed down the same path it did after the 1980 amendment adding Article I, Section 23 to the Florida Constitution. The ballot summary there stated only that the amendment would create a "right of privacy" in the Constitution, with scant indication to voters that they might be approving a right to abortion, and repeated assurances from proponents of the 1980 amendment that it would protect informational privacy only. Within a decade, proponents of the 1980 amendment who had disclaimed that the amendment affected decisional autonomy at all—never mind abortion—were advocating that it protected all manner of personal decisions, including abortion. *See* Brief for Respondent at 16–22 & n.27, *Planned Parenthood of Sw. & Cent. Fla. v. State*, No. SC2022-1050 (filed in this Court Mar. 29, 2023). This Court then ruled that the 1980 amendment did protect abortion, to an even greater extent than did the U.S. Supreme Court's rulings in *Roe* and *Casey*. *See In re T.W.*, 551 So. 2d 1186, 1191–92, 1195 (Fla. 1989);

3

*N. Fla. Women's Health & Counseling Servs., Inc. v. State*, 866 So. 2d 612, 620–22, 634–36 (2003).

The ballot summary here is part of a similar overall design to lay ticking time bombs that will enable abortion proponents later to argue that the amendment has a much broader meaning than voters would ever have thought. It hides behind an uninformative parroting of the text of the amendment to veil from voters its potentially expansive scope. The ballot summary thus contravenes one of the important prerequisites for an amendment initiative to go on the ballot: that the ballot summary explain to voters "the chief purpose of the measure" in "clear and unambiguous language." § 101.161(1), Fla. Stat.

The ballot summary fails this requirement in multiple ways. First, it conveys that the amendment would continue to allow the Legislature to restrict abortion after "viability." The problem is that some voters will read "viability" as *Roe* and *Casey* used the term— as referring to a baby "potentially able to live outside the mother's womb," *Roe*, 410 U.S. at 160. Others will understand "viability" in the more traditional clinical sense—as referring to a pregnancy that, but for an abortion or other misfortune, will result in the child's live

4

birth. This ambiguity is no small interpretive quibble; "viability" in the *Roe*/*Casey* sense occurs much later than in the traditional clinical sense. And polling shows that the stage of pregnancy at which abortion becomes illegal is crucial to whether voters approve of particular restrictions on abortion.

Second, the ballot summary does not explain whether the "patient's health" (a precondition under the amendment for post-viability abortions) encompasses only physical health or also mental health. With some support in the U.S. Supreme Court's now-discarded 1973–2022 abortion jurisprudence, abortion advocates have long advocated that "health" in this context encompasses both physical and mental health. The latter concept of health, while by no means trivial, is also susceptible to expansive interpretation and could be used to justify a much larger number of abortions. Here again, voters deserve to be made aware of the possibility that the health exception could be made essentially to swallow the rule.

The failure to define "viability" and "health" is exacerbated by a third feature of the ballot summary—failure to make clear that the "healthcare provider" may well have license to determine not only whether an abortion is "necessary to protect the patient's health"

but also whether the baby has reached "viability." This is because of a comma in the ballot summary before the phrase "as determined by the patient's healthcare provider." Under some interpretive canons employed by lawyers and judges, that placement could cause the phrase to modify both "before viability" and "when necessary to protect the patient's health." But voters are unlikely to be aware of the potentially enormous syntactic significance of this comma and thus to be aware that healthcare providers could have unreviewable discretion to determine in every case what "viability" means and whether an otherwise healthy baby lives or dies.

Finally, the ballot summary does not define the term "healthcare provider" itself. Voters may assume it means a physician, as preserving the doctor-patient relationship is part of the common rhetoric used to justify the legality of abortion. But the term could apply to nearly any staff involved in some way in caring for the patient at a medical facility or abortion clinic. A wide range of personnel, perhaps not even medical professionals, could effectively be determining the scope of amendment's application.

These shortfalls cause the ballot summary to fail in its essential function of explaining "the chief purpose of the measure" in

"clear and unambiguous language." § 101.161(1), Fla. Stat. But the ballot summary also fails this function in the opposite way, by over-selling the right it would provide in two critical respects. First, it states that "[n]o law shall prohibit, penalize, delay, or restrict abortion before viability" (arguably "as determined by the patient's healthcare provider"). App. 5. In other words, the summary promises the voter that pre-viability abortion will be free of legal consequence. That is simply untrue. Abortion would remain subject to federal law, which preempts any conflicting state law. Art. VI, ¶ 2, U.S. Const. Congress would remain free regardless of the amendment to restrict or even ban abortion. Indeed, partial-birth abortions currently violate federal law at any stage of the pregnancy, pre- or post-viability. 18 U.S.C. § 1531.

The ballot summary also states that "[n]o law shall prohibit, penalize, delay, or restrict abortion . . . when necessary to protect the patient's health, as determined by the patient's healthcare provider." App. 5. This explanation runs into conflict with the same statute as above. The federal partial-birth abortion statute has an exception, but only for when the partial-birth abortion is "necessary to save the life of a mother." 18 U.S.C. § 1531(a). Thus, a pre-

7

viability partial-birth abortion performed to protect health but not life would remain illegal even after the amendment. It is therefore highly misleading to tell voters that "[n]o law," full stop, "shall prohibit, penalize, delay, or restrict abortion before viability," when in fact federal law still could, and indeed currently does, restrict abortion before viability.

