# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

FLORIDIANS PROTECTING
FREEDOM, INC.,

*Plaintiff*,

v.

JOSEPH A. LADAPO, in his official
capacity as State Surgeon General and
Head of the Florida Department of
Health, and JOHN WILSON, former
General Counsel to the Florida
Department of Health, in his individual
capacity,

*Defendants*.

Civil Action No. 4:24-cv-00419

---

## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65(b), Plaintiff Floridians
Protecting Freedom, Inc., for the reasons set forth in the memorandum of law filed
concurrently with this motion as supported by exhibits and declarations submitted
therewith, respectfully moves the Court for a preliminary injunction enjoining
Defendant Ladapo, his employees, his agents, and successors in office, and any other

persons who are in active concert or participation with them, from taking any further actions to coerce, threaten, or intimate repercussions directly or indirectly to television stations, broadcasters, or other parties for airing Plaintiff's speech, or undertaking enforcement action against Plaintiff for running political advertisements or engaging in other speech protected under the First Amendment. Plaintiff states as follows:

1.     On October 3, 2024, Defendants sent cease-and-desist letters to Florida television stations over a political advertisement concerning Amendment 4, a November ballot measure that would limit government interference with abortion. The letters demanded that stations remove the advertisement within 24 hours or face legal consequences, including criminal prosecution.

2.     Federal Rule of Civil Procedure 65 provides for the issuance of a preliminary injunction where the facts alleged demonstrate irreparable injury, loss, or damage to the moving party. Plaintiffs face irreparable injury because Florida voters are actively voting on Amendment 4, making this a crucial time for Plaintiff's advocacy, and because Plaintiff intends to continue to engage in political speech in the coming weeks that Defendants have explicitly threatened to treat as a crime.

3.     Plaintiff has submitted a Memorandum of Law in support of this motion alleging such injury and addressing all elements entitling it to relief.

4.      Plaintiff seeks preliminary relief against only Defendant Ladapo, in his official capacity. Plaintiff does not seek preliminary relief against Defendant Wilson, in his individual capacity, at this time.

WHEREFORE, for the foregoing reasons, and those set forth in Plaintiff's supporting Memorandum of Law, Plaintiff respectfully requests this Court enter a preliminary injunction.

Dated: October 17, 2023

Respectfully submitted,

*/s/ Christina Ford*
Christina Ford, FL Bar No. 1011634

Ben Stafford*
**ELIAS LAW GROUP LLP**
1700 Seventh Ave., Suite 2100
Seattle, Washington 98101
Telephone: (206) 656-0177
bstafford@elias.law

Emma Olson Sharkey*
Christina Ford (FL Bar No. 1101634)
Renata O'Donnell*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, D.C., 20001
Telephone: (202) 968-4490
eolsonsharkey@elias.law
cford@elias.law
rodonnell@elias.law

Daniel B. Tilley (FBN 102882)
Samantha J. Past (FBN 1054519)
Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
nwarren@aclufl.org
spast@aclufl.org

Jennifer Blohm
**MEYER, BLOHM AND POWELL, P.A.**
P.O. Box 1547,
Tallahassee, Florida  32302
(850)878-5212
jblohm@meyerblomlaw.com

*Admitted pro hac vice*

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

FLORIDIANS PROTECTING FREEDOM, INC.,

<em>Plaintiff</em>,

    v.

JOSEPH A. LADAPO, in his official capacity as State Surgeon General and Head of the Florida Department of Health, and JOHN WILSON, former General Counsel to the Florida Department of Health, in his individual capacity,

                        Case No. 4:24-cv-00419

<em>Defendants</em>.

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND ...........................................................................3

  I.    For months, the State of Florida has mounted an aggressive campaign to defeat Amendment 4. .......................................................................................3

  II.   The State threatens to prosecute TV stations that air FPF's advertisement, "Caroline." ....................................................................................................7

  III.  Defendants' actions successfully coerce a TV station to stop airing "Caroline" and threaten FPF's forthcoming speech. ....................................10

LEGAL STANDARD ...................................................................................13

ARGUMENT ..............................................................................................13

  I.    FPF is likely to succeed on its First Amendment claims.............................13

      A.   FPF has standing to pursue its claims.................................................14

      B.   FPF is likely to succeed in showing Defendants have unconstitutionally used coercive threats to censor FPF's protected speech. .......................16

      C.   FPF is likely to succeed in showing Defendants are engaged in unconstitutional viewpoint discrimination. ...........................................26

  II.   Absent preliminary relief, FPF will continue to suffer irreparable injury.....30

  III.  The balance of equities and public interest favor a preliminary injunction. .33

CONCLUSION ...........................................................................................34

# INTRODUCTION

More than sixty years ago, the United States Supreme Court held that the government cannot deploy the threat of legal sanctions to coercively suppress speech it disfavors. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). The Supreme Court reaffirmed this bedrock principle of free speech just this year. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024). Nor can the State "pu[t] its thumb on the scale" to censor certain viewpoints because it disagrees with or believes those viewpoints to be "dangerous." *Honeyfund.com Inc. v. Governor of Fla.*, 94 F.4th 1272, 1275 (11th Cir. 2024). This case, which concerns the State of Florida's efforts to take a political advertisement off the air because it disagrees with the advertisement's viewpoint, presents a textbook First Amendment violation.

Plaintiff Floridians Protecting Freedom ("FPF") is the sponsor of Amendment 4, a proposed constitutional amendment to limit government interference with abortion. In the days before the November 5 election, while Floridians are already actively casting their vote-by-mail ballots, FPF is working tirelessly to educate voters about Amendment 4 and advocate for its passage. To that end, FPF launched an advertisement on TV stations across the state, "Caroline," in which one Floridian tells her own story about requiring abortion care and her fear that such care is not available under Florida's existing abortion laws. Amendment 4 would return Florida

to a state where women like Caroline can make personal medical decisions, free of government intrusion.

Several Florida state officials oppose Amendment 4. Indeed, they are so opposed to Amendment 4 that they have embarked on a taxpayer-funded campaign of investigation and intimidation against FPF, Amendment 4, and the voters who have supported it. In response to "Caroline," the State escalated that campaign even further, demanding that television stations remove the advertisement from the air within 24 hours, or face criminal prosecution. In so doing, the State crossed the line from advocating against Amendment 4 to censoring speech in support of Amendment 4, something it cannot do under the First Amendment.

