## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

|  |  |
|---|---|
| FLORIDIANS PROTECTING FREEDOM, INC., | |
| *Plaintiff*, | |
| v. | Civil Action No. 4:24-cv-00419 |
| JOSEPH A. LADAPO, in his official capacity as State Surgeon General and Head of the Florida Department of Health, AND JOHN WILSON, former General Counsel to the Florida Department of Health, in his individual capacity, | |
| *Defendants*. | |

## DECLARATION OF CHRISTINA FORD IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I, Christina Ford, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.       I am over the age of 18 and competent to make this declaration. I am

an attorney with the law firm of Elias Law Group LLP and am admitted to practice

law in the state of Florida and the U.S. District Court for the Northern District of

Florida. I am an attorney for Plaintiff. I submit this declaration to provide the Court

with true and correct copies of certain documents submitted in connection with

Plaintiff's Motion for Preliminary Injunction.

2.     Exhibit A is a true and correct copy of the Florida Department of Health's letter dated October 3, 2024 to broadcast stations concerning the advertisement, "Caroline."

3.     Exhibit B is a true and correct copy of the declaration of Shelly Tien.

4.     Exhibit C is a true and correct copy of the declaration of Sara Latshaw.

5.     Exhibit D is a true and correct copy of the declaration of Caroline Williams.

6.     Exhibit E is a true and correct copy of the Initial Brief of the Attorney General, *Advisory Opinion to the Attorney General Re: Limiting Government Interference with Abortion*, SC2023-1392, Filing # 185188996 (Oct. 31, 2023).

7.     Exhibit F is a true and correct copy of a contract between the Florida Department of Health and Lombard Miles PLLC for legal services, executed October 10, 2024, which is publicly available and was obtained from the  Florida Department of Financial Services via the State's Accountability Contract Tracking System.

8.     Exhibit G is a true and correct copy of a contract between the Florida Department of Health and First & Fourteenth PLLC for legal services, executed October 10, 2024, which is publicly available and was obtained from the  Florida Department of Financial Services via the State's Accountability Contract Tracking

System.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: October 17, 2024

/s/ *Christina Ford*
Christina Ford (FL Bar No. 1011634)
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, D.C., 20001
Telephone: (202) 968-4490
cford@elias.law

# Exhibit A



**Mission:**
To protect, promote & improve the health of all people in Florida through integrated state, county & community efforts.

**Ron DeSantis**
Governor

**Joseph A. Ladapo, MD, PhD**
State Surgeon General

**Vision:** To be the **Healthiest State** in the Nation

October 3, 2024

Alan Chatman & Mike Jones
WCJB-TV
6220 NW 43rd Street
Gainesville FL 32653
alan.chatman@wcjb.com
mike.jones@graymedia.com

Dear Mr. Chatman & Mr. Jones:

The Florida Department of Health has been notified that your company is disseminating a political advertisement claiming that current Florida law does not allow physicians to perform abortions necessary to preserve the lives and health of pregnant women.[1]

This claim is categorically false. Florida's Heartbeat Protection Act does not prohibit abortion if a physician determines the gestational age of the fetus is less than 6 weeks. § 390.0111(1), Fla. Stat. After 6 weeks, an abortion may be performed if "[t]wo physicians certify in writing that, in reasonable medical judgment, the termination of the pregnancy is necessary to save the pregnant woman's life or avert a serious risk of substantial and irreversible physical impairment of a major bodily function of the pregnant woman other than a psychological condition." § 390.0111(1)(a), Fla. Stat. The two-physician requirement is waived in the case of an emergency medical procedure. § 390.0111(1)(b), Fla. Stat. And while physicians must exercise professional skill, care, and diligence to preserve the life and health of a fetus in the third trimester, "if preserving the life and health of the fetus conflicts with preserving the life and health of the pregnant woman, the physician must consider the woman's life and health the overriding and superior concern." § 390.0111(4), Fla. Stat.

The advertisement is not only false; it is dangerous. Women faced with pregnancy complications posing a serious risk of death or substantial and irreversible physical impairment may and should seek medical treatment in Florida. However, if they are led to believe that such treatment is unavailable under Florida law, such women could foreseeably travel out of state to seek emergency medical care, seek emergency medical care from unlicensed providers in Florida, or not seek emergency medical care at all. Such actions would threaten or impair the health and lives of these women.

Under section 386.01, Florida Statutes, "the commission of any act, by an individual, municipality, organization, or corporation . . . by which the health or life of an individual, or the health or lives of individuals, may be threatened or impaired" constitutes a "sanitary nuisance." The Department of Health,

---

[1] The advertisement is displayed on the home page of the Amendment sponsor's website under the title "Caroline." *See* https://floridiansprotectingfreedom.com/. The woman featured in the advertisement states: "The doctors knew if I did not end my pregnancy, I would lose my baby, I would lose my life, and my daughter would lose her mom. Florida has now banned abortion even in cases like mine."



**Florida Department of Health**
**Office of the General Counsel**
4052 Bald Cypress Way, Bin A-02 • Tallahassee, FL 32399-1701
PHONE: 850/245-4444 • FAX: 850/245-4790
FloridaHealth.gov

**Accredited Health Department**
Public Health Accreditation Board

upon determining the existence of such nuisance, must notify the person or persons committing the nuisance "to remove or cause to be removed the same within 24 hours." § 386.03(1), Fla. Stat. If the nuisance is not removed within the time prescribed, the Department is authorized to institute legal proceedings under section 381.0012, Florida Statutes, to obtain an injunction. § 386.03(2)(c), Fla. Stat. The Department is further authorized to "[i]nstitute criminal proceedings in the county court in the jurisdiction of which the condition exists against all persons failing to comply with notices to correct sanitary nuisance conditions." § 386.03(2)(b), Fla. Stat. Creating, keeping, or maintaining a nuisance injurious to health is a second-degree misdemeanor. § 386.051, Fla. Stat.

While your company enjoys the right to broadcast political advertisements under the First Amendment of the United States Constitution and Article I, section 4 of the Florida Constitution, that right does not include free rein to disseminate false advertisements which, if believed, would likely have a detrimental effect on the lives and health of pregnant women in Florida.

/s/ John Wilson
John Wilson
General Counsel
Florida Department of Health

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

FLORIDIANS PROTECTING
FREEDOM, INC.

*Plaintiff,*

v.

Civil Action No. _____

JOSEPH A. LADAPO, in his official
capacity as State Surgeon General and
Head of the Florida Department of
Health, AND JOHN WILSON, in his
individual capacity and in his official
capacity as General Counsel to the
Florida Department of Health,

*Defendants.*

## DECLARATION OF DR. SHELLY TIEN

My name is Shelly Tien. I am over the age of 18 and fully competent to make

this declaration. Under penalty of perjury, pursuant to 28 U.S.C. § 1746, I declare:

1.     I am a board-certified physician in obstetrics and gynecology, and

2

maternal-fetal medicine. I currently practice at Planned Parenthood of South, East and North Florida ("PPSENFL") and Genesis Maternal-Fetal Medicine in Tucson, Arizona. I also serve as a contract physician for Trust Women Wichita, Kansas and provide telehealth for Mitera.

2.      I provide the following opinions as an expert in obstetrics and gynecology and maternal-fetal medicine, including the provision of abortions. The opinions herein are based on my knowledge and experience in these areas, including my training, clinical experience, teaching, ongoing review of the relevant medical literature, and attendance at and participation in relevant conferences.  A copy of my curriculum vitae is attached as **Exhibit A.**

3.      I also base this declaration on my experience with the unworkable exceptions in Florida's extreme abortion ban and my understanding of Caroline's circumstances as set out herein.

4.      I submit this declaration regarding the Department of Health's letter dated October 3, 2024 ("DOH letter") about the television ad "Caroline" which is currently airing in Florida.  The DOH Letter is attached hereto as **Exhibit B.**

5.      It is my understanding that in March of 2022, Caroline was diagnosed with a mass in her brain.  At the time, she was about 17 weeks pregnant with her second child.   When she was about 20 weeks pregnant, she underwent surgery to

3

investigate the mass and was diagnosed with terminal brain cancer.

6.    Under Florida's extreme abortion ban, patients in factual circumstances similar to those set out above who need an abortion must find a doctor who will perform the abortion and two doctors must certify in writing that the termination of pregnancy is "necessary to save the pregnant woman's life or avert a serious risk of substantial and irreversible physical impairment of a major bodily function of the pregnant woman other than a psychological condition." Fla. Stat. s. 390.0111(1).

7.    In the setting of a terminal malignancy, Caroline needed medical interventions in order to treat the brain cancer to prolong her life. Ending the pregnancy allowed her to have the best treatment options to improve the quality of, and hopefully, prolong her life—and the treatment would have likely harmed the fetus— therefore, she needed an abortion to receive the optimal cancer treatment.

8.    Under Florida's current law, I would not have provided this abortion because it could be viewed as a crime to terminate Caroline's pregnancy because the termination itself would not have "save[d] the pregnant woman's life," and there are no exceptions in the law for palliative care, treatments to alleviate cancer-related suffering, or to prolong a patient's life. As the cancer was terminal, the abortion would not have saved the patient's life and therefore could be illegal under Florida law.

9.    As physicians we face these complex clinical scenarios every day and these dangerous bans prevent us from being able to provide the best science-based

4

care for our patients. The exceptions provided under Florida law are not adequate for many, many women who need medically necessary abortions. In my opinion, you cannot legislate medical complexity, and you cannot legislate individualized evidence-based clinical decision making.

10.     The Department of Health's actions in trying to silence patients' and doctors' experiences – and the extreme abortion ban itself – are dangerous for healthcare providers and their patients. The Department has provided only the most minimal of guidance on the exceptions, which guidance is woefully inadequate and medically nonsensical, leaving doctors and healthcare systems to interpret the laws themselves. Doctors are navigating providing medical care in a truly threatening environment where the consequence of inaccurate interpretation of the law means disciplinary and criminal action. This environment effectively prevents physicians from providing the standard of care out of fear of prosecution and egregiously harms our patients.

I, Shelly Tien, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Dated: 15/10/2024 _____

_____
**Shelly Tien**

5

# Exhibit A

**(DECLARATION OF DR. SHELLY TIEN)**

Shelly Hsiao-Ying Tien, M.D./M.P.H.
shtien@gmail.com
312-810-3833

**Genesis Maternal-Fetal Medicine, Tucson, Arizona**
04/2022 – current, physician

**Planned Parenthood – South, East and North Florida**
03/2021 – current, physician

**Trust Women, Oklahoma and Kansas**
02/2021 - current, physician

**Mitera Telehealth, California**
08/2024 – current, physician

**Planned Parenthood – Southeast, Alabama**
12/2021 – 5/2022, physician

**NorthShore University Health System/University of Chicago**
07/2015 – 12/2020, physician

**Fellowship, Maternal-Fetal Medicine**
University of Minnesota, Minneapolis
07/2012 – 06/2015

**Residency, Obstetrics and Gynecology**
Advocate Illinois Masonic Medical Center, Chicago, Illinois
07/2008 – 06/2012

**Medical Education**
Tufts University School of Medicine, Boston, Massachusetts
08/2003 - 05/2008
M.D./M.P.H.

**Education**
Undergraduate - University of Illinois, Champaign/Urbana
Biology
08/1999 - 06/2003
B.S.

**Board certification**
Maternal-Fetal Medicine 2018
Obstetrics and Gynecology 2013

**Memberships**
Society for Maternal-Fetal Medicine
2012 – current
American College of Obstetricians and Gynecologists
2008 – current
Society of Family Planning
2022 – current

**Medical Expert Witness cases**

Gainesville Woman Care, LLC, et al., vs. State of Florida, et al., in the 24 hour Mandated Delay
- January 2022 - Provided deposition as the medical expert witness on behalf of the ACLU.

Planned Parenthood of Southwest and Central Florida, et al., vs. State of Florida, et al., in the 15 week abortion ban
- June 2022 - Provided deposition and trial testimony as the medical expert witness and plaintiff on behalf of the ACLU and PPFA.

**Committees**

**Northshore University Health System Obstetric Practice Committee - Chair,** 2016 – 2020
- Educational committee that creates physician guidelines and nursing protocols for obstetric care for Evanston and Highland Park hospitals.

**Northshore University Health System Epic Physician builder,** 2018 – 2020
- Developed and implemented obstetric clinical workflows for our Epic electronic medical record system.

**Illinois Perinatal Quality Collaborative (ILPQC) - Clinical lead for the Immediate Postpartum Long-Acting Reversible Contraception initiative,** 2018 – 2020
- Implementation of immediate postpartum LARCs for patients at Evanston and Highland Park hospitals.
- Provision of educational support for other birthing hospitals in the state.

**Maternal-Fetal Medicine Clinical Competency Committee,** 2018 - 2020
- Biannual meeting and evaluation of educational progress for maternal-fetal medicine fellows.

**Volunteer Experience**

**Medical Students for Choice (MSFC), Massachusetts,** 09/2003-04/2008
Student coordinator
- Facilitated multiple lectures and workshops on reproductive education and contraception.
- Organized the 2005 regional student conference for MSFC.

**Cross Cultural Solutions, Ghana,** 06/2003-07/2003
Medical Volunteer
- Volunteered through the organization Cross Cultural Solutions.
- Provided immunizations to children, assisted in the local health center pharmacy, and taught women's health education in the maternity ward.

**Provena Mental Health, Illinois,** 04/2001-05/2002
Suicide Hotline Volunteer
- Volunteer counselor on the suicide hotline.
- Provided mental health interventions to clients in crisis, and general health resources and information for family members and support persons.

**Rape Crisis Services, Illinois,** 05/2000-05/2003
Medical Advocate and Hotline Volunteer
- Hotline volunteer providing counseling, support and resources to survivors of sexual violence.
- Medical advocate for patients – provided education and support during the emergency room visits for patients who presented after an assault.

**Publications**

Tien SH, Crabtree JN, Gray HL, Peterson EJ. Immunologic response to vaccine challenge in pregnant PTPN22 R620W carriers and non-carriers. PLoS One. 2017 Jul 19;12(7):e0181338.

Tien S and Yamamura Y. Cervical ectopic pregnancy: persistence despite a serologically negative ß-hCG. J Reprod Med 2015;60(5-6):257-60.

Tien S, Villines D, Parilla B. Gestational Weight Gain in Obese Patients and Adverse Pregnancy Events.  Health 2014;6:1420-1428.

Grimes K, Schulz M, Cohen S, Mullin B, Lehar S, Tien S. Pursuing Cost-Effectiveness in Mental Health Service Delivery for Youth with Complex Needs. J Ment Health Policy Econ 2011;14:73-86.

**Publications, non-peer reviewed**

Rugino A, Tien SH. Strip of the Month: Complete Heart Block Masquerading as a Reactive Nonstress Test. NeoReviews November 2018, Volume 19/Issue 11.

Rodriguez-Kovacs J, Tien SH, Plunkett BA. Selective Serotonin Reuptake Inhibitor Use in Pregnancy: Repercussions on the Oblivious Passenger. NeoReviews March 2018, Volume 19/Issue 3.

Cockrum RH, Tien SH. Strip of the Month: August 2016. NeoReviews August 2016, Volume 17/Issue 8.

Schneider P, Tien SH. Strip of the Month: February 2016. NeoReviews February 2016, Volume 17/Issue 2.


**Presentations**

Tien S, Crabtree J, Gray H, Peterson E. (2015, February). "Immunologic response to vaccine challenge in PTPN22 gene variants in pregnancy." Poster presentation at: the Society for Maternal-Fetal Medicine, San Diego, CA.

Tien S, Aguilera M. (2014, October). "Monochorionic Monoamniotic Twin Gestation: A review of antenatal management at three tertiary care centers." Poster presentation at: Central Association of Obstetricians and Gynecologists, Albuquerque, NM.

Tien S, Gray H, Jacobs K, Giacobbe L, Wagner W, Aguilera M. (2013, October). "A review of ten years' experience with placenta accreta at a single tertiary care center." Poster presentation at: Central Association of Obstetricians and Gynecologists, Napa Valley, CA.

Tien S, Gray H, Jacobs K, Giacobbe L, Swartout J, Aguilera M. (2013, October). "Spinal anesthesia converted to general anesthesia for cesarean hysterectomy is associated with improved neonatal Apgar scores versus general anesthesia alone." Poster presentation at: Central Association of Obstetricians and Gynecologists, Napa Valley, CA.

Tien S, Casserly K, Rauk P. (2013, April). "A right atrial thrombus in the setting of puerperal coagulopathy." Poster presentation at: Society for Obstetric Anesthesia and Perinatology, San Juan, Puerto Rico.

Tien S, Gray H, Jacobs K, Giacobbe L, Swartout J, Aguilera M. (2013, April). "Maternal obesity associated with clinically increased blood loss and postoperative hospital stay in patients undergoing peripartum hysterectomy." Poster presentation at: Society for Obstetric Anesthesia and Perinatology, San Juan, Puerto Rico.

Tien S, August C, Fernandez C, Dini M. (2012, October). "Metastatic colon cancer presenting as an adnexal mass." Poster presentation at: the Advocate Research Forum, Advocate Illinois Masonic Medical Center, Chicago, IL.

Tien S, Villines D, Parilla B. (2012, October). "Gestational Weight Gain in Obese Patients and Adverse Pregnancy Events." Oral presentation at: Central Association of Obstetricians and Gynecologists, Chicago, IL.

Tien S, Popper F. (2009, October). "A Retrospective Review of Misoprostol Efficacy for the Treatment of Early Pregnancy Failure." Poster presentation at: Central Association of Obstetricians and Gynecologists, Maui, HI.

Grimes K, Mullin B, Lehar S, Schulz M, Creeden M, Tien S. (2008, February). "Strength in Numbers: Using Concurrent Measurement to Guide Quality." Poster presentation at: Research and Training Center for Children's Mental Health, Tampa, FL.

# Exhibit B

**(DECLARATION OF DR. SHELLY TIEN)**



**Mission:**
To protect, promote & improve the health
of all people in Florida through integrated
state, county & community efforts.

**Ron DeSantis**
Governor

**Joseph A. Ladapo, MD, PhD**
State Surgeon General

**Vision:** To be the **Healthiest State** in the Nation

October 3, 2024

Alan Chatman & Mike Jones
WCJB-TV
6220 NW 43rd Street
Gainesville FL 32653
alan.chatman@wcjb.com
mike.jones@graymedia.com

Dear Mr. Chatman & Mr. Jones:

The Florida Department of Health has been notified that your company is disseminating a political advertisement claiming that current Florida law does not allow physicians to perform abortions necessary to preserve the lives and health of pregnant women.[1]

This claim is categorically false. Florida's Heartbeat Protection Act does not prohibit abortion if a physician determines the gestational age of the fetus is less than 6 weeks. § 390.0111(1), Fla. Stat. After 6 weeks, an abortion may be performed if "[t]wo physicians certify in writing that, in reasonable medical judgment, the termination of the pregnancy is necessary to save the pregnant woman's life or avert a serious risk of substantial and irreversible physical impairment of a major bodily function of the pregnant woman other than a psychological condition." § 390.0111(1)(a), Fla. Stat. The two-physician requirement is waived in the case of an emergency medical procedure. § 390.0111(1)(b), Fla. Stat. And while physicians must exercise professional skill, care, and diligence to preserve the life and health of a fetus in the third trimester, "if preserving the life and health of the fetus conflicts with preserving the life and health of the pregnant woman, the physician must consider preserving the woman's life and health the overriding and superior concern." § 390.0111(4), Fla. Stat.

The advertisement is not only false; it is dangerous. Women faced with pregnancy complications posing a serious risk of death or substantial and irreversible physical impairment may and should seek medical treatment in Florida. However, if they are led to believe that such treatment is unavailable under Florida law, such women could foreseeably travel out of state to seek emergency medical care, seek emergency medical care from unlicensed providers in Florida, or not seek emergency medical care at all. Such actions would threaten or impair the health and lives of these women.

Under section 386.01, Florida Statutes, "the commission of any act, by an individual, municipality, organization, or corporation . . . by which the health or life of an individual, or the health or lives of individuals, may be threatened or impaired" constitutes a "sanitary nuisance." The Department of Health,

---

[1] The advertisement is displayed on the home page of the Amendment sponsor's website under the title "Caroline." *See* https://floridiansprotectingfreedom.com/. The woman featured in the advertisement states: "The doctors knew if I did not end my pregnancy, I would lose my baby, I would lose my life, and my daughter would lose her mom. Florida has now banned abortion even in cases like mine."

**Florida Department of Health**
**Office of the General Counsel**
4052 Bald Cypress Way, Bin A-02 • Tallahassee, FL 32399-1701
PHONE: 850/245-4444 • FAX: 850/245-4790
FloridaHealth.gov



**Accredited Health Department**
Public Health Accreditation Board

upon determining the existence of such nuisance, must notify the person or persons committing the nuisance "to remove or cause to be removed the same within 24 hours." § 386.03(1), Fla. Stat. If the nuisance is not removed within the time prescribed, the Department is authorized to institute legal proceedings under section 381.0012, Florida Statutes, to obtain an injunction. § 386.03(2)(c), Fla. Stat. The Department is further authorized to "[i]nstitute criminal proceedings in the county court in the jurisdiction of which the condition exists against all persons failing to comply with notices to correct sanitary nuisance conditions." § 386.03(2)(b), Fla. Stat. Creating, keeping, or maintaining a nuisance injurious to health is a second-degree misdemeanor. § 386.051, Fla. Stat.

While your company enjoys the right to broadcast political advertisements under the First Amendment of the United States Constitution and Article I, section 4 of the Florida Constitution, that right does not include free rein to disseminate false advertisements which, if believed, would likely have a detrimental effect on the lives and health of pregnant women in Florida.

/s/ John Wilson
John Wilson
General Counsel
Florida Department of Health

# Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

FLORIDIANS PROTECTING      :
FREEDOM, INC.,      :
     :
     *Plaintiff*,      :
     :
v.      :    Case No.
     :
JOSEPH A. LADAPO, in his      :
official capacity as State Surgeon      :
General, *et al.*,      :
     :
     *Defendants*.      :

## <u>DECLARATION OF SARA LATSHAW</u>

My name is Sara Latshaw. I am over the age of 18 and fully competent to make this declaration. Under penalty of perjury, pursuant to 28 U.S.C. § 1746, I declare:

1.  I am the Chair of Floridians Protecting Freedom, Inc. ("FPF"), the plaintiff in this action.

2.  I have been the Chair of FPF since September 2023.

3.  FPF is a Florida nonprofit corporation, organized and operating under 501(c)(4) of the Internal Revenue Code, and a Florida political committee.

4.     FPF is the sponsor of the citizen initiative entitled "Amendment to Limit Government Interference with Abortion" ("Amendment 4").

5.     If adopted by voters, Amendment 4 would amend the Florida Constitution to provide: "Except as provided in Article X, Section 22, no law shall prohibit, penalize, delay, or restrict abortion before viability or when necessary to protect the patient's health, as determined by the patient's healthcare provider."

6.     To be eligible for placement on the general election ballot, a citizen initiative petition must be "signed by a number of electors in each of one half of the congressional districts of the state, and of the state as a whole, equal to eight percent of the votes cast in each of such districts respectively and in the state as a whole in the last preceding election in which presidential electors were chosen." Article XI, § 3, Fla. Const. Therefore, for FPF's purposes, the Amendment 4 petition needed to be signed by: (i) the number of voters equal to at least eight percent of the votes cast in at least half of Florida's 28 congressional districts, and (ii) at least 891,523 voters statewide. After months of circulating petitions, FPF submitted well over one million petition signatures and the state verified 997,035 petition signatures as valid. *See Amendment to Limit Government Interference with Abortion 23-07*, Fla. Div. of Elections, https://dos.elections.myflorida.com/initiatives/initdetail.asp?account=83927&seqn um=1.

7.     FPF spent approximately $20 million to collect these petitions and pay for the state to verify the petition signatures, as required by Florida law. On January 25, 2024, the Secretary of State confirmed that FPF secured more than the required number of certified petition signatures for placement on the 2024 General Election ballot. Cord Byrd, Fla. Dep't of State, Div. of Elections (Jan. 25, 2024), https://floridiansprotectingfreedom.com/wp-content/uploads/2024/01/DOC012524-01252024163359.pdf.

8.     On October 9, 2023, Attorney General Ashley Moody petitioned the Florida Supreme Court for an opinion regarding the validity of Amendment 4, chiefly arguing that Amendment 4 did not comply with Florida law's single-subject requirements or ballot title and language obligations.

9.     On April 1, 2024, the Florida Supreme Court approved Amendment 4 for placement on the ballot. *See Advisory Op. to Att'y Gen. Re: Limiting Gov't Interference with Abortion*, 384 So. 3d 122, 127, 136 (Fla. 2024).

10.     Since the Supreme Court approved Amendment 4 for placement on the ballot, the State of Florida has engaged in a long and multifaceted attack on FPF and Amendment 4 to undermine Amendment 4 with the public. The State is using government resources to push its version of the "truth" about Florida's anti-abortion laws and to assert that anyone expressing a different view is "lying." Below, I recount some examples that are most directly relevant to the State of Florida's

3

current efforts to interfere with FPF's advocacy for Amendment 4 and silence FFP's efforts to communicate with voters about Amendment 4.

