## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

FLORIDIANS PROTECTING
FREEDOM, INC.,

            *Plaintiff*,

    v.

JOSEPH A. LADAPO, in his official
capacity as State Surgeon General
and Head of the Florida Department
of Health,

            *Defendant*.

Case No. 4:24-cv-00419-MW-MAF

---

## DEFENDANT JOSEPH A. LADAPO'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................1

LEGAL STANDARD .........................................................................6

ARGUMENT .....................................................................................6

I.    The Court Lacks Authority to Issue the Injunctive Relief Requested by
      Plaintiff. ...................................................................................6

    A.    The Court Lacks Article III Jurisdiction to Issue Injunctive Relief......6

    B.    The Rule Against Claim-Splitting Bars This Federal Court
       Action. ...........................................................................12

II.   Plaintiff Is Unlikely to Succeed on the Merits of Its First Amendment
      Claim..................................................................................15

    A.    The First Amendment Does Not Exempt Plaintiff from Public Health
       Laws of General Applicability. ..........................................16

    B.    The Constitution Does Not Protect False Statements About the
       Availability of Emergency Medical Services That Cause Legally
       Cognizable Harm.............................................................18

    C.    At Most, Intermediate Scrutiny Applies, and Application of Florida's
       Sanitary Nuisance Statute to the Objectively False "Caroline"
       Advertisement Survives Any Form of Scrutiny.....................23

    D.    Plaintiff's Remaining First Amendment Arguments Are
       Unpersuasive. ................................................................27

III.  Equitable Considerations Disfavor a Preliminary Injunction.......................30

CONCLUSION ................................................................................33

i

## INTRODUCTION

The Constitution does not grant individuals a right to spread false information about the availability of lifesaving medical services.  There is no right, for instance, to air commercials falsely claiming that all of a city's hospitals are closed, or that 911 services are down.  Yet Floridians Protecting Freedom, Inc. ("FPF") claims that it has just such a right because the false information that it is spreading pertains to abortion, and an abortion referendum is taking place in Florida this November.  Not so.  The First Amendment does not grant FPF the special treatment that it seeks.  Accordingly, this Court should deny the request for a preliminary injunction.

## BACKGROUND

The State of Florida is responsible for protecting the health and welfare of its residents.  One way that the State has chosen to do so is through its Heartbeat Protection Act.  The Act regulates abortion in ways that safeguard the health and wellbeing of pregnant mothers and their unborn children.  Ordinarily, a woman may not obtain an abortion after the sixth week of pregnancy.  Fla. Stat. § 390.0111(1).  But Florida law contains an important exception:  A pregnant woman may obtain an abortion whenever doing so "is necessary to save [her] life or avert a serious risk of substantial and irreversible physical impairment of a major bodily function."  Fla. Stat. § 390.0111(1)(a).  The statute is crystal clear.  If an abortion is necessary to save a woman's life, she may obtain the procedure.  All that the statute requires is

1

for two physicians to "certify in writing that, in reasonable medical judgment," doing so is necessary.  *Id.*  And even this dual-physician requirement can be overcome, if a physician "certifies in writing that, in reasonable medical judgment, there is a medical necessity for legitimate emergency medical procedures for termination of the pregnancy to save the pregnant woman's life" and "another physician is not available for consultation."  Fla. Stat. § 390.0111(1)(b).  This life-of-the-woman exception is vital to ensuring that Florida women receive lifesaving medical care when they need it.

Florida's Amendment 4 is a ballot referendum pertaining to abortion.  Many organizations have aired advertisements with respect to the amendment—both for and against it.  The Department of Health did not intervene with respect to any of those countless advertisements.  FPF recently began airing a commercial of a different sort—what it has dubbed its "Caroline" advertisement.  ECF 1, Compl. ¶ 39.  This television commercial contains objectively false factual information about the availability of emergency medical services in Florida.  The woman featured in the advertisement states:  "The doctors knew if I did not end my pregnancy, I would lose my baby, I would lose my life, and my daughter would lose her mom.  Florida has now banned abortion even in cases like mine."  *Id.* [1]

---

[1] In this litigation, FPF has shared additional information about the narrator in its "Caroline" ad—including that she suffers from terminal cancer.  *See, e.g.*, ECF 24, Mem. of Law in Support of Pl.'s Mot. for Prelim. Inj. at 7–9, 23–24 (citing various

But as just discussed, Florida law expressly *permits* abortion when the procedure is "necessary to save the pregnant woman's life or avert a serious risk of substantial and irreversible physical impairment of a major bodily function." Fla. Stat. § 390.0111(1)(a). Indeed, such abortions continue to be performed in Florida under the current regulatory regime. *See* Ex. B, Decl. of Kimberly Smoak, ¶¶ 7–11. FPF's claim—that Florida has now "banned abortion in cases" where the procedure is necessary to prevent a woman from losing her "life"—is an out-and-out falsehood. And it is an out-and-out falsehood that jeopardizes the lives of vulnerable women in Florida, who could refrain from seeking lifesaving medical treatment or attempt to obtain such treatment in more dangerous ways because of the commercial's lies about the availability of emergency medical treatment in the State.

The Florida Department of Health's mission is to "protect and promote the health" of the State's residents and visitors. Fla. Stat. § 20.43(1). In response to FPF's false statements about the availability of emergency medical services, the Department sent a letter to various broadcast outlets. The letter explained that FPF's

---

declarations). Such information was not included in the advertisement and so has no bearing on Florida's ability to apply its nuisance statute. And even if such information had been included, it would not change anything: The fact that an individual will eventually succumb to some other illness does not prevent a doctor in Florida from providing lifesaving care to a pregnant woman. Nothing in the text of Florida's Heartbeat Protection Act can reasonably be read to support such a convoluted conclusion. Prolonging a person's life *is* saving it. *See* Fla. Stat. § 390.0111(1)(a).

claim that "Florida law does not allow physicians to perform abortions necessary to preserve the lives and health of pregnant women" is "categorically false." ECF 1-1, Fla. Dep't of Health Letter at 1. Florida law *does* permit a pregnant woman to obtain an abortion when doing so is necessary to save her life or prevent a substantial risk of serious physical impairment. *Id.*; *see also* Fla. Stat. § 390.0111(1)(a). This is beyond dispute.