For all these reasons, the initiative fails to explain "the chief purpose of the measure" in "clear and ambiguous language," § 101.161(1), Fla. Stat., and does not belong on the ballot.

## LEGAL STANDARD

Section 16.061, Florida Statutes, provides that "[t]he Attorney General shall, within 30 days after receipt of a proposed revision or amendment to the State Constitution by initiative petition from the Secretary of State, petition the Supreme Court, requesting an advisory opinion regarding" three possible issues: (1) "the compliance of the text of the proposed amendment or revision with s. 3, Art. XI of the State Constitution" (i.e., the requirement that the amendment "embrace but one subject and matter directly connected therewith"); (2) "whether the proposed amendment is facially invalid under the

United States Constitution"; and (3) "the compliance of the proposed ballot title and substance with s. 101.161."

The Attorney General is chiefly concerned here with the third of these requirements: compliance with § 101.161. That statute codifies the standard for reviewing ballot titles and summaries of proposed constitutional amendments. Any measure submitted to the vote of the people must include a ballot title "not exceeding 15 words in length, by which the measure is commonly referred to or spoken of," § 101.161(1)(d), Fla. Stat., and a ballot summary, "not exceeding 75 words in length," explaining "the chief purpose of the measure" in "clear and unambiguous language," *id.* § 101.161(1).

This Court thus "consider[s] two questions" in assessing compliance with § 101.161(1): "(1) whether the ballot title and summary, in clear and unambiguous language, fairly inform the voters of the chief purpose of the amendment; and (2) whether the language of the ballot title and summary, as written, will be affirmatively misleading to voters." *Adv. Op. to Att'y Gen. re: Regulate Marijuana in a Manner Similar to Alcohol to Establish Age, Licensing, and Other Restrictions*, 320 So. 3d 657, 668 (Fla. 2021) ("*Regulate Marijuana Similar to Alcohol*") (quoting *In re Adv. Op. to Att'y Gen. re Use*

*of Marijuana for Certain Medical Conditions*, 132 So. 3d 786, 797 (Fla. 2014)  ("*Medical Marijuana I*")); *see also Fla. Educ. Ass'n v. Fla. Dep't of State*, 48 So. 3d 694, 701 (Fla. 2010).

The Court has said that this review should be "deferential," and that it will invalidate an initiative "only if it is shown to be 'clearly and conclusively defective.'" *Regulate Marijuana Similar to Alcohol*, 320 So. 3d at 667. But the question should simply be whether the summary violates either of these statutory requirements, not whether it does so "clearly." Far from undermining Floridians' right to "formulate 'their own organic law,'" *Adv. Op. to Att'y Gen. re: All Voters in Primary Elections for State Legislature, Governor, and Cabinet*, 291 So. 3d 901, 905 (Fla. 2020), careful judicial analysis of a ballot summary reinforces democracy by ensuring that the people are fully informed before changing Florida's governing charter. *See Medical Marijuana I*, 132 So. 3d at 819–20 (Canady, J., dissenting) (noting that the people's "right to vote on constitutional amendments" is "subverted when the voters are presented a misleading ballot summary"). It anchors the initiative process more securely in the true will of the people.

10

The Court need not revisit its standard of review here, however, because the Amendment to Limit Government Interference with Abortion initiative is clearly and conclusively defective and would fail even under that more deferential standard.

## ARGUMENT

The Florida Constitution "reserve[s] to the people" the enormously consequential power to amend the State's governing charter through the citizen-initiative process. Art. XI, § 3, Fla. Const. Because "voters deciding whether to approve a proposed amendment to our constitution never see the actual text of the proposed amendment" and "vote based *only* on the ballot title and the summary," "an accurate, objective, and neutral summary of the proposed amendment is the *sine qua non* of the citizen-driven process of amending our constitution." *In re Adv. Op. to Att'y Gen. re Additional Homestead Tax Exemption*, 880 So. 2d 646, 653–54 (Fla. 2004) ("*Homestead Tax Exemption*"). This Court has thus characterized the statute regulating the form of the ballot title and summary, § 101.161(1), as a "codification of the accuracy requirement implicit in article XI, section 5 of the Florida Constitution." *Detzner v. League of Women Voters*, 256 So. 3d 803, 807 (Fla. 2018) (quoting

11

*Adv. Op. to Att'y Gen. re Referenda Required for Adoption & Amendment of Local Gov't Comprehensive Land Use Plans*, 902 So. 2d 763, 770 (Fla. 2005)). "The accuracy requirement in article XI, section 5, functions as a kind of 'truth in packaging law' for the ballot." *Armstrong v. Harris*, 773 So.2d 7, 13 (Fla. 2000). Absent that informational safeguard, the Constitution becomes "not a safe harbor for protecting all the residents of Florida, but the den of special interest groups seeking to impose their own narrow agendas." *Homestead Tax Exemption*, 880 So. 2d at 654.

The ballot title and summary must also be complete; they must "provide fair notice of the content of the proposed amendment so that the voter will not be misled as to its purpose, and can cast an intelligent and informed ballot." *Adv. Op. to Att'y Gen.—Fee on Everglades Sugar Production*, 681 So. 2d 1124, 1127 (Fla. 1996). An "accurate *and* informative" title and summary are necessary to "make certain that the 'electorate is advised of the true meaning, *and ramifications*, of an amendment.'" *Detzner*, 256 So. 3d at 808 (quoting *Adv. Op. to Att'y Gen. re Tax Limitation*, 644 So. 2d 486, 490 (Fla. 1994)) (emphasis added). "A ballot title and summary cannot either 'fly under false colors' or 'hide the ball' as to the

12

amendment's true effect. *Armstrong*, 773 So. 2d at 16 (quoting *Askew v. Firestone*, 421 So. 2d 151, 156 (Fla. 1982)). Absent complete and accurate information about the amendment's purpose and effect, "voter approval would be a nullity." *Id.* at 12.