FPF has every right to advocate for Amendment 4 and inform voters about how Florida's current anti-abortion law endangers women, tramples their rights, and puts their health care providers in untenable situations. It does not matter whether the State likes that speech or not, or finds FPF's speech to be "dangerous." *Honeyfund.com*, 94 F.4th at 1275. Defendants have flagrantly violated FPF's First Amendment rights by (1) coercing television stations to remove FPF's protected speech from the airwaves and (2) engaging in classic viewpoint discrimination. With the election 19 days away and FPF's right to core political speech hanging in the balance, the Court should enter a preliminary injunction to protect FPF's rights

against Defendant Lapado, his officers, agents, servants, employees, and attorneys; and other persons who are in active concert or participation with him.

## FACTUAL BACKGROUND

### I.  For months, the State of Florida has mounted an aggressive campaign to defeat Amendment 4.

For the better part of a year, state officials have used state power to attempt to defeat Amendment 4—first attempting to keep it from ever reaching the voters, then by investigating Amendment 4's supporters and accusing FPF of misleading the public, and by launching state-sponsored websites and advertisements against the Amendment.

The State's opposition to Amendment 4 began in earnest shortly after FPF secured the necessary signatures to place the initiative on the general election ballot. *See* Fla. Const. art. XI, § 3; Decl. of Christina Ford in Supp. of Pls.' Mot. for Preliminary Injunction ("Ford Decl."), Ex. C ¶¶ 8–16 ("Latshaw Decl."). Amendment 4, which is titled "Amendment to Limit Government Interference with Abortion," would override the State's existing six-week abortion ban, which prohibits abortions after six weeks' gestation, except in extremely narrow circumstances. Fla. Stat. § 390.0111. If adopted, Amendment 4 would amend the Florida Constitution to invalidate that ban and instead provide that, "[e]xcept as provided in Article X, Section 22, no law shall prohibit, penalize, delay, or restrict

abortion before viability or when necessary to protect the patient's health, as determined by the patient's healthcare provider."

Shortly after the Secretary of State's Office confirmed that Amendment 4 had qualified, *see* Latshaw Decl. ¶ 8, Florida's Attorney General sought to exclude it from the ballot in litigation before the Florida Supreme Court, arguing that the Amendment's sponsors sought to "trick voters" and "hoodwink the Florida electorate," in proposing Amendment 4. *See* Ford Decl., Ex. E at 2–3. The Court rejected the State's argument and approved Amendment 4 for the ballot, confirming that its title and summary were "clear and unambiguous," "not misleading," and contained "no lack of candor or accuracy." *See Advisory Op. to Att'y Gen. Re: Limiting Gov't Interference with Abortion*, 384 So. 3d 122, 127, 136 (Fla. 2024).

Unable to block the Amendment in Court, the State then began what county Supervisors of Elections called an "unprecedented" investigation into voters who had signed the petition supporting Amendment 4. *See* Romy Ellenbogen et al., *DeSantis' election police questioned people who signed abortion petitions*, TAMPA BAY TIMES (Sept. 6, 2024);[1] Latshaw Decl. ¶ 11. One voter, who confirmed that he signed the petition to put Amendment 4 on the ballot, said that officers showed up at

---

[1] Available at https://www.tampabay.com/news/florida-politics/elections/2024/09/06/florida-abortion-amendment-petition-signature-fraud-voters/ [https://perma.cc/8JNY-AZV5]. Notably, this investigation was initiated *after* the Secretary's Office had already confirmed that Amendment 4 had received sufficient valid signatures for placement on the ballot.

his home with a copy of his driver's license and other personal documents, leaving him shaken by the encounter. *See* Ellenbogen et al., *supra* note 1. Another voter felt "intimidated" by a law enforcement officer coming to her door. *Id.*

The State has coupled its "investigation" with state-sponsored, taxpayer-funded advocacy against Amendment 4. In September, as the election approached, the Florida Agency for Health Care Administration ("AHCA") launched a state-sponsored website to pursue its own public relations campaign against Amendment 4. *See Florida is Protecting Life*, FLA. AGENCY FOR HEALTH CARE ADMIN. (Sept. 2024).[2] The website purports to tell the public that the State's view of its current anti-abortion laws is the "truth," while those who support Amendment 4 and disagree with the State are telling "lies." *Id.* Among other things, the website screams: "DON'T LET THE FEARMONGERS LIE TO YOU," and argues that "Current Florida Law **Protects Women**," whereas supposedly "Amendment 4 **Threatens Women's Safety**." *Id.*

The State has used this website to push state-sponsored narratives to oppose Amendment 4, and in particular, FPF's advertisements and messaging supporting the Amendment. As just one example, in September, FPF launched an advertisement called, "Before," which highlights that Florida's existing law bans abortions "before

---

[2]     Available     at     https://quality.healthfinder.fl.gov/floridacares/floridacares [https://perma.cc/M9X7-VLHD] (last accessed Oct. 15, 2024).

many women even realize they are pregnant." Press Release, YES ON 4, *Floridians Protecting Freedom's Yes on 4 Campaign Launches Multi-Million Dollar Paid Media Campaign with First TV Ad* (Sept. 10, 2024).[3] Days later, Florida launched its website, including "Transparency Documents" about Amendment 4 that purport to list "myths vs. facts" about existing abortion access. *Florida is Protecting Life*, *supra* note 2. Among the purported "myths," according to the State, is that "[w]omen won't even know they're pregnant" before they can get an abortion under Florida's existing law. *Id.* The State then represents as "fact" that "pregnancy tests have evolved" such that "[t]race levels of hCG can now be detected as early as eight days after ovulation." *Id.* That statement, even if true, in no way means it is "false" or a "myth" that Florida's six-week abortion ban prohibits abortions before many women *actually* realize they are pregnant, including women who are not attempting to get pregnant and have no reason to take a monthly hCG test.