11.    As publicly reported, law enforcement officers are targeting and intimidating voters in their own homes—knocking on their doors and asking whether they signed a petition supporting Amendment 4. One voter from Lee County recounted such an interaction with law enforcement had left him "shaken," while another voter from the same county recalled feeling "intimidated by having a law enforcement officer come to her door." Notably, not even the Lee County Sheriff was notified of the "state agency's independent investigation." Romy Ellenbogen, Justin Garcia & Lawrence Mower, *DeSantis' election police questioned people who signed abortion petitions*, TAMPA BAY TIMES (Sept. 6, 2024), https://www.tampabay.com/news/florida-politics/elections/2024/09/06/florida-abortion-amendment-petition-signature-fraud-voters/.

12.    According to Florida law, a citizen initiative's ballot title and summary must be accompanied by a financial impact statement ("FIS"). *See* Fla. Stat. § 100.371(13). On June 10, 2024, in a lawsuit filed by FPF challenging the adopted FIS, the Leon County circuit court granted FPF's motion for summary judgment: finding the FIS violated Article XI, Section 5 of the Florida Constitution and section 100.371 of the Florida Statutes and ordered adoption of a valid FIS. The new FIS was drafted not by "professional staff of the House of Representatives" and "a person

from the Executive Office of the Governor" ("EOG"), as Florida law requires, but rather by an employee of the Heritage Foundation and a person who had left his EOG job to head a cabinet agency, and was published over the objection of the state's top economist, the one dissenting member of the newly reconstituted Financial Impact Estimating Conference ("FIEC").  This new FIS reversed the FIEC's previous findings on financial impact and ignored the court's directive to not speculate on litigation by including rank speculation about not only potential litigation challenging certain laws under the amendment, but also the potential outcome of such litigation. Because of the extraordinarily tight timelines for obtaining court review, no further litigation on the new and equally unlawful FIS was feasible. Moreover, the State's position is that an FIS is completely immune from any court review at all, no matter how admittedly unlawful it is.

13.    On October 11, 2024, the Department of State, Office of Election Crimes & Security ("OECS") released an interim report "to update the Governor and the Florida Legislature on investigations concerning initiative petition fraud." *Office of Election Crimes & Security Interim Report*, FLORIDA DEPT. OF STATE (Oct. 11, 2024) files.floridados.gov/media/708442/oecs-interim-report-10-11-2024.pdf.  The interim report addresses purported fraud by individual petition circulators, and seems to intimate wrongdoing by FPF, using a capacious understanding of the term "fraud." For example, OECS asserted a petition form was "obtained by fraud" if the

5

circulator told signatories that the petition would "keep the State of Florida from taking away women's rights." *Id.* at 5.

14.   The State, through the Agency for Health Care Administration ("AHCA"), created a website, opposing Amendment 4.

15.   This government website states that proponents of Amendment 4 are misleading Floridians. It states: "DON'T LET THE FEARMONGERS <u>LIE TO YOU</u>", asserts that "Current Florida Law **Protects Women**," whereas supposedly "Amendment 4 **Threatens Women's Safety**," and purports to set out a series of characterizations of the status quo in Florida as the "truth" in contrast to the summary of the Amendment 4, which it casts as a lie.

16.   It is my understanding that AHCA has spent millions of dollars running television and radio advertisements promoting this website and the State of Florida's official narratives regarding its existing abortion laws and Amendment 4. For example, one "public service announcement" asserts that viewers have "probably heard a lot of misinformation about our abortion laws," that these are "lies that could convince women to not seek necessary care and put themselves at risk and that's unacceptable," and that "abortions are always available at any time to protect the life and health of mothers." *Unacceptable*, FLA. AGENCY FOR HEALTH CARE ADMIN., https://host2.adimpact.com/admo/viewer/cea0900b-2cb8-43de-a96a-5a6d4be48fec. This government advertisement also threatens that any doctor with a different

6

understanding of Florida law than the State "is committing malpractice and could lose their medical license."

17. In order for Florida voters to make an informed decision by Election Day, it is imperative that FPF be able to speak—both by advocating for Amendment 4 and advocating against arguments and representations made by Amendment 4's opposition. It is all the more important that FPF run advertisements expressing its views about Amendment 4 in the face of the substantial public relations campaign against Amendment 4 that the State is waging, because communications from the government can carry particular weight as they bear the imprimatur of being official statements.

18. As part of FPF's efforts, it is critical that FPF share the experiences and stories of individuals directly affected by Florida's extreme abortion ban. Sharing these experiences directly educates voters about why the State's characterizations of current law are not accurate in FPF's view. However, as explained below, in response to FPF highlighting one such individual's story, the State began threatening stations with criminal prosecution for airing an FPF television advertisement.

19. On October 1, 2024, FPF began running a political advertisement titled, "Caroline." This advertisement is a first-hand account of Caroline Williams, a woman who was diagnosed with stage four terminal brain cancer when she was 20 weeks pregnant. In the advertisement, Caroline explains, "The doctors knew if I did

7

not end my pregnancy, I would lose my baby, I would lose my life, and my daughter would lose her mom. Florida has now banned abortion even in cases like mine." *Yes on 4 Campaign Launches TV Ad Featuring "Caroline"*, YES ON 4 (Oct. 1, 2024), https://floridiansprotectingfreedom.com/caroline/.[1]

20.     Before running this advertisement, FPF spoke with Ms. Williams to understand what had happened to her and confirm her experience. Because the advertisement is Ms. Williams's firsthand account, and she personally delivered her account in the advertisement, FPF's and my understanding is that every part of Ms. Williams's recounting of what happened to her is true.

21.     The purpose of the advertisement was to reflect FPF's views and urge voters to support Amendment 4 by demonstrating—through a tragic, real-world example—that Florida's current anti-abortion laws infringe on the liberty of women and their right to make medical decisions about their own bodies and health.

22.     On October 3, 2024, the Florida Department of Health (the "Department") sent a letter to media outlets across the state airing *Caroline*. FPF was initially provided with a copy of the letter by WCJB-TV in Gainesville. In this

---

[1] In full, the voiceover of the advertisement states: "*When I saw the tumor on the MRI, My first thought was… am I gonna be able to see my daughter again?  The doctors knew that if I did not end my pregnancy, I would lose my baby, I would lose my life, And my daughter would lose her mom.  Florida has now banned abortion… even in cases like mine.  Amendment Four is gonna protect women like me. We have to vote Yes.*" The advertisement concludes with an image of the language of Amendment 4 and indicates that it is a paid political advertisement.

letter, the Department claims that the *Caroline* "advertisement is not only false; it is dangerous."

23.    The Department letter goes on to assert that *Caroline* is a "sanitary nuisance"—citing section 386.01, Florida Statutes—and demands that the stations remove or cause the advertisement to be removed within 24 hours or face legal proceedings, including criminal proceedings.

24.    On October 4, 2024, counsel for FPF sent a response letter to WCJB-TV, and other stations, making clear that the Department letter raised serious First Amendment concerns and confirming that *Caroline* is true.

25.    On October 8, 2024, FPF learned that another station, WINK TV in Fort Myers, which received a similar demand letter from the Department, decided to remove the advertisement from their airwaves and refused to discuss the matter for several days. FPF is currently in discussions with WINK TV on the specifics of when and how Caroline will resume airing. Regardless of how these discussions resolve, FPF has lost critical time communicating with voters in the Fort Myers area.

26.    FPH has devoted substantial time, money, and resources—which it would have otherwise devoted to its efforts to advocate for Amendment 4—to addressing this issue, including contacting various stations to attempt to determine whether they had received the letter and whether they were taking action based on

it, conferring with legal counsel, and attempting to dissuade stations from acceding to the Department's demands.

27.    FPF fears that the Department will continue its efforts to deter television stations from running FPF advertisements. FPF will continue to put forth advertisements that educate voters about the lack of meaningful exceptions to Florida's extreme abortion ban.

28.    For instance, *Deborah and Lee* is an FPF advertisement that began airing on October 3, 2024, and addresses a couple who learned that their child would not survive childbirth but who were forced to endure a painful pregnancy due to Florida's extreme abortion ban. *See The Yes on 4 Campaign Releases New Campaign Video Featuring a Florida Couple Not Granted Exception for Fetal Abnormality*, YES ON 4 (Oct. 3, 2024), https://floridiansprotectingfreedom.com/deborah-and-lee/.

29.    FPF also intends to begin running an advertisement on digital platforms, *Anya*, that will feature a Florida woman who was miscarrying but denied access to abortion care because she was not sufficiently on the brink of death to qualify for an abortion. When she left the hospital after being denied medical care, she was forced to carry a non-viable pregnancy until she began losing significant amounts of blood in a public restroom. Only then, when Anya was rushed to the hospital in an ambulance, bleeding out, was she finally provided abortion care. This

advertisement will, like *Caroline*, tell a Florida woman's story and the dangerous and near-fatal consequences of Florida's extreme abortion ban.

30.    The ability to educate voters on FPF's views on the current state of the law is essential to FPF's mission. These advertisements reflect FPF's view—rooted in undeniable reality and women's own words about their own experiences—that the exceptions to the current law, a near-total ban on abortion, are not meaningfully accessible to many patients. However, FPF fears that the Department's threats will deter television stations and digital platforms from running these advertisements.

31.    I have read the Department's letter to television stations about *Caroline*. The letter states that "creating" a "nuisance injurious to health" is a second-degree misdemeanor, and suggests that *Caroline* is such a "sanitary nuisance." I understand this to mean that the Department of Health—which has enforcement authority to regulate sanitary nuisances—is officially asserting that FPF is responsible for creating a sanitary nuisance and therefore, it is asserting FPF has committed a crime. FPF fears that it will face prosecution by the Department, or other State agents, if it continues to educate voters about Amendment 4 and Florida's current law.

32.    FPF also fears that stations will refuse to air *Caroline* or FPF's other advertisements in light of the State's threat to prosecute stations for airing FPF's speech.

33.     As of this filing, FPF is not aware of any efforts by the Florida Department of Health, or any other state actor, to retract the letter about *Caroline* or assure broadcasters that they will not, in fact, face criminal penalties for airing FPF's advertisements.

I, Sara Latshaw, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Dated:  10/15/2024                                    _____
**Sara Latshaw**

# Exhibit D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

---

FLORIDIANS PROTECTING
FREEDOM, INC.

          *Plaintiff,*

    v.

JOSEPH A. LADAPO, in his official
capacity as State Surgeon General and
Head of the Florida Department of
Health, AND JOHN WILSON, in his
individual capacity and in his official
capacity as General Counsel to the
Florida Department of Health,

          *Defendants.*

Civil Action No. _____

---

## DECLARATION OF CAROLINE WILLIAMS

My name is Caroline Williams. I am over the age of 18 and fully competent to make this declaration. Under penalty of perjury, pursuant to 28 U.S.C. § 1746, I declare:

1.     I am the woman featured in an advertisement by Floridians Protecting Freedom. In the advertisement, I state the following: "When I saw the tumor on my MRI, my first thought was 'Am I going to going to be able to see my daughter again? The doctors knew if I did not end my pregnancy, I would lose my baby, I would lose my life, and my daughter would lose her mom. Florida has now banned abortion even in cases like mine. Amendment 4 is going to protect women like me. We have to vote yes.'"

2.     Every statement I made in this advertisement is true. In 2022, when I was about 17 weeks pregnant with my second child, I was diagnosed with a hemorrhagic mass on my brain. When I was about 20 weeks pregnant, I was diagnosed with grade four terminal brain cancer.

3.     I understood that while my diagnosis was terminal, there were available life-extending treatment options. However, my doctors told me that they could not treat me with chemotherapy or radiation while I was pregnant. They also told me that increased hormones from my pregnancy were supercharging my tumor, and that waiting until 36 weeks to begin treatment would be too late.

4.     So, instead, in order to have more time with my family, I had an abortion in Florida in April 2022.

2

5.      I needed the cancer treatment I received, but because my diagnosis is terminal, any cancer treatment could not be considered life-saving, and I did not face an immediate and emergent threat to my life in April 2022.

6.      It is my understanding that current Florida law would only allow for abortions after six weeks' gestation when the abortion is necessary to save a pregnant woman's life or avoid a serious risk of substantial and irreversible physical impairment of a major bodily function other than a psychological condition. Based on this understanding, I would not have been able to obtain an abortion under this law because my diagnosis was terminal – the abortion did not save my life, it only extended it.

7.      I also understand that if passed, Amendment 4 would protect women in circumstances like those I faced. I strongly believe that we have to vote yes on Amendment 4.

I, Caroline Williams, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.


Dated: __15/10/2024____                    _Caroline Williams (Oct 15, 2024 09:57 EDT)_

**Caroline Williams**

3

# Exhibit E

SC2023-1392

# In the Supreme Court of Florida

ADVISORY OPINION TO THE ATTORNEY GENERAL RE:
LIMITING GOVERNMENT INTERFERENCE WITH ABORTION

ON PETITION FOR AN ADVISORY OPINION
TO THE ATTORNEY GENERAL

## ATTORNEY GENERAL'S INITIAL BRIEF

ASHLEY MOODY
 Attorney General

HENRY C. WHITAKER (FBN 1031175)
 Solicitor General
JEFFREY PAUL DeSOUSA (FBN 110951)
DANIEL W. BELL (FBN 1008587)
 Chief Deputy Solicitors General
NATHAN A. FORRESTER (FBN 1045107)
 Senior Deputy Solicitor General

JOHN M. GUARD (FBN 374600)
 Chief Deputy Attorney General
JAMES H. PERCIVAL (FBN 1016188)
 Chief of Staff

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300

henry.whitaker@myfloridalegal.com
jenna.hodges@myfloridalegal.com

*Counsel for the Attorney General*

October 31, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................iii

STATEMENT OF THE CASE ........................................................ 1

SUMMARY OF ARGUMENT ......................................................... 1

LEGAL STANDARD ...................................................................... 8

ARGUMENT ...................................................................................11

I.    The ballot summary vastly understates the potentially
      sweeping scope of the amendment, by failing to explain
      what "viability," "health," or "healthcare provider" means,
      and by not disclosing that a "healthcare provider" might
      have power to determine when a baby is viable.....................14

      A.    The ballot summary does not explain whether
            "viability" refers to a baby healthy enough to come
            to term or to a baby able to survive outside the
            womb. .........................................................................16

      B.    The ballot summary does not explain whether the
            "patient's health" encompasses only physical health
            or mental health as well. ..............................................24

      C.    The ballot summary suggests that only physicians
            will qualify as "healthcare providers." ..........................27

      D.    The ballot summary does not explain that a
            "healthcare provider" might be able to decide both
            whether an abortion is "necessary to protect the
            patient's health" and whether a baby has reached
            "viability. ....................................................................28

II.   The ballot summary also overstates the scope of the
      amendment, by guaranteeing that "[n]o law" will restrict
      abortion in the circumstances stated, without mentioning
      the preemptive effect of federal law.....................................33

i

A.     The ballot summary does not explain that partial-birth abortions will continue to be illegal before viability........................................................................34

B.     The ballot summary does not explain that partial-birth abortions will continue to be illegal after viability if they are unnecessary to protect the life of the mother.................................................................37

CONCLUSION ....................................................................39

CERTIFICATE OF COMPLIANCE ...................................................40

CERTIFICATE OF SERVICE ........................................................41

# TABLE OF AUTHORITIES

## Cases

*Adv. Op. to Att'y Gen. re Adult Use of Marijuana*, 315
   So. 3d 1176 (Fla. 2021) ...............................................35, 36, 37

*Adv. Op. to Att'y Gen. re Fish & Wildlife Conserv.
   Comm'n*, 705 So. 2d 1351 (Fla. 1998) ......................................33

*Adv. Op. to Att'y Gen. re Referenda Required for
   Adoption & Amendment of Local Gov't
   Comprehensive Land Use Plans*, 902 So. 2d 763
   (Fla. 2005) ..............................................................................12

*Adv. Op. to Att'y Gen. re Right to Competitive Energy
   Mkt. for Customers of Inv'r-Owned Utils.*, 287 So.
   3d 1256 (Fla. 2020)...................................................................31

*Adv. Op. to Att'y Gen. re Tax Limitation*, 644 So. 2d
   486 (Fla. 1994) ...................................................................12, 33

*Adv. Op. to Att'y Gen. re Use of Marijuana for
   Debilitating Med. Conditions*, 181 So. 3d 471 (Fla.
   2015)........................................................................................36

*Adv. Op. to Att'y Gen. re: All Voters in Primary
   Elections for State Legislature, Governor, and
   Cabinet*, 291 So. 3d 901 (Fla. 2020) ........................................10

*Adv. Op. to Att'y Gen. re: Regulate Marijuana in a
   Manner Similar to Alcohol to Establish Age,
   Licensing, and Other Restrictions*, 320 So. 3d 657
   (Fla. 2021) ......................................................................passim

*Adv. Op. to Att'y Gen. re: Stop Early Release of
   Prisoners*, 642 So. 2d 724 (Fla. 1994) ................................29, 33

*Adv. Op. to Att'y Gen.—Fee on Everglades Sugar
   Production*, 681 So. 2d 1124 (Fla. 1996) ............................12, 14

*Advisory Opinion to the Attorney General re People's
   Property Rights Amendments*, 699 So. 2d 1304
   (Fla. 1997) .........................................................21, 22, 26, 33

*Armstrong v. Harris*, 773 So.2d 7 (Fla. 2000) .............. 12, 13, 16, 23

iii

*Askew v. Firestone*, 421 So. 2d 151 (Fla. 1982)................. 13, 22, 23

*Detzner v. League of Women Voters*, 256 So. 3d 803
(Fla. 2018) ............................................................... 11, 12, 14

*Dobbs v. Jackson Women's Health Organization*, 142
S. Ct. 2228 (2022)....................................................... 2

*Doe v. Bolton*, 410 U.S. 179 (1973) ................................ 24

*Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021) .......................... 28

*Fla. Educ. Ass'n v. Fla. Dep't of State*, 48 So. 3d 694
(Fla. 2010) .............................................................. 10

*In re Adv. Op. to Att'y Gen. re Additional Homestead
Tax Exemption*, 880 So. 2d 646 (Fla. 2004) ................... 11, 12, 33

*In re Adv. Op. to Att'y Gen. re Use of Marijuana for
Certain Medical Conditions*, 132 So. 3d 786 (Fla.
2014)................................................................. 10, 33, 36, 37

*In re T.W.*, 551 So. 2d 1186 (Fla. 1989)................................... 3, 15

*Kasischke v. State*, 991 So. 2d 803 (Fla. 2008) ........................... 28

*N. Fla. Women's Health & Counseling Servs., Inc. v.
State*, 866 So. 2d 612 (2003) ................................................ 4, 15

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S.
833 (1992) ....................................................................... passim

*Planned Parenthood of Sw. & Cent. Fla. v. State*, No.
SC2022-1050 (Fla.)............................................................ 2, 3

*Roe v. Wade*, 410 U.S. 113 (1973) ........................................ passim

*Smathers v. Smith*, 338 So. 2d 825 (Fla. 1976)............................ 13

*United States v. Aquart*, 912 F.3d 1, 60 (2d Cir.
2018).................................................................................. 35

*United States v. Comstock*, 560 U.S. 126 (2010) ............................ 35

## Statutes

§ 101.161, Fla. Stat. ............................................................ passim

§ 146C.1(4)(d), Iowa Code................................................... 26

§ 16.061, Fla. Stat. ............................................................... 8

§ 16-34-2-1(a)(A)(ii), Ind. Code........................................26

§ 26-23H-3(6), Ala. Code ................................................26

§ 390.0111, Fla. Stat. ...........................................24, 26

18 U.S.C. § 1531.........................................7, 34, 38

Ch. 2022-69, Laws of Fla. (Apr. 14, 2022) ..................... 2

Heartbeat Protection Act, ch. 2023-21, Laws of Fla.
    (Apr. 13, 2023)........................................................ 2

## Constitutional Provisions

Art. I, § 23, Fla. Const..........................................3, 15

Art. II, § 8, Fla. Const................................................22

Art. VI, ¶ 2, U.S. Const. .......................................7, 35

Art. XI, § 3, Fla. Const. ...............................8, 11, 21, 33

Art. XI, § 5, Fla. Const. .......................................11, 12

## Filings

Brief for Petitioner, *Planned Parenthood of Sw. &
    Cent. Fla. v. State*, No. SC2022-1050 (filed in this
    Court Feb. 27, 2023)................................................ 2

Brief for Respondent, *Planned Parenthood of Sw. &
    Cent. Fla. v. State*, No. SC2022-1050 (filed in this
    Court Mar. 29, 2023) ............................................. 3

## Other Sources

Am. Coll. of Obstetricians & Gynecologists, *Abortion
    Is Essential Health Care*, https://www.acog.org/
    advocacy/abortion-is-essential..................................17

Am. Coll. of Obstetricians & Gynecologists, *Facts
    Are Important: Understanding and Navigating
    Viability*, https://tinyurl.com/2ks3yxcj.............................17, 18

Antonin Scalia & Bryan Garner, *Reading Law: The
    Interpretation of Legal Texts* (2012) ..........................29

Cynthia Dailard, *Abortion Restrictions and the Derive for Mental Health Parity: A Conflict in Values?*, Guttmacher Report on Public Policy (June 1999), https://tinyurl.com/vxd7vjtt ...................................................25

E. Gkiougki et al., *Periviable Birth: A Review of Ethical Considerations*, 25 Hippokratia 1 (2021), https://www.ncbi.nlm.nih.gov/pmc/articles/ PMC8877922/ ........................................................................19

Elizabeth Chloe Romanis, *Is 'viability' viable? Abortion, conceptual confusion and the law in England and Wales and the United States*, 7 J. L. & Biosciences (Oct. 2020), https://doi.org/10. 1093/jlb/lsaa059 ...................................................................18

Gallup, *Where Do Americans Stand on Abortion?* (July 7, 2023), https://tinyurl.com/t9ejcyc2 ...........................20

Jill Kalman & Stacey E. Rosen, *Abortion Rights Get to the Heart of the Doctor-Patient Relationship*, MedPage Today (June 28, 2022), https://tinyurl.com/mvrp3epw...............................................27

Maria Serenella Pignotti, *The Definition of Human Viability: A Historical Perspective*, Acta Pædiatrica (Oct. 2009), https://tinyurl.com/5cj2tua3 ...............................18

Pew Research Ctr., *Americans' Views on Whether, and in What Circumstances, Abortion Should Be Legal* (May 6, 2022), https://tinyurl.com/ mr39v6p2 .............................................................................20

## STATEMENT OF THE CASE

The text of the Amendment to Limit Government Interference with Abortion, Serial No. 23-07, states as follows:

> **Limiting government interference with abortion.**—Except as provided in Article X, Section 22, no law shall prohibit, penalize, delay, or restrict abortion before viability or when necessary to protect the patient's health, as determined by the patient's healthcare provider.

App. 5. It would be an entirely new section in Article I of the Florida Constitution.

The accompanying ballot summary, 49 words in length, would state as follows:

> No law shall prohibit, penalize, delay, or restrict abortion before viability or when necessary to protect the patient's health, as determined by the patient's healthcare provider. This amendment does not change the Legislature's constitutional authority to require notification to a parent or guardian before a minor has an abortion.

App. 5.

## SUMMARY OF ARGUMENT

In *Dobbs v. Jackson Women's Health Organization*, the U.S. Supreme Court overruled its "egregiously wrong" decisions in *Roe v. Wade*, 410 U.S. 113 (1973), and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), and returned the "profound moral issue" regarding the legality of abortion to the

1

place where it belongs: "the people's elected representatives." 142
S. Ct. 2228, 2240, 2243 (2022). Florida's legislature has taken up
the mantle and enacted the Heartbeat Protection Act, which, with
certain exceptions, would prohibit physicians from performing abor-
tions on babies more than six weeks past gestation. § 4, ch. 2023-
21, Laws of Fla. (Apr. 13, 2023). Pending the outcome of *Planned
Parenthood of Southwest & Central Florida v. State*, No. SC2022-
1050 (Fla.), in which this Court has already received briefing and
heard oral argument, this law would amend another one passed a
year earlier that drew the line at fifteen weeks. § 4, ch. 2022-69,
Laws of Fla. (Apr. 14, 2022).

Abortion proponents have waged a war on two fronts to pre-
vent either law from taking effect. First, they have urged this Court
not to follow the U.S. Supreme Court's lead in *Dobbs* and instead to
retain precedents that have interpreted the Florida Constitution in
ways as egregiously wrong as were *Roe* and *Casey. See* Brief for
Petitioner at 40, *Planned Parenthood of Sw. & Cent. Fla. v. State*, No.
SC2022-1050 (filed in this Court Feb. 27, 2023). Second, they have
proposed an amendment to the Florida Constitution using a mis-
leading ballot summary to trick voters into freezing in place a legal

2

framework that conceals the amendment's potentially sweeping legal effects, thereby mooting the outcome of the *Planned Parenthood* appeal to this Court. *See* App. 5.

This effort to hoodwink the Florida electorate should be rebuffed, lest Florida proceed down the same path it did after the 1980 amendment adding Article I, Section 23 to the Florida Constitution. The ballot summary there stated only that the amendment would create a "right of privacy" in the Constitution, with scant indication to voters that they might be approving a right to abortion, and repeated assurances from proponents of the 1980 amendment that it would protect informational privacy only. Within a decade, proponents of the 1980 amendment who had disclaimed that the amendment affected decisional autonomy at all—never mind abortion—were advocating that it protected all manner of personal decisions, including abortion. *See* Brief for Respondent at 16–22 & n.27, *Planned Parenthood of Sw. & Cent. Fla. v. State*, No. SC2022-1050 (filed in this Court Mar. 29, 2023). This Court then ruled that the 1980 amendment did protect abortion, to an even greater extent than did the U.S. Supreme Court's rulings in *Roe* and *Casey. See In re T.W.*, 551 So. 2d 1186, 1191–92, 1195 (Fla. 1989);

3

*N. Fla. Women's Health & Counseling Servs., Inc. v. State*, 866 So. 2d 612, 620–22, 634–36 (2003).