The Department's letter explained that FPF's false statements about the availability of emergency medical services were "dangerous" from a public health perspective. Fla. Dep't of Health Letter at 1. "Women faced with pregnancy complications posing a serious risk of death or substantial and irreversible physical impairment may and should seek medical treatment in Florida." *Id.* "However, if they are led to believe that such treatment is unavailable under Florida law, such women could foreseeably travel out of state to seek emergency medical care, seek emergency medical care from unlicensed providers in Florida, or not seek emergency medical care at all." *Id.* "Such actions would threaten or impair the health and lives of these women." *Id.* The letter then reminded broadcast outlets about their obligation to comply with Florida's sanitary nuisance statute. *See id.* at 1–2 (citing Fla. Stat. § 386.01).

In the aftermath of these letters, it appears that only one television station—WINK TV in Fort Myers—stopped airing FPF's false claim about the availability of

4

lifesaving medical services.  Compl. ¶¶ 57–58.  It is unclear from the evidence in the record why this occurred.  *Id.*; *see also* ECF 24-1, Ford Decl., Ex. C ¶ 25.  And it was unclear to the State—until quite recently—whether WINK TV had resumed airing the advertisements at all.  At the temporary restraining order hearing, FPF's counsel indicated—consistent with its Complaint—that WINK TV was refusing to air its "Caroline" advertisement:

> [W]hat the verified complaint and the Latshaw declaration together state is that the ad was running on WINK-TV in Fort Myers.  We learned that that station removed the advertisement from the airwaves after receiving defendant's letter and then refused to discuss the matter for several days and that there are concurrent discussions with the station on the specifics of when and how the ad will resume airing.
>
> So certainly, just to start here, there is a First Amendment injury.

TRO Hearing Transcript at 44–45.  But evidence obtained by the State of Florida indicates that the advertisements had resumed by *October 14*—days before FPF initiated this lawsuit, and days before this Court issued its temporary restraining order.  *See* Ex. A, Decl. of James Williams III ¶¶ 10–12 (noting the advertisement aired on WINK TV "seven times on October 14," four times on October 16," and "five times on October 17").  Assuming this information is correct, it raises serious questions concerning FPF's factual assertions.

FPF, trying to guarantee its ability to spread false factual information about the availability of emergency medical services in Florida, filed this lawsuit.  It immediately requested a temporary restraining order, which this Court granted.  FPF

now asks the Court to issue a preliminary injunction during the pendency of this suit. This Court should refrain from doing so.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking the preliminary injunction—here FPF—"bears the burden of persuasion to clearly establish all four of these prerequisites." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (cleaned up). When a plaintiff fails to meet any one of them, preliminary injunctive relief is improper. *Id.*

## ARGUMENT

**I.    The Court Lacks Authority to Issue the Injunctive Relief Requested by Plaintiff.**

This Court lacks authority to issue a preliminary injunction for two threshold reasons. First, the Court lacks Article III jurisdiction because FPF lacks standing. And second, the Court must dismiss this action because FPF has engaged in improper claim-splitting.

6

**A.**     **The Court Lacks Article III Jurisdiction to Issue Injunctive Relief.**

FPF lacks standing to seek and obtain a pre-enforcement preliminary injunction because it cannot show an injury-in-fact that is either actual or imminent.

The "irreducible constitutional minimum of standing" requires that a plaintiff has "suffered an injury in fact" that is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). Because the "operation of [a] statute is better grasped when viewed in light of a particular application," *Texas v. United States*, 523 U.S. 296, 301 (1998), the Supreme Court has "repeatedly" held in the context of pre-enforcement challenges that a "threatened injury must be *certainly impending* to constitute injury in fact." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (emphasis added). FPF, as "[t]he party invoking federal jurisdiction bears the burden of establishing standing," *id*. at 411–12, and must prove each element of standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. When "a plaintiff moves for a preliminary injunction," this means proving each element of standing "under the heightened standard for evaluating a motion for summary judgment." *Waskul v. Washtenaw Cnty. Community Mental Health*, 900 F.3d 250, 255 n.3 (6th Cir. 2018). FPF fails to satisfy this requirement.

1. FPF claims that the State's letter "chills FPF's right to free expression." ECF 24, Mem. of Law in Support of Pl.'s Mot. for Prelim. Inj. at 14. But in fact,

7

FPF has not alleged that its speech is chilled at all. To the contrary, Plaintiff's declarant states that "FPF will continue to put forth advertisements that educate voters about" Florida's abortion laws. ECF 1-3, Latshaw Decl. ¶ 27.

Chilled speech is a form of *present* injury: "the injury is self-censorship," which exists "when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences." *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001). FPF cannot show a self-censorship injury here, however, because it is not choosing to self-censor. FPF's declaration describes the speech it intends to continue sharing. Latshaw Decl. ¶¶ 27–29. And nowhere does FPF allege an intention to refrain from *any* speech. Thus, no matter how loosely the injury-in-fact requirement is applied, FPF simply cannot establish a self-censorship injury because its speech is not chilled.