The ballot summary for the "Amendment to Limit Government Interference with Abortion" fails these requirements several times over. It consists of two sentences and 49 words, not even availing itself of the full 75 allotted by § 101.161(1). Instead of explaining the effect of the amendment in any useful manner, the first sentence merely restates the primary clause of the amendment, without the slightest elucidation as to what that clause would mean. As will be explained next, the unenlightening first sentence both understates and overstates the potential legal effects of the amendment. "[L]awmakers who are asked to consider constitutional changes, and the people who are asked to approve them, must be able to comprehend the sweep of each proposal from a fair notification in the proposition itself that it is *neither less nor more extensive than it appears to be.*" *Askew*, 421 So. 2d at 155 (quoting *Smathers v. Smith*, 338 So. 2d 825, 829 (Fla. 1976)) (emphasis added). The ballot summary fails in both respects; it hence falls far short of

13

enabling voters to "cast an intelligent and informed ballot." *Everglades Sugar Production*, 681 So. 2d at 1127.

**I.    The ballot summary vastly understates the potentially sweeping scope of the amendment, by failing to explain what "viability," "health," or "healthcare provider" means, and by not disclosing that a "healthcare provider" might have power to determine when a baby is viable.**

"A ballot title and summary need not explain every detail or ramification of the proposed amendment, . . . [b]ut they nevertheless must be accurate." *Regulate Marijuana Similar to Alcohol*, 320 So. 3d at 668 (quotations omitted). In particular, "[a] proposed amendment must be removed from the ballot when the summary does not accurately describe the scope of the text of the amendment." *Id.* (quoting *Detzner*, 256 So. 3d at 808). The ballot summary here does nothing to warn voters of the amendment's potentially sweeping scope. This is for several reasons. First, the undefined term "viability" has two dominant understandings, one of which would permit abortions much later in the pregnancy than the other. Abortion advocates, fueled by the U.S. Supreme Court's now-defunct rulings in *Roe* and *Casey*, have consistently urged the later meaning. In addition, the undefined term "health" could mean physical only or mental as well; abortion advocates again have

14

pushed for the latter. And under an arcane canon of statutory interpretation, the ballot summary suggests that "healthcare providers"—a term itself not defined or limited to medical professionals—could have unilateral authority to determine whether a baby is "viable" and whether an abortion is necessary to protect the mother's "health."

While the Attorney General does not concede that these aggressive interpretations would be correct, abortion proponents are certain to argue that they are, and they have been successful in an orchestrated long-term program of packing broad misinterpretations into similarly open-ended legal concepts—ranging from the "penumbras of the Bill of Rights," *Roe*, 410 U.S. at 152, to "a realm of personal liberty" in the Due Process Clause, *Casey*, 505 U.S. at 847, to the "right of privacy" in Article I, Section 23 of the Florida Constitution, *T.W.*, 551 So. 2d at 1190–92; *N. Fla. Women's Health*, 866 So. 2d at 634–36. The potential misinterpretations of the amendment would allow a healthcare provider to render nearly any abortion restriction a practical nullity. Yet they are nowhere addressed in the ballot summary. Voters have a right to be aware of

the potential for this kind of mischief, should they approve the amendment.

It does not matter that the ballot summary essentially replicates the text of the amendment. When the meaning of a term is unclear, this Court has ruled that the ballot summary must explain it, even if the term is lifted straight from the text of the amendment. *See, e.g.*, *Armstrong*, 773 So. 2d at 15. The drafters of a ballot summary cannot hide behind opaque legalese that conveniently copies opaque legalese from the amendment and then claim to have explained to voters "the chief purpose of the measure" in "clear and unambiguous language." § 101.161(1), Fla. Stat. If the meaning of amendment text is not discernible as a matter of common understanding, the ballot summary must supply the deficiency. The ballot summary is all the voter has, upon entering the polling booth, to understand what a "yes" or "no" vote will mean.

## A. The ballot summary does not explain whether "viability" refers to a baby healthy enough to come to term or to a baby able to survive outside the womb.

Even abortion advocates acknowledge that the term "viability" has multiple meanings. The American College of Obstetricians and Gynecologists—which baldly states that abortion "is essential for

16

people's health, safety, and well-being," Am. Coll. of Obstetricians & Gynecologists, *Abortion Is Essential Health Care*, https://www.acog. org/advocacy/abortion-is-essential (last visited Oct. 31, 2023)— admits that "[t]he concept of viability of a fetus is frequently misrepresented or misinterpreted based on ideological principles." Am. Coll. of Obstetricians & Gynecologists, *Facts Are Important: Understanding and Navigating Viability*, https://tinyurl.com/2ks3yxcj (last visited Oct. 31, 2023). "While there is no single formally recognized clinical definition of 'viability,'" they say, "the term is often used in medical practice in two distinct circumstances." *Id.* "In the first, 'viability' addresses whether a pregnancy is expected to continue developing normally." This means that, "[i]n early pregnancy, a normally developing pregnancy would be deemed viable, whereas early pregnancy loss or miscarriage would not." *Id.* In the second common medical usage, "'viability' addresses whether a fetus might survive outside of the uterus." *Id.* "Later in pregnancy, a clinician may use the term 'viable'" in this second sense "to indicate the