The agency has spent millions of dollars running advertisements promoting this website and the State's official narratives regarding its existing abortion laws and Amendment 4. Latshaw Decl. ¶ 16. Although framed as "public service announcements," the state's advertisements instruct Florida voters to go to the state's

---

[3]     Available     at     https://floridiansprotectingfreedom.com/first-tv-ad/ [https://perma.cc/VE42-VZU4].

website to obtain "accurate information" on abortion,[4] which asserts that Amendment 4's supporters are "lying" to voters. *Florida is Protecting Life*, *supra* note 2. One of these political-advertisements-in-all-but-name warned viewers about "a lot of misinformation about [Florida's] abortion laws" that are "lies that could convince women to not seek necessary care and put themselves at risk and that's unacceptable," and that "abortions are always available at any time to protect the life and health of mothers." *Unacceptable*, FLA. AGENCY FOR HEALTH CARE ADMIN. (2024).[5]

## II.   The State threatens to prosecute TV stations that air FPF's advertisement, "Caroline."

This month, the State's campaign against Amendment 4 reached new heights. The State escalated from handing down the state-sponsored "truth" about its abortion laws to threatening to *prosecute* those who dare facilitate speech opposing the State's viewpoint.

The impetus was a new political advertisement that FPF launched in TV markets across the state on October 1 called "Caroline." Latshaw Decl. ¶ 19. The advertisement tells the story of Caroline, a Florida mother who was diagnosed with

---

[4]    @AHCA_FL, X.com (Oct. 2, 2024, 8:03 AM), https://x.com/AHCA_FL/status/1841448825786892289 [https://perma.cc/KB87-BS77].

[5] Available at https://host2.adimpact.com/admo/viewer/cea0900b-2cb8-43de-a96a-5a6d4be48fec [https://perma.cc/T7DS-Z2WY] (last accessed Oct. 15, 2024).

stage-four terminal brain cancer 20 weeks into her second pregnancy. *Id*. Caroline's doctors advised her that, although her terminal diagnosis meant they could not save her life, they could offer her treatment to extend her life, to spend time with her family and her young daughter. Ford Decl., Ex. D ¶¶ 3–4 ("Williams Decl."). To accept that treatment, however, Caroline had to end her pregnancy. *Id.* As Caroline concludes in the advertisement in urging voters to support Amendment 4, "Florida has now banned abortion even in cases like mine." Latshaw Decl. ¶ 19.

"Caroline" is true in every way, as Caroline herself attests, *see* Williams Decl. ¶ 2, and as doctors do too, *see* Ford Decl., Ex. B ¶¶ 7–10 ("Tien Decl."), accurately reflecting how narrow Florida's existing exceptions to abortions are crafted. Specifically, under existing Florida law, and as relevant here, abortions may be performed only after six weeks' gestation if "[t]wo physicians certify in writing that, in reasonable medical judgment, the termination of the pregnancy is necessary to save the pregnant woman's life or avert a serious risk of substantial and irreversible physical impairment of a major bodily function of the pregnant woman other than a psychological condition." Fla. Stat. § 390.0111(1)(a). Repeatedly, medical professionals across Florida who must now attempt to provide care under this law, have emphasized that it has "created an unworkable legal landscape that endangers both patients and clinicians . . . lead[ing] to preventable suffering, and compels clinicians to deviate from established standards of care and medical ethics." Whitney

Arey, et al., *Delayed and Denied: How Florida's Six-Week Abortion Ban Criminalizes Medical Care*, PHYSICIANS FOR HUMAN RIGHTS (Sept. 17, 2024).[6] Dr. Shelly Tien, a board-certified physician in obstetrics, gynecology, and maternal-fetal medicine affirms that Florida's current abortion ban would prevent her from treating a patient in Caroline's situation. Tien Decl. ¶¶ 1, 8. Because Caroline's diagnosis was terminal, neither the cancer treatment the doctors wished to provide her, nor the abortion itself, could in fact save Caroline's life or treat an immediately emergent issue, and thus would not qualify under the narrow existing exceptions to abortion under Florida law. *Id.*; *see also* Williams Decl. ¶ 5 ("[B]ecause my diagnosis is terminal, any cancer treatment could not be considered life-saving, and I did not face an immediate and emergent threat to my life in April 2022.").

Two days after "Caroline" began airing, the Florida Department of Health (the "Department") sent a letter to stations demanding that they cease airing the advertisement within 24 hours or face legal action by the State, including criminal proceedings. Ford Decl., Ex. A. The letter calls the advertisement both "false" and "dangerous" (without actually identifying any such "false" statement) and alleges that its airing is a "sanitary nuisance" that the station must remove under Fla. Stat. § 386.03. The letter explicitly asserts that "[t]he Department is further authorized to

---

[6]Available at https://phr.org/our-work/resources/delayed-and-denied-floridas-six-week-abortion-ban/ [https://perma.cc/5B3C-HHT5].

"[i]nstitute criminal proceedings . . . [for] failing to comply with notices to correct sanitary nuisance conditions" and that "maintaining a nuisance injurious to health is a second-degree misdemeanor." *Id*. at 2 (citing Fla. Stat. §§ 386.03(2)(b), 386.051). The letter is on official letterhead of the Department and signed by its General Counsel, Defendant John Wilson. *See id*. at 1–2.

It is no small thing when a state threatens to prosecute broadcasters for airing a political advertisement. Indeed, Defendants' actions prompted the Chair of the Federal Communications Commission to issue a public statement in response to the "threats made by government officials in Florida against broadcast stations for airing a political ad." Press Release, FCC, *Chairwoman Rosenworcel on First Amendment Threats to Florida Broadcast Stations* (Oct. 8, 2024) ("FCC Press Release").[7] As the Chair reiterated in that statement, "[t]he right of broadcasters to speak freely is rooted in the First Amendment. Threats against broadcast stations for airing content that conflicts with the government's views are dangerous and undermine the fundamental principle of free speech." *Id.*

## III.   Defendants' actions successfully coerce a TV station to stop airing "Caroline" and threaten FPF's forthcoming speech.

As soon as FPF learned of Defendants' letter, it contacted broadcast stations to advise them about the unconstitutionality of the State's attempt to suppress FPF's

---

[7]    Available    at    https://docs.fcc.gov/public/attachments/DOC-406321A1.pdf [https://perma.cc/2NEM-BEDH].

speech, explaining both that the advertisement was true and that the Department's letter raised serious concerns under the First Amendment. Latshaw Decl. ¶ 24. At least one broadcast station in South Florida (WINK TV), however, was intimidated enough by the letter to take "Caroline" off the air, costing FPF irreplaceable airtime when Florida voters are actively casting their ballots. *Id*. ¶ 25; *see also* ECF No. 1 ¶ 55 (verified complaint attesting, "FPF learned that WINK TV in Fort Myers decided to remove the advertisement from the airwaves after receiving Defendants' letter"). FPF is still working with that station on the specifics of when it will return "Caroline" to the air. Latshaw Decl. ¶ 25.