The ballot summary here is part of a similar overall design to lay ticking time bombs that will enable abortion proponents later to argue that the amendment has a much broader meaning than voters would ever have thought. It hides behind an uninformative parroting of the text of the amendment to veil from voters its potentially expansive scope. The ballot summary thus contravenes one of the important prerequisites for an amendment initiative to go on the ballot: that the ballot summary explain to voters "the chief purpose of the measure" in "clear and unambiguous language." § 101.161(1), Fla. Stat.

The ballot summary fails this requirement in multiple ways. First, it conveys that the amendment would continue to allow the Legislature to restrict abortion after "viability." The problem is that some voters will read "viability" as *Roe* and *Casey* used the term— as referring to a baby "potentially able to live outside the mother's womb," *Roe*, 410 U.S. at 160. Others will understand "viability" in the more traditional clinical sense—as referring to a pregnancy that, but for an abortion or other misfortune, will result in the child's live

4

birth. This ambiguity is no small interpretive quibble; "viability" in the *Roe*/*Casey* sense occurs much later than in the traditional clinical sense. And polling shows that the stage of pregnancy at which abortion becomes illegal is crucial to whether voters approve of particular restrictions on abortion.

Second, the ballot summary does not explain whether the "patient's health" (a precondition under the amendment for post-viability abortions) encompasses only physical health or also mental health. With some support in the U.S. Supreme Court's now-discarded 1973–2022 abortion jurisprudence, abortion advocates have long advocated that "health" in this context encompasses both physical and mental health. The latter concept of health, while by no means trivial, is also susceptible to expansive interpretation and could be used to justify a much larger number of abortions. Here again, voters deserve to be made aware of the possibility that the health exception could be made essentially to swallow the rule.

The failure to define "viability" and "health" is exacerbated by a third feature of the ballot summary—failure to make clear that the "healthcare provider" may well have license to determine not only whether an abortion is "necessary to protect the patient's health"

but also whether the baby has reached "viability." This is because of a comma in the ballot summary before the phrase "as determined by the patient's healthcare provider." Under some interpretive canons employed by lawyers and judges, that placement could cause the phrase to modify both "before viability" and "when necessary to protect the patient's health." But voters are unlikely to be aware of the potentially enormous syntactic significance of this comma and thus to be aware that healthcare providers could have unreviewable discretion to determine in every case what "viability" means and whether an otherwise healthy baby lives or dies.

Finally, the ballot summary does not define the term "healthcare provider" itself. Voters may assume it means a physician, as preserving the doctor-patient relationship is part of the common rhetoric used to justify the legality of abortion. But the term could apply to nearly any staff involved in some way in caring for the patient at a medical facility or abortion clinic. A wide range of personnel, perhaps not even medical professionals, could effectively be determining the scope of amendment's application.

These shortfalls cause the ballot summary to fail in its essential function of explaining "the chief purpose of the measure" in

6

"clear and unambiguous language." § 101.161(1), Fla. Stat. But the ballot summary also fails this function in the opposite way, by over-selling the right it would provide in two critical respects. First, it states that "[n]o law shall prohibit, penalize, delay, or restrict abortion before viability" (arguably "as determined by the patient's healthcare provider"). App. 5. In other words, the summary promises the voter that pre-viability abortion will be free of legal consequence. That is simply untrue. Abortion would remain subject to federal law, which preempts any conflicting state law. Art. VI, ¶ 2, U.S. Const. Congress would remain free regardless of the amendment to restrict or even ban abortion. Indeed, partial-birth abortions currently violate federal law at any stage of the pregnancy, pre- or post-viability. 18 U.S.C. § 1531.

The ballot summary also states that "[n]o law shall prohibit, penalize, delay, or restrict abortion . . . when necessary to protect the patient's health, as determined by the patient's healthcare provider." App. 5. This explanation runs into conflict with the same statute as above. The federal partial-birth abortion statute has an exception, but only for when the partial-birth abortion is "necessary to save the life of a mother." 18 U.S.C. § 1531(a). Thus, a pre-

7

viability partial-birth abortion performed to protect health but not life would remain illegal even after the amendment. It is therefore highly misleading to tell voters that "[n]o law," full stop, "shall prohibit, penalize, delay, or restrict abortion before viability," when in fact federal law still could, and indeed currently does, restrict abortion before viability.

For all these reasons, the initiative fails to explain "the chief purpose of the measure" in "clear and ambiguous language," § 101.161(1), Fla. Stat., and does not belong on the ballot.

## LEGAL STANDARD

Section 16.061, Florida Statutes, provides that "[t]he Attorney General shall, within 30 days after receipt of a proposed revision or amendment to the State Constitution by initiative petition from the Secretary of State, petition the Supreme Court, requesting an advisory opinion regarding" three possible issues: (1) "the compliance of the text of the proposed amendment or revision with s. 3, Art. XI of the State Constitution" (i.e., the requirement that the amendment "embrace but one subject and matter directly connected therewith"); (2) "whether the proposed amendment is facially invalid under the

United States Constitution"; and (3) "the compliance of the proposed ballot title and substance with s. 101.161."

The Attorney General is chiefly concerned here with the third of these requirements: compliance with § 101.161. That statute codifies the standard for reviewing ballot titles and summaries of proposed constitutional amendments. Any measure submitted to the vote of the people must include a ballot title "not exceeding 15 words in length, by which the measure is commonly referred to or spoken of," § 101.161(1)(d), Fla. Stat., and a ballot summary, "not exceeding 75 words in length," explaining "the chief purpose of the measure" in "clear and unambiguous language," *id.* § 101.161(1).

This Court thus "consider[s] two questions" in assessing compliance with § 101.161(1): "(1) whether the ballot title and summary, in clear and unambiguous language, fairly inform the voters of the chief purpose of the amendment; and (2) whether the language of the ballot title and summary, as written, will be affirmatively misleading to voters." *Adv. Op. to Att'y Gen. re: Regulate Marijuana in a Manner Similar to Alcohol to Establish Age, Licensing, and Other Restrictions*, 320 So. 3d 657, 668 (Fla. 2021) ("*Regulate Marijuana Similar to Alcohol*") (quoting *In re Adv. Op. to Att'y Gen. re Use*

9

*of Marijuana for Certain Medical Conditions*, 132 So. 3d 786, 797 (Fla. 2014) ("*Medical Marijuana I*")); *see also Fla. Educ. Ass'n v. Fla. Dep't of State*, 48 So. 3d 694, 701 (Fla. 2010).

The Court has said that this review should be "deferential," and that it will invalidate an initiative "only if it is shown to be 'clearly and conclusively defective.'" *Regulate Marijuana Similar to Alcohol*, 320 So. 3d at 667. But the question should simply be whether the summary violates either of these statutory requirements, not whether it does so "clearly." Far from undermining Floridians' right to "formulate 'their own organic law,'" *Adv. Op. to Att'y Gen. re: All Voters in Primary Elections for State Legislature, Governor, and Cabinet*, 291 So. 3d 901, 905 (Fla. 2020), careful judicial analysis of a ballot summary reinforces democracy by ensuring that the people are fully informed before changing Florida's governing charter. *See Medical Marijuana I*, 132 So. 3d at 819–20 (Canady, J., dissenting) (noting that the people's "right to vote on constitutional amendments" is "subverted when the voters are presented a misleading ballot summary"). It anchors the initiative process more securely in the true will of the people.

The Court need not revisit its standard of review here, however, because the Amendment to Limit Government Interference with Abortion initiative is clearly and conclusively defective and would fail even under that more deferential standard.

## ARGUMENT

The Florida Constitution "reserve[s] to the people" the enormously consequential power to amend the State's governing charter through the citizen-initiative process. Art. XI, § 3, Fla. Const. Because "voters deciding whether to approve a proposed amendment to our constitution never see the actual text of the proposed amendment" and "vote based *only* on the ballot title and the summary," "an accurate, objective, and neutral summary of the proposed amendment is the *sine qua non* of the citizen-driven process of amending our constitution." *In re Adv. Op. to Att'y Gen. re Additional Homestead Tax Exemption*, 880 So. 2d 646, 653–54 (Fla. 2004) ("*Homestead Tax Exemption*"). This Court has thus characterized the statute regulating the form of the ballot title and summary, § 101.161(1), as a "codification of the accuracy requirement implicit in article XI, section 5 of the Florida Constitution." *Detzner v. League of Women Voters*, 256 So. 3d 803, 807 (Fla. 2018) (quoting

11

*Adv. Op. to Att'y Gen. re Referenda Required for Adoption & Amendment of Local Gov't Comprehensive Land Use Plans*, 902 So. 2d 763, 770 (Fla. 2005)). "The accuracy requirement in article XI, section 5, functions as a kind of 'truth in packaging law' for the ballot." *Armstrong v. Harris*, 773 So.2d 7, 13 (Fla. 2000). Absent that informational safeguard, the Constitution becomes "not a safe harbor for protecting all the residents of Florida, but the den of special interest groups seeking to impose their own narrow agendas." *Homestead Tax Exemption*, 880 So. 2d at 654.

The ballot title and summary must also be complete; they must "provide fair notice of the content of the proposed amendment so that the voter will not be misled as to its purpose, and can cast an intelligent and informed ballot." *Adv. Op. to Att'y Gen.—Fee on Everglades Sugar Production*, 681 So. 2d 1124, 1127 (Fla. 1996). An "accurate *and* informative" title and summary are necessary to "make certain that the 'electorate is advised of the true meaning, *and ramifications*, of an amendment.'" *Detzner*, 256 So. 3d at 808 (quoting *Adv. Op. to Att'y Gen. re Tax Limitation*, 644 So. 2d 486, 490 (Fla. 1994)) (emphasis added). "A ballot title and summary cannot either 'fly under false colors' or 'hide the ball' as to the

12

amendment's true effect. *Armstrong*, 773 So. 2d at 16 (quoting *Askew v. Firestone*, 421 So. 2d 151, 156 (Fla. 1982)). Absent complete and accurate information about the amendment's purpose and effect, "voter approval would be a nullity." *Id.* at 12.

The ballot summary for the "Amendment to Limit Government Interference with Abortion" fails these requirements several times over. It consists of two sentences and 49 words, not even availing itself of the full 75 allotted by § 101.161(1). Instead of explaining the effect of the amendment in any useful manner, the first sentence merely restates the primary clause of the amendment, without the slightest elucidation as to what that clause would mean. As will be explained next, the unenlightening first sentence both understates and overstates the potential legal effects of the amendment. "[L]awmakers who are asked to consider constitutional changes, and the people who are asked to approve them, must be able to comprehend the sweep of each proposal from a fair notification in the proposition itself that it is *neither less nor more extensive than it appears to be.*" *Askew*, 421 So. 2d at 155 (quoting *Smathers v. Smith*, 338 So. 2d 825, 829 (Fla. 1976)) (emphasis added). The ballot summary fails in both respects; it hence falls far short of

13

enabling voters to "cast an intelligent and informed ballot." *Everglades Sugar Production*, 681 So. 2d at 1127.

## I. The ballot summary vastly understates the potentially sweeping scope of the amendment, by failing to explain what "viability," "health," or "healthcare provider" means, and by not disclosing that a "healthcare provider" might have power to determine when a baby is viable.

"A ballot title and summary need not explain every detail or ramification of the proposed amendment, . . . [b]ut they nevertheless must be accurate." *Regulate Marijuana Similar to Alcohol*, 320 So. 3d at 668 (quotations omitted). In particular, "[a] proposed amendment must be removed from the ballot when the summary does not accurately describe the scope of the text of the amendment." *Id.* (quoting *Detzner*, 256 So. 3d at 808). The ballot summary here does nothing to warn voters of the amendment's potentially sweeping scope. This is for several reasons. First, the undefined term "viability" has two dominant understandings, one of which would permit abortions much later in the pregnancy than the other. Abortion advocates, fueled by the U.S. Supreme Court's now-defunct rulings in *Roe* and *Casey*, have consistently urged the later meaning. In addition, the undefined term "health" could mean physical only or mental as well; abortion advocates again have

14

pushed for the latter. And under an arcane canon of statutory interpretation, the ballot summary suggests that "healthcare providers"—a term itself not defined or limited to medical professionals—could have unilateral authority to determine whether a baby is "viable" and whether an abortion is necessary to protect the mother's "health."

While the Attorney General does not concede that these aggressive interpretations would be correct, abortion proponents are certain to argue that they are, and they have been successful in an orchestrated long-term program of packing broad misinterpretations into similarly open-ended legal concepts—ranging from the "penumbras of the Bill of Rights," *Roe*, 410 U.S. at 152, to "a realm of personal liberty" in the Due Process Clause, *Casey*, 505 U.S. at 847, to the "right of privacy" in Article I, Section 23 of the Florida Constitution, *T.W.*, 551 So. 2d at 1190–92; *N. Fla. Women's Health*, 866 So. 2d at 634–36. The potential misinterpretations of the amendment would allow a healthcare provider to render nearly any abortion restriction a practical nullity. Yet they are nowhere addressed in the ballot summary. Voters have a right to be aware of

15

the potential for this kind of mischief, should they approve the amendment.

It does not matter that the ballot summary essentially replicates the text of the amendment. When the meaning of a term is unclear, this Court has ruled that the ballot summary must explain it, even if the term is lifted straight from the text of the amendment. *See, e.g.*, *Armstrong*, 773 So. 2d at 15. The drafters of a ballot summary cannot hide behind opaque legalese that conveniently copies opaque legalese from the amendment and then claim to have explained to voters "the chief purpose of the measure" in "clear and unambiguous language." § 101.161(1), Fla. Stat. If the meaning of amendment text is not discernible as a matter of common understanding, the ballot summary must supply the deficiency. The ballot summary is all the voter has, upon entering the polling booth, to understand what a "yes" or "no" vote will mean.

**A.    The ballot summary does not explain whether "viability" refers to a baby healthy enough to come to term or to a baby able to survive outside the womb.**

Even abortion advocates acknowledge that the term "viability" has multiple meanings. The American College of Obstetricians and Gynecologists—which baldly states that abortion "is essential for

people's health, safety, and well-being," Am. Coll. of Obstetricians & Gynecologists, *Abortion Is Essential Health Care*, https://www.acog. org/advocacy/abortion-is-essential (last visited Oct. 31, 2023)— admits that "[t]he concept of viability of a fetus is frequently misrep-resented or misinterpreted based on ideological principles." Am. Coll. of Obstetricians & Gynecologists, *Facts Are Important: Under-standing and Navigating Viability*, https://tinyurl.com/2ks3yxcj (last visited Oct. 31, 2023). "While there is no single formally recog-nized clinical definition of 'viability,'" they say, "the term is often used in medical practice in two distinct circumstances." *Id.* "In the first, 'viability' addresses whether a pregnancy is expected to con-tinue developing normally." This means that, "[i]n early pregnancy, a normally developing pregnancy would be deemed viable, whereas early pregnancy loss or miscarriage would not." *Id.* In the second common medical usage, "'viability' addresses whether a fetus might survive outside of the uterus." *Id.* "Later in pregnancy, a clinician may use the term 'viable'" in this second sense "to indicate the

17

chance for survival that a fetus has if delivered before it can fully develop in the uterus." *Id.*[1]

In *Roe* and *Casey*, the U.S. Supreme Court chose the latter of these two clinical understandings to define the scope of the abortion right. *See Casey*, 505 U.S. at 870 (defining "viability" as "the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb, so that the independent existence of the second life can in reason and all fairness be the object of state protection that now overrides the rights of the woman" (citing *Roe*, 410 U.S. at 163)).[2] But many voters—uninitiated into the U.S. Supreme

---

[1] *See also* Elizabeth Chloe Romanis, *Is 'viability' viable? Abortion, conceptual confusion and the law in England and Wales and the United States*, 7 J. L. & Biosciences, at 8–10 (Oct. 2020), https://doi.org/10.1093/jlb/lsaa059 (describing the "multitude of approaches" among states to defining viability); Maria Serenella Pignotti, *The Definition of Human Viability: A Historical Perspective*, Acta Pædiatrica, at 3 (Oct. 2009), https://tinyurl.com/5cj2tua3 ("There is a great deal of misunderstanding about the concept of viability in the lay public and also amongst politicians. . . . We could probably state that the definition is inherently impossible because it is too variable from one individual to another and from one community to another[.]").

[2] In *T.W.*, this Court defined viability even more generously to the abortion right, as "that point in time when the fetus becomes capable of *meaningful life* outside the womb through *standard medical measures*. 551 So. 2d at 1194 (emphasis added); *see id.* at 1198 (Ehrlich, J., concurring) ("The *Roe* definition allows the use of any

Court's orphic abortion jurisprudence circa 1973–2022—will understand "viability" in the ballot summary to have the first meaning. This dichotomy in understanding could play a significant role in whether voters approve the amendment. Under the first definition, a baby could be viable at a very early stage of pregnancy, if there are no indications that the baby will be miscarried or stillborn. Under the second definition, a baby might not achieve viability until roughly 26 weeks past gestation. *See* E. Gkiougki et al., *Periviable Birth: A Review of Ethical Considerations*, 25 Hippokratia 1, 1 (2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8877922/ ("Most neonates born at or above 26 weeks of gestation have, with active intervention, a high likelihood of survival, while below 22 weeks are virtually nonviable."). And some voters may understand babies in the so-called "periviable" stage (between 22 and 26 weeks)

---

medical technology that could allow the fetus to develop to live a meaningful life outside the mother's womb. Once we accept that the point of 'viability' is that point at which some type of medical technology may be used, I frankly do not understand how or why we would differentiate between different medical measures, whether currently considered 'standard' or 'extraordinary,' as long as they enable the fetus to survive outside the womb and develop to live a *meaningful life*.").

to be "viable" because they do have a chance of survival outside the womb.

Polling indicates that the stage of pregnancy at which abortion becomes illegal matters greatly to voters. "A majority of U.S. adults say how long a woman has been pregnant should be a factor in determining whether abortion should be legal." Pew Research Ctr., *Americans' Views on Whether, and in What Circumstances, Abortion Should Be Legal* (May 6, 2022), https://tinyurl.com/mr39v6p2 (last visited Oct. 31, 2023). A recent Gallup poll found that "about two-thirds of Americans say it should be legal in the first trimester (69%), while support drops to 37% for the second trimester and 22% for the third." Gallup, *Where Do Americans Stand on Abortion?* (July 7, 2023), https://tinyurl.com/t9ejcyc2 (last visited Oct. 31, 2023). "Majorities oppose abortion being legal in the second (55%) and third (70%) trimesters." *Id.*

In short, the ballot summary's regurgitation of the primary clause of the amendment does nothing to explain to the voter what "viability" means. It does not warn the voter that the amendment might be considerably more protective of late-term abortions than would at first appear.

The same problem caused this Court to strike one of the ballot summaries in its *Advisory Opinion to the Attorney General re People's Property Rights Amendments*, 699 So. 2d 1304 (Fla. 1997) ("*Property Rights*"). The proposal there would have changed the initiative process for constitutional amendments in Article XI, Section 3, allowing proposed amendments to cover multiple subjects if the amendments would "require full compensation be paid to the *owner* when government restricts use (except *common law nuisances*) of private real property causing a loss in the fair market value, which *in fairness* should be borne by the public." 699 So. 2d at 1307 (emphasis added). The ballot summary copied this language nearly verbatim, explaining that the proposal would allow amendments to cover multiple subjects if the amendments would "require full compensation be paid to the *owner* when government restricts use (excepting *common law nuisances*) of private real property causing a loss in fair market value, which *in fairness* should be borne by the public." *Id.* (emphasis added).

This Court said that that ballot summary did not satisfy § 101.161(1), because it did not define "owner," "common law nuisance," or "in fairness." 699 So. 2d at 1308–09. It did not matter

21

that those terms also appeared in the text of the amendment itself. Among other things, this Court said it was "unclear if 'owner' is restricted to people who own the property or also to corporate entities." *Id.*. In other words, it was possible the amendment would have much broader application than some voters might have assumed. The same is true to an even greater extent of the word "viability" in the ballot summary here.

To similar effect is this Court's ruling in *Askew*. In *Askew*, the proposed amendment would have amended Article II, Section 8(e), as follows:

> (e) No member of the legislature or statewide elected officer shall personally represent another person or entity for compensation before <u>any state</u> ~~the~~ government body or agency<u>, unless such person files full and public disclosure of his or her financial interests pursuant to subsection (a),</u> ~~of which the individual was an officer or member~~ for a period of two years following vacation of office.

421 So. 2d at 153. The ballot summary restated the new text in the amendment almost word for word:

> Prohibits former legislators and statewide elected officers from representing other persons or entities for compensation before any state government body for a period of 2 years following vacation of office, *unless they file full and public disclosure of their financial interests*.

*Id.* (emphasis added). This Court nevertheless enjoined placement of the amendment on the ballot. "The problem," this Court said, "lies not with what the summary says, but, rather, with what it does not say." *Id.* at 156. The summary failed to disclose an existing, "complete two-year ban on lobbying before one's agency," irrespective of whether the former officer had disclosed their financial interests. *Id.* at 155. In other words, as this Court would later explain, "[a]lthough the ballot summary [in *Askew*] faithfully tracked the text of the proposed amendment, the summary failed to explain that the amendment would supersede an already existing constitutional provision that imposed an absolute two-year ban on lobbying by former legislators (i.e., regardless of financial disclosure)." *Armstrong*, 773 So. 2d at 15.

The voter could have sought out the underlying text of the amendment in *Askew* prior to the election and thereby ascertained that it was actually liberalizing the lobbying restriction. That did not cure the infirmity in the ballot summary. Again, all the voter sees upon entering the election booth is the ballot summary. Here, even a diligent voter who does search out the amendment text before voting will remain uncertain what "viability" means. The ballot

23

summary in this case thus presents an even stronger basis for invalidation.

### B. The ballot summary does not explain whether the "patient's health" encompasses only physical health or mental health as well.

The ballot summary provides no explanation of when an abortion could be considered "necessary to protect the patient's health." Florida's current abortion statute has a carefully circumscribed health exception, allowing abortions after 15 weeks (6 weeks if the recent amendment becomes effective) to "avert a serious risk of [imminent] substantial and irreversible physical impairment of a major bodily function of the pregnant woman *other than a psychological condition.*" § 390.0111(1)(a), (b), Fla. Stat. (emphasis added). Abortion advocates have long contended, however, that "health" in this context should be read to encompass both physical and mental health. There is some support for this more aggressive interpretation in *Doe v. Bolton*, 410 U.S. 179, 192 (1973), the less-heralded companion case to *Roe*, which interpreted the word "health" as encompassing "all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient." Emotional or psychological health, while by no means trivial,

are capacious concepts and could be used to justify a much larger number of abortions than might appear on the face of the ballot summary.

For example, a 1999 article published by the Guttmacher Institute, a prominent advocate of abortion, urged that "[p]rochoice and mental health advocates should join together to educate policymakers about the importance of maintaining parity in the abortion context"—i.e., ensuring that health exceptions to abortion restrictions covered mental as well as physical health. Cynthia Dailard, *Abortion Restrictions and the Derive for Mental Health Parity: A Conflict in Values?,* Guttmacher Report on Public Policy at 14 (June 1999), https://tinyurl.com/vxd7vjtt. The article dismissed concerns expressed by some that "the health exception can be defined 'as just about anything,' including a psychological crisis caused when a teenager realizes that she 'won't fit into a prom dress' or 'hates being "fat."'" *Id.* at 5 (quoting advertisement of National Conference of Catholic Bishops). "The mental health exception is also critical," this article said, "because it has been the aegis under which most abortions in cases of severe fetal abnormality have been justified." *Id.*

25

Some states have express exceptions to their abortion restrictions for mental health or fetal abnormality. *See, e.g.*, § 26-23H-3(6), Ala. Code ("mental health"); § 16-34-2-1(a)(A)(ii), Ind. Code ("lethal fetal anomaly"); § 146C.1(4)(d), Iowa Code ("fetal abnormality"). Florida's current abortion statute allows abortions for "fatal fetal abnormality," § 390.0111(1)(c), Fla. Stat., but it does so in a provision separate from the health-of-the-mother exception, which as noted does not cover a "psychological condition," *id.* §§ 390.0111(1)(a), (b). Voters thus might assume that the ballot summary's failure to mention either mental health or fetal defects means the proposed amendment does not protect abortion in these circumstances. But abortion advocates can be expected to urge the broader meaning, arguing that "health" includes mental health, as determined by the healthcare provider, and that fetal defects pose a threat to the mother's mental health. Not defining "health" in the ballot summary means that "the voter is not informed as to what restrictions" might or might not apply "under the terms of the amendment." *Property Rights*, 699 So. 2d at 1309.

26

**C.    The ballot summary suggests that only physicians will qualify as "healthcare providers."**

Another term the ballot summary does not explain is "healthcare provider" itself. Voters may assume it means a physician, as preserving the doctor-patient relationship is part of the common rhetoric used to justify the legality of abortion. *See, e.g.,* Jill Kalman & Stacey E. Rosen, *Abortion Rights Get to the Heart of the Doctor-Patient Relationship*, MedPage Today (June 28, 2022), https://tinyurl.com/mvrp3epw. But the term could apply to nearly any staff involved in some way in caring for the patient at a medical facility or abortion clinic. It leaves unclear whether the term would apply to physicians only, or physicians' assistants as well, or to nurses, or even to regular employees of a corporate "healthcare provider." The ballot summary thus does not inform voters about what kind of informed, professional judgment—if indeed it is professional at all—would be brought to bear in determining whether a baby is viable or whether continuing the pregnancy poses a threat to the mother's health.