Nor can FPF establish an injury in fact by pointing to the threat of *future* enforcement of the sanitary nuisance law against it. Such a future injury "may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted). But that is not the case here. To make the assessment, courts often consider several main factors: "(1) a history of past enforcement against the plaintiffs or others; (2) enforcement warning letters sent to the plaintiffs regarding their specific conduct; (3) an attribute of the challenged statute that makes

enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action; and (4) the defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff." *Friends of George's Inc. v. Mulroy*, 108 F.4th 431, 439 (6th Cir. 2024). Here, these factors cut *against* a finding of standing. In particular, FPF received no warning letter. A warning letter is a statutory prerequisite to bringing any enforcement action under the sanitary nuisance statute. Fl. Stat. § 386.03(1)–(2) ("notice" required before taking action). FPF *cannot* be the subject of enforcement at this time, given that the Department has not sent FPF an enforcement letter. FPF has also failed to show that the only entities that did receive a letter from the Department—third-party television stations—took any action against FPF because of those letters. And since sending those letter, the Department has taken no further action against those third-parties. Other factors cut against Plaintiff's standing, too. There is no broad-based enforcement mechanism allowing any member of the public to initiate enforcement, there is no history of past enforcement, and the Department has disclaimed enforcement under the present circumstances. *See* Ex. C, Decl. of Cassandra G. Pasley ¶¶ 4–5; *SBA List*, 573 U.S. at 165–66 (applying the same factors).

Additionally, Plaintiff does not allege any chill to its own speech, which lends further support to the *lack* of a "certainly impending" enforcement action. *Clapper*, 568 U.S. at 401. One explanation for why FPF intends to continue speaking as it

was already intending to speak is that Plaintiff does not fear that Floridia's sanitary nuisance law will be enforced against it.

Accordingly, FPF has not established any reasonable fear that "the State will take action . . . against FPF itself," as required to demonstrate standing for this pre-enforcement challenge.  *See* Mem. of Law in Support of Pl.'s Mot. for Prelim. Inj. at 15.

2.  Plaintiff's second injury-in-fact argument is based on the assertion that "WINK TV stopped running this [FPF] advertisement in the face of the State's threats." *Id.*  But FPF has not put forward evidence sufficient to show that the State's letter *caused* WINK TV to stop running its advertisement, and so any injury Plaintiff incurred as a result of WINK TV's actions is not traceable to the Department. *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) ("It is a bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not before the court." (citation omitted)).  Plaintiff's own declaration says only that "WINK TV . . . decided to remove the [FPF] advertisement from their airwaves and refused to discuss the matter for several days." Latshaw Decl. ¶ 25. The timing of WINK TV's decision is unknown.  FPF asserts that WINK TV received a letter, but not when it received the letter or when it decided to stop airing the advertisement.  Nor has FPF shown that WINK TV kept the advertisement off the air until this Court's temporary restraining order was issued.  In fact, recently

10

obtained evidence shows that WINK TV resumed playing the advertisement *before* FPF filed this lawsuit, and days before the Court issued its Temporary Restraining Order.  *See* Ex. A, Decl. of James Williams III ¶¶ 10–12.  It is deeply troubling that FPF failed to share these developments—which cut strongly against standing— with Court.

At the preliminary injunction stage, FPF's failure to put forward evidence affirmatively establishing causation is fatal to its claim.  Whether Defendant's letter *caused* WINK TV to pull the advertisement is clearly a genuinely disputed material fact for which FPF has not mustered sufficient evidence permitting the inference that WINK TV pulled the advertisement because of Defendant's enforcement letter.

As to other television stations, Plaintiff does not allege—let alone provide evidence to support—that *any* of them pulled the advertisement or reduced its viewership in any way based on the Department's letter.  Courts are rightfully "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 413.  Yet that is what FPF asks the Court to do here. FPF has not shown that Defendant's letter "censors" its right to free expression.  *See* Mem. of Law in Support of Pl.'s Mot. for Prelim. Inj. at 14 .  So it cannot show  an actual injury traceable to the Department, or even a prospective injury that is substantially likely to occur.

**B.      The Rule Against Claim-Splitting Bars This Federal Court Action.**

Claim-splitting occurs when a plaintiff seeks to litigate related claims in multiple jurisdictions—often to obtain a perceived strategic advantage.   That is exactly what happened here.   FPF has a pending state court lawsuit against Florida pertaining to Amendment 4.   *See FPF v. Agency for Health Care Admin.*, No. 2024CA1532 (2d Cir. Ct., Leon County) ("*FPF I*").   In that lawsuit, FPF has claimed that Florida is violating the law through its efforts to educate residents about Amendment 4.   *See* Ex. D, State Compl. ¶¶ 21–46.   And it sought an order requiring the State to "remove advertising, materials, and information" from its websites that allegedly "violate[d] FPF's rights."   *Id.*   ¶ 46.   FPF tried but failed to obtain preliminary relief in that case.   *See* Ex. F, Order on Emergency Motion for Temporary Injunction (Sept. 30, 2024).   So rather than assert its First Amendment claim in the pending state court action, FPF has split up its claims.   Such gamesmanship is improper.   Indeed, it is precisely what the rule against claim-splitting tries to prevent.   Because the claim-splitting doctrine will require the Court to dismiss FPF's complaint, preliminary injunctive relief is improper.

Start with some legal background.   Under Eleventh Circuit precedent, the rule against claim-splitting "requires a plaintiff to assert all of its causes of action arising from a common set of facts in one lawsuit."   *Vanover v. NCO Fin. Servs., Inc.*, 857 F.3d 833, 841–42 (11th Cir. 2017) (quoting *Katz v. Gerardi*, 655 F.3d 1212, 1217

(10th Cir. 2011)).  Otherwise, "parties waste scarce judicial resources and undermine the efficient and comprehensive disposition of cases."  *Id.*  To determine whether a party has improperly split its claims, courts must ask two questions.  First, whether the case "involves the same parties and their privies."  *Id.* at 841–42.  And second, whether the cases "arise from the same transaction or series of transactions."  *Id.* at 842.