17

chance for survival that a fetus has if delivered before it can fully develop in the uterus." *Id.*[1]

In *Roe* and *Casey*, the U.S. Supreme Court chose the latter of these two clinical understandings to define the scope of the abortion right. *See Casey*, 505 U.S. at 870 (defining "viability" as "the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb, so that the independent existence of the second life can in reason and all fairness be the object of state protection that now overrides the rights of the woman" (citing *Roe*, 410 U.S. at 163)).[2] But many voters—uninitiated into the U.S. Supreme

---

[1] *See also* Elizabeth Chloe Romanis, *Is 'viability' viable? Abortion, conceptual confusion and the law in England and Wales and the United States*, 7 J. L. & Biosciences, at 8–10 (Oct. 2020), https://doi.org/10.1093/jlb/lsaa059 (describing the "multitude of approaches" among states to defining viability); Maria Serenella Pignotti, *The Definition of Human Viability: A Historical Perspective*, Acta Pædiatrica, at 3 (Oct. 2009), https://tinyurl.com/5cj2tua3 ("There is a great deal of misunderstanding about the concept of viability in the lay public and also amongst politicians. . . . We could probably state that the definition is inherently impossible because it is too variable from one individual to another and from one community to another[.]").

[2] In *T.W.*, this Court defined viability even more generously to the abortion right, as "that point in time when the fetus becomes capable of *meaningful life* outside the womb through *standard medical measures. 551 So. 2d at 1194 (emphasis added); *see id.* at 1198 (Ehrlich, J., concurring) ("The *Roe* definition allows the use of any

Court's orphic abortion jurisprudence circa 1973–2022—will understand "viability" in the ballot summary to have the first meaning. This dichotomy in understanding could play a significant role in whether voters approve the amendment. Under the first definition, a baby could be viable at a very early stage of pregnancy, if there are no indications that the baby will be miscarried or stillborn. Under the second definition, a baby might not achieve viability until roughly 26 weeks past gestation. *See* E. Gkiougki et al., *Periviable Birth: A Review of Ethical Considerations*, 25 Hippokratia 1, 1 (2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8877922/ ("Most neonates born at or above 26 weeks of gestation have, with active intervention, a high likelihood of survival, while below 22 weeks are virtually nonviable."). And some voters may understand babies in the so-called "periviable" stage (between 22 and 26 weeks)

---

medical technology that could allow the fetus to develop to live a meaningful life outside the mother's womb. Once we accept that the point of 'viability' is that point at which some type of medical technology may be used, I frankly do not understand how or why we would differentiate between different medical measures, whether currently considered 'standard' or 'extraordinary,' as long as they enable the fetus to survive outside the womb and develop to live a *meaningful life*.").

19

to be "viable" because they do have a chance of survival outside the womb.

Polling indicates that the stage of pregnancy at which abortion becomes illegal matters greatly to voters. "A majority of U.S. adults say how long a woman has been pregnant should be a factor in determining whether abortion should be legal." Pew Research Ctr., *Americans' Views on Whether, and in What Circumstances, Abortion Should Be Legal* (May 6, 2022), https://tinyurl.com/mr39v6p2 (last visited Oct. 31, 2023). A recent Gallup poll found that "about two-thirds of Americans say it should be legal in the first trimester (69%), while support drops to 37% for the second trimester and 22% for the third." Gallup, *Where Do Americans Stand on Abortion?* (July 7, 2023), https://tinyurl.com/t9ejcyc2 (last visited Oct. 31, 2023). "Majorities oppose abortion being legal in the second (55%) and third (70%) trimesters." *Id.*

In short, the ballot summary's regurgitation of the primary clause of the amendment does nothing to explain to the voter what "viability" means. It does not warn the voter that the amendment might be considerably more protective of late-term abortions than would at first appear.

20

The same problem caused this Court to strike one of the ballot summaries in its *Advisory Opinion to the Attorney General re People's Property Rights Amendments*, 699 So. 2d 1304 (Fla. 1997) ("*Property Rights*"). The proposal there would have changed the initiative process for constitutional amendments in Article XI, Section 3, allowing proposed amendments to cover multiple subjects if the amendments would "require full compensation be paid to the *owner* when government restricts use (except *common law nuisances*) of private real property causing a loss in the fair market value, which *in fairness* should be borne by the public." 699 So. 2d at 1307 (emphasis added). The ballot summary copied this language nearly verbatim, explaining that the proposal would allow amendments to cover multiple subjects if the amendments would "require full compensation be paid to the *owner* when government restricts use (excepting *common law nuisances*) of private real property causing a loss in fair market value, which *in fairness* should be borne by the public." *Id.* (emphasis added).

This Court said that that ballot summary did not satisfy § 101.161(1), because it did not define "owner," "common law nuisance," or "in fairness." 699 So. 2d at 1308–09. It did not matter

21

that those terms also appeared in the text of the amendment itself. Among other things, this Court said it was "unclear if 'owner' is restricted to people who own the property or also to corporate entities." *Id.*. In other words, it was possible the amendment would have much broader application than some voters might have assumed. The same is true to an even greater extent of the word "viability" in the ballot summary here.