At no point have Defendants conceded that "Caroline" does not constitute a "sanitary nuisance" or agreed that it will not prosecute WINK TV for airing it. Indeed, as of this filing, FPF is not aware of any efforts by the State to retract its letter or assure broadcasters that they will not face criminal penalties for airing "Caroline" or any other forthcoming FPF advertisements. *Id*. ¶ 33. In fact, to the contrary, the Department has retained two law firms to represent the agency with regard to the "false political advertisements under chapters 381 and 386." Ford Decl., Exs. F & G. The contracts combined authorize well more than $1 million in billable services. *See id*, Exs. F & G.

In addition to "Caroline," which FPF itself promotes on its website and intends to resume airing on WINK TV, *see* Latshaw Decl. ¶¶ 19, 25, FPF has both

existing and forthcoming advertisements that will include similar information about the real-world consequences of Florida's anti-abortion laws. Specifically, in "Deborah and Lee," FPF tells the story of a woman who was forced to carry her baby to term under Florida's current restrictive laws, even though her doctors told her that her baby would not survive. *See id.* ¶ 28. FPF also intends to begin running an advertisement, called "Anya," that will feature a Florida woman who was miscarrying but denied access to abortion care because she was not sufficiently on the brink of death to obtain an abortion. *See id.* ¶ 29. In Anya's case, Florida's extreme abortion ban nearly resulted in her death. *See id.*

FPF does not know if television stations will air these ads in the face of Defendants' intimidation tactics. With only 19 days until November 5, FPF fears that Defendants' threats, which have already successfully prevented FPF's speech from reaching Florida voters in a key media market when one station was unwilling to risk criminal prosecution, will effectively impede FPF's campaign in support of Amendment 4 at a time when Florida voters are actively returning their absentee ballots, *see* Fla. Stat. § 101.62. This is a critical time during which FPF has its last remaining opportunity to convince Florida voters to support Amendment 4. Once ballots are cast, that window of opportunity closes. And every opportunity to persuade a voter may contribute to the ultimate success or failure of the Amendment.

## LEGAL STANDARD

The Court should grant a preliminary injunction if the moving party shows "(1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury unless an injunction issues; (3) this threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Honeyfund.com*, 94 F.4th at 1277 (quotations and citations omitted). Although FPF bears the initial burden of persuasion, the State bears the burden of justifying its conduct under the First Amendment. *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298–1301(11th Cir. 2017).

## ARGUMENT

## I.    FPF is likely to succeed on its First Amendment claims.

In a Section 1983 case against a public official sued in their official capacity, the plaintiff must show: "(1) some person has deprived him or her of a federal right; and (2) that he or she acted under color of state law." *McKinley v. Kaplan*, 177 F.3d 1253, 1257–58 (11th Cir. 1999). This motion concerns FPF's official capacity claim against the head of the Department, Joseph Ladapo, which alleges a deprivation of

FPF's First Amendment rights.[8] For the reasons that follow, FPF is likely to prevail on the merits of its claims that Defendants violated FPF's First Amendment rights in two distinct ways: (1) by coercing third-party television stations to remove FPF's ad "Caroline" from the airwaves and (2) engaging in rank viewpoint discrimination.

### A.   FPF has standing to pursue its claims.

As an initial matter, FPF has standing to pursue its claims. FPF must show a likelihood that (1) it has suffered an injury-in-fact that is (2) traceable to Defendants and that (3) can be redressed by a favorable ruling. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Here, the State's ongoing pressure campaign to censor FPF's political speech surely constitutes an Article III injury this Court can and should remedy.

The injury-in-fact requirement applies "most loosely where First Amendment rights are involved, lest free speech be chilled even before the law or regulation is enforced." *Harrell v. Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010). The State's letter threatening television stations from airing FPF's advertisements both outright censors and chills FPF's right to free expression, which is a well-established injury-in-fact. *Pittman v. Cole,* 267 F.3d 1269, 1283 (11th Cir. 2001). FPF has also clearly

---

[8] The First Amendment applies to the State of Florida via incorporation by the Due Process Clause of the Fourteenth Amendment. *See Turner v. Williams*, 65 F.4th 564, 579 (11th Cir. 2023).

already suffered from an injury because WINK TV stopped running this advertisement in the face of the State's threats. *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) ("[E]ven a temporary infringement of First Amendment rights constitutes a serious and substantial injury."). In light of the State's ongoing pressure campaign against Amendment 4 and recent threat to prosecute those who air FPF's speech, FPF reasonably fears the State will take action either against FPF itself, or stations that refuse to comply with the State's demands, given the "credible threat of prosecution" from the State here. *Pittman*, 267 F.3d at 1284 (citing *Am. C.L. Union v. Fla. Bar*, 999 F.2d 1486, 1492 (11th Cir. 1993)).

FPF's injuries are also traceable to Defendants and redressable by a favorable order from this Court. *See Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021) ("The latter two requirements—traceability and redressability—often travel together"). FPF's injuries are traceable to Defendants because FPF "could be subject to enforcement actions under the authority" of Defendants, as Defendants' own letter makes clear. *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1172 (N.D. Fla. 2022); *see also* Ford Decl., Ex. A at 1-2 (letter threatening enforcement action); Fla. Stat. § 386.041(2) (authorizing "[t]he Department of Health, its agents and deputies" to investigate sanitary nuisances and "take such action to abate the said nuisance condition in accordance with the provisions of this chapter"). And FPF's injuries are redressable because the requested

relief would give FPF and stations the freedom to engage in speech "without fear of government enforcement." *DeSantis*, 622 F. Supp. 3d at 1172.

**B.     FPF is likely to succeed in showing Defendants have unconstitutionally used coercive threats to censor FPF's protected speech.**

**i.     Defendants' threat to punish broadcast stations for airing FPF's speech is unconstitutional under *Vullo* and *Bantam*.**

Sixty years ago, in the seminal case of *Bantam Books*, the U.S. Supreme Court held that the government cannot invoke "'legal sanctions and other means of coercion' against a third party 'to achieve suppression' of disfavored speech" consistent with the First Amendment. *Vullo*, 602 U.S. at 180 (citing *Bantam*, 372 U.S. at 67). In *Vullo*, decided just this past term, the U.S. Supreme Court "reaffirm[ed]" what it said in *Bantam*: "Government officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." *Id.* That is precisely what Defendants have done in issuing threatening letters to broadcast stations disseminating FPF's political advertisements, and it is just as unconstitutional as it was in *Bantam* and *Vullo*.