27

**D.   The ballot summary does not explain that a "health-care provider" might be able to decide both whether an abortion is "necessary to protect the patient's health" and whether a baby has reached "viability.**

Finally, the placement of the last comma in the first sentence of the ballot summary amplifies the misleading effect of failing to define "viability," "health," or "healthcare provider." The first sentence states: "No law shall prohibit, penalize, delay, or restrict abortion before viability or when necessary to protect the patient's health, as determined by the patient's healthcare provider." App. 5. That comma raises the prospect that the phrase "as determined by the patient's healthcare provider" will modify both "before viability" and "when necessary to protect the patient's health." Under one interpretive canon, "a qualifying phrase separated from antecedents by a comma is evidence that the qualifier is supposed to apply to all the antecedents instead of only to the immediately preceding one." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1170 (2021) (collecting treatises); *accord Kasischke v. State*, 991 So. 2d 803, 812–13 (Fla. 2008). In other words, the comma could "cancel the last-antecedent canon," under which the adjectival phrase following a list ordinarily modifies only the last item in the list. Antonin Scalia & Bryan Gar-

ner, *Reading Law: The Interpretation of Legal Texts* § 23, at 161 (2012). Consequently, the "healthcare provider" might have license under the amendment to determine not only whether an abortion is "necessary to protect the patient's health" but also whether the baby has reached "viability." This latter potential consequence, while hugely significant, is largely hidden. It might license abortion providers effectively to determine the scope of the abortion right.

Voters cannot be expected to have immersed themselves in scholarly treatises on grammar and syntax or be familiar with the episodes in this Nation's legal history in which a comma, or want thereof, has carried with it such immense interpretive import. *See, e.g.*, *id.* at 162–64 & nn. 6–11; *O'Connor v. Oakhurst Dairy*, 851 F.3d 69, 70 (1st Cir. 2017). They will not suss out that the comma here might sneak into the amendment "legal loopholes so large" that healthcare providers "can, if they so choose, render" the remaining limitations in the amendment "illusory." *Adv. Op. to Att'y Gen. re: Stop Early Release of Prisoners*, 642 So. 2d 724, 727 (Fla. 1994). This obscurity will leave voters—to whom, again, polling shows the scope of the abortion right matters greatly—in the dark as to how much power the "healthcare provider" truly bears. The

29

ballot summary could have dispelled this misconception, at the expense of eight additional words, by explaining the circumstances in which abortion would be illegal in separate sentences: "No law shall prohibit, penalize, delay, or restrict abortion before viability. No law shall prohibit, penalize, delay, or restrict abortion ~~or~~ when necessary to protect the patient's health, as determined by the patient's healthcare provider." Or it could have confirmed the breadth of the exceptions with seven additional words: "No law shall prohibit, penalize, delay, or restrict abortion before viability, as determined by the patient's healthcare provider, or when necessary to protect the patient's health, as determined by the patient's healthcare provider." Either way, voters would know how much power healthcare providers would have under the amendment. But the ballot summary does neither, and so it hides this potentially far-reaching consequence of the amendment.

The ballot summary this Court struck down in its *Regulate Marijuana Similar to Alcohol* advisory opinion raised a similar concern. There, the ballot summary characterized the amendment as "regulat[ing] marijuana . . . for *limited* use and growing by persons twenty-one years of age or older." 320 So. 3d at 667 (emphasis

added). This Court found the use of the word "limited" to be mis-leading. "The ballot summary plainly [told] voters that the proposed amendment 'limit[s]' the personal use—i.e., consumption—of recreational marijuana by age-eligible persons. But the proposed amendment itself [did] not do so." *Id.* at 668. Rather, it established a "quantity *floor* below which an age-eligible person [could ]not be prosecuted," and "authoriz[ed] the state and local governments to permit unlimited personal use of recreational marijuana." *Id.* The only sense in which the amendment might have imposed any limits was in allowing *private businesses* "to limit or prohibit the use of marijuana on their property." *Id.* The amendment thus "falsely t[old] voters that the proposed amendment limit[ed] the use of recreational marijuana," when in fact it "'d[id] no such thing.'" *Id.* (quoting *Adv. Op. to Att'y Gen. re Right to Competitive Energy Mkt. for Customers of Inv'r-Owned Utils.*, 287 So. 3d 1256, 1260–61 (Fla. 2020)).

The ballot summary here similarly presents the amendment as allowing restrictions on abortion after "viability" and thus as having limits. Even voters who understand "viability" in the more abortion-friendly *Roe*/*Casey* sense will assume the term imposes some limit on the scope of the abortion right. The ballot title—"Amendment to

31

*Limit* Government Interference with Abortion," App. 5 (emphasis added)—reinforces that inference. But in fact, the comma in the first sentence may effectively delegate to private parties— "healthcare providers"—the authority to determine "viability," just as the "limits" promised in the *Regulate Marijuana Similar to Alcohol* amendment were up to private businesses to determine on a case-by-case basis. The idea that the amendment "limit[s] government interference with abortion" could thus prove largely illusory.

The comma, in short, portends a potentially dramatic shift in lawmaking power from the legislature and the judiciary to private parties. Ordinarily, the legislature would have some authority to flesh out a term like "viability," through subsequent enactments that impose particular abortion restrictions. The judiciary would likewise have authority to interpret and apply the term to the restrictions that the legislature enacts. The ballot summary conceals the possibility that this may not be the case, and that "healthcare

providers" may have the power to override future abortion re-
strictions in every case with their own assessments of "viability."[3]

## II. The ballot summary also overstates the scope of the amendment, by guaranteeing that "[n]o law" will restrict abortion in the circumstances stated, without mentioning the preemptive effect of federal law.

The ballot summary here is affirmatively misleading in the op-
posite direction as well: It "will not deliver to the voters of Florida
what it says it will." *Stop Early Release*, 642 So. 2d at 727.[4] It
promises both that "[n]o law shall prohibit, penalize, delay, or re-
strict abortion *before viability* . . . , as determined by the patient's
healthcare provider," and that "[n]o law shall prohibit, penalize,
delay, or restrict abortion . . . *when necessary to protect the pa-*

_____

[3] This unusual shift in regulatory power from the legislature
and the judiciary to third parties also raises the concern that the
proposal "*substantially alters* or *performs the functions of* multiple
branches," in violation of the single-subject requirement in Article
XI, Section 3. *Homestead Tax Exemption*, 880 So. 2d at 650 (quoting
*Adv. Op. to Att'y Gen. re Fish & Wildlife Conserv. Comm'n*, 705 So.
2d 1351, 1353–54 (Fla. 1998)); *see also Property Rights*, 699 So. 2d
at 1308.

[4] *See also Tax Limitation*, 644 So. 2d at 494 (summary falsely
implying that there is "presently no cap or limitation on taxes in the
constitution" is invalid); *Medical Marijuana I*, 132 So. 3d at 820
(Canady, J., dissenting) (ballot summary is fatally defective if voters
"are potentially hoodwinked into believing that the amendment is
consistent with . . . federal law").

*tient's health*, as determined by the patient's healthcare provider."
App. 5. Neither is true. Federal law, mentioned nowhere in the ballot summary, would limit both types of abortions in circumstances the ballot summary does not disclose. The Court should strike the proposal from the ballot for this reason as well.

### A. The ballot summary does not explain that partial-birth abortions will continue to be illegal before viability.

The first sentence of the ballot summary states: "No law shall prohibit, penalize, delay, or restrict abortion before viability . . . , as determined by the patient's healthcare provider." App. 5. This is not an accurate description of the effect of the amendment. Under federal law, partial-birth abortions will remain unlawful at any stage of the pregnancy, pre- or post-viability, unless necessary to save the life of the mother. 18 U.S.C. § 1531.[5] Within our federal system, a

---

[5] Subsection (a) of the federal statute provides in relevant part: "Any physician who, in or affecting interstate or foreign commerce, knowingly performs a partial-birth abortion and thereby kills a human fetus shall be fined under this title or imprisoned not more than 2 years, or both. This subsection does not apply to a partial-birth abortion that is necessary to save the life of a mother whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself." 18 U.S.C. § 1531(a)

state has no power to authorize its residents to participate in conduct that would constitute a federal crime. *See* art. VI, ¶ 2, U.S. Const.; *cf. United States v. Aquart*, 912 F.3d 1, 60 (2d Cir. 2018) ("[T]he authority to prescribe punishments for federal crimes is not a 'power[] that the Constitution reserved to the States.'" (quoting *United States v. Comstock*, 560 U.S. 126, 144 (2010)). A state may of course eliminate or reduce *state-law* penalties for conduct that is simultaneously regulated by state and federal law; but because federal-law penalties will remain even then, the conduct is unlawful. It is thus misleading to tell voters that "[n]o law," full stop, "shall prohibit, penalize, delay, or restrict abortion before viability."

The amendment suffers from the same defect as the ballot summary for the recent Adult Use of Marijuana initiative, which this Court ordered stricken from the ballot two years ago, *Adv. Op. to Att'y Gen. re Adult Use of Marijuana*, 315 So. 3d 1176, 1180–81 (Fla. 2021) ("*Adult Use*"). There, the summary told voters the amendment would "[p]ermit[] adults 21 years or older to possess, use, purchase, display, and transport up to 2.5 ounces of marijuana and marijuana accessories for personal use for any reason." *Id.* at 1179. "The summary's unqualified use of the word '[p]ermits'

35

strongly suggest[ed] that the conduct to be authorized by the amendment w[ould] be free of any criminal or civil penalty in Florida," when in fact a marijuana user would "remain exposed to potential prosecution under federal law—no small matter." *Id.* at 1180–81.

Likewise here, the unqualified phrase "[n]o law" strongly suggests that restrictions on pre-viability abortions will be free of penalty, civil or criminal. Unlike the ballot summaries this Court approved in its two opinions involving medical marijuana amendments, the ballot summary in this case makes no attempt to warn voters that the amendment will "not authorize violations of federal law," *Medical Marijuana I*, 132 So. 3d at 808, or that it does not "give immunity under federal law," *Adv. Op. to Att'y Gen. re Use of Marijuana for Debilitating Med. Conditions*, 181 So. 3d 471, 475 (Fla. 2015) ("*Medical Marijuana II*"). A ballot summary may not "mislead voters regarding the interplay between the proposed amendment and federal law." *Medical Marijuana I*, 132 So. 3d at

808.[6] In particular, "[a] constitutional amendment cannot unequivocally 'permit' or authorize conduct that is criminalized under federal law," and any ballot summary "suggesting otherwise is affirmatively misleading." *Adult Use*, 315 So. 3d at 1181.

In short, a ballot summary cannot say that "no law shall prohibit, penalize, delay, or restrict abortion before viability," when in fact "some law" will. For this reason, the ballot summary in this case is both inaccurate and incomplete.

### B. The ballot summary does not explain that partial-birth abortions will continue to be illegal after viability if they are unnecessary to protect the life of the mother.

The other half of the first sentence of the ballot summary promises in the alternative that "[n]o law shall prohibit, penalize, delay, or restrict abortion . . . when necessary to protect the patient's health, as determined by the patient's healthcare provider."

---

[6] *See also id.* at 819 (Polston, C.J., dissenting) ("[W]hile ballot summaries are not required to mention the current state of federal law or a proposed state constitutional amendment's effect on federal law, they are required to not affirmatively mislead Florida voters by falsely implying the opposite of what that current state of federal law is."); *id.* at 820 (Canady, J., dissenting) (explaining that an initiative should be kept off the ballot where "the ballot summary seriously misrepresents the interaction of the proposed amendment with federal law").

App. 5. This health exception runs into conflict with the same federal statute as above. The federal partial-birth abortion statute allows partial-birth abortions only when "necessary to save the life of a mother." 18 U.S.C. § 1531(a). Thus, a post-viability partial-birth abortion performed to protect health but not life would remain illegal even after the amendment. Here again the ballot summary misleads as to the amendment's true effect.

**CONCLUSION**

The Limiting Government Interference with Abortion initiative should be stricken from the ballot.

Respectfully submitted,

Ashley Moody
  Attorney General

HENRY C. WHITAKER (FBN1031175)
  Solicitor General
JEFFREY PAUL DESOUSA (FBN110951)
DANIEL W. BELL (FBN1008587)
  Chief Deputy Solicitors General

  */s/ Nathan A. Forrester*
NATHAN A. FORRESTER (FBN1045107)
  Senior Deputy Solicitor General

JOHN M. GUARD (FBN374600)
  Chief Deputy Attorney General
JAMES H. PERCIVAL (FBN1016188)
  Chief of Staff

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300

henry.whitaker@myfloridalegal.com
October 31, 2023          jenna.hodges@myfloridalegal.com

*Counsel for the Attorney General*

39

## CERTIFICATE OF COMPLIANCE

I certify that this brief was prepared in 14-point Bookman Old Style font, in compliance with Florida Rule of Appellate Procedure 9.210(a)(2), and contains 7,598 words.

*/s/ Nathan A. Forrester*
Nathan A. Forrester
*Senior Deputy Solicitor General*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been furnished via the e-filing portal or by e-mail this 31st day of October, 2023, to the following:

Courtney R. Brewer
*Counsel for Proponent, Floridians Protecting Freedom, Inc.*
P.O. Box  3441
Tallahassee, FL 32315-3441
cbrewer.law@gmail.com

Hélène Barthélemy
*Counsel for Proponent, Floridians Protecting Freedom, Inc.*
ACLU Found. of Fla.
4343 W. Flagler St., Suite 400
Miami, FL 33134
hbarthelemy@aclufl.org

Daniel B. Tilley
*Counsel for Proponent, Floridians Protecting Freedom, Inc.*
ACLU Found. of Fla.
4343 W. Flagler St., Suite 400
Miami, FL 33134
dtilley@aclufl.org

Nicholas L.V. Warren
*Counsel for Proponent, Floridians Protecting Freedom, Inc.*
ACLU Found. of Fla.
1809 Art Museum Drive, Suite 203
Jacksonville, FL 32207
nwarren@aclufl.org

Michelle Morton
*Counsel for Proponent, Floridians Protecting Freedom, Inc.*
ACLU Found. of Fla.
4343 W. Flagler St., Suite 400

Miami, FL 33134
mmorton@aclufl.org

Mathew D. Staver
Anita L. Staver
Horatio G. Mihet
Hugh C. Phillips
*Counsel for Opponent, Florida Voters Against Extremism, PC*
Liberty Counsel
P.O. Box 540774
Orlando, FL 32854
court@lc.org

Stephen C. Emmanuel
Ausley McMullen
*Counsel for Opponent, Florida Conference of Catholic Bishops, Inc.*
P.O. Box 391 (32302)
123 South Calhoun Street
Tallahassee, Florida 32301
semmanuel@ausley.com

Cord Byrd
Secretary of State, Florida Department of State
R.A. Gray Building
500 S. Bronough St.
Tallahassee, FL 32399-0250
Joseph.VandeBogart@dos.myflorida.com

Ron DeSantis
Governor, State of Florida
The Capitol
400 S. Monroe St.
Tallahassee, FL 32399-0001
ryan.newman@eog.myflorida.com

Kathleen Passidomo
President, Florida Senate
Senate Office Building

404 S. Monroe St.
Tallahassee, FL 32399-1100
carlos.rey@flsenate.gov

Paul Renner
Speaker, Florida House of Representatives
420 The Capitol
402 S. Monroe St.
Tallahassee, FL 32399-1300
david.axelman@myfloridahouse.gov

/s/ Nathan A. Forrester
Nathan A. Forrester
*Senior Deputy Solicitor General*

# Exhibit F

CFDA No.

CSFA No.

☐ Client  ☐ Non-Client
☐ Multi-County

**STATE OF FLORIDA**
**DEPARTMENT OF HEALTH**
**STANDARD CONTRACT**

THIS CONTRACT, which includes Attachment I and the accompanying attachments and exhibits, is entered into between the State of Florida, Department of Health, hereinafter referred to as the Department", and **Lombard Miles PLLC** hereinafter referred to as the "Provider", each a "party" and jointly referred to as the "parties."

**THE PARTIES AGREE:**

**I.  PROVIDER AGREES:**

**A.  To provide services in accordance with the terms specified in Attachment I attached hereto**

**B.  To the Following Governing Law**

1.  **State of Florida Law:** This Contract is executed and entered into in the state of Florida, and will be construed, performed, and enforced in all respects in accordance with the laws, rules, and regulations of the state of Florida (State). Each party will perform its obligations in accordance with the terms and conditions of this Contract.

2.  **Federal Law:**

    a.  If this Contract contains federal funds, Provider must comply with the provisions of 2 C.F.R. part 200, appendix II as revised, and other applicable regulations as specified in the Contract.

    b.  If this Contract includes federal funds that will be used for construction or repairs, Provider must comply with the provisions of the Copeland "Anti-Kickback" Act (18 U.S.C. section 874), as supplemented by the U.S. Department of Labor regulations (29 C.F.R. part 3, "Contractors and Subcontractors on Public Building or Public Work Financed in Whole or in Part by Loans or Grants from the United States"). The act prohibits providers from inducing, by any means, any person employed in the construction, completion, or repair of public work, to give up any part of the compensation to which he or she is otherwise entitled. All suspected violations must be reported to the Department.

    c.  If this Contract includes federal funds that will be used for the performance of experimental, developmental, or research work, Provider must comply with 37 C.F.R., part 401, "Rights to Inventions Made by Nonprofit Organizations and Small Business Firms under Governmental Grants, Contracts, and Cooperative Agreements."

    d.  If this Contract contains federal funds and is over $100,000, Provider must comply with all applicable standards, orders, or regulations of the Clean Air Act, as amended (42 U.S.C. chapter 85) and the Clean Water Act, as amended (33 U.S.C. chapter 26), President's Executive Order 11738, and Environmental Protection Agency regulations codified in Title 40 of the Code of Federal Regulations. Provider must report any violations of the above to the Department.

    e.  If this Contract contains federal funding more than $100,000, Provider must, prior to Contract execution, complete the Certification Regarding Lobbying form, Attachment _____. If a Disclosure of Lobbying Activities form, Standard Form LLL, is required, it may be obtained from the Contract Manager and must be completed prior to Contract execution. All disclosure forms as required by the Certification Regarding Lobbying form must be completed and returned to the Contract Manager.

    f.  If this Contract contains federal funds, Provider must comply with President's Executive Order 11246, Equal Employment Opportunity (30 Fed. Reg. 12935), as amended by President's Executive Order 11375, (32 Fed. Reg. 14303), and as supplemented by regulations at 41 C.F.R. chapter 60, as revised.

    g.  If this Contract contains federal funds, Provider must comply with the Pro-Children Act of 1994, 20 U.S.C. sections 6081-6084, which requires that smoking not be permitted in any portion of any indoor facility used for the provision of federally funded services including health, daycare, early childhood development, education, or library services on a routine or regular basis, to children up to age 18. Provider's failure to comply with the provisions of the law may result in the imposition of a civil monetary penalty of up to $1,000 for each violation and the imposition of an administrative compliance order on the responsible entity. Provider must include a similar provision in any subcontracts it enters under this Contract.

    h.  **Health Insurance Portability and Accountability Act of 1996 (HIPAA):** When applicable, Provider must comply with Federal Privacy and Security Regulations developed by the U.S. Department of Health and Human Services as specified in 45 C.F.R. parts 160 and 164 promulgated pursuant to HIPAA, Pub. L. No. 104-191, and the Health Information Technology for Economic and Clinical Health Act, Title XIII of Division A, Title IV of Division B, Pub. L. No 111-5, as revised, collectively referred to as "HIPAA."

    i.  **Use and Disclosure of Confidential Women, Infant and Children (WIC) Information:** When applicable, Provider must restrict the use and disclosure of the United States Department of Agriculture (USDA), WIC confidential applicant and participant information as specified in 7 CFR § 246.26(d)(1)(i) in accordance with 7 CFR § 246.26(d)(1)(ii). If Provider is determined to be a sub-recipient of federal funds, Provider must comply

Form Revised June 2024

Contract # CO127

with the requirements of the American Recovery and Reinvestment Act and the Federal Funding Accountability and Transparency Act, by obtaining a Data Universal Numbering System (D-U-N-S) number and registering with the federal System for Award Management (SAM). No payments will be issued until Provider has submitted a valid D-U-N-S number and evidence of registration (i.e., a printed copy of the completed SAM registration) in SAM to the Contract Manager. To request a D-U-N-S number visit https://fedgov.dnb.com/webform and to obtain registration and instructions for SAM, visit https://sam.gov/.

**C. Audits, Records (including electronic storage media), and Records Retention**

1.  To establish and maintain books, records, and documents in accordance with generally accepted accounting procedures and practices, which sufficiently and properly reflect all revenues and expenditures of funds provided by the Department under this Contract.

2.  To retain financial records, supporting documents, statistical records, and any other documents pertinent to this Contract for a period of six years after termination of the Contract, or if an audit has been initiated and audit findings have not been resolved at the end of six years, the records must be retained until resolution of the audit findings or any litigation which may be based on the terms of this Contract.

3.  Upon completion or termination of this Contract and at the request of the Department, Provider must, at its expense, cooperate with the Department in the duplication and transfer of any said records or documents during the required retention period as specified in Section I, paragraph C.2., above.

4.  Persons duly authorized by the Department and federal auditors, pursuant to 2 C.F.R. section 200.337, as revised, will have full access to and the right to examine any of Provider's records and documents related to this Contract, regardless of the form in which kept, at all reasonable times for as long as records are retained.

5.  To ensure these audit and record-keeping requirements are included in all subcontracts and assignments. Provider agrees to provide such records, papers, and documents, outlined in paragraphs 1 through 4 above, to the Department within 10 business days after the request is made in accordance with section 216.1366, Florida Statutes.

6.  If Provider is a recipient or subrecipient as specified in Attachment _____, Provider will perform the required financial and compliance audits in accordance with the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. Part 200 as revised, subpart F and section 215.97, Florida Statutes, as applicable and conform to the following requirements:

    a.  **Documentation:** Maintain separate accounting of revenues and expenditures of funds under this Contract and each Catalog of State Financial Assistance (CSFA) or Catalog of Federal Domestic Assistance (CFDA) number identified on the attached Exhibit 1, in accordance with generally accepted accounting practices and procedures. Expenditures that support Provider's activities not solely authorized under this Contract must be allocated in accordance with applicable laws, rules, and regulations and the allocation methodology must be documented and supported by competent evidence.

    b.  Maintain sufficient documentation of all expenditures incurred (e.g., invoices, canceled checks, payroll detail, bank statements, etc.) under this Contract which evidences that expenditures are:
        1)  Allowable under the Contract and applicable laws, rules, and regulations;
        2)  Reasonable; and
        3)  Necessary for Provider to fulfill its obligations under this Contract.
        All documentation required by this section is subject to review by the Department and the State's Chief Financial Officer. Provider must timely comply with any requests for documentation.

    c.  **Annual Financial Report:** Submit to the Department an annual financial report stating, by line item, all expenditures made as a direct result of services provided through this Contract within 45 days from the end of each Contract year, but no later than submission of the final invoice for that year. Each report must include a statement signed by an individual with legal authority to bind Provider, certifying that these expenditures are true, accurate, and directly related to this Contract.

    d.  Ensure that funding received under this Contract in excess of expenditures is remitted to the Department within 45 days of the end of each Contract year and the Contract end date.

    e.  **Annual Compensation Report:** If applicable, Provider must submit Attachment _____, Annual Compensation Report, including the most recent Internal Revenue Services (IRS) Form 990, detailing the total compensation for the Providers' executive leadership teams, to the Contract Manager no later than January 31 of each Contract year. Total compensation must include salary, bonuses, cashed-in leave, cash equivalents, severance pay, retirement benefits, deferred compensation, real-property gifts, and any other payout. If Provider is exempt from filing IRS Form 990, submit Attachment _____ without including the IRS Form 990, to the Department. All Annual Compensation Reports must indicate what percent of compensation comes directly from State or Federal funding allocations given to Provider. In addition, Provider, by executing this Contract, which includes any

2

subsequent amendments, agrees to inform the Department of any changes in total executive compensation specified in Provider's submitted Annual Compensation Reports.

7. **Public Records:** Keep and maintain public records, as defined by Chapter 119, Florida Statutes that are required by the Department to perform the services required by the Contract. Upon request from the Department's custodian of public records, provide the Department with a copy of the requested public records or allow the records to be inspected or copied within a reasonable time at a cost that does not exceed that provided in Chapter 119, Florida Statutes, or as otherwise provided by law. Ensure that public records that are exempt or that are confidential and exempt from public record disclosure are not disclosed, except as authorized by law for the duration of the Contract term and following completion of the Contract if Provider does not transfer the public records to the Department. Upon completion of the Contract, transfer to the Department at no cost, all public records in possession of Provider or keep and maintain public records required by the Department to perform the Contract services. If Provider transfers all public records to the Department upon completion of the Contract, Provider will destroy any duplicate public records that are exempt or confidential and exempt. If Provider keeps and maintains public records upon completion of the Contract, Provider will meet all applicable requirements for retaining public records. All records stored electronically must be provided to the Department, upon request of the Department's custodian of public records, in a format that is compatible with the information technology systems of the Department. The Department may unilaterally terminate this Contract if Provider refuses to allow access to all public records made or maintained by Provider in conjunction with this Contract, unless the records are exempt from section 24(a) of Art. I of the State Constitution and section 119.07(1), Florida Statutes.