The answer to the first question is yes.  Both lawsuits involve a common plaintiff: FPF.  And both lawsuits involve a common defendant: the State of Florida.  To be sure, the state court lawsuit is against Florida's Agency for Health Care Administration, and this lawsuit is against the head of Florida's Department of Health in his official capacity.  But the two Defendants are both arms of the State's government.  *See* Fla. Stat. §§ 20.42–43.  And as such, they are properly understood as representing the same legal entity: the State of Florida.  At minimum, however, the two Defendants are "privies" within the meaning of *Vanover*.  The Supreme Court has long recognized that there "is privity between officers of the same government."  *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402–03 (1940).  And the general rule is that "a government official sued in his or her official capacity is considered to be in privity with the government" as well.  *Rodemaker v. City of Valdosta Bd. of Ed.*, 110 F.4th 1318, 1328 (11th Cir. 2024).  That makes sense, because components of the same government share a common "legal

13

interest." *Privy*, Black's Law Dictionary (12th ed. 2024).  Thus, the first step of *Vanover*'s claim-splitting analysis is satisfied.

So too is the second step, which asks whether two cases arise "from the same transaction or series of transactions." *Vanover*, 857 F.3d at 842.  This test is met when "two actions are based on the same nucleus of operative facts." *Id.*  Under this test, "a new action will be permitted only where it raises *new and independent* claims, not part of the previous transaction, based on the new facts." *Id.* (quoting *Hatch v. Boulder Town Council*, 471 F.3d 1142, 1150 (10th Cir. 2006)).

In *FPF I*, the Plaintiff requested a temporary injunction to prevent Florida's government from "interfering" with the vote on Amendment 4 and contributing to "misinformation about Amendment 4" through the State's public statements, advertisements, and actions.  *See* Ex. E, Pl.'s Emergency Mot. for Temporary Inj. and Mem. of Law at 1, 9 (Sept. 12, 2024).  Similar factual allegations feature prominently in FPF's complaint in this case.  *See* Compl. ¶¶ 2, 28–33 (recounting alleged actions of the Florida Agency for Health Care Administration).  And these factual allegations are not just make-weights.  They occupy multiple pages of Plaintiff's motion for a preliminary injunction in this case.  *See* ECF 24, Mem. of Law in Support of Pl.'s Mot. for Prelim. Inj. at 5–7.  Nor was this factual connection lost on the Court:  Its opinion granting the temporary restraining order alludes to the Florida Agency for Health Care Administration's actions on the very first page.  *See*

ECF 25, Order Granting TRO at 1–2.  Thus, while the legal theories FPF is pressing in its state and federal lawsuits are distinct, they are nonetheless part of a single "series of transactions." *Vanover*, 857 F.3d at 842.  That is to say, the claims are not fully "independent." *Id.*  And as a result, FPF ought not have split them.  Because FPF did so, this Court is likely to dismiss the case, and any grant of injunctive relief would be improper.

## II.   Plaintiff Is Unlikely to Succeed on the Merits of Its First Amendment Claim.

When a plaintiff is unlikely to succeed on the merits of its claim, preliminary injunctive relief is improper.  *See Munaf v. Geren*, 553 U.S. 674, 690 (2008).  Such is the case here.  FPF is unlikely to succeed for two main reasons.  First, because the First Amendment does not exempt FPF from public health laws of general applicability.  And second, because the First Amendment does not give FPF the right to spread objectively false information about the availability of medical treatment when doing so causes legally cognizable harm.   These principles transcend the politics of the moment.  Indeed, were FPF's theory to prevail, the State would have no recourse if an organization knowingly spread false information about the location of hospitals, the availability of 911 services, or the absence of a contagious disease in some area—so long as the lies were at least nominally in service of some political agenda.  That is not consistent with the letter of the law or with longstanding practice.  Accordingly, FPF is unlikely to prevail on the merits, and the Court should deny its

request for a preliminary injunction.

**E.    The First Amendment Does Not Exempt Plaintiff from Public Health Laws of General Applicability.**

The constitutional analysis in this case is governed by the Supreme Court's decision in *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991).  There the Supreme Court held that publishers receive "no special immunity from the application of general laws" under the First Amendment.  *Id.* at 670.  *Cohen* involved a claim for economic damages against newspapers that breached a promise to keep Cohen's identity confidential in exchange for information.  This breach cost Cohen his job. The Supreme Court reasoned that the publication of information gathered in violation of Minnesota's law of promissory estoppel was not protected by the First Amendment because the violation was of "generally applicable" law—not of a law that targeted speech as such.  *Id.*

*Cohen* is part of a "well-established" line of Supreme Court precedent "holding that generally applicable laws do not offend the First Amendment simply because their enforcement" has "incidental effects" on First Amendment activities. *Id.* at 669.  So, for example, the First Amendment does not exempt those involved in expressive activities from complying with grand jury subpoenas and answering questions under oath. *Branzburg v. Hayes,* 408 U.S. 665 (1972).  It does not exempt expressive organizations, like the press, from obeying copyright laws.  *See Zacchini v. Scripps–Howard Broadcasting Co.,* 433 U.S. 562, 576–79 (1977).  And it does

16

not allow individuals to violate the Nation's labor, antitrust, or tax laws simply because they are engaged in First Amendment activities. *See Associated Press v. NLRB*, 301 U.S. 103 (1937) (National Labor Relations Act); *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 192–93 (1946) (Fair Labor Standards Act); *Associated Press v. United States,* 326 U.S. 1 (1945) (antitrust laws); *Citizen Publishing Co. v. United States*, 394 U.S. 131, 139 (1969) (same); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 581–83 (1983) (non-discriminatory taxes).