To similar effect is this Court's ruling in *Askew*. In *Askew*, the proposed amendment would have amended Article II, Section 8(e), as follows:

> (e) No member of the legislature or statewide elected officer shall personally represent another person or entity for compensation before <u>any state</u> ~~the~~ government body or agency<u>, unless such person files full and public disclosure of his or her financial interests pursuant to subsection (a),</u> ~~of which the individual was an officer or member~~ for a period of two years following vacation of office.

421 So. 2d at 153. The ballot summary restated the new text in the amendment almost word for word:

> Prohibits former legislators and statewide elected officers from representing other persons or entities for compensation before any state government body for a period of 2 years following vacation of office, *unless they file full and public disclosure of their financial interests.*

*Id.* (emphasis added). This Court nevertheless enjoined placement of the amendment on the ballot. "The problem," this Court said, "lies not with what the summary says, but, rather, with what it does not say." *Id.* at 156. The summary failed to disclose an existing, "complete two-year ban on lobbying before one's agency," irrespective of whether the former officer had disclosed their financial interests. *Id.* at 155. In other words, as this Court would later explain, "[a]lthough the ballot summary [in *Askew*] faithfully tracked the text of the proposed amendment, the summary failed to explain that the amendment would supersede an already existing constitutional provision that imposed an absolute two-year ban on lobbying by former legislators (i.e., regardless of financial disclosure)." *Armstrong*, 773 So. 2d at 15.

The voter could have sought out the underlying text of the amendment in *Askew* prior to the election and thereby ascertained that it was actually liberalizing the lobbying restriction. That did not cure the infirmity in the ballot summary. Again, all the voter sees upon entering the election booth is the ballot summary. Here, even a diligent voter who does search out the amendment text before voting will remain uncertain what "viability" means. The ballot

23

summary in this case thus presents an even stronger basis for invalidation.

**B.    The ballot summary does not explain whether the "patient's health" encompasses only physical health or mental health as well.**

The ballot summary provides no explanation of when an abortion could be considered "necessary to protect the patient's health." Florida's current abortion statute has a carefully circumscribed health exception, allowing abortions after 15 weeks (6 weeks if the recent amendment becomes effective) to "avert a serious risk of [imminent] substantial and irreversible physical impairment of a major bodily function of the pregnant woman *other than a psychological condition.*" § 390.0111(1)(a), (b), Fla. Stat. (emphasis added). Abortion advocates have long contended, however, that "health" in this context should be read to encompass both physical and mental health. There is some support for this more aggressive interpretation in *Doe v. Bolton*, 410 U.S. 179, 192 (1973), the less-heralded companion case to *Roe*, which interpreted the word "health" as encompassing "all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient." Emotional or psychological health, while by no means trivial,

24

are capacious concepts and could be used to justify a much larger number of abortions than might appear on the face of the ballot summary.

For example, a 1999 article published by the Guttmacher Institute, a prominent advocate of abortion, urged that "[p]rochoice and mental health advocates should join together to educate policymakers about the importance of maintaining parity in the abortion context"—i.e., ensuring that health exceptions to abortion restrictions covered mental as well as physical health. Cynthia Dailard, *Abortion Restrictions and the Derive for Mental Health Parity: A Conflict in Values?,* Guttmacher Report on Public Policy at 14 (June 1999), https://tinyurl.com/vxd7vjtt. The article dismissed concerns expressed by some that "the health exception can be defined 'as just about anything,' including a psychological crisis caused when a teenager realizes that she 'won't fit into a prom dress' or 'hates being "fat."'" *Id.* at 5 (quoting advertisement of National Conference of Catholic Bishops). "The mental health exception is also critical," this article said, "because it has been the aegis under which most abortions in cases of severe fetal abnormality have been justified." *Id.*

25

Some states have express exceptions to their abortion restrictions for mental health or fetal abnormality. *See, e.g.*, § 26-23H-3(6), Ala. Code ("mental health"); § 16-34-2-1(a)(A)(ii), Ind. Code ("lethal fetal anomaly"); § 146C.1(4)(d), Iowa Code ("fetal abnormality"). Florida's current abortion statute allows abortions for "fatal fetal abnormality," § 390.0111(1)(c), Fla. Stat., but it does so in a provision separate from the health-of-the-mother exception, which as noted does not cover a "psychological condition," *id.* §§ 390.0111(1)(a), (b). Voters thus might assume that the ballot summary's failure to mention either mental health or fetal defects means the proposed amendment does not protect abortion in these circumstances. But abortion advocates can be expected to urge the broader meaning, arguing that "health" includes mental health, as determined by the healthcare provider, and that fetal defects pose a threat to the mother's mental health. Not defining "health" in the ballot summary means that "the voter is not informed as to what restrictions" might or might not apply "under the terms of the amendment." *Property Rights*, 699 So. 2d at 1309.

26

### C.   The ballot summary suggests that only physicians will qualify as "healthcare providers."

Another term the ballot summary does not explain is "healthcare provider" itself. Voters may assume it means a physician, as preserving the doctor-patient relationship is part of the common rhetoric used to justify the legality of abortion. *See, e.g.,* Jill Kalman & Stacey E. Rosen, *Abortion Rights Get to the Heart of the Doctor-Patient Relationship*, MedPage Today (June 28, 2022), https://tinyurl.com/mvrp3epw. But the term could apply to nearly any staff involved in some way in caring for the patient at a medical facility or abortion clinic. It leaves unclear whether the term would apply to physicians only, or physicians' assistants as well, or to nurses, or even to regular employees of a corporate "healthcare provider." The ballot summary thus does not inform voters about what kind of informed, professional judgment—if indeed it is professional at all—would be brought to bear in determining whether a baby is viable or whether continuing the pregnancy poses a threat to the mother's health.