Even a brief inspection of the facts in *Bantam* and *Vullo* shows how similar Defendants' letter was to the acts deemed unconstitutional in those cases. In *Bantam*, the Court considered a Rhode Island commission's pressure campaign to censor books it deemed "objectionable" by threatening criminal investigation and prosecution to book distributors. 372 U.S. at 59–62. There, the commission sent

16

official notices to distributers citing the state's obscenity laws and underscoring the commission's "duty to recommend to the Attorney General" violations of those laws. *Id.* at 62–63 & n.5. The notices informed distributors that lists of objectionable publications had been "circulated to local police departments," but indicated that "cooperation in removing the listed and other objectionable publications from your newsstands (sic) will be appreciated," and "will eliminate the necessity of our recommending prosecution to the Attorney General's department." *Id.* In response to these letters, at least some distributors halted further circulation of the "objectionable" publications. *Id.* at 63. When the publishers of those "objectionable" books sued, the Court held the state's pressure campaign towards distributors constituted unconstitutional government coercion against speech. *Id.* at 63–64.

Similarly, in *Vullo*, the Court held that the National Rifle Association (NRA) stated a plausible claim of unconstitutional government coercion where it alleged that Vullo, the then-superintendent of New York's Department of Financial Services (DFS), used the DFS's authority to "coerce[] DFS-regulated entities into disassociating with the NRA in order to punish or suppress the NRA's gun-promotion advocacy." 602 U.S. at 191. As alleged by the NRA, DFS engaged in a pressure campaign to urge financial institutions to "sever[] their ties" with the NRA. *Id.* at 181–84. That campaign included the issuing "Guidance Letters" on official state letterhead that "encouraged" financial institutions doing business with the NRA to

(1) "evaluat[e] and manag[e] their risks, including reputational risks, that may arise from their dealings with the NRA"; (2) "review any relationships they have with the NRA"; and (3) "take prompt actions to manage these risks and promote public health and safety." *Id.* at 184 (cleaned up). Vullo later met with the financial institutions to warn them they had committed a variety of insurance law-violations, but indicated that DFS would be "less interested in pursuing these infractions so long as [the institutions] ceased providing insurance to gun groups, especially the NRA." *Id.* at 192 (cleaned up). At least one insurer thereafter terminated its insurance with the NRA. *Id.* at 185.

In both *Bantam* and *Vullo*, the Court found unconstitutional government coercion (or at least allegations of such unconstitutional conduct in *Vullo*) after considering a variety of factors, including (1) whether the entity seeking to limit speech had actual enforcement authority, (2) whether the communications were presented as mere suggestions or instead as "orders" with "thinly veiled threats," and (3) how the third parties reacted to the communications. *See id.* at 190 (quoting and citing relevant factors from *Bantam*, 372 U.S. at 68); *id.* at 191–94 (considering same factors in *Vullo*). Although neither *Bantam* nor *Vullo* suggest that all factors must be shown to establish unconstitutional government coercion, *see id.* at 175 (acknowledging that "the Courts of Appeals that employ a multifactor test agree that no one factor is dispositive" (cleaned up)), all three factors are present here.

18

*First*, the Department is an official enforcement agency with the ability to engage in civil and criminal legal proceedings, as the agency itself threateningly underscores in its letter to the stations. *See* Ford Decl., Ex. A at 2 (explicitly announcing its authority "to institute legal proceedings under section 381.0012, Florida Statutes, to obtain an injunction" and authority to "[i]nstitute criminal proceedings in the county court in the jurisdiction of which the condition exists against all persons failing to comply with notices to correct sanitary nuisance conditions"). As the Court recognized in *Vullo*, "[t]he power that a government official wields, while certainly not dispositive, is relevant to the objective inquiry of whether a reasonable person would perceive the official's communication as coercive." 602 U.S. at 191. Here, just as the regulator *in Vullo* "had direct regulatory and enforcement authority over all insurance companies and financial service institutions doing business in New York" and could "initiate investigations and refer cases for prosecution," *id.* at 192, and just as the Rhode Island commission in *Bantam* had the power to recommend criminal prosecutions to the Attorney General, *see Bantam*, 372 U.S. at 59–62, the Department wields significant enforcement authority.

Indeed, if anything, the Department possesses significantly *more* enforcement authority than the government defendants in *Vullo* and *Bantam*, who could merely recommend referral for prosecution, rather than institute criminal proceedings

directly, as the Department is empowered to do. *See* Fla. Stat. § 386.03(2)(b) (authorizing Department to directly "[i]nstitute criminal proceedings . . . against all persons failing to comply with notices to correct sanitary nuisance conditions"); *see also id.* § 381.0012(2), (4) (empowering Department to apply for an injunction and to request the issuance of a criminal warrant); *id.* § 381.0012(5) (requiring "every state and county attorney, sheriff, police officer, and other appropriate city and county officials upon request to assist the department . . . in enforcing the state health laws"). In this regard, Defendants' letter is similar to the facts of *Backpages.com, LLC v. Dart*, where Judge Posner, writing for the Seventh Circuit, found unconstitutional coercion where a law enforcement officer's letter demanded that credit card companies "cease and desist" from allowing credit cards to be used on a website while citing to a money-laundering statute. *See* 807 F.3d. 229, 231–32 (7th Cir. 2015). As the Seventh Circuit held, "[the law enforcement officer] is not permitted to issue and publicize dire threats against credit card companies that process payments made through Backpage's website, including threats of prosecution . . . in an effort to throttle Backpage." *Id.* at 235.