   **If the Provider has questions regarding the application of Chapter 119, Florida Statutes, to the Provider's duty to provide public records relating to this Contract, contact the custodian of public records at (850)245-4005, PublicRecordsRequest@flhealth.gov or 4052 Bald Cypress Way, Bin A02, Tallahassee, FL 32399.**

8. **Coordination of Contracted Services:** Pursuant to section 287.0575(2), Florida Statutes, if Provider has more than one Contract with one or more of the five Florida health and human services agencies (the Department of Children and Families, the Agency for Persons with Disabilities, the Department of Health, the Department of Elderly Affairs, and the Department of Veterans' Affairs), a comprehensive list of the Provider's health and human services Contracts must be submitted to the respective agencies Contract Manager(s). The list must include the following information: a) The name of each Contracting state agency and the applicable office or program issuing the Contract; b) the identifying name and number of each Contract; c) the starting and ending date of each Contract; d) the amount of each Contract; e) a brief description of the purpose of the Contract and the types of services provided under each Contract; f) the name and contact information of the contract manager.
9. **Cooperation with Inspectors General:** To the extent applicable, Provider acknowledges and understands it has a duty to and will cooperate with the inspector general in any investigation, audit, inspection, review, or hearing pursuant to section 20.055(5), Florida Statutes.
10. **Cooperation with the Florida Senate and the Florida House of Representatives:** Pursuant to section 287.058(7), Florida Statutes, Provider agrees to disclose any requested information, relevant to the performance of this Contract, to members or staff of the Florida Senate or the Florida House of Representatives, as requested. Provider is strictly prohibited from enforcing any nondisclosure clauses that conflict with this requirement.
11. **Exit Transition Services:** If applicable, Provider must provide to the Department, or its designee, all reasonable services necessary for the transfer of knowledge regarding the services and deliverables provided under the Contract to facilitate the orderly transfer of such services to the Department or its designee. If the Department determines that Exit Transition Services are necessary, such services may continue for up to six months after termination, expiration, or cancellation of the Contract, at no cost to the Department, or as agreed upon by the Parties in writing.

**D. Monitoring by the Department and Dispute Resolution:**

1. **Monitoring by the Department:** To permit persons duly authorized by the Department to inspect any records, papers, documents, facilities, goods, and services of Provider, which are relevant to this Contract and interview any clients or employees of Provider to assure the Department of satisfactory performance of the terms and conditions of this Contract. The Provider must provide the requested records, papers, and documents to the Department within 10 business days after the request is made. Following the Department's monitoring, the Department may provide the Provider with a written report specifying the noncompliance and request a Corrective Action Plan to be carried out by the Provider. At the sole and exclusive discretion of the Department, the Department may take any of the following actions including the assessment of financial consequences pursuant to section 287.058(1)(h), Florida Statutes, termination of this Contract for cause, demand

the recoupment of funds from subsequent invoices under this Contract, or demand repayment pursuant to the terms set forth in this Contract.

2. **Dispute Resolution:** Any dispute concerning the performance of this Contract or payment hereunder shall be decided by the Department in writing and submitted to the Provider for review. The decision is final unless Provider submits a written objection to the Department within 10 calendar days from receipt of the decision. Upon receiving an objection, the Department shall provide an opportunity to resolve the dispute by mutual agreement between the parties using a negotiation process to be completed within 7 calendar days from the Department's receipt of the objection. Completion of the negotiation process is a condition precedent to any legal action by Provider or the Department concerning this Contract. Nothing contained in this section is construed to limit the parties' rights of termination specified in this Contract.

**E. Indemnification and Limitation of Liability**

1. **Indemnification:**
   a. This section is not applicable to contracts executed with State agencies or subdivisions, as defined in section 768.28, Florida Statutes.
   b. Provider is liable for and will indemnify, defend, and hold harmless the Department and all of its officers, agents, and employees from all claims, suits, judgments, or damages, consequential or otherwise and including attorneys' fees and costs, arising out of any act, actions, neglect, or omissions by Provider, its agents, or employees during the performance or operation of this Contract or any subsequent modifications thereof, whether direct or indirect, and whether to any person or tangible or intangible property.
   c. Provider's inability to evaluate liability or its evaluation of no liability will not excuse Provider's duty to defend and indemnify the Department. Only adjudication or judgment after the highest appeal is exhausted specifically finding Provider not liable will excuse the performance of this provision. Provider will pay all costs and fees related to this obligation and its enforcement by the Department. The Department's failure to notify Provider of a claim will not release Provider of the above duty to indemnify.
   d. Nothing in this Contract shall be construed as the Department agreeing to indemnify the Provider.

3. **Limitation of Liability:** For all claims against the Provider under the Contract, and regardless of the basis on which the claim is made, the Provider's liability under the Contract for direct damages will be limited to the greater of $500,000.00, the dollar amount of the Contract, or two times the charges rendered by the Provider under the Contract. This limitation will not apply to claims arising under the Indemnification paragraph contained in section E.1. above. Unless otherwise specifically enumerated in the Contract, or where such limitation is unconscionable under law, no party will be liable to another for special, indirect, punitive, or consequential damages, including lost data or records (unless the Contract requires the Provider to back-up data or records), even if the party has been advised that such damages are possible. No party will be liable for lost profits, lost revenue, or lost institutional operating savings. The Department and the State may, in addition to other remedies available to them at law or equity and upon notice to the Provider, retain such monies from amounts due Provider as may be necessary to satisfy any claim for damages, penalties, costs, and the like asserted by or against them. The Department and the State may set off any liability or other obligation of the Provider or its affiliates to the Department or the State against any payments due to the Provider under the Contract. Nothing contained herein negates the sovereign immunity protections provided to State agencies or subdivisions, as defined in section 768.28, Florida Statutes.

**F. Insurance:** To maintain insurance sufficient to adequately protect the Department from all liability and property damage and hazards that may result from Provider's performance under this contract. Provider must always hold such insurance during the existence of this Contract and any renewal(s) and extension(s) of it. Upon execution of this Contract, unless it is a state agency or subdivision as defined in section 768.28, Florida Statutes, Provider accepts full responsibility for identifying and determining the type(s) and extent of liability, workers compensation, and property damage insurance necessary to provide reasonable financial protections for Provider and the clients to be served under this Contract. The limits of coverage under each policy maintained by Provider do not limit Provider's liability and obligations under this Contract. Upon the execution of this Contract, Provider must furnish the Department written verification supporting both the determination and existence of such insurance coverage. Such coverage may be provided by a self-insurance program established and operating under the laws of the State. The Department reserves the right to require additional insurance as specified in Attachment I.

**G. Safeguarding Information:** Provider will not use or disclose any information concerning a recipient of services under this Contract for any purpose not in conformity with State and federal law except upon written consent of the recipient or the responsible parent or guardian when authorized by law.

**H. Assignments and Subcontracts**

1. **Assignment:** Provider will not assign the responsibility of this Contract to another party without the prior written approval of the Department, which will not be unreasonably withheld. Any assignment or transfer otherwise occurring without the Department's approval will be null and void and the Provider will not be paid for such assigned services. This Contract will bind the successors, assigns, and legal representatives of Provider and any legal entity that succeeds to perform the Provider's obligations. The Department will be entitled to assign or transfer, in whole or part, its rights, duties, or obligations under this Contract to another governmental entity or as required under Florida law upon prior written notice to Provider.

2. **Subcontracts:**

   a. Provider will be responsible for all work performed and all expenses incurred for this Contract. Provider will not subcontract any work contemplated under this Contract without the prior written approval of the Department. If the Department permits Provider to subcontract under this Contract, the Department will not be liable to the subcontractor for any expenses or liabilities incurred under the subcontract and Provider will be solely liable to the subcontractor for all expenses and liabilities incurred under the subcontract. If the Department permits the Provider to subcontract, such permission will be indicated in Attachment I. If Provider subcontracts any of the services performed under the Contract without obtaining the Department's prior written approval, such action will be null and void and Provider will not be paid for such subcontracted services.

   b. Unless otherwise stated in the Provider's Contract with the subcontractor, payments must be made within seven working days after receipt of full or partial payments from the Department in accordance with section 287.0585, Florida Statutes. Failure to pay within seven working days will result in a penalty charged against the Provider to be paid by the Provider to the subcontractor in the amount of one-half of one percent of the amount due per day from the expiration of the period allowed herein for payment. The penalty will be in addition to actual payments owed and will not exceed 15 percent of the outstanding balance due.

**I. Return of Funds:** Return to the Department any overpayments due to unearned funds or funds disallowed and any interest attributable to such funds pursuant to the terms of this Contract that were paid to Provider by the Department. If Provider or its independent auditor discovers that an overpayment has been made, Provider will repay the overpayment within 40 calendar days without prior notification from the Department. If the Department first discovers an overpayment has been made, the Department will notify Provider in writing of such a finding.  Should repayment not be made in the time specified by the Department, Provider will pay interest of one percent per month compounded on the outstanding balance after 40 calendar days after the date of notification or discovery. The Department reserves the right, in its sole and exclusive discretion, to recoup Provider's unearned funds from any invoice submitted under this Contract or through collection proceedings.

**J. Transportation Disadvantaged:** If clients are to be transported under this Contract, Provider must comply with the provisions of Chapter 427, Florida Statutes, and Florida Administrative Code, Chapter 41-2 and submit reports as directed by the Department.

**K. Purchasing**

1. **Prison Rehabilitative Industries and Diversified Enterprises, Inc. (PRIDE):** Pursuant to section 946.515(2), Florida Statutes, it is expressly understood and agreed that any articles which are the subject of, or required to carry out, this Contract shall be purchased from the corporation identified under Chapter 946, Florida Statutes, in the same manner and under the same procedures set forth in section 946.515(2) and (4), Florida Statutes; and for purposes of this Contract the person, firm, or other business entity carrying out the provisions of this contract shall be deemed to be substituted for the Department insofar as dealings with such corporation are concerned. An abbreviated list of products and services available from PRIDE may be obtained by contacting PRIDE at 1-800-643-8459 or visiting http://www.pride-enterprises.org.

2. **Procurement of Materials with Recycled Content:** Any products or materials which are the subject of or are required to carry out this Contract will be procured in accordance with the provisions of section 403.7065, Florida Statutes.

3. **MyFloridaMarketPlace Vendor Registration:** Each Provider doing business with the State for the sale of commodities or contractual services as defined in section 287.012, Florida Statutes, must register in the MyFloridaMarketPlace system, unless exempted under Florida Administrative Code, Rule 60A-1.033.

4. **MyFloridaMarketPlace Transaction Fee:**

   a. The state of Florida, through its Department of Management Services (DMS), has instituted MyFloridaMarketPlace, a statewide procurement system. Pursuant to section 287.057(24), Florida Statutes, all payments will be assessed a Transaction Fee of one percent, which Provider will pay to the State.

b.  For payments within the State accounting system (FLAIR or its successor), the Transaction Fee will, when possible, be automatically deducted from payments to the Provider. If automatic deduction is not possible, Provider will pay the Transaction Fee pursuant to Florida Administrative Code, Rule 60A-1.031(2).

c.  Provider will receive a credit for any Transaction Fee paid by the Provider for the purchase of any item, if such item is returned to Provider through no fault, act, or omission of Provider. Notwithstanding the foregoing, a Transaction Fee is non-refundable when an item is rejected or returned, or declined, due to the Provider's failure to perform or comply with the specifications or requirements of this Contract. Failure to comply with these requirements will constitute grounds for declaring the Provider in default and recovering reprocurement costs from the Provider in addition to all outstanding fees. A Provider delinquent in paying transaction fees may be excluded from conducting future business with the State.

5.  **Alternative Contract Source:** This Contract may be used as an alternative contract source, subject to approval from DMS, pursuant to section 287.042(16), Florida Statutes and Florida Administrative Code, Rule 60A-1.045.

6.  **Registered to do Business with the State:** All limited liability companies, corporations, corporations not for profit, and partnerships seeking to do business with the State must be registered with the Florida Department of State in accordance with the provisions of Chapters 605, 607, 617, and 620, Florida Statutes, respectively prior to Contract execution.

7.  **Taxes:** The Department is generally exempt from all federal, state, and local taxes and no such taxes must be included in the price of the Contract. The Department will have no responsibility for the payment of taxes that become payable by Provider or its subcontractors in the performance of the Contract.

**L.   Background Screening Requirements and Drug Screening Requirements:**

1.  **Background Screening Requirements:** In the Department's sole and exclusive discretion, it may determine that background screening of some or all the Provider's officers, agents, employees, subcontractors, or assignees is necessary (collectively individuals). In the event background screenings are required under this contract, the Provider agrees to the following:

a.  Conduct background screenings in accordance with Chapter 435, Florida Statutes, using level 2 screening standards.

b.  Provide the Department with a written attestation confirming that the individual has completed and cleared the level 2 background screening.

c.  Not allow the individual to begin work under this contract until that individual has been cleared by the Department.

d.  Be responsible for any costs incurred in meeting this screening requirement.

2.  **Drug Screening Requirements:**

a.  If the Provider's officers, agents, employees, subcontractors, or assignees (collectively "individuals") are assigned to work in a Department designated Safety-Sensitive Class and/or Position, under this Contract, then a drug test must be performed prior to the individual being allowed to start work under this Contract. If an individual has already been screened by the Provider, then a written attestation confirming that the individual has completed and cleared the drug screening must be submitted to the Department prior to contract execution. If an individual has not been drug screened, notify the Department immediately. No individual can begin work under this Contract until they have been cleared by the Department.

b.  If at any time while performing services under this Contract reasonable suspicion exists to believe that the Provider's staff, which includes, but is not limited to, Provider's officers, agents, employees, subcontractors, or assignees, are under the influence of or impaired by drugs, the Department reserves the right to require the individual to undergo drug testing. The Department may require the individual to cease performing services pending drug test results. In the event of a positive drug test, the Provider must notify the Department in writing and at which time the Department may request a replacement of equal or superior skills and qualifications of the prior individual.

c.  The Provider is responsible for any costs associated with meeting this screening requirement.

**M. Civil Rights Requirements**:

1.  Provider, including its officers, agents, employees, subcontractors, or assignees must review the following policies and procedures as directed by the Department: Policy for Access to Programs and Activities; Procedure for Access to Programs and Activities; Language and Disability Access Plan; and the Civil Rights Training for Access to Programs and Activities.

2.  Upon contract execution and each subsequent year thereafter, the Provider must complete the Department's Civil Rights Compliance Checklist and submit it as directed by the Department.

6

**N. Independent Capacity of the Provider**
1. Provider is an independent contractor and is solely liable for the performance of all tasks and deliverables contemplated by this Contract.
2. Except where Provider is a state agency, Provider, its officers, agents, employees, subcontractor, or assignees, in performance of this Contract, will act in the capacity of an independent contractor and not as an officer, employee, or agent of the State. Provider will not represent to others that it has the authority to bind the Department unless specifically authorized to do so.
3. Provider, its officers, agents, employees, subcontractor, or assignees are not entitled to state retirement or state leave benefits, or to any other compensation of state employment as a result of performing the duties and obligations of this Contract.
4. Provider agrees to take such actions as may be necessary to ensure that each subcontractor of Provider understand they are independent contractor and will not be considered or permitted to be an agent, servant, joint venturer, or partner of the state of Florida.
5. Unless justified by Provider and agreed to by the Department in the Attachment I, the Department will not furnish services of support (e.g., office space, office supplies, telephone service, secretarial, or clerical support) to Provider or its subcontractor or assignee.
6. All deductions for social security, withholding taxes, income taxes, contributions to unemployment compensation funds, and all necessary insurance for Provider, Provider's officers, employees, agents, subcontractors, or assignees will be the responsibility of Provider.

**O. Sponsorship:** As required by section 286.25, Florida Statutes, if Provider is a non-governmental organization that sponsors a program financed wholly or in part by state funds, including any funds obtained through this Contract, it will, in publicizing, advertising, or describing the sponsorship of the program, state: "*Sponsored by (Provider's name) and the State of Florida, Department of Health.*" If the sponsorship reference is in written material, the words "*State of Florida, Department of Health*" will appear in at least the same size letters or type as Provider's name.

**P. Final Invoice:** To submit the final invoice for payment to the Department as specified in Attachment I or is terminated. If Provider fails to do so, all right to payment is forfeited and the Department will not honor any requests submitted after the aforesaid time period. Any payment due under the terms of this Contract may be withheld until all deliverables and any necessary adjustments have been approved by the Department.

**Q. Use of Funds for Lobbying Prohibited:** Comply with the provisions of sections 11.062 and 216.347, Florida Statutes, which prohibit the expenditure of Contract funds for the purpose of lobbying the Legislature, judicial branch, or a state agency.

**R. Public Entity Crime, Discriminatory Vendor, Antitrust Violator Vendor List, and Scrutinized Companies**
1. **Public Entity Crime:** Pursuant to section 287.133, Florida Statutes, the following restrictions are placed on the ability of persons convicted of public entity crimes to transact business with the Department: When a person or affiliate has been placed on the convicted vendor list following a conviction for a public entity crime, he or she may not submit a bid on a contract to provide any goods or services to a public entity, may not submit a bid on a contract with a public entity for the construction or repair of a public building or public work, may not submit bids on leases of real property to a public entity, may not be awarded or perform work as a Provider, supplier, subcontractor, or consultant under a contract with any public entity, and may not transact business with any public entity in excess of the threshold amount provided in section 287.017, Florida Statutes, for CATEGORY TWO for a period of 36 months from the date of being placed on the convicted vendor list.
2. **Discriminatory Vendor:** Pursuant to section 287.134, Florida Statutes, the following restrictions are placed on the ability of persons convicted of discrimination to transact business with the Department: When a person or affiliate has been placed on the discriminatory vendor list following a conviction for discrimination, he or she may not submit a bid on a contract to provide any goods or services to a public entity, may not submit a bid on a contract with a public entity for the construction or repair of a public building or public work, may not submit bids on leases of real property to a public entity, may not be awarded or perform work as a Provider, supplier, subcontractor, or consultant under a contract with any public entity, and may not transact business with any public entity in excess of the threshold amount provided in section 287.017, Florida Statutes, for CATEGORY TWO for a period of 36 months from the date of being placed on the discriminatory vendor list.
3. **Scrutinized Companies:**
   a. The following paragraph applies regardless of the dollar value of the good or services provided: In accordance with the requirements of section 287.135, Florida Statutes, the Provider certifies that it is not participating in a boycott of Israel. At the Department's option, the Contract may be terminated if the Contractor is placed on the Quarterly List of Scrutinized Companies that Boycott Israel (referred to in

statute as the "Scrutinized Companies that Boycott Israel List") or becomes engaged in a boycott of Israel.

    b.    The following paragraph applies only when goods or services to be provided are $1 million or more: In accordance with the requirements of section 287.135, Florida Statutes, the Provider certifies that it is not on the Scrutinized List of Prohibited Companies (referred to in statute as the "Scrutinized Companies with Activities in Sudan List" and the "Scrutinized Companies with Activities in the Iran Petroleum Energy Sector List") and, to the extent not preempted by Federal law, that it has not been engaged in business operations in Cuba or Syria. At the Department's option, the Contract may be terminated if such certification (or the certification regarding a boycott of Israel) is false, if the Contractor is placed on the Scrutinized List of Prohibited Companies, or, to the extent not preempted by Federal law, if the Contractor engages in business operations in Cuba or Syria.

4.    **Antitrust Violator Vendor List:** Pursuant to section 287.137(2)(a), "[a] person or affiliate who has been placed on the antitrust violator vendor list following a conviction or being held civilly liable for an antitrust violation may not submit a bid, proposal, or reply for a new contract with a public entity for the construction or repair of a public building or public work; may not submit a bid, proposal, or reply on new leases of real property to a public entity; may not be awarded or perform work as a contractor, supplier, subcontractor, or consultant under a new contract with a public entity; and may not transact new business with a public entity."

5.    **Department Notification Requirements:** Provider must notify the Department in writing if it or any of its suppliers, subcontractors, or consultants have been placed on the convicted vendor list, the discriminatory vendor list, or the antitrust violator vendor list during the term of the Contract.

**S.  Patents, Copyrights, Royalties, and Ownership of Property**

1.    Provider shall not assert any rights to: a) intellectual property created or otherwise developed specifically for the Department under this Contract or any prior agreement between the parties (which includes any deliverables); b) intellectual property furnished by the Department; and c) any data collected or created for the Department. Provider shall transfer all such intellectual property or data to the Department upon completion, termination, or cancellation of the Contract and prior to payment of the final invoice. If the Department or State has the authority to assert a right in any of the intellectual property or data, Provider shall assist, if necessary, in the assertion of such right. Provider must inform the Department of any inventions or discoveries developed in connection with this Contract and will be referred to the Department of State for a determination on whether patent protection will be sought for the invention or discovery. The state of Florida will be the sole owner of all patents resulting from any invention or discovery made in connection with this Contract.

2.    Provider must notify the Department of State of any books, manuals, films, or other copyrightable works developed in connection with this Contract. All copyrights accruing under or in connection with the performance of the Contract are the sole property of the state of Florida.

3.    Provider, without exception, will indemnify and save harmless the state of Florida and its employees from liability of any nature or kind, including cost and expenses for or on account of any copyrighted, patented, or unpatented invention, process, or article manufactured by Provider. Provider has no liability when such claim is solely and exclusively due to the Department of State's alteration of the article. The state of Florida will provide prompt written notification of claim of copyright or patent infringement. Further, if such claim is made or is pending, Provider may, at its option and expense, procure for the Department of State, the right to continue use of, replace, or modify the article to render it non-infringing. If Provider uses any design, device, or materials covered by letters, patent, or copyright, it is mutually agreed and understood without exception that the bid prices will include all royalties or cost arising from the use of such design, device, or materials in any way involved in the work.

4.    Proceeds derived from the sale, licensing, marketing, or other authorization related to any such Department-controlled intellectual property rights shall belong to the Department, unless otherwise specified by applicable State law.

5.    Notwithstanding the foregoing, and unless otherwise specified in the Attachment I, Provider's intellectual property rights that preexist this Contract will remain with Provider unless such preexisting software or work was developed under a previous Contract with the Department.

**T.  Construction or Renovation of Facilities Using State Funds:** Any state funds provided for the purchase of or improvements to real property are contingent upon Provider granting to the state a security interest in the property at least to the amount of the state funds provided for at least five years from the date of purchase or the completion of the improvements or as further required by law. As a condition of a receipt of state funding for this purpose, Provider agrees that, if it disposes of the property before the state's interest is vacated, Provider will refund the proportionate share of the state's initial investment, as adjusted by depreciation or appreciation.

U. **Electronic Fund Transfer:** Provider agrees to enroll in Electronic Fund Transfer (EFT) provided by DFS. Questions should be directed to DFS's EFT Section at (850) 410-9466. The previous sentence is for notice purposes only. Copies of the authorization form and sample bank letter are available from DFS.

V. **Information Security and Confidentiality of Data, Files, and Records:**

1. **Information Security:** The State requires that all data generated, used, or stored by Provider pursuant to this Contract reside and remain in the United States and not be transferred outside of the United States. The State also requires that all services provided under the Contract, including call center or other help services, will be performed by persons located in the United States.

2. **Confidentiality of Data, Files, and Records:** Provider must maintain confidentiality of all data, files, and records, including client records, related to the services or commodities provided pursuant to this Contract in accordance with applicable state and federal laws, rules, and regulations and any Department program-specific supplemental protocols, which are incorporated herein by reference and the receipt of which is acknowledged by Provider upon execution of this Contract, including any amendments. The Department will provide any Department program-specific supplemental protocols to Provider and reserves the right to update such protocols throughout the term of the Contract. The Provider agrees that it will continue to comply with all protocols, as updated and supplemented, throughout the duration of this Contract. Provider agrees to restrict the use and disclosure of confidential United States Department of Agriculture (USDA), WIC applicant, and participant information as specified in 7 CFR § 246.26(d)(1)(i) in accordance with 7 CFR § 246.26(d)(1)(ii), as applicable. Provider is required to have written policies and procedures ensuring the protection and confidentiality of Protected Health Information as defined in 45 CFR § 160.103. Provider must comply with any applicable professional standards of practice with respect to the confidentiality of information.

3. **Business Associate Agreement:** If applicable, Provider must execute Attachment _____, Business Associates Agreement prior to receiving any Protected Health Information, as defined in 45 CFR § 160.103, from the Department.

4. **Acceptable Use and Confidentiality Agreement:** If applicable, and Provider requires access to the Department's network under the Contract, Provider must execute Attachment _____, Acceptable Use and Confidentiality Agreement prior to accessing the network.

W. **Venue and Remedies for Default:**

1. **Venue:** Venue for any legal actions arising from this Contract must be in Leon County, Florida, to the exclusion of any other jurisdiction unless the Contract is entered into by one of the Department's County health departments, in which case, venue for any legal actions will be in the county in which the county health department is located. Each party hereby consents to the jurisdiction of such court and irrevocably waives, to the maximum extent permitted by law, any objection or defense of lack of jurisdiction or inconvenient forum. In the event of a dispute, each party is responsible for their own attorney fees and costs unless otherwise prohibited by law.

2. **Remedies for Default:** Provider's failure to adhere to the Contract terms and conditions will subject Provider to the remedies set forth in Section III., paragraph B. 3., below.