So too with Florida's sanitary nuisance law. *See* Fla. Stat. § 386.03. The statute is a "law of general applicability." *Cohen*, 501 U.S. at 670. It prohibits certain public health violations no matter who commits them. The nuisance statute "does not target or single out" expressive activities or organizations for differential treatment. *Id.* Nor is publication or speech a statutory element of the offense. Instead, the law "is generally applicable to the daily transactions of all the citizens of" Florida. *Id.* And because the sanitary nuisance statute is generally applicable, the "First Amendment does not forbid its application" to FPF simply because the organization is involved in expressive activities. *Id.*

The Plaintiff effectively seeks a carve-out from Florida's public health laws because it is engaged in political activities. But organizations like FPF "have no special license to break laws of general applicability in pursuit of a headline."

17

*Planned Parenthood Fed'n of Am., Inc. v. Newman*, 51 F.4th 1125, 1134 (9th Cir. 2022).  Nor do organizations engaged in expressive activity "enjoy general immunity from tort liability" or similar laws.  *Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 127 (1st Cir. 2000).  Rather—as *Cohen* and the well-established line of cases at its back show—organizations like FPF may be "held to the letter of the law, just like all other members of our society."  *Newman*, 51 F.4th at 1134.

### F. The Constitution Does Not Protect False Statements About the Availability of Emergency Medical Services That Cause Legally Cognizable Harm.

FPF claims a constitutional right to publish objectively false information about the availability of medical services, even if the publication of that false information causes a woman not to seek medical care in a life-or-death emergency. But the Constitution protects no such thing.  Accordingly, FPF is unlikely to succeed on the merits of its First Amendment claim, and injunctive relief is improper.

Under the Supreme Court's decision in *United States v. Alvarez*, 567 U.S. 709 (2012), there is no First Amendment right to spread false information about the availability of medical services when doing so stops someone from accessing necessary treatment.  Synthesizing the many past cases in which the Supreme Court had observed that false statements "'are not protected by the First Amendment in the same manner as truthful statements,'" the *Alvarez* plurality observed that such quotations "all derive from cases discussing defamation, fraud, or some other legally

cognizable harm associated with a false statement." 567 U.S. at 718–19 (quoting *Brown v. Hartlage*, 456 U.S. 45, 60–61 (1982)). The concurring Justices agreed that statutes that prohibit falsities are typically permissible when there is proof of specific or tangible harm. *See id.* at 734–36 (Breyer, J., concurring in the judgment). Thus, while *Alvarez* makes clear that the First Amendment protects some false speech, the First Amendment permits the government to prohibit false speech that causes legally cognizable harm.

Three federal courts of appeals have read *Alvarez* to permit government prohibitions on false speech that causes legally cognizable harm. The key cases in this area involve statutes passed in several states that made it a crime to access agriculture production facilities by false pretenses. Advocacy groups challenged the statutes under the First Amendment, relying on *Alvarez*. Yet all three federal courts of appeals reviewing the challenges interpreted *Alvarez* to permit government prohibitions on false speech when such speech causes legally cognizable harm. *See Animal Legal Def. Fund v. Reynolds*, 89 F.4th 1065, 1068 (8th Cir. 2024) ("[T]he State may proscribe intentionally false speech undertaken to accomplish a legally cognizable harm." (cleaned up)); *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1232 (10th Cir. 2021) ("[R]estrictions on false factual statements that cause legally cognizable harm tend not to offend the Constitution."); *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1194 (9th Cir. 2018) (observing that "false speech may be

criminalized . . . if such speech inflicts a legally cognizable harm" (cleaned up)).  As these cases underscore, "neither the plurality nor the concurrence in *Alvarez* held that false statements are *always* protected under the First Amendment."  *Wasden*, 878 F.3d at 1194.  Rather, when false speech causes legally cognizable harm, the government may intervene without offending the First Amendment.[2]  If a Florida woman suffers legally cognizable harm as a result of the advertisement, any subsequent enforcement action would be consistent with the First Amendment under *Alvarez*.  Start with the most important fact in this case:  FPF's commercial contains objectively false information about the availability of emergency medical treatment in Florida.  In FPF's commercial, a woman claims that "doctors knew if I did not end my pregnancy . . . I would lose my life" and that "Florida has now banned abortion even in cases like mine."  Compl. ¶ 39.  But that is simply not true.  Florida's Heartbeat Protection Act expressly permits ending a pregnancy when doing so "is necessary to save the pregnant woman's life" or to "avert a serious risk of substantial and irreversible physical impairment of a major bodily function other

---

[2] This reading of *Alvarez* has been widely adopted by federal and state courts across the Nation.  *See*, *e.g.*, *United States v. Nabaya*, 765 F. App'x 895, 899 (4th Cir. 2019); *Geomatrix, LLC v. NSF Int'l*, 82 F.4th 466, 492 (6th Cir. 2023) (Murphy, J., concurring); *see also Win v. Cegavske*, 570 F. Supp. 3d 936, 941–42 (D. Nev. 2021); *Nat'l Coal. on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78, 120 (S.D.N.Y. 2023); *Holloway v. Am. Media, Inc.*, 947 F. Supp. 2d 1252, 1263 (N.D. Ala. 2013); *State v. Ruggiero*, 330 P.3d 408, 414 (Idaho Ct. App. 2014).

than a psychological condition." Fla. Stat. § 390.0111(1)(a).  There is no ambiguity here.  If ending a pregnancy is necessary to save a woman's life, Florida law permits it—full stop.  Indeed, Florida law has long permitted abortions in such cases.  And such abortions continue to occur in Florida under the regulatory framework that has applied since April.  *See* Ex. B, Decl. of Kimberly Smoak, ¶¶ 7–11.  So this case does not involve FPF bending the truth at the borderline in service of some political agenda.  It involves out-and-out falsehoods about the availability of life-or-death medical treatment in Florida—and the cognizable legal harms that may foreseeably result.