27

### D.   The ballot summary does not explain that a "health-care provider" might be able to decide both whether an abortion is "necessary to protect the patient's health" and whether a baby has reached "viability.

Finally, the placement of the last comma in the first sentence of the ballot summary amplifies the misleading effect of failing to define "viability," "health," or "healthcare provider." The first sentence states: "No law shall prohibit, penalize, delay, or restrict abortion before viability or when necessary to protect the patient's health, as determined by the patient's healthcare provider." App. 5. That comma raises the prospect that the phrase "as determined by the patient's healthcare provider" will modify both "before viability" and "when necessary to protect the patient's health." Under one interpretive canon, "a qualifying phrase separated from antecedents by a comma is evidence that the qualifier is supposed to apply to all the antecedents instead of only to the immediately preceding one." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1170 (2021) (collecting treatises); *accord Kasischke v. State*, 991 So. 2d 803, 812–13 (Fla. 2008). In other words, the comma could "cancel the last-antecedent canon," under which the adjectival phrase following a list ordinarily modifies only the last item in the list. Antonin Scalia & Bryan Gar-

ner, *Reading Law: The Interpretation of Legal Texts* § 23, at 161 (2012). Consequently, the "healthcare provider" might have license under the amendment to determine not only whether an abortion is "necessary to protect the patient's health" but also whether the baby has reached "viability." This latter potential consequence, while hugely significant, is largely hidden. It might license abortion providers effectively to determine the scope of the abortion right.

Voters cannot be expected to have immersed themselves in scholarly treatises on grammar and syntax or be familiar with the episodes in this Nation's legal history in which a comma, or want thereof, has carried with it such immense interpretive import. *See, e.g., id.* at 162–64 & nn. 6–11; *O'Connor v. Oakhurst Dairy*, 851 F.3d 69, 70 (1st Cir. 2017). They will not suss out that the comma here might sneak into the amendment "legal loopholes so large" that healthcare providers "can, if they so choose, render" the remaining limitations in the amendment "illusory." *Adv. Op. to Att'y Gen. re: Stop Early Release of Prisoners*, 642 So. 2d 724, 727 (Fla. 1994). This obscurity will leave voters—to whom, again, polling shows the scope of the abortion right matters greatly—in the dark as to how much power the "healthcare provider" truly bears. The

ballot summary could have dispelled this misconception, at the expense of eight additional words, by explaining the circumstances in which abortion would be illegal in separate sentences: "No law shall prohibit, penalize, delay, or restrict abortion before viability<u>.</u> <u>No law shall prohibit, penalize, delay, or restrict abortion</u> ~~or~~ when necessary to protect the patient's health, as determined by the patient's healthcare provider." Or it could have confirmed the breadth of the exceptions with seven additional words: "No law shall prohibit, penalize, delay, or restrict abortion before viability<u>, as</u> <u>determined by the patient's healthcare provider,</u> or when necessary to protect the patient's health, as determined by the patient's healthcare provider." Either way, voters would know how much power healthcare providers would have under the amendment. But the ballot summary does neither, and so it hides this potentially far-reaching consequence of the amendment.

The ballot summary this Court struck down in its *Regulate Marijuana Similar to Alcohol* advisory opinion raised a similar concern. There, the ballot summary characterized the amendment as "regulat[ing] marijuana . . . for *limited* use and growing by persons twenty-one years of age or older." 320 So. 3d at 667 (emphasis

30

added). This Court found the use of the word "limited" to be mis-
leading. "The ballot summary plainly [told] voters that the proposed
amendment 'limit[s]' the personal use—i.e., consumption—of recre-
ational marijuana by age-eligible persons. But the proposed
amendment itself [did] not do so." *Id.* at 668. Rather, it established
a "quantity *floor* below which an age-eligible person [could ]not be
prosecuted," and "authoriz[ed] the state and local governments to
permit unlimited personal use of recreational marijuana." *Id.* The
only sense in which the amendment might have imposed any limits
was in allowing *private businesses* "to limit or prohibit the use of
marijuana on their property." *Id.* The amendment thus "falsely t[old]
voters that the proposed amendment limit[ed] the use of recreation-
al marijuana," when in fact it "'d[id] no such thing.'" *Id.* (quoting
*Adv. Op. to Att'y Gen. re Right to Competitive Energy Mkt. for Cus-
tomers of Inv'r-Owned Utils.*, 287 So. 3d 1256, 1260–61 (Fla. 2020)).

The ballot summary here similarly presents the amendment as
allowing restrictions on abortion after "viability" and thus as having
limits. Even voters who understand "viability" in the more abortion-
friendly *Roe/Casey* sense will assume the term imposes some limit
on the scope of the abortion right. The ballot title—"Amendment to

31

*Limit* Government Interference with Abortion," App. 5 (emphasis added)—reinforces that inference. But in fact, the comma in the first sentence may effectively delegate to private parties— "healthcare providers"—the authority to determine "viability," just as the "limits" promised in the *Regulate Marijuana Similar to Alcohol* amendment were up to private businesses to determine on a case-by-case basis. The idea that the amendment "limit[s] government interference with abortion" could thus prove largely illusory.