*Second*, "viewed in context," Defendants' letter is "reasonably understood to convey a threat of adverse government action" rather than a mere suggestion. *Vullo*, 602 U.S. at 191. Defendants' letter, which is transmitted on official letterhead and signed by the Department's General Counsel, explicitly states the Advertisement is

a "sanitary nuisance" under Florida law, details the Department's civil and criminal authority to remove sanitary nuisances, and reminds the broadcasters that continuing to publicize a sanitary nuisance would be a crime. Ford Decl., Ex. A at 1–2. Defendants' letter is a bald threat—not even a "thinly veiled" one—"to institute criminal proceedings if the [stations] did not come around." *Vullo*, 602 U.S. at 189 (quoting *Bantam*, 372 U.S. at 68), and contains all of the markers of a threat that were present in *Vullo* and *Bantam*, if not more. *See id.* at 192–93 (considering that DFS's communications urging financial institutions to cease affiliating with the NRA came on official state letterhead and Vullo's meetings with the entities conveyed the message "loud and clear" that there would be penalties for continuing to associate with the NRA); *Bantam*, 372 U.S. at 61–63, 68 (considering the Commission's notices reminded the distributors that local police departments were made aware of the "objectionable" books and thanked the distributors in advance for their "cooperation," which the Court viewed in context as a "thinly veiled threat" rather than a suggestion that the distributers remove the books from circulation). And since the October 3 letter, Defendants have only taken action that further suggests they intend to follow through on their threat, hiring counsel specifically to represent the agency in connection with proceedings to address "false political advertisements under chapters 381 and 386," the same enforcement chapters the Department cites

in its letters to the broadcast stations. Ford Decl., Exs. F and G (Department contracts), Ex. A at 1-2 (Department letter).

*Third*, how stations reacted to Defendants' letter underscores that the letter's recipients heard it loud and clear for the threat it was. WINK TV, of course, responded by pulling "Caroline" off the air, *see supra* at 11. Indeed, Defendants' letter is so obviously a threat that it prompted the Chair of the FCC had to issue a statement condemning the Department's "[t]hreats against broadcast stations." FCC Press Release, *supra* note 7. But even if no station had bowed to the threat, Defendants' letter is still plainly unconstitutionally coercive and threatens to chill FPF's core protected speech. There is no requirement that FPF show that every recipient of Defendants' message actually censored FPF's speech to prevail. *See Vullo*, 602 U.S. at 193–94 (considering reaction primarily from Lloyd's underwriters to DFS's threats); *Bantam*, 372 U.S. at 68–69 (considering reaction from one distributor, Silverstein, to the Commission's notices); *Backpages.com*, 807 F.3d at 231 ("Notice that such a threat is actionable and thus can be enjoined even if it turns out to be empty—the victim ignores it, and the threatener folds his tent.").

Although any government-coerced suppression of speech by third parties is unconstitutional, Defendants' conduct here is particularly alarming given its target— core political speech in an ongoing election. Floridians are in the midst of voting on Amendment 4. Less than three weeks from today, the final votes will be cast.

Defendants succeeded in coercing WINK TV to remove "Caroline" from the air; thereby censoring FPF in a critical television market in the home stretch of the election—and at the same time the State is flooding the airwaves with its own "public service announcements" advancing the State's narrative about abortion access in Florida. *See supra* at 6-7. In the days to come, without relief from this Court, FPF will be put in an impossible position: it must either self-censor its speech for fear that Defendants will make good on their threat or continue its speech and risk repercussions from state officials who have proven themselves only too willing to use state power to investigate, harass, and coerce those who dare advocate for Amendment 4.

### ii. Although the advertisement is true, even its purported falsity does not permit Defendants to threaten stations with criminal sanctions for airing a political advertisement.

Every word of "Caroline" is true, both in describing Caroline's own first-hand experience, *see* Williams Decl. ¶ 2, and in applying Caroline's situation to Florida's existing abortion laws, which provide, as relevant here, that an abortion may be performed only if "two physicians certify in writing" that "the termination . . . is necessary to save the pregnant woman's life," among other narrow exceptions. Fla. Stat. § 390.0111(1)(a). As Dr. Tien attests, she could not have certified that Caroline's circumstances met this requirement, in large part because Caroline's cancer was terminal—that is, her life could not be saved. *See* Tien Decl. ¶ 8. Nor

was the cancer diagnosis, as devastating as it was, an *immediate* threat to Caroline's life, which put it outside the kinds of "immediate danger to the health, safety, and welfare to [pregnant] women" that the State has indicated in official guidance might permit an abortion, such as in the case of preterm premature rupture of membranes, ectopic pregnancy, and molar pregnancy. Fla. Admin. Code R. 59AER24-2. It was thus true for Caroline to tell Florida voters that "Florida has now banned abortion even in cases like mine." *See* Williams Decl. ¶ 1; Tien Decl. ¶ 8; Latshaw Decl. ¶¶ 19–20.

It is deeply offensive that Defendants told stations that a dying woman's recounting of her own tragic medical circumstances was "false," but ultimately the truth or falsity of the advertisement is beside the point. Even if the advertisement had been false, or if Defendants genuinely believed it to be false, that would not be grounds for Defendants to censor FPF's political speech. "As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. Am. C.L. Union,* 535 U.S. 564, 573 (2002) (cleaned up). As the U.S. Supreme Court explained in *United States v. Alvarez*, although the Court has permitted content-based restrictions in limited categories such as child pornography, true threats, fighting words, and the like, there is no "general exception to the First Amendment for false statements." 567 U.S. 709, 718 (2012) (plurality op.). The Court has

24

extended this protection to false statements because they are "inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee." *Id*. (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964)). Consequently, as Justice Kennedy summarized for the plurality opinion in *Alvarez*, "[t]he remedy for speech that is false is speech that is true"—not the suppression or banning of that speech. *Id.* at 727.

As even the five concurring and dissenting Justices recognized in *Alvarez*, speech about electoral issues represents "broad areas in which any attempt by the state to penalize purportedly false speech would present a grave and unacceptable danger of suppressing truthful speech." *Id.* at 751 (Alito, J., dissenting with two other Justices); *accord id.* at 731–32 (Breyer, J., concurring with another Justice). As Justice Alito explained:

> Laws restricting false statements about philosophy, religion, history, the social sciences, the arts, and other matters of public concern would present such a threat. The point is not that there is no such thing as truth or falsity in these areas or that the truth is always impossible to ascertain, but rather that it is perilous to permit the state to be the arbiter of truth.

*Id.* at 751–52 (Alito, J., dissenting with two other Justices); *accord id.* at 731–32 (Breyer, J., concurring with another Justice). As Justice Alito warned, "[a]llowing the state to proscribe false statements in these areas also opens the door for the state

to use its power for political ends." *Id.* at 752 (Alito, J., dissenting with two other Justices).