X. **Force Majeure:** Provider may be excused from liability for the failure or delay in performance of any obligation under this Contract for any event beyond Provider's reasonable control, including but not limited to, Acts of God, fire, flood, explosion, earthquake, or other natural forces, war, civil unrest, any strike, or labor disturbance. Such excuse from liability is effective only to the extent and duration of the event(s) causing the failure or delay in performance and provided that Provider or its employees, including any subcontracted providers, have not caused such event(s) to occur. If Provider believes an excusable delay has occurred, Provider must notify the Department in writing of the delay or potential delay within five business days after its occurrence for review and approval (which will not be unreasonably withheld) and include at a minimum, a description of the delay, date the force majeure event occurred including the duration, and the tasks and deliverables affected by the delay. Provider will not be entitled to an increase in the Contract price or payment of any kind from the Department for direct, indirect, consequential, impact or other costs, expenses or damages, including but not limited to costs of acceleration or inefficiency, arising because of delay, disruption, interference, or hindrance from any cause whatsoever. All delivery dates under this Contract that have been affected by the force majeure event is tolled for the duration of such force majeure event. If the Contract is tolled for any reason, Provider is not entitled to payment for the days services were not rendered and no financial consequences will be assessed by the Department for that affected task(s) or deliverable. In the event a force majeure event persists for 30 days or more, the Department may terminate this Contract at its sole discretion upon written notice being given to Provider.

Y. **Employment Eligibility Verification**: Provider is required to use the U.S. Department of Homeland Security's E-Verify system, located at https://www.e-verify.gov to verify the employment eligibility of all newly hired employees used by Provider under this Contract. Provider must also include in related subcontractors, if authorized under this Contract, a

requirement that subcontractors performing work under this Contract use the E-Verify system to verify employment eligibility of all newly hired employees. Failure to comply with the requirements of section 448.095, Florida Statutes, will result in the Contract being terminated.

Z. **USDA WIC Services:** Provider agrees to abide by the following requirements if the Contract is related to services or commodities being provided to WIC applicants or participants: Assurance of Civil Rights Compliance: Provider hereby agrees that it will comply with Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.); Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.); Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794); the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.); Title II and Title III of the Americans with Disabilities Act (ADA) of 1990, as amended by the ADA Amendment Act of 2008 (42 U.S.C. 12131-12189) and as implemented by Department of Justice regulations at 28 CFR Parts 35 and 36; Executive Order 13166, "Improving Access to Services for Persons with Limited English Proficiency" (August 11, 2000); all provisions required by the implementing regulations of the U.S. Department of Agriculture (7 CFR Part 15 et seq.); and FNS directives and guidelines to the effect that no person shall, on the ground of race, color, national origin, age, sex, or disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity for which the agency receives Federal financial assistance from FNS; and hereby gives assurance that it will immediately take measures necessary to effectuate this agreement.

By providing this assurance, the Provider agrees to compile data, maintain records, and submit records and reports as required to permit effective enforcement of the nondiscrimination laws, and to permit Department personnel during normal working hours to review and copy such records, books, and accounts, access such facilities, and interview such personnel as needed to ascertain compliance with the non-discrimination laws. If there are any violations of this assurance, the USDA shall have the right to seek judicial enforcement of this assurance. This assurance is given in consideration of and for the purpose of obtaining any and all Federal financial assistance, grants, and loans of Federal funds, reimbursable expenditures, grant or donation of Federal property and interest in property, the detail of Federal personnel, the sale and lease of, and the permission to use Federal property or interest in such property or the furnishing of services without consideration or at a nominal consideration, or at a consideration that is reduced for the purpose of assisting the recipient, or in recognition of the public interest to be served by such sale, lease, or furnishing of services to the recipient, or any improvements made with Federal financial assistance extended to the Program applicant by USDA. This includes any Federal agreement, arrangement, or other Contract that has as one of its purposes the provision of cash assistance for the purchase of food, and cash assistance for purchase or rental of food service equipment or any other financial assistance extended in reliance on the representations and agreements made in this assurance.

This assurance is binding on the Provider, its successors, transferees, and assignees if it receives or retains possession of any assistance from the Department. The person or persons whose signatures appear below are authorized to agree to abide by these assurances on behalf of the Provider.

AA. **Replacement of Provider staff:** The Department may request the removal or replacement of Provider staff, which includes, but is not limited to, Provider's officers, agents, employees, subcontractors, or assignees, from performing services under this Contract. The Provider's offered replacement must have equal or superior skills and qualifications of the prior individual.

BB. **Purchase of Motor Vehicles:** Pursuant to section 287.14(3), Florida Statutes, funds received under this Contract cannot be used to purchase or allow for the continuous lease of any motor vehicle unless funds were appropriated by the Legislature. This requirement does not apply to motor vehicles needed to meet unforeseen or emergency situations if approved by the Executive Office of the Governor after consultation with the legislative appropriations committees.

CC. **Pharmacy Benefit Manager Services:** Pursuant to Fla. Exec. Order No. 22-164, if this Contract is for the provision of Pharmacy Benefit Manager Services (PBM), Provider's PBM is prohibited from the use of spread pricing and financial claw backs. Provider agrees to have data reporting measures, including, but not limited to, data regarding rebates and payments from drug manufacturers, insurers, and pharmacies, if applicable, available to the Department for review. Any information provided by the Provider may only be collected, shared, or disclosed in accordance with federal and state law, including any relevant privacy laws related to proprietary or confidential information.

DD. **Notice Requirements:** Any notices provided under this Contract must be delivered by certified mail, return receipt requested, in person with proof of delivery, or by email to the email address of the respective party identified in Section III.D., below.

## II. METHOD OF PAYMENT

**A. Contract Amount:** The Department agrees to pay the Provider for the completion of the deliverables as specified in Attachment I, in an amount not to exceed <u>$500,000.00</u>, subject to the availability of funds. The state of Florida's performance and obligation to pay under this Contract is contingent upon an annual appropriation by the Legislature. The costs of services paid under any other contract or from any other source are not eligible for reimbursement under this Contract.

**B. Contract Payment:**

1. Provider must submit bills for fees or other compensation for services or expenses in sufficient detail for a proper pre-audit and post-audit thereof.

2. Where reimbursement of travel expenses is allowable as specified in Attachment I, bills for any travel expenses must be submitted in accordance with section 112.061, Florida Statutes. The Department may, if specified in Attachment I, establish rates lower than the maximum provided in section 112.061, Florida Statutes.

3. Pursuant to section 215.422, Florida Statutes, the Department has five working days to inspect and approve goods and services, unless this Contract specifies otherwise. Except for payments to health care providers for hospital, medical, or other health care services, if payment is not available within 40 days, measured from the latter of the date the invoice is received or the goods or services are received, inspected, and approved, a separate interest penalty set by the State's Chief Financial Officer pursuant to section 55.03, Florida Statutes, will be due and payable in addition to the invoice amount. To obtain the applicable interest rate, contact the Department's fiscal office or Contract administrator. Payments to health care providers for hospitals, medical, or other health care services, will be made not more than 35 days from the date eligibility for payment is determined, at the daily interest rate of 0.03333 percent. Invoices returned to the Provider due to preparation errors will result in a payment delay. Interest penalties of less than one dollar will not be enforced unless the Provider requests payment. Invoice payment requirements do not start until a properly completed invoice is provided to the Department.

4. **Bonuses:** Pursuant to section 215.425, Florida statutes, any bonus scheme implemented by Provider must: 1) base the award of a bonus on work performance; 2) describe the performance standards and evaluation process by which a bonus will be awarded; 3) notify all employees of the policy, ordinance, rule, or resolution before the beginning of the evaluation period on which a bonus will be based; and 4) consider all employees for the bonus. A copy of the Provider's policy, ordinance, rule, or resolution must be submitted to the Contract Manager for review prior to Contract funds being allocated for such payment. The Department reserves the right to refuse Provider's request to allocate any Contract funds for the payment of bonuses.

5. **Florida Substitute Form W-9:** Provider is required to submit a substitute W-9 form to the Department of Financial Services (DFS) electronically prior to doing business with the state of Florida via the Vendor Website at https://flvendor.myfloridacfo.com. Any subsequent changes to Provider's W-9 must be made on this website; however, if the Provider needs to change its Federal Employer Identification Number (FEID), it must contact the DFS Vendor Ombudsman Section at (850) 413-5516.

**C. Vendor Ombudsman:** A Vendor Ombudsman has been established within DFS whose duties include acting as an advocate for providers who may be experiencing problems in obtaining timely payment from a state agency. The Vendor Ombudsman may be contacted at (850) 413-5516 or by calling the DFS Consumer Hotline at 1-(800)-342-2762.

**D. Counterparts; Electronic Signatures:** This Contract may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. For purposes of this Contract, use of a facsimile, e-mail, or another electronic medium shall have the same force and effect as an original signature.

## III. PROVIDER CONTRACT TERM

**A. Effective and Ending Dates:** This Contract will begin on <u>10/10/2024</u> or on the date on which the Contract has been signed by both parties, whichever is later. It will end on <u>10/12/2026</u>.

**B. Termination**

1. **Termination at Will:** This Contract may be terminated by either party upon no less than 30 calendar days' written notice to the other party, without cause, unless a lesser time is mutually agreed upon in writing by both parties. Provider will be compensated for any work completed prior to the effective date of the termination.

2. **Termination Because of Lack of Funds:** In the event funds to finance this Contract become unavailable, the Department may terminate the Contract upon no less than 24 hours' written notice to Provider. The Department will be the final authority as to the availability and adequacy of funds. Provider will be compensated for any work completed prior to the effective date of the termination.

3. **Termination for Breach:** This Contract may be terminated for material breach upon no less than 24 hours' written notice to Provider. Waiver of breach of any provisions of this Contract will not be deemed to be a waiver of any other breach and will not be construed to be a modification of the terms of this Contract. In the event of default, in addition to the Department's right to terminate the Contract, the Department may pursue any of its remedies at law or in equity, including but not limited to, any losses or expenditures of the Department in obtaining replacement services or commodities, investigating, monitoring, or auditing, including legal fees, professional fees, consulting fees, and witness fees. These remedies shall include offsetting any sums due to Provider under the Contract, and any other remedies at law or in equity.

**C. Modification:** Any modifications to this Contract must be in writing and executed by the parties.

**D. Contract Representatives Contact Information:**

1. The name, mailing address, email address, and telephone number of Provider's official payee to whom the payment will be made is:

Lombard Miles PLLC

215 South Monroe South, Suite 300

Tallahassee, Florida 32301

850-567-7511

2. The name of the contact person and street address where Provider's financial and administrative records are maintained is:

Lombard Miles PLLC

215 South Monroe South, Suite 300

Tallahassee, Florida 32301

850-567-7511

\3. The name, mailing address, email address, and telephone number of the Department's Contract Manager is:

Wanda Range

Department of Health, Office of the General Counsel

4052 Bald Cypress Way, Bin A-02, Tallahassee, FL 32399

850-245-4005

4.The name, mailing address, email address, and telephone number of Provider's representative responsible for administration of the program under this Contract is:

Lombard Miles PLLC

215 South Monroe South, Suite 300

Tallahassee, Florida 32301

850-567-7511

5. Provide written notice to the other party of any changes in the above Contract representative's contact information. Any such changes will not require a formal amendment to this Contract.

**E. All Terms and Conditions Included:** This Contract and its attachments and exhibits as referenced, <u>Attachment A</u> contain all the terms and conditions agreed upon by the parties. There are no provisions, terms, conditions, or obligations other than those contained herein, and this Contract will supersede all previous communications, representations, or agreements, either verbal or written between the parties. If any term or provision of this Contract is found to be illegal or unenforceable, the remainder of the Contract will remain in full force and effect and such term or provision will be stricken.

IN WITNESS THEREOF, the parties hereto have caused this <u>16</u>-page Contract to be executed by their undersigned, duly authorized, officials, and attest to have read the above Contract and agree to the terms contained within it.

**PROVIDER: LOMBARD MILES PLLC**

SIGNATURE: *Eduardo Lombard*
~~GDE994768G6F49D~~

PRINT/TYPE NAME: EDUARDO LOMBARD

TITLE: PARTNER

DATE: 10/10/2024

STATE AGENCY 29-DIGIT FLAIR CODE:

FEID# (PLUS 3-DIGIT SEQ.) (OR SSN): F010818904001

PROVIDER FISCAL YEAR ENDING DATE: 2024/2025

**STATE OF FLORIDA, DEPARTMENT OF HEALTH**

SIGNATURE: *John Wilson*
~~F914C177F029406~~

PRINT/TYPE NAME: JOHN WILSON

TITLE: GENERAL COUNSEL

DATE: 10/10/2024

BY SIGNING THIS CONTRACT, THE ABOVE ATTESTS THERE IS EVIDENCE IN THE CONTRACT FILE DEMONSTRATING THIS CONTRACT WAS REVIEWED BY THE DEPARTMENT'S OFFICE OF THE GENERAL COUNSEL.OF

# OFFICE OF THE ATTORNEY GENERAL
## ATTACHMENT A FOR
## PRIVATE ATTORNEY SERVICES

## A. <u>SCOPE OF SERVICES</u>

The CONTRACTOR shall:

1.      Provide legal representation for the AGENCY in regard to false political advertisements under chapters 381 and 386.

2.      Review and analyze AGENCY legal files, data, documents, and other materials concerning the above matter and advise on recommended legal course. Attend and participate in meetings, conference calls, inspections or the like and report on the status of the legal matters.

3.      Prepare and file pleadings, motions, or briefs, initiate and conduct discovery, as required, and represent the AGENCY in any related litigation and otherwise represent the AGENCY at trial or on appeal.

## B. <u>COMPENSATION-FEES</u>

1.      The AGENCY shall be billed in accordance with Exhibit 1. Fees shall not exceed $500,000.00 and fees in excess of such amount shall not be compensable. The CONTRACTOR shall notify the AGENCY, in writing, when fees for billable services reach $400,000.00. Said notification shall be made as soon as is practicable and prior to the next monthly invoice. Failure to comply with these provisions will result in non-payment.

2.      Billable hours shall be measured in 6-minute increments. Compensation of attorney hours will be for actual time spent providing attorney services to the AGENCY.

3.      Premium rates will not be paid for overtime work.

4.      Attorney time while traveling will be compensated at 100% percent of the hourly rates reflected in Exhibit 1.

## C. <u>COMPENSATION-COSTS</u>

1.      Reimbursement of costs for such items as exhibits, transcripts and witness fees requires prior email authorization by the AGENCY and shall be reimbursed based upon documented third party vendor charges. The AGENCY shall not pay for firm surcharges added to third party vendor charges.

2.      Routine expenses such as phone calls, facsimile transmissions, routine postage, copy work, local travel expenses, printed library materials and local courier, word processing, clerical or secretarial services are overhead and will not be separately compensated.

3.      Non-routine office overhead expenses such as long-distance phone calls, long distance facsimile transmissions, long distance courier services, bulk mailings, bulk third party copying, blueprints, x-rays, photographs, and computer-assisted legal research services must be justified to the AGENCY and shall be reimbursed based on documented third party vendor charges. If these charges exceed $1,000.00 prior written approval from the AGENCY must be obtained. In-house bulk mailings and bulk copying expenses must be supported by usage logs or similar documentation. Firm surcharges are not reimbursable.

4.      The CONTRACTOR shall only bill the AGENCY for a proportionate share of the cost of legal research, attending hearings or engaging in client representation of any type, which is applicable

1

to other clients.

5.      Reimbursable costs shall not exceed $20,000.00. The CONTRACTOR shall notify the AGENCY in writing when costs reach $10,000.00.  Said notification shall be made as soon as is practicable and prior to the next monthly invoice.

## D.  FORMAT FOR INVOICES

1.      Within 30 days of service provision, each statement for fees and costs shall be submitted in 3 copies in a format that includes, at a minimum, the following information:

    a. Case name and number, if applicable, or other legal matter reference

    b. Invoice number for the particular bill or statement

    c. CONTRACTOR taxpayer identification number (FEIN)

    d. CONTRACTOR and AGENCY contract administrators' names

    e. Inclusive dates of the month covered by the invoice

    f. Itemization of the date; hours billed (if hourly); a concise, meaningful description of the services rendered, with sufficient detail to enable the AGENCY to evaluate the services rendered and costs; the person(s) who performed the services for each day during which the CONTRACTOR performed work; their hourly rate (if hourly) as specified in Exhibit 1, and any billing rate that is for some reason different from the one itemized in Exhibit 1, e.g., travel at a reduced hourly rate.

    g. A listing of all invoiced costs to be accompanied by copies of actual receipts.

    h. The total of only the current bill.

    i. Prior balances or payment history should be shown separately, if at all.

    j. A certification statement, signed by the CONTRACTOR's contract administrator that reads, "I certify that all costs and fees claimed for payment are accurate and were performed in furtherance of the AGREEMENT between the Lombard Miles, PLLC and Florida Department of Health."

    k. Any other information as may be requested by the AGENCY's contract administrator.

## E.  ADMINISTRATION OF AGREEMENT

1.      The AGENCY contract administrator is Wanda Range.

2.      The CONTRACTOR contract administrator is Eduardo Lombard. However, if multiple law firms are parties to the Contract, then the contract must address the internal system of governance amongst the firms and each law firm must identify one member of its firm who is authorized to legally bind the firm.

3.      All email approvals must be obtained from the parties' contract administrators or their designees.  All notices must be given to the parties' contract administrators.

4.      This AGREEMENT shall be governed by and construed under the laws of Florida.

## F.  OTHER AVAILABLE SERVICES

Upon receiving approval from the AGENCY, the CONTRACTOR shall use existing AGENCY agreements, when available and cost effective, to acquire services (e.g., computer-assisted legal research) and the assistance of professionals (e.g., court reporters, expert witnesses) at reduced rates.

## G.  PUBLIC RECORDS

All documents prepared pursuant to the AGREEMENT are subject to Florida's Public Records Law.  Refusal of the CONTRACTOR to allow public access to such records, as required by such law, shall constitute grounds for unilateral cancellation of this AGREEMENT.

2

## H.  **SPECIAL CONDITIONS**

1.      The CONTRACTOR will make affirmative efforts to achieve cost effectiveness by consolidating court hearings, limiting travel, streamlining case processing, using printed forms, using the appropriate level of attorney or staff experience required by task, and taking other actions to improve efficiency.

2.      Multiple staffing at meetings, hearings, depositions, trials, etc., by the CONTRACTOR will not be compensated without prior written approval from the AGENCY.

3.      CONTRACTOR agrees that all documents shall be promptly returned at the termination of the CONTRACTOR's involvement in the case or matter at hand.

4.      AGENCY in-house staff shall be used in the legal matter to the maximum extent possible.

5.      The CONTRACTOR will provide immediate notice by facsimile transmission or telephone regarding significant case developments which will likely result in media inquiries.

6.      The CONTRACTOR shall provide the AGENCY immediate notice of any representation undertaken by the CONTRACTOR in matters where the client is suing or being sued by the state or state entities in any civil or adversarial administrative action.

7.      A contingency fee contract must be commercially reasonable.  "Commercially reasonable" means the fees shall be no more than the amount permissible pursuant to Rule 4-1.5 of the rules regulating The Florida Bar and case law interpreting that rule.  If the amount of the fee is in dispute, the counsel retained by the state shall participate in mandatory binding arbitration.  Payment of all attorney's fees is subject to appropriation.  Attorney's fees shall be forfeited if, during the pendency of the case, the counsel retained by the state takes a public position that is averse to the state's litigation or settlement posture.

8.      Each private attorney who is under contract to provide attorney services for the state or a state agency shall, from the inception of the contractual relationship until at least 4 years after the contract expires or terminates, maintain detailed current records, including documentation of all expenses, disbursements, charges, credits, underlying receipts and invoices, and other financial transactions that concern the provision of such attorney services.  The private attorney shall make all such records available for inspection and copying upon request in accordance with Chapter 119, Florida Statutes.

9.      The AGENCY's general counsel must approve and sign the contract as to form and legality. The Contract must be signed by the AGENCY head, who shall also maintain custody of the contract.

10.     The AGENCY's State of Florida, Department of Health, Standard Contract, is incorporated by reference into this AGREEMENT.  All references to "Provider" mean "Contractor" and "Department" means "Agency", within said document.

3

EXHIBIT 1 - Fee Schedule

**I.  HOURLY BILLING SCHEDULE:**
A.  CONTRACTOR's attorney and paralegal staff to be used under this contract include the following at the hourly rates indicated:

| | |
|---|---|
| Senior Shareholder | $445.00 |
| Junior Shareholder | $375.00 |
| Of Counsel | $325.00 |
| Associates | $275.00 |
| Paralegal | $140.00 |

The above rates may be adjusted if both parties agree and shall be documented in writing by amendment to this AGREEMENT.

4

# Exhibit G

CFDA No.
CSFA No.

☐ Client  ☐ Non-Client
☐ Multi-County

**STATE OF FLORIDA**
**DEPARTMENT OF HEALTH**
**STANDARD CONTRACT**

THIS CONTRACT, which includes Attachment I and the accompanying attachments and exhibits, is entered into between the State of Florida, Department of Health, hereinafter referred to as the Department", and <u>First & Fourteenth, PLLC</u> hereinafter referred to as the "Provider", each a "party" and jointly referred to as the "parties."

**THE PARTIES AGREE:**

**I.   PROVIDER AGREES:**

**A.  To provide services in accordance with the terms specified in Attachment I attached hereto**

**B.  To the Following Governing Law**

1.   **State of Florida Law:** This Contract is executed and entered into in the state of Florida, and will be construed, performed, and enforced in all respects in accordance with the laws, rules, and regulations of the state of Florida (State). Each party will perform its obligations in accordance with the terms and conditions of this Contract.

2.   **Federal Law:**

   a.   If this Contract contains federal funds, Provider must comply with the provisions of 2 C.F.R. part 200, appendix II as revised, and other applicable regulations as specified in the Contract.

   b.   If this Contract includes federal funds that will be used for construction or repairs, Provider must comply with the provisions of the Copeland "Anti-Kickback" Act (18 U.S.C. section 874), as supplemented by the U.S. Department of Labor regulations (29 C.F.R. part 3, "Contractors and Subcontractors on Public Building or Public Work Financed in Whole or in Part by Loans or Grants from the United States"). The act prohibits providers from inducing, by any means, any person employed in the construction, completion, or repair of public work, to give up any part of the compensation to which he or she is otherwise entitled. All suspected violations must be reported to the Department.

   c.   If this Contract includes federal funds that will be used for the performance of experimental, developmental, or research work, Provider must comply with 37 C.F.R., part 401, "Rights to Inventions Made by Nonprofit Organizations and Small Business Firms under Governmental Grants, Contracts, and Cooperative Agreements."

   d.   If this Contract contains federal funds and is over $100,000, Provider must comply with all applicable standards, orders, or regulations of the Clean Air Act, as amended (42 U.S.C. chapter 85) and the Clean Water Act, as amended (33 U.S.C. chapter 26), President's Executive Order 11738, and Environmental Protection Agency regulations codified in Title 40 of the Code of Federal Regulations. Provider must report any violations of the above to the Department.

   e.   If this Contract contains federal funding more than $100,000, Provider must, prior to Contract execution, complete the Certification Regarding Lobbying form, Attachment _____. If a Disclosure of Lobbying Activities form, Standard Form LLL, is required, it may be obtained from the Contract Manager and must be completed prior to Contract execution. All disclosure forms as required by the Certification Regarding Lobbying form must be completed and returned to the Contract Manager.

   f.   If this Contract contains federal funds, Provider must comply with President's Executive Order 11246, Equal Employment Opportunity (30 Fed. Reg. 12935), as amended by President's Executive Order 11375, (32 Fed. Reg. 14303), and as supplemented by regulations at 41 C.F.R. chapter 60, as revised.

   g.   If this Contract contains federal funds, Provider must comply with the Pro-Children Act of 1994, 20 U.S.C. sections 6081-6084, which requires that smoking not be permitted in any portion of any indoor facility used for the provision of federally funded services including health, daycare, early childhood development, education, or library services on a routine or regular basis, to children up to age 18. Provider's failure to comply with the provisions of the law may result in the imposition of a civil monetary penalty of up to $1,000 for each violation and the imposition of an administrative compliance order on the responsible entity. Provider must include a similar provision in any subcontracts it enters under this Contract.

   h.   **Health Insurance Portability and Accountability Act of 1996 (HIPAA):** When applicable, Provider must comply with Federal Privacy and Security Regulations developed by the U.S. Department of Health and Human Services as specified in 45 C.F.R. parts 160 and 164 promulgated pursuant to HIPAA, Pub. L. No. 104-191, and the Health Information Technology for Economic and Clinical Health Act, Title XIII of Division A, Title IV of Division B, Pub. L. No 111-5, as revised, collectively referred to as "HIPAA."

   i.   **Use and Disclosure of Confidential Women, Infant and Children (WIC) Information:** When applicable, Provider must restrict the use and disclosure of the United States Department of Agriculture (USDA), WIC confidential applicant and participant information as specified in 7 CFR § 246.26(d)(1)(i) in accordance with 7 CFR § 246.26(d)(1)(ii). If Provider is determined to be a sub-recipient of federal funds, Provider must comply

1

with the requirements of the American Recovery and Reinvestment Act and the Federal Funding Accountability and Transparency Act, by obtaining a Data Universal Numbering System (D-U-N-S) number and registering with the federal System for Award Management (SAM). No payments will be issued until Provider has submitted a valid D-U-N-S number and evidence of registration (i.e., a printed copy of the completed SAM registration) in SAM to the Contract Manager. To request a D-U-N-S number visit https://fedgov.dnb.com/webform and to obtain registration and instructions for SAM, visit https://sam.gov/.