Furthermore, while the Department of Health sent letters to various television stations informing them of their potential liability under Florida's sanitary nuisance law, the Department has since clarified that it "is currently unaware of any harm that has arisen from the airing of the 'Caroline' commercial," and that it "is not moving forward with an enforcement action under these circumstances."  Pasley Decl. ¶¶ 4–5.  If injuries do occur in the future, they will constitute "legally cognizable harm" that the State may remedy through its laws—consistent with *Alvarez* and the Supreme Court's other First Amendment precedents.

FPF disagrees.  But under FPF's reasoning, an entity could air commercials falsely claiming that all of a city's hospitals were closed and that individuals should not bother going in for emergency treatment—so long as the commercials were aired

in service of some political agenda.  The same would be true about knowingly false statements about a jurisdiction's 911 system being down, or a contagious disease not being in a town.  But this is not, and has never been, the law in our Nation.  To the contrary, such falsehoods are unprotected because they work genuine perils on public health and public safety, while having little to no redeeming value.  Tellingly, FPF cites no authority upholding a First Amendment claim in a remotely similar context.  That is because knowing falsehoods about the availability of emergency medical services—tending as they do to imperil public health and public safety— are not protected by the First Amendment.[3]

---

[3] Neither the *Animal Legal Defense Fund* line of cases nor the cases discussed in footnote two, *supra*, required the defendant to show that alleged restrictions on speech were "traditionally recognized"—i.e., that the restriction fell within one of the categories listed in Justice Kennedy's plurality opinion in *Alvarez*, or was otherwise part of a long tradition of proscription.  In any event, pure speech "injurious to public health and comfort" was "a common nuisance, and a misdemeanor at common law."  Francis Wharton, *A Treatise on Criminal Law* §§ 1676, 1704, 1719 (10th ed. 1912); *see also id.* at §§ 1678, 1704, 1719 (specifically discussing speech that is "detrimental to public health," "likely to generate a disease or infection," or "calculated to disturb the peace of a community"); *see also Com. v. Hechtman*, 81 Pa. D. & C. 488, 490 (Quar. Sess. 1953).  FPF's falsehoods about the availability of medical services—discussed in the Department of Health's letters—are thus "traditionally recognized" to be outside the protection of the First Amendment.

G.    **At Most, Intermediate Scrutiny Applies, and Application of Florida's Sanitary Nuisance Statute to the Objectively False "Caroline" Advertisement Survives Any Form of Scrutiny.**

To the extent that the Department's contemplated enforcement of Florida's sanitary nuisance law is subject to any First Amendment scrutiny at all, the Court should apply at most intermediate scrutiny.  In *Alvarez*, the Court examined the constitutionality of a law that prohibited individuals from falsely claiming to have received military honors.  A four-Justice plurality applied something akin to strict scrutiny.  *See id.* at 724.  But Justice Breyer—in a two-Justice concurrence in the judgment—explained that when assessing such falsehoods, the proper standard of review is "intermediate scrutiny." *Id.* at 731.  The remaining three Justices dissented. Under the rule of *Marks v United States*, 430 U.S. 188 (1977), Justice Breyer's concurrence in judgment is thus controlling.  For when "a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices," the "position taken by those Members who concurred in the judgments on the narrowest grounds" constitutes the "holding" of the Court.  *Id.* at 193; *see also Daytona Grand, Inc. v. City of Daytona Beach*, 490 F.3d 860, 875 n.19 (11th Cir. 2007) (same).  In *Alvarez*, the narrowest grounds for decision—intermediate scrutiny, rather than strict scrutiny—are set forth in Justice Breyer's concurrence in the judgment.  So that opinion supplies the Court's holding.  *See*, *e.g.*, *United States*

23

*v. Mackey*, 652 F. Supp. 3d 309, 342–46 (E.D.N.Y. 2023) (applying intermediate scrutiny in the context of false political speech).

The actions taken by the Department of Health withstand intermediate scrutiny. Intermediate scrutiny first asks whether the government has a "substantial justification" for its actions. *Alvarez*, 567 U.S. at 737 (Breyer, J., concurring in judgment). If so, the test then examines whether the government action is appropriately tailored to the government's interest. *Id.* To be constitutionally permissible, the government's action "need not be the least restrictive or least intrusive means" of accomplishing its goal. *Ward*, 491 U.S. at 798. Instead, it must be narrowly tailored to the legitimate interest at hand.

To begin, there can be little doubt that Florida has substantial government interests—ensuring that pregnant women are not misled about their ability to receive lifesaving medical care, and avoiding the harms that will foreseeably result from such deception. Indeed, the State's interests are significantly more pressing than many that the Supreme Court has recognized in First Amendment cases. Those include protecting "city streets and parks from excessive noise," *Ward v. Rock Against Racism*, 491 U.S. 781, 796 (1989); safeguarding "residential privacy," *Frisby v. Schultz*, 487 U.S. 474, 484 (1988); preventing the "visual assault" of "an accumulation of signs posted on public property," *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 807 (1984); maintaining parks in

24

"attractive and intact condition," *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 296 (1984); and even "protecting noncable households from loss of regular television broadcasting service," *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 647 (1994). Against this backdrop, Florida's interests—in protecting pregnant women from being deceived about their ability to access emergency medical services, and from the foreseeable health risks of such deception—surely qualify as "substantial." Indeed, even if the Court were to apply strict scrutiny's compelling interest framework, the Department would clear that bar too; the harms the Department seeks to prevent are "interests of the highest order." *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021).