The comma, in short, portends a potentially dramatic shift in lawmaking power from the legislature and the judiciary to private parties. Ordinarily, the legislature would have some authority to flesh out a term like "viability," through subsequent enactments that impose particular abortion restrictions. The judiciary would likewise have authority to interpret and apply the term to the re-strictions that the legislature enacts. The ballot summary conceals the possibility that this may not be the case, and that "healthcare

providers" may have the power to override future abortion restrictions in every case with their own assessments of "viability."[3]

## II. The ballot summary also overstates the scope of the amendment, by guaranteeing that "[n]o law" will restrict abortion in the circumstances stated, without mentioning the preemptive effect of federal law.

The ballot summary here is affirmatively misleading in the opposite direction as well: It "will not deliver to the voters of Florida what it says it will." *Stop Early Release*, 642 So. 2d at 727.[4] It promises both that "[n]o law shall prohibit, penalize, delay, or restrict abortion *before viability* . . . , as determined by the patient's healthcare provider," and that "[n]o law shall prohibit, penalize, delay, or restrict abortion . . . *when necessary to protect the pa-*

---

[3] This unusual shift in regulatory power from the legislature and the judiciary to third parties also raises the concern that the proposal "*substantially alters* or *performs the functions of* multiple branches," in violation of the single-subject requirement in Article XI, Section 3. *Homestead Tax Exemption*, 880 So. 2d at 650 (quoting *Adv. Op. to Att'y Gen. re Fish & Wildlife Conserv. Comm'n*, 705 So. 2d 1351, 1353–54 (Fla. 1998)); *see also Property Rights*, 699 So. 2d at 1308.

[4] *See also Tax Limitation*, 644 So. 2d at 494 (summary falsely implying that there is "presently no cap or limitation on taxes in the constitution" is invalid); *Medical Marijuana I*, 132 So. 3d at 820 (Canady, J., dissenting) (ballot summary is fatally defective if voters "are potentially hoodwinked into believing that the amendment is consistent with . . . federal law").

*tient's health*, as determined by the patient's healthcare provider."
App. 5. Neither is true. Federal law, mentioned nowhere in the ballot summary, would limit both types of abortions in circumstances the ballot summary does not disclose. The Court should strike the proposal from the ballot for this reason as well.

### A.  The ballot summary does not explain that partial-birth abortions will continue to be illegal before viability.

The first sentence of the ballot summary states: "No law shall prohibit, penalize, delay, or restrict abortion before viability . . . , as determined by the patient's healthcare provider." App. 5. This is not an accurate description of the effect of the amendment. Under federal law, partial-birth abortions will remain unlawful at any stage of the pregnancy, pre- or post-viability, unless necessary to save the life of the mother. 18 U.S.C. § 1531.[5] Within our federal system, a

---

[5] Subsection (a) of the federal statute provides in relevant part: "Any physician who, in or affecting interstate or foreign commerce, knowingly performs a partial-birth abortion and thereby kills a human fetus shall be fined under this title or imprisoned not more than 2 years, or both. This subsection does not apply to a partial-birth abortion that is necessary to save the life of a mother whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself." 18 U.S.C. § 1531(a)

state has no power to authorize its residents to participate in conduct that would constitute a federal crime. *See* art. VI, ¶ 2, U.S. Const.; *cf. United States v. Aquart*, 912 F.3d 1, 60 (2d Cir. 2018) ("[T]he authority to prescribe punishments for federal crimes is not a 'power[] that the Constitution reserved to the States.'" (quoting *United States v. Comstock*, 560 U.S. 126, 144 (2010)). A state may of course eliminate or reduce *state-law* penalties for conduct that is simultaneously regulated by state and federal law; but because federal-law penalties will remain even then, the conduct is unlawful. It is thus misleading to tell voters that "[n]o law," full stop, "shall prohibit, penalize, delay, or restrict abortion before viability."

The amendment suffers from the same defect as the ballot summary for the recent Adult Use of Marijuana initiative, which this Court ordered stricken from the ballot two years ago, *Adv. Op. to Att'y Gen. re Adult Use of Marijuana*, 315 So. 3d 1176, 1180–81 (Fla. 2021) ("*Adult Use*"). There, the summary told voters the amendment would "[p]ermit[] adults 21 years or older to possess, use, purchase, display, and transport up to 2.5 ounces of marijuana and marijuana accessories for personal use for any reason." *Id.* at 1179. "The summary's unqualified use of the word '[p]ermits'

35

strongly suggest[ed] that the conduct to be authorized by the amendment w[ould] be free of any criminal or civil penalty in Florida," when in fact a marijuana user would "remain exposed to potential prosecution under federal law—no small matter." *Id.* at 1180–81.

Likewise here, the unqualified phrase "[n]o law" strongly suggests that restrictions on pre-viability abortions will be free of penalty, civil or criminal. Unlike the ballot summaries this Court approved in its two opinions involving medical marijuana amendments, the ballot summary in this case makes no attempt to warn voters that the amendment will "not authorize violations of federal law," *Medical Marijuana I*, 132 So. 3d at 808, or that it does not "give immunity under federal law," *Adv. Op. to Att'y Gen. re Use of Marijuana for Debilitating Med. Conditions*, 181 So. 3d 471, 475 (Fla. 2015) ("*Medical Marijuana II*"). A ballot summary may not "mislead voters regarding the interplay between the proposed amendment and federal law." *Medical Marijuana I*, 132 So. 3d at

808.[6] In particular, "[a] constitutional amendment cannot unequivocally 'permit' or authorize conduct that is criminalized under federal law," and any ballot summary "suggesting otherwise is affirmatively misleading." *Adult Use*, 315 So. 3d at 1181.