Defendants cannot get around this bar by claiming that FPF's speech is not only false, but also that it violates state law as a "sanitary nuisance." Even if that contention was not absurd on its face—and it is, *see infra* at 28-29—*Bantam* and *Vullo* emphasized that the government may not coerce third parties to pre-emptively censor speech even if the government believes the speech to be unlawful under state law. As the Court explained in *Vullo*, it did not matter in *Bantam* that the Rhode Island commission believed that distributors were distributing books that, "in the [commission's] view, violated the State's obscenity laws." 602 U.S. at 196 (citing *Bantam*, 372 U.S. at 64). Nor did it matter in *Vullo* that DFS believed that "the NRA and the insurers violated New York law." *Id*. Nor should it matter here whether Defendants believe FPF's advertisements are "sanitary nuisances." Defendants are not the arbiters of truth.

**C.    FPF is likely to succeed in showing Defendants are engaged in unconstitutional viewpoint discrimination.**

In addition to reflecting unconstitutional government coercion of speech, Defendants' conduct also amounts to unconstitutional viewpoint discrimination. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). And because viewpoint discrimination is

"uniquely harmful to a free and democratic society," *Vullo*, 602 U.S. at 187, it is not only presumptively unconstitutional, *Rosenberger v. Rectors & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995), as with traditional content-based restrictions, but "likely even invalid per se," *Honeyfund.com*, 94 F.4th at 1278. Those commands apply especially where the government's action "suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 785–86 (1978). While a government official "can share her views freely and criticize particular beliefs[] . . . rely[ing] on the merits and force of her ideas, . . . she cannot . . . use the power of the State to punish or suppress disfavored expression." *Vullo*, 602 U.S. at 188.

Here, FPF's speech, which urges Florida voters to vote yes on a proposed constitutional amendment concerning women's health and reproductive freedom, lies at the "core of the protection afforded by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995). Although that speech is entitled to the highest protection, Defendants have attempted to forbid the dissemination of "particular views taken by speakers," *Rosenberger*, 515 U.S. at 829—here, FPF's view that Florida's existing abortion ban does not adequately protect women and poses a risk to women's health and safety.

Defendants no doubt disagree with the FPF's position, and many Florida state officials have done so vehemently, in official briefs to state courts, *see* Ford Decl.,

27

Ex. E, on government-sponsored websites that advocate that "Amendment 4 **Threatens Women's Safety**" while "Current Florida Law **Protects Women**," *see Florida is Protecting Life*, *supra* note 2, and on the airwaves in "public service announcements" that are nothing but thinly-veiled campaign advertisements against Amendment 4, *see supra* at 6-7. Whatever the merit of those arguments, and setting aside whether it is a proper use of state resources to advocate against a citizen-proposed constitutional amendment, these arguments are at least speech in opposition to FPF's viewpoint, not an outright attempt to suppress FPF's viewpoint, as the State has done with its letter. The letter is simply an attempt to "choose[] winners and losers in the marketplace of ideas—which it may not do." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 (11th Cir. 2022).

As an attempt to censor speech on the basis of viewpoint, Defendants' action is "prohibited, seemingly as a per se matter." *Id.* at 1126 (quotation marks omitted) (citing *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018)); *Honeyfund.com*, 94 F.4th at 1278 (agreeing that viewpoint discrimination is "likely even invalid per se"). But even if this Court were to apply strict scrutiny, Defendants could not satisfy it.

Although Defendants have the burden to show their action was narrowly tailored to a compelling state interest, *see supra* at 13, they cannot show that the letter was "the least restrictive way to achieve a stated—and crucial—purpose." *Honeyfund.com,* 94 F.4th at 1281. To start, the State does not have a compelling state

interest in suppressing FPF's viewpoint. Nor does it have an interest in restricting "false" ideas, to the extent the State believes FPF's viewpoint about Florida's abortion laws are "false." To the contrary, "[t]he remedy for speech that is false is speech that is true"—not the suppression or banning of that speech. *Alvarez*, 567 U.S. at 727.

Even if Defendants have—in the abstract—a compelling interest in guarding against true sanitary nuisances, their action here would not be narrowly tailored because it is not tailored whatsoever to guarding against an actual sanitary nuisance—just speech Defendants dislike. Under Florida law, a sanitary nuisance "is the commission of any act . . . by which the health or life of an individual, or the health or lives of individuals, may be threatened or impaired." Fla. Stat. § 386.01. The State pre-emptively defines sanitary nuisances to include, among other obvious unsanitary conditions, "[u]ntreated or improperly treated human waste, garbage, offal, dead animals, or dangerous waste materials," "noisome odors which are harmful to human or animal life," poorly built or maintained septic tanks, diseased animals, and other similar kinds of unsanitary conditions. Fla. Stat. § 386.041. Not surprisingly, the statutes do not include, as a listed nuisance, "political advertising that contradicts state officials' political beliefs and/or legal interpretations."

Moreover, FPF is not aware of any instance in which the State has previously prosecuted an *idea* expressed in a political advertisement as a sanitary nuisance, and

that Defendants threatened to do so here only highlights the extent to which the State has taken unique measures to censor FPF's viewpoint. *See, e.g.*, *Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024) (finding it probative in a First Amendment retaliation action that, before the plaintiff's arrest, "no one has ever been arrested for engaging in a certain kind of conduct" even though the "criminal prohibition is longstanding and the conduct at issue is not novel").

Because "the First Amendment keeps the government from putting its thumb on the scale," *Honeyfund.com*, 94 F.4th at 1275, just as Defendants have done in attempting to censor FPF's speech, Defendants' conduct is likely unconstitutional. For this reason, too, the Court should find that FPF is likely to succeed on its First Amendment claims.

## II.   Absent preliminary relief, FPF will continue to suffer irreparable injury.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)). There is a presumption of irreparable harm where, as here, "pure speech" is chilled, let alone censored. *See Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000). As of this filing, FPF is not aware of any efforts by the Department to retract its letter or assure broadcasters that they will not face criminal penalties for airing "Caroline" or other forthcoming FPF advertisements. *See* Latshaw Decl.

¶ 33. Given the State's longstanding and ongoing campaign against Amendment 4, *see supra* at 4-7, FPF has every reason to believe that the State will continue to threaten any broadcast station airing "Caroline" or any similar FPF advertisement. Latshaw Decl. ¶ 33.