**C. Audits, Records (including electronic storage media), and Records Retention**

1. To establish and maintain books, records, and documents in accordance with generally accepted accounting procedures and practices, which sufficiently and properly reflect all revenues and expenditures of funds provided by the Department under this Contract.

2. To retain financial records, supporting documents, statistical records, and any other documents pertinent to this Contract for a period of six years after termination of the Contract, or if an audit has been initiated and audit findings have not been resolved at the end of six years, the records must be retained until resolution of the audit findings or any litigation which may be based on the terms of this Contract.

3. Upon completion or termination of this Contract and at the request of the Department, Provider must, at its expense, cooperate with the Department in the duplication and transfer of any said records or documents during the required retention period as specified in Section I, paragraph C.2., above.

4. Persons duly authorized by the Department and federal auditors, pursuant to 2 C.F.R. section 200.337, as revised, will have full access to and the right to examine any of Provider's records and documents related to this Contract, regardless of the form in which kept, at all reasonable times for as long as records are retained.

5. To ensure these audit and record-keeping requirements are included in all subcontracts and assignments. Provider agrees to provide such records, papers, and documents, outlined in paragraphs 1 through 4 above, to the Department within 10 business days after the request is made in accordance with section 216.1366, Florida Statutes.

6. If Provider is a recipient or subrecipient as specified in Attachment _____, Provider will perform the required financial and compliance audits in accordance with the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. Part 200 as revised, subpart F and section 215.97, Florida Statutes, as applicable and conform to the following requirements:

    a. **Documentation:** Maintain separate accounting of revenues and expenditures of funds under this Contract and each Catalog of State Financial Assistance (CSFA) or Catalog of Federal Domestic Assistance (CFDA) number identified on the attached Exhibit 1, in accordance with generally accepted accounting practices and procedures. Expenditures that support Provider's activities not solely authorized under this Contract must be allocated in accordance with applicable laws, rules, and regulations and the allocation methodology must be documented and supported by competent evidence.

    b. Maintain sufficient documentation of all expenditures incurred (e.g., invoices, canceled checks, payroll detail, bank statements, etc.) under this Contract which evidences that expenditures are:
        1) Allowable under the Contract and applicable laws, rules, and regulations;
        2) Reasonable; and
        3) Necessary for Provider to fulfill its obligations under this Contract.
    All documentation required by this section is subject to review by the Department and the State's Chief Financial Officer. Provider must timely comply with any requests for documentation.

    c. **Annual Financial Report:** Submit to the Department an annual financial report stating, by line item, all expenditures made as a direct result of services provided through this Contract within 45 days from the end of each Contract year, but no later than submission of the final invoice for that year. Each report must include a statement signed by an individual with legal authority to bind Provider, certifying that these expenditures are true, accurate, and directly related to this Contract.

    d. Ensure that funding received under this Contract in excess of expenditures is remitted to the Department within 45 days of the end of each Contract year and the Contract end date.

    e. **Annual Compensation Report:** If applicable, Provider must submit Attachment _____, Annual Compensation Report, including the most recent Internal Revenue Services (IRS) Form 990, detailing the total compensation for the Providers' executive leadership teams, to the Contract Manager no later than January 31 of each Contract year. Total compensation must include salary, bonuses, cashed-in leave, cash equivalents, severance pay, retirement benefits, deferred compensation, real-property gifts, and any other payout. If Provider is exempt from filing IRS Form 990, submit Attachment _____ without including the IRS Form 990, to the Department. All Annual Compensation Reports must indicate what percent of compensation comes directly from State or Federal funding allocations given to Provider. In addition, Provider, by executing this Contract, which includes any

subsequent amendments, agrees to inform the Department of any changes in total executive compensation specified in Provider's submitted Annual Compensation Reports.

7. **Public Records:** Keep and maintain public records, as defined by Chapter 119, Florida Statutes that are required by the Department to perform the services required by the Contract. Upon request from the Department's custodian of public records, provide the Department with a copy of the requested public records or allow the records to be inspected or copied within a reasonable time at a cost that does not exceed that provided in Chapter 119, Florida Statutes, or as otherwise provided by law. Ensure that public records that are exempt or that are confidential and exempt from public record disclosure are not disclosed, except as authorized by law for the duration of the Contract term and following completion of the Contract if Provider does not transfer the public records to the Department. Upon completion of the Contract, transfer to the Department at no cost, all public records in possession of Provider or keep and maintain public records required by the Department to perform the Contract services. If Provider transfers all public records to the Department upon completion of the Contract, Provider will destroy any duplicate public records that are exempt or confidential and exempt. If Provider keeps and maintains public records upon completion of the Contract, Provider will meet all applicable requirements for retaining public records. All records stored electronically must be provided to the Department, upon request of the Department's custodian of public records, in a format that is compatible with the information technology systems of the Department. The Department may unilaterally terminate this Contract if Provider refuses to allow access to all public records made or maintained by Provider in conjunction with this Contract, unless the records are exempt from section 24(a) of Art. I of the State Constitution and section 119.07(1), Florida Statutes.

> **If the Provider has questions regarding the application of Chapter 119, Florida Statutes, to the Provider's duty to provide public records relating to this Contract, contact the custodian of public records at (850)245-4005, [PublicRecordsRequest@flhealth.gov](mailto:PublicRecordsRequest@flhealth.gov) or 4052 Bald Cypress Way, Bin A02, Tallahassee, FL 32399.**

8. **Coordination of Contracted Services:** Pursuant to section 287.0575(2), Florida Statutes, if Provider has more than one Contract with one or more of the five Florida health and human services agencies (the Department of Children and Families, the Agency for Persons with Disabilities, the Department of Health, the Department of Elderly Affairs, and the Department of Veterans' Affairs), a comprehensive list of the Provider's health and human services Contracts must be submitted to the respective agencies Contract Manager(s). The list must include the following information: a) The name of each Contracting state agency and the applicable office or program issuing the Contract; b) the identifying name and number of each Contract; c) the starting and ending date of each Contract; d) the amount of each Contract; e) a brief description of the purpose of the Contract and the types of services provided under each Contract; f) the name and contact information of the contract manager.

9. **Cooperation with Inspectors General:** To the extent applicable, Provider acknowledges and understands it has a duty to and will cooperate with the inspector general in any investigation, audit, inspection, review, or hearing pursuant to 20.055(5), Florida Statutes.

10. **Cooperation with the Florida Senate and the Florida House of Representatives:** Pursuant to section 287.058(7), Florida Statutes, Provider agrees to disclose any requested information, relevant to the performance of this Contract, to members or staff of the Florida Senate or the Florida House of Representatives, as requested. Provider is strictly prohibited from enforcing any nondisclosure clauses that conflict with this requirement.

11. **Exit Transition Services:** If applicable, Provider must provide to the Department, or its designee, all reasonable services necessary for the transfer of knowledge regarding the services and deliverables provided under the Contract to facilitate the orderly transfer of such services to the Department or its designee. If the Department determines that Exit Transition Services are necessary, such services may continue for up to six months after termination, expiration, or cancellation of the Contract, at no cost to the Department, or as agreed upon by the Parties in writing.

**D. Monitoring by the Department and Dispute Resolution:**

1. **Monitoring by the Department:** To permit persons duly authorized by the Department to inspect any records, papers, documents, facilities, goods, and services of Provider, which are relevant to this Contract and interview any clients or employees of Provider to assure the Department of satisfactory performance of the terms and conditions of this Contract. The Provider must provide the requested records, papers, and documents to the Department within 10 business days after the request is made. Following the Department's monitoring, the Department may provide the Provider with a written report specifying the noncompliance and request a Corrective Action Plan to be carried out by the Provider. At the sole and exclusive discretion of the Department, the Department may take any of the following actions including the assessment of financial consequences pursuant to section 287.058(1)(h), Florida Statutes, termination of this Contract for cause, demand

the recoupment of funds from subsequent invoices under this Contract, or demand repayment pursuant to the terms set forth in this Contract.

2. **Dispute Resolution:** Any dispute concerning the performance of this Contract or payment hereunder shall be decided by the Department in writing and submitted to the Provider for review. The decision is final unless Provider submits a written objection to the Department within 10 calendar days from receipt of the decision. Upon receiving an objection, the Department shall provide an opportunity to resolve the dispute by mutual agreement between the parties using a negotiation process to be completed within 7 calendar days from the Department's receipt of the objection. Completion of the negotiation process is a condition precedent to any legal action by Provider or the Department concerning this Contract. Nothing contained in this section is construed to limit the parties' rights of termination specified in this Contract.

E. **Indemnification and Limitation of Liability**

1. **Indemnification:**
   a. This section is not applicable to contracts executed with State agencies or subdivisions, as defined in section 768.28, Florida Statutes.
   b. Provider is liable for and will indemnify, defend, and hold harmless the Department and all of its officers, agents, and employees from all claims, suits, judgments, or damages, consequential or otherwise and including attorneys' fees and costs, arising out of any act, actions, neglect, or omissions by Provider, its agents, or employees during the performance or operation of this Contract or any subsequent modifications thereof, whether direct or indirect, and whether to any person or tangible or intangible property.
   c. Provider's inability to evaluate liability or its evaluation of no liability will not excuse Provider's duty to defend and indemnify the Department. Only adjudication or judgment after the highest appeal is exhausted specifically finding Provider not liable will excuse the performance of this provision. Provider will pay all costs and fees related to this obligation and its enforcement by the Department. The Department's failure to notify Provider of a claim will not release Provider of the above duty to indemnify.
   d. Nothing in this Contract shall be construed as the Department agreeing to indemnify the Provider.

3. **Limitation of Liability:** For all claims against the Provider under the Contract, and regardless of the basis on which the claim is made, the Provider's liability under the Contract for direct damages will be limited to the greater of $500,000.00, the dollar amount of the Contract, or two times the charges rendered by the Provider under the Contract. This limitation will not apply to claims arising under the Indemnification paragraph contained in section E.1. above. Unless otherwise specifically enumerated in the Contract, or where such limitation is unconscionable under law, no party will be liable to another for special, indirect, punitive, or consequential damages, including lost data or records (unless the Contract requires the Provider to back-up data or records), even if the party has been advised that such damages are possible. No party will be liable for lost profits, lost revenue, or lost institutional operating savings. The Department and the State may, in addition to other remedies available to them at law or equity and upon notice to the Provider, retain such monies from amounts due Provider as may be necessary to satisfy any claim for damages, penalties, costs, and the like asserted by or against them. The Department and the State may set off any liability or other obligation of the Provider or its affiliates to the Department or the State against any payments due to the Provider under the Contract. Nothing contained herein negates the sovereign immunity protections provided to State agencies or subdivisions, as defined in section 768.28, Florida Statutes.

F. **Insurance:** To maintain insurance sufficient to adequately protect the Department from all liability and property damage and hazards that may result from Provider's performance under this contract. Provider must always hold such insurance during the existence of this Contract and any renewal(s) and extension(s) of it. Upon execution of this Contract, unless it is a state agency or subdivision as defined in section 768.28, Florida Statutes, Provider accepts full responsibility for identifying and determining the type(s) and extent of liability, workers compensation, and property damage insurance necessary to provide reasonable financial protections for Provider and the clients to be served under this Contract. The limits of coverage under each policy maintained by Provider do not limit Provider's liability and obligations under this Contract. Upon the execution of this Contract, Provider must furnish the Department written verification supporting both the determination and existence of such insurance coverage. Such coverage may be provided by a self-insurance program established and operating under the laws of the State. The Department reserves the right to require additional insurance as specified in Attachment I.

G. **Safeguarding Information:** Provider will not use or disclose any information concerning a recipient of services under this Contract for any purpose not in conformity with State and federal law except upon written consent of the recipient or the responsible parent or guardian when authorized by law.

**H. Assignments and Subcontracts**

1. **Assignment:** Provider will not assign the responsibility of this Contract to another party without the prior written approval of the Department, which will not be unreasonably withheld. Any assignment or transfer otherwise occurring without the Department's approval will be null and void and the Provider will not be paid for such assigned services. This Contract will bind the successors, assigns, and legal representatives of Provider and any legal entity that succeeds to perform the Provider's obligations. The Department will be entitled to assign or transfer, in whole or part, its rights, duties, or obligations under this Contract to another governmental entity or as required under Florida law upon prior written notice to Provider.

2. **Subcontracts:**
   a. Provider will be responsible for all work performed and all expenses incurred for this Contract. Provider will not subcontract any work contemplated under this Contract without the prior written approval of the Department. If the Department permits Provider to subcontract under this Contract, the Department will not be liable to the subcontractor for any expenses or liabilities incurred under the subcontract and Provider will be solely liable to the subcontractor for all expenses and liabilities incurred under the subcontract. If the Department permits the Provider to subcontract, such permission will be indicated in Attachment I. If Provider subcontracts any of the services performed under the Contract without obtaining the Department's prior written approval, such action will be null and void and Provider will not be paid for such subcontracted services.
   b. Unless otherwise stated in the Provider's Contract with the subcontractor, payments must be made within seven working days after receipt of full or partial payments from the Department in accordance with section 287.0585, Florida Statutes. Failure to pay within seven working days will result in a penalty charged against the Provider to be paid by the Provider to the subcontractor in the amount of one-half of one percent of the amount due per day from the expiration of the period allowed herein for payment. The penalty will be in addition to actual payments owed and will not exceed 15 percent of the outstanding balance due.

**I. Return of Funds:** Return to the Department any overpayments due to unearned funds or funds disallowed and any interest attributable to such funds pursuant to the terms of this Contract that were paid to Provider by the Department. If Provider or its independent auditor discovers that an overpayment has been made, Provider will repay the overpayment within 40 calendar days without prior notification from the Department. If the Department first discovers an overpayment has been made, the Department will notify Provider in writing of such a finding.  Should repayment not be made in the time specified by the Department, Provider will pay interest of one percent per month compounded on the outstanding balance after 40 calendar days after the date of notification or discovery. The Department reserves the right, in its sole and exclusive discretion, to recoup Provider's unearned funds from any invoice submitted under this Contract or through collection proceedings.

**J. Transportation Disadvantaged:** If clients are to be transported under this Contract, Provider must comply with the provisions of Chapter 427, Florida Statutes, and Florida Administrative Code, Chapter 41-2 and submit reports as directed by the Department.

**K. Purchasing**

1. **Prison Rehabilitative Industries and Diversified Enterprises, Inc. (PRIDE):** Pursuant to section 946.515(2), Florida Statutes, it is expressly understood and agreed that any articles which are the subject of, or required to carry out, this Contract shall be purchased from the corporation identified under Chapter 946, Florida Statutes, in the same manner and under the same procedures set forth in section 946.515(2) and (4), Florida Statutes; and for purposes of this Contract the person, firm, or other business entity carrying out the provisions of this contract shall be deemed to be substituted for the Department insofar as dealings with such corporation are concerned. An abbreviated list of products and services available from PRIDE may be obtained by contacting PRIDE at 1-800-643-8459 or visiting http://www.pride-enterprises.org.

2. **Procurement of Materials with Recycled Content:** Any products or materials which are the subject of or are required to carry out this Contract will be procured in accordance with the provisions of section 403.7065, Florida Statutes.

3. **MyFloridaMarketPlace Vendor Registration:** Each Provider doing business with the State for the sale of commodities or contractual services as defined in section 287.012, Florida Statutes, must register in the MyFloridaMarketPlace system, unless exempted under Florida Administrative Code, Rule 60A-1.033.

4. **MyFloridaMarketPlace Transaction Fee:**
   a. The state of Florida, through its Department of Management Services (DMS), has instituted MyFloridaMarketPlace, a statewide procurement system. Pursuant to section 287.057(24), Florida Statutes, all payments will be assessed a Transaction Fee of one percent, which Provider will pay to the State.

b.  For payments within the State accounting system (FLAIR or its successor), the Transaction Fee will, when possible, be automatically deducted from payments to the Provider. If automatic deduction is not possible, Provider will pay the Transaction Fee pursuant to Florida Administrative Code, Rule 60A-1.031(2).

c.  Provider will receive a credit for any Transaction Fee paid by the Provider for the purchase of any item, if such item is returned to Provider through no fault, act, or omission of Provider. Notwithstanding the foregoing, a Transaction Fee is non-refundable when an item is rejected or returned, or declined, due to the Provider's failure to perform or comply with the specifications or requirements of this Contract. Failure to comply with these requirements will constitute grounds for declaring the Provider in default and recovering reprocurement costs from the Provider in addition to all outstanding fees. A Provider delinquent in paying transaction fees may be excluded from conducting future business with the State.

5.  **Alternative Contract Source:** This Contract may be used as an alternative contract source, subject to approval from DMS, pursuant to section 287.042(16), Florida Statutes and Florida Administrative Code, Rule 60A-1.045.

6.  **Registered to do Business with the State:** All limited liability companies, corporations, corporations not for profit, and partnerships seeking to do business with the State must be registered with the Florida Department of State in accordance with the provisions of Chapters 605, 607, 617, and 620, Florida Statutes, respectively prior to Contract execution.

7.  **Taxes:** The Department is generally exempt from all federal, state, and local taxes and no such taxes must be included in the price of the Contract. The Department will have no responsibility for the payment of taxes that become payable by Provider or its subcontractors in the performance of the Contract.

**L.  Background Screening Requirements and Drug Screening Requirements:**

1.  **Background Screening Requirements:** In the Department's sole and exclusive discretion, it may determine that background screening of some or all the Provider's officers, agents, employees, subcontractors, or assignees is necessary (collectively individuals). In the event background screenings are required under this contract, the Provider agrees to the following:

    a.  Conduct background screenings in accordance with Chapter 435, Florida Statutes, using level 2 screening standards.

    b.  Provide the Department with a written attestation confirming that the individual has completed and cleared the level 2 background screening.

    c.  Not allow the individual to begin work under this contract until that individual has been cleared by the Department.

    d.  Be responsible for any costs incurred in meeting this screening requirement.

2.  **Drug Screening Requirements:**

    a.  If the Provider's officers, agents, employees, subcontractors, or assignees (collectively "individuals") are assigned to work in a Department designated Safety-Sensitive Class and/or Position, under this Contract, then a drug test must be performed prior to the individual being allowed to start work under this Contract. If an individual has already been screened by the Provider, then a written attestation confirming that the individual has completed and cleared the drug screening must be submitted to the Department prior to contract execution. If an individual has not been drug screened, notify the Department immediately. No individual can begin work under this Contract until they have been cleared by the Department.

    b.  If at any time while performing services under this Contract reasonable suspicion exists to believe that the Provider's staff, which includes, but is not limited to, Provider's officers, agents, employees, subcontractors, or assignees, are under the influence of or impaired by drugs, the Department reserves the right to require the individual to undergo drug testing. The Department may require the individual to cease performing services pending drug test results. In the event of a positive drug test, the Provider must notify the Department in writing and at which time the Department may request a replacement of equal or superior skills and qualifications of the prior individual.

    c.  The Provider is responsible for any costs associated with meeting this screening requirement.

**M. Civil Rights Requirements:**

1.  Provider, including its officers, agents, employees, subcontractors, or assignees must review the following policies and procedures as directed by the Department: Policy for Access to Programs and Activities; Procedure for Access to Programs and Activities; Language and Disability Access Plan; and the Civil Rights Training for Access to Programs and Activities.

2.  Upon contract execution and each subsequent year thereafter, the Provider must complete the Department's Civil Rights Compliance Checklist and submit it as directed by the Department.

N. **Independent Capacity of the Provider**
   1. Provider is an independent contractor and is solely liable for the performance of all tasks and deliverables contemplated by this Contract.
   2. Except where Provider is a state agency, Provider, its officers, agents, employees, subcontractor, or assignees, in performance of this Contract, will act in the capacity of an independent contractor and not as an officer, employee, or agent of the State. Provider will not represent to others that it has the authority to bind the Department unless specifically authorized to do so.
   3. Provider, its officers, agents, employees, subcontractor, or assignees are not entitled to state retirement or state leave benefits, or to any other compensation of state employment as a result of performing the duties and obligations of this Contract.
   4. Provider agrees to take such actions as may be necessary to ensure that each subcontractor of Provider understand they are independent contractor and will not be considered or permitted to be an agent, servant, joint venturer, or partner of the state of Florida.
   5. Unless justified by Provider and agreed to by the Department in the Attachment I, the Department will not furnish services of support (e.g., office space, office supplies, telephone service, secretarial, or clerical support) to Provider or its subcontractor or assignee.
   6. All deductions for social security, withholding taxes, income taxes, contributions to unemployment compensation funds, and all necessary insurance for Provider, Provider's officers, employees, agents, subcontractors, or assignees will be the responsibility of Provider.

O. **Sponsorship:** As required by section 286.25, Florida Statutes, if Provider is a non-governmental organization that sponsors a program financed wholly or in part by state funds, including any funds obtained through this Contract, it will, in publicizing, advertising, or describing the sponsorship of the program, state: "*Sponsored by (Provider's name) and the State of Florida, Department of Health.*" If the sponsorship reference is in written material, the words "*State of Florida, Department of Health*" will appear in at least the same size letters or type as Provider's name.

P. **Final Invoice:** To submit the final invoice for payment to the Department as specified in Attachment I or is terminated. If Provider fails to do so, all right to payment is forfeited and the Department will not honor any requests submitted after the aforesaid time period. Any payment due under the terms of this Contract may be withheld until all deliverables and any necessary adjustments have been approved by the Department.

Q. **Use of Funds for Lobbying Prohibited:** Comply with the provisions of sections 11.062 and 216.347, Florida Statutes, which prohibit the expenditure of Contract funds for the purpose of lobbying the Legislature, judicial branch, or a state agency.

R. **Public Entity Crime, Discriminatory Vendor, Antitrust Violator Vendor List, and Scrutinized Companies**
   1. **Public Entity Crime:** Pursuant to section 287.133, Florida Statutes, the following restrictions are placed on the ability of persons convicted of public entity crimes to transact business with the Department: When a person or affiliate has been placed on the convicted vendor list following a conviction for a public entity crime, he or she may not submit a bid on a contract to provide any goods or services to a public entity, may not submit a bid on a contract with a public entity for the construction or repair of a public building or public work, may not submit bids on leases of real property to a public entity, may not be awarded or perform work as a Provider, supplier, subcontractor, or consultant under a contract with any public entity, and may not transact business with any public entity in excess of the threshold amount provided in section 287.017, Florida Statutes, for CATEGORY TWO for a period of 36 months from the date of being placed on the convicted vendor list.
   2. **Discriminatory Vendor:** Pursuant to section 287.134, Florida Statutes, the following restrictions are placed on the ability of persons convicted of  discrimination to transact business with the Department: When a person or affiliate has been placed on the discriminatory vendor list following a conviction for discrimination, he or she may not submit a bid on a contract to provide any goods or services to a public entity, may not submit a bid on a contract with a public entity for the construction or repair of a public building or public work, may not submit bids on leases of real property to a public entity, may not be awarded or perform work as a Provider, supplier, subcontractor, or consultant under a contract with any public entity, and may not transact business with any public entity in excess of the threshold amount provided in section 287.017, Florida Statutes, for CATEGORY TWO for a period of 36 months from the date of being placed on the discriminatory vendor list.
   3. **Scrutinized Companies:**
      a. The following paragraph applies regardless of the dollar value of the good or services provided: In accordance with the requirements of section 287.135, Florida Statutes, the Provider certifies that it is not participating in a boycott of Israel. At the Department's option, the Contract may be terminated if the Contractor is placed on the Quarterly List of Scrutinized Companies that Boycott Israel (referred to in

statute as the "Scrutinized Companies that Boycott Israel List") or becomes engaged in a boycott of Israel.

    b.    The following paragraph applies only when goods or services to be provided are $1 million or more: In accordance with the requirements of section 287.135, Florida Statutes, the Provider certifies that it is not on the Scrutinized List of Prohibited Companies (referred to in statute as the "Scrutinized Companies with Activities in Sudan List" and the "Scrutinized Companies with Activities in the Iran Petroleum Energy Sector List") and, to the extent not preempted by Federal law, that it has not been engaged in business operations in Cuba or Syria. At the Department's option, the Contract may be terminated if such certification (or the certification regarding a boycott of Israel) is false, if the Contractor is placed on the Scrutinized List of Prohibited Companies, or, to the extent not preempted by Federal law, if the Contractor engages in business operations in Cuba or Syria.

4.    **Antitrust Violator Vendor List:** Pursuant to section 287.137(2)(a), "[a] person or affiliate who has been placed on the antitrust violator vendor list following a conviction or being held civilly liable for an antitrust violation may not submit a bid, proposal, or reply for a new contract with a public entity for the construction or repair of a public building or public work; may not submit a bid, proposal, or reply on new leases of real property to a public entity; may not be awarded or perform work as a contractor, supplier, subcontractor, or consultant under a new contract with a public entity; and may not transact new business with a public entity."

5.    **Department Notification Requirements:** Provider must notify the Department in writing if it or any of its suppliers, subcontractors, or consultants have been placed on the convicted vendor list, the discriminatory vendor list, or the antitrust violator vendor list during the term of the Contract.

**S.   Patents, Copyrights, Royalties, and Ownership of Property**

1.    Provider shall not assert any rights to: a) intellectual property created or otherwise developed specifically for the Department under this Contract or any prior agreement between the parties (which includes any deliverables); b) intellectual property furnished by the Department; and c) any data collected or created for the Department. Provider shall transfer all such intellectual property or data to the Department upon completion, termination, or cancellation of the Contract and prior to payment of the final invoice. If the Department or State has the authority to assert a right in any of the intellectual property or data, Provider shall assist, if necessary, in the assertion of such right. Provider must inform the Department of any inventions or discoveries developed in connection with this Contract and will be referred to the Department of State for a determination on whether patent protection will be sought for the invention or discovery. The state of Florida will be the sole owner of all patents resulting from any invention or discovery made in connection with this Contract.