Because the Department has established a substantial government interest, the intermediate scrutiny analysis then turns to narrow tailoring. *See Alvarez*, 567 U.S. at 737 (Breyer, J., concurring in judgment). This requirement "is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799 (cleaned up). Such is the case here. Florida's interests—in ensuring that pregnant women are not misled about their ability to access lifesaving medical services, and do not suffer severe health consequences as a result—are directly furthered by discouraging television stations from airing false claims about the availability of abortion when necessary to save a woman's life. Accordingly, the Department's action "responds precisely to

25

the substantive problems which legitimately concern the" State. *Clark*, 468 U.S. at 296 (quoting *Taxpayers for Vincent*, 466 U.S. at 810).

Nor are adequate alternatives readily available. Counter speech from the government would not stop the ill effects of FPF's falsehoods. For one thing, there may not be time to correct the false information before a pregnant woman needs lifesaving treatment—especially given the emergency nature of the medical issues at play. *See Linert v. MacDonald*, 901 N.W.2d 664, 670 (Minn. Ct. App. 2017) (rejecting argument that "counterspeech" would be "an effective alternative means to combat false claims" given time constraints). For another, the Department has no way to identify and reach the specific pregnant women who may have been misled by FPF's false claims. Finally, sometimes the damage from falsehoods cannot readily be undone. And in such cases—like this one—counter speech will not suffice to redress the real and tangible harm inflicted by the falsehoods. *See Minnesota Voters All. v. Mansky*, 585 U.S. 1, 18 n. 4 (2018) ("We do not doubt that the State may prohibit messages intended to mislead voters about voting requirements and procedures."). Finally, FPF cannot credibly assert that counter speech is a viable alternative given its pending state-court lawsuit, which claims that much of Florida's speech about the State's abortion laws is prohibited. *See generally* Ex. D, State Compl. ¶¶ 21–46, 57.

In sum, the Department's actions were appropriately tailored to its substantial

26

interest and so survive the threshold of intermediate scrutiny. And since no less restrictive means are available for achieving the State's compelling interests, its actions would also survive strict scrutiny.

## H. Plaintiff's Remaining First Amendment Arguments Are Unpersuasive.

FPF's other First Amendment arguments fail to move the needle. To begin, FPF leans heavily on *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024), and *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). It relies on these cases in support of its argument that the Department has engaged in unconstitutional coercion. *See* Mem. of Law in Support of Pl.'s Mot. for Prelim. Inj. at 16–23. But FPF misreads both cases, which stand for the proposition that when speech is protected, the government cannot attempt to ban it through "informal" means. *Bantam Books*, 372 U.S. at 67, 71. Put differently, the government "cannot do indirectly what [it] is barred from doing directly." *Vullo*, 602 U.S. at 190. This case is different, however, because the Department could outright ban FPF's false claims about the availability of emergency medical services without violating the First Amendment for the reasons explained above. *See supra* II.A–C. So *Vullo* and *Bantam Books* have nothing to say about the permissibility of Florida's actions.

Second, despite FPF's arguments to the contrary, dissemination of objectively false information about the availability of medical treatment is entitled to no greater First Amendment protection when it appears in a political advertisement. In *Win v.*

27

*Cegavske*, 570 F. Supp. 3d 936, 941–42 (D. Nev. 2021), the court applied *Alvarez* and upheld a state statute that prohibited falsely claiming to be an incumbent in election materials. The court declined to apply heightened scrutiny even though the false speech at issue occurred in the context of a political campaign. *See also Treasurer of Comm. to Elect Gerald D. Lostracco v. Fox*, 389 N.W.2d 446 (Mich. App. 1986) (upholding similar statute), *cited in Alvarez*, 567 U.S. at 738 (Breyer, J., concurring in judgment). Moreover, unlike cases in which the Supreme Court has applied a more exacting level of scrutiny to laws that regulate political speech, *see Ariz. Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011), the Florida sanitary nuisance statute at issue here does not single out political speech for special treatment. Indeed, the sanitary nuisance law does not even specifically regulate speech. It simply prohibits creating a nuisance that jeopardizes public health, whether through word or deed.

Third, FPF errs in characterizing Florida's sanitary nuisance statute as a regime of prior restraint. The statute does not set up a preclearance regime by which an administrative censor determines beforehand what advertisements FPF may circulate to broadcasters or what advertisements a broadcaster may carry. *See Cooper v. Dillon*, 403 F.3d 1208, 1215 (11th Cir. 2005) (citing *Alexander v. United States*, 509 U.S. 544, 553 (1993)). Rather, the statute charges the Department of Health with (i) providing notice to someone it believes may have committed a

28

violation and then (ii) if the Department decides to take enforcement action, with sustaining its burden of proof in legal proceedings. *Cf. Freedman v. Maryland*, 380 U.S. 51, 58 (1965). Only if the Department of Health sustains its burden of proof in such a proceeding would a judge be authorized to impose penalties. No speech is constrained or penalized prior to that judicial determination. Those are not the characteristics of an unlawful prior restraint.