In short, a ballot summary cannot say that "no law shall prohibit, penalize, delay, or restrict abortion before viability," when in fact "some law" will. For this reason, the ballot summary in this case is both inaccurate and incomplete.

### B. The ballot summary does not explain that partial-birth abortions will continue to be illegal after viability if they are unnecessary to protect the life of the mother.

The other half of the first sentence of the ballot summary promises in the alternative that "[n]o law shall prohibit, penalize, delay, or restrict abortion . . . when necessary to protect the patient's health, as determined by the patient's healthcare provider."

---

[6] *See also id.* at 819 (Polston, C.J., dissenting) ("[W]hile ballot summaries are not required to mention the current state of federal law or a proposed state constitutional amendment's effect on federal law, they are required to not affirmatively mislead Florida voters by falsely implying the opposite of what that current state of federal law is."); *id.* at 820 (Canady, J., dissenting) (explaining that an initiative should be kept off the ballot where "the ballot summary seriously misrepresents the interaction of the proposed amendment with federal law").

App. 5. This health exception runs into conflict with the same federal statute as above. The federal partial-birth abortion statute allows partial-birth abortions only when "necessary to save the life of a mother." 18 U.S.C. § 1531(a). Thus, a post-viability partial-birth abortion performed to protect health but not life would remain illegal even after the amendment. Here again the ballot summary misleads as to the amendment's true effect.

## CONCLUSION

The Limiting Government Interference with Abortion initiative should be stricken from the ballot.

Respectfully submitted,

Ashley Moody
 Attorney General

HENRY C. WHITAKER (FBN1031175)
 Solicitor General
JEFFREY PAUL DESOUSA (FBN110951)
DANIEL W. BELL (FBN1008587)
 Chief Deputy Solicitors General

 */s/ Nathan A. Forrester*
NATHAN A. FORRESTER (FBN1045107)
 Senior Deputy Solicitor General

JOHN M. GUARD (FBN374600)
 Chief Deputy Attorney General
JAMES H. PERCIVAL (FBN1016188)
 Chief of Staff

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300

henry.whitaker@myfloridalegal.com
October 31, 2023       jenna.hodges@myfloridalegal.com

*Counsel for the Attorney General*

39

## CERTIFICATE OF COMPLIANCE

I certify that this brief was prepared in 14-point Bookman Old Style font, in compliance with Florida Rule of Appellate Procedure 9.210(a)(2), and contains 7,598 words.

/s/ *Nathan A. Forrester*
Nathan A. Forrester
*Senior Deputy Solicitor General*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been furnished via the e-filing portal or by e-mail this 31st day of October, 2023, to the following:

Courtney R. Brewer
*Counsel for Proponent, Floridians Protecting Freedom, Inc.*
P.O. Box  3441
Tallahassee, FL 32315-3441
cbrewer.law@gmail.com

Hélène Barthélemy
*Counsel for Proponent, Floridians Protecting Freedom, Inc.*
ACLU Found. of Fla.
4343 W. Flagler St., Suite 400
Miami, FL 33134
hbarthelemy@aclufl.org

Daniel B. Tilley
*Counsel for Proponent, Floridians Protecting Freedom, Inc.*
ACLU Found. of Fla.
4343 W. Flagler St., Suite 400
Miami, FL 33134
dtilley@aclufl.org

Nicholas L.V. Warren
*Counsel for Proponent, Floridians Protecting Freedom, Inc.*
ACLU Found. of Fla.
1809 Art Museum Drive, Suite 203
Jacksonville, FL 32207
nwarren@aclufl.org

Michelle Morton
*Counsel for Proponent, Floridians Protecting Freedom, Inc.*
ACLU Found. of Fla.
4343 W. Flagler St., Suite 400

Miami, FL 33134
mmorton@aclufl.org

Mathew D. Staver
Anita L. Staver
Horatio G. Mihet
Hugh C. Phillips
*Counsel for Opponent, Florida Voters Against Extremism, PC*
Liberty Counsel
P.O. Box 540774
Orlando, FL 32854
court@lc.org

Stephen C. Emmanuel
Ausley McMullen
*Counsel for Opponent, Florida Conference of Catholic Bishops, Inc.*
P.O. Box 391 (32302)
123 South Calhoun Street
Tallahassee, Florida 32301
semmanuel@ausley.com

Cord Byrd
Secretary of State, Florida Department of State
R.A. Gray Building
500 S. Bronough St.
Tallahassee, FL 32399-0250
Joseph.VandeBogart@dos.myflorida.com

Ron DeSantis
Governor, State of Florida
The Capitol
400 S. Monroe St.
Tallahassee, FL 32399-0001
ryan.newman@eog.myflorida.com

Kathleen Passidomo
President, Florida Senate
Senate Office Building

404 S. Monroe St.
Tallahassee, FL 32399-1100
carlos.rey@flsenate.gov

Paul Renner
Speaker, Florida House of Representatives
420 The Capitol
402 S. Monroe St.
Tallahassee, FL 32399-1300
david.axelman@myfloridahouse.gov

> _/s/ Nathan A. Forrester_
> Nathan A. Forrester
> _Senior Deputy Solicitor General_