Beyond this, Defendants' actions have subjected and continue to subject FPF to irreparable harm in two concrete ways. First, FPF has already suffered irreparable harm because Defendants successfully censored FPF's speech by coercing WINK TV to take down "Caroline." *Id.* ¶ 25. More stations may follow suit and refuse to air, or delay in airing, FPF advertisements in light of the State's threats of criminal penalties.

Second, FPF continues to suffer irreparable harm in the final days of its campaign because it has to respond to Defendants' actions rather than spend its resources persuading Florida voters to vote yes on Amendment 4. FPF has devoted substantial time, money, and resources—which it would have otherwise devoted to advocacy—to addressing Defendants' letters to the stations, including monitoring which stations received the State's letter, attempting to determine which stations were pulling "Caroline" in response, and attempting to dissuade stations from acceding to the Department's demands. *Id.* ¶ 26. "Courts frequently find that organizational plaintiffs will suffer irreparable harm where these plaintiffs show ongoing harms to their organizational missions as a result of [illegal conduct]."

*Farmworker Ass'n of Fla., Inc. v. Moody*, --- F. Supp. 3d ---, 2024 WL 2310150, at *18 (S.D. Fla. May 22, 2024) (cleaned up); *see also Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008) (recognizing injury to organization that diverted resources from election mobilization efforts to combatting the state's illegal voter registration practices); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) (recognizing similar injury). FPF is suffering these same harms as it does its best to combat the State's illegal coercion, which has thwarted its ability to devote all available resources towards mobilizing voters to vote yes on Amendment 4 in these critical days before the November election.

These injuries are classic examples of irreparable injuries because they "cannot be undone through monetary remedies." *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987); *see also Ne. Fla. Ch. of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (holding First Amendment harms cannot "be compensated for by monetary damages" because of their "intangible nature"). As this Court has aptly acknowledged, "[o]nce the election comes and goes, there can be no do-over and no redress." *Madera v. Detzner*, 325 F. Supp. 3d 1269, 1282 (N.D. Fla. 2018) (quotation omitted). Because only FPF's requested equitable relief can remedy these harms, the Court should find this factor weighs strongly in favor of issuing a preliminary injunction.

### III. The balance of equities and public interest favor a preliminary injunction.

The balance of equities and public interest weigh in FPF's favor because Defendants will suffer no harm if the Court grants the requested relief, and the public interest is served when courts protect constitutional rights. The Court considers these factors jointly when a plaintiff seeks relief against the government. *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 870 (11th Cir. 2020).

As the Eleventh Circuit explained in *Otto*, "neither the government nor the public has any legitimate interest in enforcing [] unconstitutional" conduct. *Id.*; *see also KH Outdoor,* 458 F.3d at 1272 (holding that, in weighing the equities, "even a temporary infringement of First Amendment rights constitutes a serious and substantial injury, [whereas] the city has no legitimate interest in enforcing an unconstitutional ordinance"). Indeed, "it is always in the public interest to protect First Amendment liberties." *KH Outdoor*, 458 F.3d at 1272 (cleaned up).

Here, the public interest favors giving FPF the opportunity to air its viewpoint in the important debate surrounding Amendment 4, rather than silencing it, even if the State genuinely believes FPF's speech to be false. Again, "[t]he remedy for speech that is false is speech that is true." *Alvarez*, 567 U.S. at 727; *see also Whitney v. California*, 274 U.S. 357, 377 (1927) (explaining, "the remedy" to "falsehood[s] and fallacies" is "*more* speech, not enforced silence") (emphasis added) (Brandeis, J., concurring). This Court has likewise noted that even if the State "may well find

33

Plaintiff['s] speech 'repugnant,' . . . the 'remedy' for repugnant speech" is more speech, not to "muzzle[] [the State's] opponent[]." *DeSantis*, 622 F. Supp. 3d at 1180 (quoting *Whitney*, 274 U.S. at 377). If Defendants' view of the advertisement is correct, it can "make its case" and prevail in the "uninhibited marketplace of ideas," not by silencing a contrary viewpoint. *Id.* (quoting *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969)).

<h2 style="text-align:center">CONCLUSION</h2>

Like all Americans, those in the Free State of Florida, including FPF, have a right to free speech—whether the State likes that speech or not. For the foregoing reasons, this Court should enter a preliminary injunction. A proposed order is attached.

Dated: October 17, 2023

Respectfully submitted,

*/s/ Christina Ford*
Christina Ford, FL Bar No. 1011634

Ben Stafford*
**ELIAS LAW GROUP LLP**
1700 Seventh Ave., Suite 2100
Seattle, Washington 98101
Telephone: (206) 656-0177
bstafford@elias.law

Emma Olson Sharkey*
Christina Ford (FL Bar No. 1101634)

Daniel B. Tilley (FBN 102882)
Samantha J. Past (FBN 1054519)
Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
nwarren@aclufl.org

Renata O'Donnell*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, D.C., 20001
Telephone: (202) 968-4490
eolsonsharkey@elias.law
cford@elias.law
rodonnell@elias.law

*Admitted pro hac vice*

*Counsel for Plaintiff*

spast@aclufl.org

Jennifer Blohm
**MEYER, BLOHM AND POWELL, P.A.**
P.O. Box 1547,
Tallahassee, Florida  32302
(850)878-5212
jblohm@meyerblohmlaw.com

**CERTIFICATE OF COMPLIANCE**

This document complies with the word limit of Local Rule 7.1(F) because, excluding the parts of the document exempted by the rule, this foregoing motion contains 324 words and the foregoing memorandum contains 7,987 words. This document complies with the type-style requirements of Local Rule 5.1(C) because this document has been prepared in a proportionally spaced typeface using the word-processing system Microsoft Word in 14-point Times New Roman. Plaintiff's counsel conferred with counsel for Defendant Ladapo before filing this motion, who confirms Defendant Ladapo opposes the relief sought in this motion.

Date: October 17, 2024

*/s/ Christina Ford*
Christina Ford

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on October 17, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel who have entered an appearance. Plaintiff's counsel will separately serve a copy of this filing via email on counsel for Defendant Wilson, who has not yet entered an appearance.

36

Date: October 17, 2024                          /s/ *Christina Ford*
                                                Christina Ford

                                                *Counsel for Plaintiff*