2.    Provider must notify the Department of State of any books, manuals, films, or other copyrightable works developed in connection with this Contract. All copyrights accruing under or in connection with the performance of the Contract are the sole property of the state of Florida.

3.    Provider, without exception, will indemnify and save harmless the state of Florida and its employees from liability of any nature or kind, including cost and expenses for or on account of any copyrighted, patented, or unpatented invention, process, or article manufactured by Provider. Provider has no liability when such claim is solely and exclusively due to the Department of State's alteration of the article. The state of Florida will provide prompt written notification of claim of copyright or patent infringement. Further, if such claim is made or is pending, Provider may, at its option and expense, procure for the Department of State, the right to continue use of, replace, or modify the article to render it non-infringing. If Provider uses any design, device, or materials covered by letters, patent, or copyright, it is mutually agreed and understood without exception that the bid prices will include all royalties or cost arising from the use of such design, device, or materials in any way involved in the work.

4.    Proceeds derived from the sale, licensing, marketing, or other authorization related to any such Department-controlled intellectual property rights shall belong to the Department, unless otherwise specified by applicable State law.

5.    Notwithstanding the foregoing, and unless otherwise specified in the Attachment I, Provider's intellectual property rights that preexist this Contract will remain with Provider unless such preexisting software or work was developed under a previous Contract with the Department.

**T.   Construction or Renovation of Facilities Using State Funds:** Any state funds provided for the purchase of or improvements to real property are contingent upon Provider granting to the state a security interest in the property at least to the amount of the state funds provided for at least five years from the date of purchase or the completion of the improvements or as further required by law. As a condition of a receipt of state funding for this purpose, Provider agrees that, if it disposes of the property before the state's interest is vacated, Provider will refund the proportionate share of the state's initial investment, as adjusted by depreciation or appreciation.

U. **Electronic Fund Transfer:** Provider agrees to enroll in Electronic Fund Transfer (EFT) provided by DFS. Questions should be directed to DFS's EFT Section at (850) 410-9466. The previous sentence is for notice purposes only. Copies of the authorization form and sample bank letter are available from DFS.

V. **Information Security and Confidentiality of Data, Files, and Records:**
1. **Information Security:** The State requires that all data generated, used, or stored by Provider pursuant to this Contract reside and remain in the United States and not be transferred outside of the United States. The State also requires that all services provided under the Contract, including call center or other help services, will be performed by persons located in the United States.
2. **Confidentiality of Data, Files, and Records:** Provider must maintain confidentiality of all data, files, and records, including client records, related to the services or commodities provided pursuant to this Contract in accordance with applicable state and federal laws, rules, and regulations and any Department program-specific supplemental protocols, which are incorporated herein by reference and the receipt of which is acknowledged by Provider upon execution of this Contract, including any amendments. The Department will provide any Department program-specific supplemental protocols to Provider and reserves the right to update such protocols throughout the term of the Contract. The Provider agrees that it will continue to comply with all protocols, as updated and supplemented, throughout the duration of this Contract. Provider agrees to restrict the use and disclosure of confidential United States Department of Agriculture (USDA), WIC applicant, and participant information as specified in 7 CFR § 246.26(d)(1)(i) in accordance with 7 CFR § 246.26(d)(1)(ii), as applicable. Provider is required to have written policies and procedures ensuring the protection and confidentiality of Protected Health Information as defined in 45 CFR § 160.103. Provider must comply with any applicable professional standards of practice with respect to the confidentiality of information.
3. **Business Associate Agreement:** If applicable, Provider must execute Attachment _____, Business Associates Agreement prior to receiving any Protected Health Information, as defined in 45 CFR § 160.103, from the Department.
4. **Acceptable Use and Confidentiality Agreement:** If applicable, and Provider requires access to the Department's network under the Contract, Provider must execute Attachment _____, Acceptable Use and Confidentiality Agreement prior to accessing the network.

W. **Venue and Remedies for Default:**
1. **Venue:** Venue for any legal actions arising from this Contract must be in Leon County, Florida, to the exclusion of any other jurisdiction unless the Contract is entered into by one of the Department's County health departments, in which case, venue for any legal actions will be in the county in which the county health department is located. Each party hereby consents to the jurisdiction of such court and irrevocably waives, to the maximum extent permitted by law, any objection or defense of lack of jurisdiction or inconvenient forum. In the event of a dispute, each party is responsible for their own attorney fees and costs unless otherwise prohibited by law.
2. **Remedies for Default:** Provider's failure to adhere to the Contract terms and conditions will subject Provider to the remedies set forth in Section III., paragraph B. 3., below.

X. **Force Majeure:** Provider may be excused from liability for the failure or delay in performance of any obligation under this Contract for any event beyond Provider's reasonable control, including but not limited to, Acts of God, fire, flood, explosion, earthquake, or other natural forces, war, civil unrest, any strike, or labor disturbance. Such excuse from liability is effective only to the extent and duration of the event(s) causing the failure or delay in performance and provided that Provider or its employees, including any subcontracted providers, have not caused such event(s) to occur. If Provider believes an excusable delay has occurred, Provider must notify the Department in writing of the delay or potential delay within five business days after its occurrence for review and approval (which will not be unreasonably withheld) and include at a minimum, a description of the delay, date the force majeure event occurred including the duration, and the tasks and deliverables affected by the delay. Provider will not be entitled to an increase in the Contract price or payment of any kind from the Department for direct, indirect, consequential, impact or other costs, expenses or damages, including but not limited to costs of acceleration or inefficiency, arising because of delay, disruption, interference, or hindrance from any cause whatsoever. All delivery dates under this Contract that have been affected by the force majeure event is tolled for the duration of such force majeure event. If the Contract is tolled for any reason, Provider is not entitled to payment for the days services were not rendered and no financial consequences will be assessed by the Department for that affected task(s) or deliverable. In the event a force majeure event persists for 30 days or more, the Department may terminate this Contract at its sole discretion upon written notice being given to Provider.

Y. **Employment Eligibility Verification:** Provider is required to use the U.S. Department of Homeland Security's E-Verify system, located at https://www.e-verify.gov to verify the employment eligibility of all newly hired employees used by Provider under this Contract. Provider must also include in related subcontractors, if authorized under this Contract, a

requirement that subcontractors performing work under this Contract use the E-Verify system to verify employment eligibility of all newly hired employees. Failure to comply with the requirements of section 448.095, Florida Statutes, will result in the Contract being terminated.

**Z.    USDA WIC Services:** Provider agrees to abide by the following requirements if the Contract is related to services or commodities being provided to WIC applicants or participants: Assurance of Civil Rights Compliance: Provider hereby agrees that it will comply with Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.); Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.); Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794); the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.); Title II and Title III of the Americans with Disabilities Act (ADA) of 1990, as amended by the ADA Amendment Act of 2008 (42 U.S.C. 12131-12189) and as implemented by Department of Justice regulations at 28 CFR Parts 35 and 36; Executive Order 13166, "Improving Access to Services for Persons with Limited English Proficiency" (August 11, 2000); all provisions required by the implementing regulations of the U.S. Department of Agriculture (7 CFR Part 15 et seq.); and FNS directives and guidelines to the effect that no person shall, on the ground of race, color, national origin, age, sex, or disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity for which the agency receives Federal financial assistance from FNS; and hereby gives assurance that it will immediately take measures necessary to effectuate this agreement.

By providing this assurance, the Provider agrees to compile data, maintain records, and submit records and reports as required to permit effective enforcement of the nondiscrimination laws, and to permit Department personnel during normal working hours to review and copy such records, books, and accounts, access such facilities, and interview such personnel as needed to ascertain compliance with the non-discrimination laws. If there are any violations of this assurance, the USDA shall have the right to seek judicial enforcement of this assurance. This assurance is given in consideration of and for the purpose of obtaining any and all Federal financial assistance, grants, and loans of Federal funds, reimbursable expenditures, grant or donation of Federal property and interest in property, the detail of Federal personnel, the sale and lease of, and the permission to use Federal property or interest in such property or the furnishing of services without consideration or at a nominal consideration, or at a consideration that is reduced for the purpose of assisting the recipient, or in recognition of the public interest to be served by such sale, lease, or furnishing of services to the recipient, or any improvements made with Federal financial assistance extended to the Program applicant by USDA. This includes any Federal agreement, arrangement, or other Contract that has as one of its purposes the provision of cash assistance for the purchase of food, and cash assistance for purchase or rental of food service equipment or any other financial assistance extended in reliance on the representations and agreements made in this assurance.

This assurance is binding on the Provider, its successors, transferees, and assignees if it receives or retains possession of any assistance from the Department. The person or persons whose signatures appear below are authorized to agree to abide by these assurances on behalf of the Provider.

**AA. Replacement of Provider staff:** The Department may request the removal or replacement of Provider staff, which includes, but is not limited to, Provider's officers, agents, employees, subcontractors, or assignees, from performing services under this Contract. The Provider's offered replacement must have equal or superior skills and qualifications of the prior individual.

**BB. Purchase of Motor Vehicles:** Pursuant to section 287.14(3), Florida Statutes, funds received under this Contract cannot be used to purchase or allow for the continuous lease of any motor vehicle unless funds were appropriated by the Legislature. This requirement does not apply to motor vehicles needed to meet unforeseen or emergency situations if approved by the Executive Office of the Governor after consultation with the legislative appropriations committees.

**CC. Pharmacy Benefit Manager Services:** Pursuant to Fla. Exec. Order No. 22-164, if this Contract is for the provision of Pharmacy Benefit Manager Services (PBM), Provider's PBM is prohibited from the use of spread pricing and financial claw backs. Provider agrees to have data reporting measures, including, but not limited to, data regarding rebates and payments from drug manufacturers, insurers, and pharmacies, if applicable, available to the Department for review. Any information provided by the Provider may only be collected, shared, or disclosed in accordance with federal and state law, including any relevant privacy laws related to proprietary or confidential information.

**DD. Notice Requirements:** Any notices provided under this Contract must be delivered by certified mail, return receipt requested, in person with proof of delivery, or by email to the email address of the respective party identified in Section III.D., below.

## II. METHOD OF PAYMENT

**A. Contract Amount:** The Department agrees to pay the Provider for the completion of the deliverables as specified in Attachment I, in an amount not to exceed $<u>900,000.00</u>, subject to the availability of funds. The state of Florida's performance and obligation to pay under this Contract is contingent upon an annual appropriation by the Legislature. The costs of services paid under any other contract or from any other source are not eligible for reimbursement under this Contract.

**B. Contract Payment:**

1. Provider must submit bills for fees or other compensation for services or expenses in sufficient detail for a proper pre-audit and post-audit thereof.
2. Where reimbursement of travel expenses is allowable as specified in Attachment I, bills for any travel expenses must be submitted in accordance with section 112.061, Florida Statutes. The Department may, if specified in Attachment I, establish rates lower than the maximum provided in section 112.061, Florida Statutes.
3. Pursuant to section 215.422, Florida Statutes, the Department has five working days to inspect and approve goods and services, unless this Contract specifies otherwise. Except for payments to health care providers for hospital, medical, or other health care services, if payment is not available within 40 days, measured from the latter of the date the invoice is received or the goods or services are received, inspected, and approved, a separate interest penalty set by the State's Chief Financial Officer pursuant to section 55.03, Florida Statutes, will be due and payable in addition to the invoice amount. To obtain the applicable interest rate, contact the Department's fiscal office or Contract administrator. Payments to health care providers for hospitals, medical, or other health care services, will be made not more than 35 days from the date eligibility for payment is determined, at the daily interest rate of 0.03333 percent. Invoices returned to the Provider due to preparation errors will result in a payment delay. Interest penalties of less than one dollar will not be enforced unless the Provider requests payment. Invoice payment requirements do not start until a properly completed invoice is provided to the Department.
4. **Bonuses:** Pursuant to section 215.425, Florida statutes, any bonus scheme implemented by Provider must: 1) base the award of a bonus on work performance; 2) describe the performance standards and evaluation process by which a bonus will be awarded; 3) notify all employees of the policy, ordinance, rule, or resolution before the beginning of the evaluation period on which a bonus will be based; and 4) consider all employees for the bonus. A copy of the Provider's policy, ordinance, rule, or resolution must be submitted to the Contract Manager for review prior to Contract funds being allocated for such payment. The Department reserves the right to refuse Provider's request to allocate any Contract funds for the payment of bonuses.
5. **Florida Substitute Form W-9:** Provider is required to submit a substitute W-9 form to the Department of Financial Services (DFS) electronically prior to doing business with the state of Florida via the Vendor Website at https://flvendor.myfloridacfo.com. Any subsequent changes to Provider's W-9 must be made on this website; however, if the Provider needs to change its Federal Employer Identification Number (FEID), it must contact the DFS Vendor Ombudsman Section at (850) 413-5516.

**C. Vendor Ombudsman:** A Vendor Ombudsman has been established within DFS whose duties include acting as an advocate for providers who may be experiencing problems in obtaining timely payment from a state agency. The Vendor Ombudsman may be contacted at (850) 413-5516 or by calling the DFS Consumer Hotline at 1-(800)-342-2762.

**D. Counterparts; Electronic Signatures:** This Contract may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. For purposes of this Contract, use of a facsimile, e-mail, or another electronic medium shall have the same force and effect as an original signature.

## III. PROVIDER CONTRACT TERM

**A. Effective and Ending Dates:** This Contract will begin on <u>10/10/2024</u> or on the date on which the Contract has been signed by both parties, whichever is later. It will end on <u>10/12/2026</u>.

**B. Termination**

1. **Termination at Will:** This Contract may be terminated by either party upon no less than 30 calendar days' written notice to the other party, without cause, unless a lesser time is mutually agreed upon in writing by both parties. Provider will be compensated for any work completed prior to the effective date of the termination.
2. **Termination Because of Lack of Funds:** In the event funds to finance this Contract become unavailable, the Department may terminate the Contract upon no less than 24 hours' written notice to Provider. The Department will be the final authority as to the availability and adequacy of funds. Provider will be compensated for any work completed prior to the effective date of the termination.

3. **Termination for Breach:** This Contract may be terminated for material breach upon no less than 24 hours' written notice to Provider. Waiver of breach of any provisions of this Contract will not be deemed to be a waiver of any other breach and will not be construed to be a modification of the terms of this Contract. In the event of default, in addition to the Department's right to terminate the Contract, the Department may pursue any of its remedies at law or in equity, including but not limited to, any losses or expenditures of the Department in obtaining replacement services or commodities, investigating, monitoring, or auditing, including legal fees, professional fees, consulting fees, and witness fees. These remedies shall include offsetting any sums due to Provider under the Contract, and any other remedies at law or in equity.

C.  **Modification:** Any modifications to this Contract must be in writing and executed by the parties.

D.  **Contract Representatives Contact Information:**

1. The name, mailing address, email address, and telephone number of Provider's official payee to whom the payment will be made is:

First & Fourteenth PLLC
2 N. Cascade Avenue
Colorado Springs, CO 80903
202-754-0522

2. The name of the contact person and street address where Provider's financial and administrative records are maintained is:

First & Fourteenth PLLC
2 N. Cascade Avenue
Colorado Springs, CO 80903
202-754-0522

3. The name, mailing address, email address, and telephone number of the Department's Contract Manager is:

Wanda Range
Department of Health, Office of the General Counsel
4052 Bald Cypress Way, Bin A-02, Tallahassee, FL 32399
850-245-4005

4. The name, mailing address, email address, and telephone number of Provider's representative responsible for administration of the program under this Contract is:

First & Fourteenth PLLC
2 N. Cascade Avenue
Colorado Springs, CO 80903
202-998-1978

5. Provide written notice to the other party of any changes in the above Contract representative's contact information. Any such changes will not require a formal amendment to this Contract.

E.  **All Terms and Conditions Included:** This Contract and its attachments and exhibits as referenced, <u>Attachment A</u> contain all the terms and conditions agreed upon by the parties. There are no provisions, terms, conditions, or obligations other than those contained herein, and this Contract will supersede all previous communications, representations, or agreements, either verbal or written between the parties. If any term or provision of this Contract is found to be illegal or unenforceable, the remainder of the Contract will remain in full force and effect and such term or provision will be stricken.

**IN WITNESS THEREOF,** the parties hereto have caused this <u>16</u>-page Contract to be executed by their undersigned, duly authorized, officials, and attest to have read the above Contract and agree to the terms contained within it.

**PROVIDER:** <u>FIRST & FOURTEENTH, PLLC</u>

SIGNATURE: *Michael Francisco*
7739C39ADDA6462

PRINT/TYPE NAME: MICHAEL FRANCISCO

TITLE: PARTNER

DATE: 10/10/2024

STATE AGENCY 29-DIGIT FLAIR CODE:

FEID# (PLUS 3-DIGIT SEQ.) (OR SSN): F832442568001

PROVIDER FISCAL YEAR ENDING DATE: **2024-25**

**STATE OF FLORIDA, DEPARTMENT OF HEALTH**

SIGNATURE: *John Wilson*
F914C177F029406

PRINT/TYPE NAME: JOHN WILSON

TITLE: GENERAL COUNSEL

DATE: 10/10/2024

BY SIGNING THIS CONTRACT, THE ABOVE ATTESTS THERE IS EVIDENCE IN THE CONTRACT FILE DEMONSTRATING THIS CONTRACT WAS REVIEWED BY THE DEPARTMENT'S OFFICE OF THE GENERAL COUNSEL.OF

# OFFICE OF THE ATTORNEY GENERAL
## ATTACHMENT A FOR
## PRIVATE ATTORNEY SERVICES

## A. <u>SCOPE OF SERVICES</u>

The CONTRACTOR shall:

1.      Provide legal representation for the AGENCY in regard to false political advertisements under chapters 381 and 386.

2.      Review and analyze AGENCY legal files, data, documents, and other materials concerning the above matter and advise on recommended legal course. Attend and participate in meetings, conference calls, inspections or the like and report on the status of the legal matters.

3.      Prepare and file pleadings, motions, or briefs, initiate and conduct discovery, as required, and represent the AGENCY in any related litigation and otherwise represent the AGENCY at trial or on appeal.

## B.  <u>COMPENSATION-FEES</u>

1.      The AGENCY shall be billed in accordance with Exhibit 1.  Fees shall not exceed $900,000.00 and fees in excess of such amount shall not be compensable.  The CONTRACTOR shall notify the AGENCY, in writing, when fees for billable services reach $880,000.00.  Said notification shall be made as soon as is practicable and prior to the next monthly invoice.  Failure to comply with these provisions will result in non-payment.

2.      Billable hours shall be measured in 6-minute increments.  Compensation of attorney hours will be for actual time spent providing attorney services to the AGENCY.

3.      Premium rates will not be paid for overtime work.

4.      Attorney time while traveling will be compensated at 100% percent of the hourly rates reflected in Exhibit 1.

## C.  <u>COMPENSATION-COSTS</u>

1.      Reimbursement of costs for such items as exhibits, transcripts and witness fees requires prior email authorization by the AGENCY and shall be reimbursed based upon documented third party vendor charges.  The AGENCY shall not pay for firm surcharges added to third party vendor charges.

2.      Routine expenses such as phone calls, facsimile transmissions, routine postage, copy work, local travel expenses, printed library materials and local courier, word processing, clerical or secretarial services are overhead and will not be separately compensated.

3.      Non-routine office overhead expenses such as long-distance phone calls, long distance facsimile transmissions, long distance courier services, bulk mailings, bulk third party copying, blueprints, x-rays, photographs, and computer-assisted legal research services must be justified to the AGENCY and shall be reimbursed based on documented third party vendor charges.  If these charges exceed $1,000.00 prior written approval from the AGENCY must be obtained.  In-house bulk mailings and bulk copying expenses must be supported by usage logs or similar documentation. Firm surcharges are not reimbursable.

4.      The CONTRACTOR shall only bill the AGENCY for a proportionate share of the cost of legal research, attending hearings or engaging in client representation of any type, which is applicable

1

to other clients.
5.       Reimbursable costs shall not exceed $20,000.00. The CONTRACTOR shall notify the AGENCY in writing when costs reach $10,000.00.  Said notification shall be made as soon as is practicable and prior to the next monthly invoice.

## D.  FORMAT FOR INVOICES
1.       Within 30 days of service provision, each statement for fees and costs shall be submitted in 3 copies in a format that includes, at a minimum, the following information:
   a. Case name and number, if applicable, or other legal matter reference
   b. Invoice number for the particular bill or statement
   c. CONTRACTOR taxpayer identification number (FEIN)
   d. CONTRACTOR and AGENCY contract administrators' names
   e. Inclusive dates of the month covered by the invoice
   f. Itemization of the date; hours billed (if hourly); a concise, meaningful description of the services rendered, with sufficient detail to enable the AGENCY to evaluate the services rendered and costs; the person(s) who performed the services for each day during which the CONTRACTOR performed work; their hourly rate (if hourly) as specified in Exhibit 1, and any billing rate that is for some reason different from the one furnished in Exhibit 1, e.g., travel at a reduced hourly rate.
   g. A listing of all invoiced costs to be accompanied by copies of actual receipts.
   h. The total of only the current bill.
   i. Prior balances or payment history should be shown separately, if at all.
   j. A certification statement, signed by the CONTRACTOR's contract administrator that reads, "I certify that all costs and fees claimed for payment are accurate and were performed in furtherance of the AGREEMENT between the First & Fourteenth, PLLC and Florida Department of Health."
   k. Any other information as may be requested by the AGENCY's contract administrator.

## E.  ADMINISTRATION OF AGREEMENT
1.       The AGENCY contract administrator is Wanda Range.
2.       The CONTRACTOR contract administrator is Michael Francisco. However, if multiple law firms are parties to the Contract, then the contract must address the internal system of governance amongst the firms and each law firm must identify one member of its firm who is authorized to legally bind the firm.
3.       All email approvals must be obtained from the parties' contract administrators or their designees.  All notices must be given to the parties' contract administrators.
4.       This AGREEMENT shall be governed by and construed under the laws of Florida.

## F.  OTHER AVAILABLE SERVICES
Upon receiving approval from the AGENCY, the CONTRACTOR shall use existing AGENCY agreements, when available and cost effective, to acquire services (e.g., computer-assisted legal research) and the assistance of professionals (e.g., court reporters, expert witnesses) at reduced rates.

## G.  PUBLIC RECORDS
All documents prepared pursuant to the AGREEMENT are subject to Florida's Public Records Law.  Refusal of the CONTRACTOR to allow public access to such records, as required by such law, shall constitute grounds for unilateral cancellation of this AGREEMENT.

2

*Form OAG-002 (07/97 [rev. 04/2006, effective])*

## H.  **SPECIAL CONDITIONS**

1.      The CONTRACTOR will make affirmative efforts to achieve cost effectiveness by consolidating court hearings, limiting travel, streamlining case processing, using printed forms, using the appropriate level of attorney or staff experience required by task, and taking other actions to improve efficiency.

2.      Multiple staffing at meetings, hearings, depositions, trials, etc., by the CONTRACTOR will not be compensated without prior written approval from the AGENCY.

3.      CONTRACTOR agrees that all documents shall be promptly returned at the termination of the CONTRACTOR's involvement in the case or matter at hand.

4.      AGENCY in-house staff shall be used in the legal matter to the maximum extent possible.

5.      The CONTRACTOR will provide immediate notice by facsimile transmission or telephone regarding significant case developments which will likely result in media inquiries.

6.      The CONTRACTOR shall provide the AGENCY immediate notice of any representation undertaken by the CONTRACTOR in matters where the client is suing or being sued by the state or state entities in any civil or adversarial administrative action.

7.      A contingency fee contract must be commercially reasonable.  "Commercially reasonable" means the fees shall be no more than the amount permissible pursuant to Rule 4-1.5 of the rules regulating The Florida Bar and case law interpreting that rule.  If the amount of the fee is in dispute, the counsel retained by the state shall participate in mandatory binding arbitration.  Payment of all attorney's fees is subject to appropriation.  Attorney's fees shall be forfeited if, during the pendency of the case, the counsel retained by the state takes a public position that is averse to the state's litigation or settlement posture.

8.      Each private attorney who is under contract to provide attorney services for the state or a state agency shall, from the inception of the contractual relationship until at least 4 years after the contract expires or terminates, maintain detailed current records, including documentation of all expenses, disbursements, charges, credits, underlying receipts and invoices, and other financial transactions that concern the provision of such attorney services.  The private attorney shall make all such records available for inspection and copying upon request in accordance with Chapter 119, Florida Statutes.

9.      The AGENCY's general counsel must approve and sign the contract as to form and legality. The Contract must be signed by the AGENCY head, who shall also maintain custody of the contract.

10.     The AGENCY's State of Florida, Department of Health, Standard Contract, is incorporated by reference into this AGREEMENT.  All references to "Provider" mean "Contractor" and "Department" means "Agency", within said document.

*Form OAG-002 (07/97 [rev. 04/2006, effective])*

EXHIBIT 1 - Fee Schedule

**I. HOURLY BILLING SCHEDULE:**

A.  CONTRACTOR's attorney and paralegal staff to be used under this contract include the
following at the hourly rates indicated:

| | | |
|---|---|---|
| Michael Francisco | Partner | $750.00 |
| | Partners | $750.00 |
| | Associates | $450.00 |
| | Paralegals | $150.00 |

The above rates may be adjusted if both parties agree and shall be documented in writing by
amendment to this AGREEMENT.

*Form OAG-002 (07/97 [rev. 04/2006, effective])*