One final point bears mentioning. The Court's order granting a temporary restraining order suggests that strict scrutiny automatically applies to government regulations that turn on the substance of speech. *See* Order Granting TRO at 10 (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). But this squeezes more from *Reed* than the case has to give. For starters, the Supreme Court has recently retreated from the broadest readings of that case. *See generally City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61 (2022). But more to the point, *Alvarez* holds that—at least with respect to the sort of falsehoods there considered— intermediate scrutiny is the rule. *Alvarez*, 567 U.S. at 732–33 (Breyer, J., concurring in judgment). And because the facts of this case more closely resemble the falsehoods of *Alvarez* than the signage in *Reed*, *Alvarez* supplies the applicable legal standard. And under that standard, FPF is unlikely to prevail on the merits of its claim. Nor would enforcement of the sanitary nuisance statute inflict viewpoint-based harm. *See* Order Granting TRO at 11. The statute is "neutral." *Christian*

*Legal Soc'y v. Martinez*, 561 U.S. 661, 694 (2010).  And its enforcement against falsehoods about the availability of lifesaving medical treatment turns not on the viewpoint being expressed, but on the public health nuisance being created.

## III.    Equitable Considerations Disfavor a Preliminary Injunction.

Because FPF is unlikely to succeed on the merits of its First Amendment claim, injunctive relief is improper.  *See Munaf*, 553 U.S. at 690.  The remaining preliminary injunction factors reinforce this conclusion.  First, FPF will suffer no "irreparable harm" in the absence of an injunction.  *Winter*, 555 U.S. at 20.  FPF has no right to mislead the public by spreading false factual information about the availability of emergency medical services in Florida (just as an individual has no right to knowingly spread falsehoods about 911 outages or the date of an election).  As a result, FPF will suffer no irreparable harm in the absence of a preliminary injunction ensuring that it can engage in such conduct.  And as explained in Section I.A, the injuries alleged by FPF are at best speculative and at worst self-inflicted.  But either way they do not amount to irreparable harm.

Second, an injunction would subject the State of Florida to "ongoing irreparable harm."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).  "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Id.* (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351

(1977) (Rehnquist, J., in chambers)). And the injury would be especially acute here, for the requested injunction implicates the State's vital interest in ensuring that pregnant women are not misled about their ability to receive lifesaving medical care. FPF simply ignores this inconvenient truth. But the importance of such care is genuine. So too is the harm likely to be inflicted by FPF's falsehoods. The balance of equities thus favors Florida.

Third, for similar reasons, an injunction would be adverse to the public interest. FPF's commercial places the lives of vulnerable women in Florida at risk by conveying false factual information about the availability of lifesaving medical care. Such falsehoods may cause women to forgo medical treatment entirely, or to substantially increase risks to their health by obtaining an abortion from an unlicensed provider or by delaying treatment through travel to another State. These realities, coupled with the fact that "false factual statements enjoy little First Amendment protection," *Alvarez*, 567 U.S. at 732–33 (Breyer, J., concurring in judgment), tilt the public interest decisively in Florida's favor.

Finally, equitable relief in the form of a preliminary injunction is improper because FPF has itself engaged in inequitable conduct. "When a party seeking equitable relief 'has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him.'" *Ramirez v. Collier*, 595 U.S. 411, 434 (2022) (quoting *Keystone Driller Co. v. General*

31

*Excavator Co.*, 290 U.S. 240, 245 (1933)); *see also* J. Pomeroy, *Equity Jurisprudence* §§ 397–98 (4th ed. 1918).   Here, FPF has done just that by intentionally spreading false factual information about the availability of lifesaving medical services in Florida.   And because FPF is "tainted with inequitableness or bad faith relative to the matter in which [it] seeks relief," historic principles of equity bar the requested injunction.   *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945).[4]

## CONCLUSION

The Court should deny Plaintiff's motion for a preliminary injunction.

---

[4] If the Court grants a preliminary injunction, that injunction should dissolve on November 6, 2024.   At that point, the referendum on Amendment 4 will have concluded, and the "irreparable injuries" alleged in FPF's preliminary injunction motion will have dissipated.   *See* Mem. of Law in Support of Pl.'s Mot. for Prelim. Inj. at 30–32. Furthermore, any preliminary injunction the Court issues must be framed with specificity as to the particular actions that Defendant is prohibited from taking.   FPF requests a preliminary injunction that would stop Defendant from "undertaking enforcement action against Plaintiff for . . . engaging in other speech protected under the First Amendment."   *Id.* at 2.   Such an obey-the-law injunction would violate due process and the Federal Rules.   *See SEC v. Goble*, 682 F.3d 934, 948 (11th Cir. 2012).

Respectfully submitted,                    Date: October 22, 2024

                                           ASHLEY MOODY
                                             *Attorney General*

/s/ *Brian W. Barnes*
Brian W. Barnes, *pro hac vice*           Henry C. Whitaker (FBN 1031175)
Samuel D. Adkisson, *pro hac vice*          *Solicitor General*
COOPER & KIRK, PLLC                        Daniel William Bell (FBN 1008587)
1523 New Hampshire Ave., N.W.                *Chief Deputy Solicitor General*
Washington, D.C., 20036                    Nathan A. Forrester (FBN 1045107)
Telephone: (202) 220-9600                    *Senior Deputy Solicitor General*
Email: bbarnes@cooperkirk.com             Office of the Attorney General
sadkisson@cooperkirk.com                  The Capitol, PL-01
                                          Tallahassee, Florida 32399-1050
                                          (850) 414-3300
                                          (850) 410-2672 (fax)

          *Counsel for Defendant Joseph A. Ladapo*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Local Rule 7.1(F) because, excluding the parts of the document exempted by the rule, the foregoing memorandum contains 7,997 words. This document complies with the type-style requirements of Local Rule 5.1(C) because this document has been prepared in a proportionally spaced typeface using the word-processing system Microsoft Word in 14-point Times New Roman.

Date: October 22, 2024

*/s/ Brian W. Barnes*
Counsel for Defendant
Joseph A. Ladapo

## CERTIFICATE OF SERVICE

I certify that on October 22, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel who have entered an appearance.

Date: October 22, 2024

*/s/ Brian W. Barnes*
Counsel for Defendant
Joseph A. Ladapo