# EXHIBIT D

## IN THE SECOND JUDICIAL CIRCUIT COURT
## IN AND FOR LEON COUNTY, FLORIDA

FLORIDIANS PROTECTING
FREEDOM, INC.,

    *Plaintiff*,

v.

                      Case No.   <u>2024 CA 001532</u>

AGENCY FOR HEALTH CARE
ADMINISTRATION,

    *Defendant*.

_____/

## <u>COMPLAINT</u>

Plaintiff Floridians Protecting Freedom, Inc. sues the Agency for Health Care Administration to stop the State of Florida's campaign to oppose Amendment 4 through the dissemination of false, inflammatory, and misleading information. With vote-by-mail ballots scheduled to be sent to voters within two weeks, the State, through the Agency for Health Care Administration, has created a website and placed television and radio advertisements that oppose Amendment 4 in the upcoming general election on November 5, 2024. The State's materials misrepresent what the Amendment would do, make allegations that are explicitly refuted by the language of the Amendment itself, and mislead through both inaccurate statements and through omission of countervailing information. Such actions violate the political power that has been constitutionally reserved to the people, and therefore should be enjoined.

## PARTIES

1.     Plaintiff Floridians Protecting Freedom, Inc. ("FPF") is a Florida corporation and political committee sponsoring the citizen initiative entitled "Amendment to Limit Government Interference with Abortion" ("Amendment 4").

2.     The Agency for Health Care Administration ("AHCA") is "responsible for health

facility licensure, inspection, and regulatory enforcement; investigation of consumer complaints related to health care facilities and managed care plans; the implementation of the certificate of need program; the operation of the Florida Center for Health Information and Transparency; the administration of the Medicaid program; the administration of the contracts with the Florida Healthy Kids Corporation; the certification of health maintenance organizations and prepaid health clinics as set forth in part III of chapter 641; and any other duties prescribed by statute or agreement." § 20.42(3), Fla. Stat.

## JURISDICTION AND VENUE

3.    This is an action for declaratory judgment and injunctive and other appropriate relief.

4.    This Court has jurisdiction pursuant to § 86.011, Fla. Stat.

5.    Venue is appropriate in this Court pursuant to § 47.011, Fla. Stat.

## FACTS

6.    Under Florida's form of government—a democratic republic—"All political power is inherent in the people." Art. I, § 1, Fla. Const.

7.    To carry out that maxim, the People of this state reserved for themselves "[t]he power to propose the revision or amendment of any portion or portions of th[e] constitution by initiative . . . ." *Id.* art. XI, § 3.

8.    The People may invoke this power by filing with the Secretary of State a petition signed by the constitutionally required number of voters. *Id.*

9.    FPF invoked the People's Constitutional power to propose a revision to the Florida Constitution, sponsoring Amendment 4 in the 2024 election cycle.

10.    On April 1, 2024, the Florida Supreme Court "approve[d] the proposed

[Amendment 4] for placement on the ballot." *Advisory Op. to Att'y Gen. re Limiting Gov't Interference with Abortion*, 384 So. 3d 122, 127 (Fla. 2024).

11.    If adopted by the voters, Amendment 4 will amend the Florida Constitution to provide: "Except as provided in Article X, Section 22, no law shall prohibit, penalize, delay, or restrict abortion before viability or when necessary to protect the patient's health, as determined by the patient's healthcare provider."

12.    AHCA is the chief health policy and planning entity for the state of Florida. "The department is responsible for health facility licensure, inspection, and regulatory enforcement investigation of consumer complaints related to health care facilities and managed care plans. § 20.42, Fla. Stat. It also administers the Medicaid program and other need programs. *Id.*

13.    AHCA's mission is "Better Health Care for All Floridians" and claims that "[a]s champions of that mission, we are responsible for the administration of the Florida Medicaid program, licensure and regulation of Florida's health facilities and providing information to Floridians about the quality of care they receive."

14.    One of the bureaus within AHCA is the Florida Center for Health Information and Transparency ("Florida Center"). § 20.42, Fla. Stat.

15.    The Florida Center is established in law to "collect, compile, coordinate, analyze, index, and disseminate health-related data and statistics." *Id.* § 408.05(1).

16.    To disseminate this data, the Florida Center is required to provide a website "that allows a consumer to research the cost of health care services and procedures and allows for price comparison." *Id.* § 408.05(3).

17.    www.FloridaHealthFinder.gov is a website hosted and operated by the Florida Center's Office of Data Dissemination and Transparency.  The website purports to be "improving

health care transparency" and "empowering Floridians to make informed health care decisions" by allowing website visitors to utilize various data and research tools to search for health care facilities by location and quality and compare procedure and prescription drug pricing.

18.    The HealthFinder website also provides "consumer guides" including "Questions You May Want to Ask the Doctor" and "Assisted Living in Florida."

19.    Through its HealthFinder website, AHCA has engaged in a campaign to disseminate misinformation to alarm voters and engage in political advocacy against Amendment 4 in the upcoming election. A screenshot of the website is attached hereto as Exhibit A.

20.    Visitors to the AHCA website are shown a series of icons on AHCA's home page, such as an icon labeled "Health Care Transparency" which links to the HealthcareFinder's home page.

21.    Under the Health Care Transparency icon is a label that says "Florida Cares."  That icon is linked to a page hosted through the HealthFinder website (https://quality.healthfinder.fl.gov/floridacares), advocating against Amendment 4 through inflammatory language and misinformation:



Current Florida Law **Protects Women**, Amendment 4 Threatens Women's Safety

22.     Under the guise of providing "facts" to the public, the website contains harmful statements that are fundamentally misleading at best, if not outright false. It includes multiple statements that lead only to the conclusion that AHCA is using its official authority or influence for the purpose of interfering with an election, or to influence votes and affect the result of the decision on Amendment 4. ("Current Law **Protects Women.** Amendment 4 **Threatens Women's Safety**"; "We must keep Florida from becoming an **abortion tourism destination state**."; "Don't Let the Fearmongers Lie to You") (emphasis in original)).

23.     The website proclaims, "Don't Let the Fearmongers Lie to You," implying—since the website is entirely about Amendment 4—that the amendment is deceptive.

24.     The Florida Supreme Court rejected the claim that Amendment 4 was deceptive or misleading, finding that "the ballot title and summary fairly inform voters, in clear and unambiguous language, of the chief purpose of the amendment and they are not misleading." *Limiting Gov't Interference*, 384 So. 3d at 136.

25.     Despite the fact that the website was established to provide data transparency, it misleads voters into the belief that abortion is broadly available, stating that "Each year in Florida 83,000 abortions are performed," even though this figure predates the current ban which criminalizes abortion six weeks after a woman's last menstrual period. Likewise, it points to outdated data on abortions performed in the state for out-of-state residents.

26.     The website also attempts to mislead voters into believing that "Amendment 4 Threatens Women's Safety," arguing that it "threatens to expose women and children to health risks which the Florida Legislature has spent years working to mitigate." It further implies current Florida laws protecting women from "dangerous and unsanitary conditions" would be repealed by Amendment 4. It goes on to summarize that Amendment 4 would "Lead to unregulated and unsafe abortions."

27.     The website does not even purport to explain how laws to protect women from dangerous and unsanitary conditions would necessarily "prohibit, penalize, delay, or restrict abortion."

28.     The website goes on to highlight the amendment's use of the terms "viability," "patient health," "healthcare provider," and a term not used in the amendment, "parental notification" arguing that they are "open-ended and arbitrary" and that "Here's the Truth: The Florida Legislature will lose the ability to protect basic, common-sense health care regulations due to these open-ended and arbitrary terms."

29.     The website does not purport to explain how these terms would impact "basic, common-sense health care regulations."

30.     The Supreme Court rejected arguments that these terms were misleading, explaining "it is difficult to imagine a Florida voter in 2024 who would be befuddled in any

material way by the ballot summary or proposed amendment due to the use of the terms 'viability,' 'health,' and 'healthcare provider.'" *Limiting Gov't Interference*, 384 So. 3d at 136. "Viability," for example, is defined in Florida law as "the stage of fetal development when the life of a fetus is sustainable outside the womb through standard medical measures." § 390.011, Fla. Stat.

31.    The website attempts to mislead voters into believing that "Sponsors of Amendment 4 have Not Disputed it Would Allow: Abortion procedures through the third trimester or [sic] pregnancy," implying abortion access would be protected at any time for any reason.

32.    The Supreme Court rejected this argument, explaining that by its plain text, "the proposed amendment would not prohibit the Legislature from passing laws "interfering" with abortion after the point of viability and when the mother's health is not in jeopardy." *Limiting Gov't Interference*, 384 So. 3d at 134.

33.    The website attempts to mislead voters by proclaiming several times in a large, standalone graphics that Amendment 4 "Eliminates Parental Consent," and further alleges that "Sponsors of Amendment 4 have Not Disputed it would allow: Minors to obtain an abortion without their parents' knowledge."



"...*This amendment does not change the Legislature's constitutional authority to require notification to a parent or guardian before a minor has an abortion...*"

Here's the **Truth:**

While the amendment acknowledges the Legislature's authority, it may also open discussions about the role of parental involvement in a minor's decision to have an abortion. The current law requires parental consent before a minor can have an abortion. The amendment could lead to differing interpretations of this, which could affect the balance between expanding access to abortion and preserving parents' rights.

**Eliminates Parental Consent**

34.    In fact, in its advisory opinion regarding Amendment 4, the Supreme Court recognized that Amendment 4 explicitly preserves the Legislature's authority to require parents be notified *before* minors seek an abortion. *Limiting Gov't Interference*, 384 So. 3d at 134.

35.    AHCA's website also claims that it's a myth that "[w]omen won't even know they're pregnant" under Florida's current six-week abortion ban, which is patently false. *See, e.g.*, Ayoola, Adejoke B., Late recognition of unintended pregnancies, Public Health Nursing 32, no. 5 (2015): 462-470, https://onlinelibrary.wiley.com/doi/abs/10.1111/phn.12182 (women with unintended pregnancies, on average, discovered their pregnancy at 7.2 weeks). There are many reasons why many individuals may not realize they are pregnant or feel the need to take a pregnancy test until after six weeks, such as having an irregular menstrual cycle or experiencing spotting.

36.    Even as it warns voters of the harm of allowing women to access abortion care if their healthcare provider determines it is necessary to protect their health, AHCA's website

8

wrongfully declares it is a "myth" that under the current ban women are denied treatment for miscarriages or abortions when their health is in jeopardy. It further misleads Floridians by stating that under current law, "After viability (when the fetus can survive outside the womb), abortions are allowed if necessary to protect the patient's health, as decided by their healthcare provider." Likewise, AHCA has sponsored a 30-second radio spot spreading the  misinformation that "abortions are available . . .  at all points in pregnancy to save the life and the health of the mother" and informs the listener that "this message is sponsored by the Florida Agency for Healthcare Administration." This state action is false, misleading, and an illegal use of public funds. The radio advertisement can be accessed at https://bit.ly/AHCARadioAd.

37.     In fact, the current law in Florida results in the denial of care to pregnant women, even when their health is at risk. Florida law only permits health-related abortions if two physicians certify in writing that it is necessary to save the patient's life or "avert a serious risk of substantial and irreversible physical impairment of a major bodily function of the pregnant woman other than a psychological condition." § 390.011, Fla. Stat. Multiple public cases illustrate that women in Florida are being denied miscarriage treatment and abortions needed to protect their health. *See, e.g.,* Caroline Kitchener, *Two Friends Were Denied Care After Florida Banned Abortion. One Almost Died*, WASH. POST (Apr. 10, 2023), https://www.washingtonpost.com/politics/2023/04/10/pprom-florida-abortion-ban. (Attached hereto as Exhibit B.)

38.     In addition, AHCA sponsored television advertisements to run on public channels that include much of the same deceptive language and specifically direct viewers to the HealthFinder website. The television advertisement can be viewed at https://bit.ly/AHCATVad.

39.     Florida law contains several provisions that prohibit public officials and employees from participating in political advocacy while on duty.

40.    For example, section 104.31 provides:

[n]o officer or employee of the state, or of any county or municipality thereof, except as hereinafter exempted from provisions hereof, shall:

(a) Use his or her official authority or influence for the purpose of interfering with an election or a nomination of office or coercing or influencing another person's vote or affecting the result thereof.

41.    Florida law further provides that

no employee in the career service shall: (a) Hold, or be a candidate for, public office while in the employment of the state or take any active part in a political campaign while on duty or within any period of time during which the employee is expected to perform services for which he or she receives compensation from the state . . . [or] (b) Use the authority of his or her position to secure support for, or oppose, any candidate, party, or issue in a partisan election or affect the results thereof.

§ 110.233, Fla. Stat.

42.    The law also limits spending public funds and resources on political activities. Florida law authorizes the creation of "a public broadcasting system for the state," for which state funds shall be provided to "educational television and radio systems." *Id.* § 1001.26(1). Funds may be provided "for educational television to meet state priorities," including "citizens' participation programs, music and fine arts programs, coverage of public hearings and governmental meetings, equal air time for political candidates, and other public interest programming." *Id.* § 1001.26(1)(e).

43.    If an educational television station is "supported in whole or in part by state funds," its "facilities, plant, or personnel . . . may not be used directly or indirectly for the promotion, advertisement, or advancement of a political candidate for a municipal, county, legislative, congressional, or state office . . . This paragraph applies to the advocacy for, or opposition to, a specific existing or proposed program of governmental action, which includes, but is not limited to, constitutional amendments, tax referenda, and bond issues." *Id.* § 1001.26(3)(a).

44.    Through the dissemination of misinformation through its website, radio spot, and

television advertisement, AHCA employees and officials have violated various provisions of state law and, accordingly, these political advertisements constitute unfair use of AHCA's power and the public funds and resources entrusted to it.

45.    This interference in the democratic process infringes on the political power the people reserved to themselves through Article I, section 1 and their right to propose amendments to the Florida Constitution through ballot initiative under Article XI, section 3.

46.    Accordingly, this Court should declare that AHCA's actions violate FPF's right to propose revisions and amendments to Florida's Constitution, order AHCA to remove the advertising, materials, and information that violate FPF's rights, and enjoin AHCA from disseminating such advertising or other materials in the future.

## CLAIM FOR RELIEF

### COUNT ONE
### Violation of Art. 1, § 1, and Art. XI, § 3, Fla. Const.

47.    FPF restates and incorporates by reference the allegations of paragraphs 1 through 46 above as though fully set forth herein.

48.    This is an action for declaratory relief pursuant to § 86.011, Fla. Stat.

49.    In educating the electorate about the purpose and ramifications of a proposed Constitutional Amendment, the government cannot do so in a manner that is inaccurate, misleading, abusive, or fraudulent.

50.    AHCA's actions regarding Amendment 4, as described above, have been inaccurate, misleading, abusive and fraudulent.

51.    In doing so, AHCA has violated FPF's right to propose revisions and amendments to Florida's Constitution.

52.     FPF is entitled to a declaratory judgment that AHCA's actions violate FPF's right to propose revisions and amendments to Florida's Constitution.

53.     There is a bona fide, actual, present practical need for the declaratory judgment, because AHCA's ongoing misinformation and advertising campaign is continuously violating FPF's rights.

54.     The immunity, power, privilege, or right of FPF to have Amendment 4 submitted to voters is dependent upon the facts or the law applicable to the facts in this matter.

55.     FPF has, or reasonably may have, an actual, present, adverse, and antagonistic interest against AHCA in the subject matter, either in fact or law.

56.     The antagonistic and adverse interests are all before this Court by proper process.

57.     Additionally, FPF seeks the issuance of a temporary injunction and permanent injunctive relief to immediately (1) stop the unlawful and unconstitutional spread of misinformation about Amendment 4 through any websites, radio spots, or television advertisements by AHCA and its agents; and (2) to prevent AHCA from spending any public funds or using, distributing, or making available any other materials containing misinformation about Amendment 4 or interfering with the right of Florida citizens to propose constitutional amendments by initiative.

58.     An injunction is warranted to prevent AHCA from abusing its power and violating Florida's Constitution to interfere in the upcoming election.

59.     FPF has a substantial likelihood of success on the merits.

60.     Because AHCA is violating the people's political power, the public interest would be served by issuance of an injunction.

61.     There is no adequate remedy at law to address AHCA's ongoing Constitution

violations.

62.    FPF is being irreparably harmed by this publicly funded misinformation campaign and, absent the entry of an injunction, FPF will be further irreparably harmed because the election is quickly approaching. Election day, November 5, 2024, is less than 60 days away. Vote-by-mail ballots will be sent to military and overseas voters in roughly one week. § 101.62(4)(a), Fla. Stat. Vote-by-mail ballots will be sent to all other voters who requested them 2–3 weeks after that. *Id.* § 101.62(4)(b). There is an imminent risk that voters will be misled and misinformed in their consideration of Amendment 4 by the State's website and advertising.


## <u>REQUEST FOR RELIEF</u>

**WHEREFORE,** Floridians Protecting Freedom respectfully requests that this Court:

A.  Declare that AHCA's actions violate FPF's right to propose revisions and amendments to Florida's Constitution;

B.  Order AHCA to remove the information regarding Amendment 4 from its website;

C.  Enter temporary and permanent injunctions enjoining AHCA and its agents from continuing to disseminate any information, advertising, or materials about Amendment 4 through any websites, radio spots, or television advertisements, or spending any public funds or using, distributing, or making available any other materials about Amendment 4 that interfere with the right of Florida citizens to propose constitutional amendments by initiative.

D.  Grant any such other relief the Court deems appropriate.

Respectfully submitted September 12, 2024,

*/s/ Nicholas L.V. Warren*

Daniel Marshall (FBN 617210)
Jodi Siegel (FBN 511617)
**Southern Legal Counsel, Inc.**
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
dan.marshall@southernlegal.org
jodi.siegel@southernlegal.org

Margaret Good (FBN 97931)
**Margaret Good Law, PLLC**
P.O. Box 5083
Sarasota, FL 34277
(941) 313-7485
margaret@margaretgoodlaw.com

Michelle Morton (FBN 81975)
Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
mmorton@aclufl.org
dtilley@aclufl.org

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida**
1809 Art Museum Drive, Suite 203
Jacksonville, FL 32207
(786) 363-1769
nwarren@aclufl.org

*Counsel for Floridians Protecting Freedom, Inc.*

# **Exhibit A**

**AHCA Website**
**https://quality.healthfinder.fl.gov/floridacares**











COMPARE

LOCATE/PROXIMITY

PRICEFINDER

MYFLORIDARX

CANCER CONNECT



Florida Agency for Health Care Administration

# Florida is Protecting Life

## DON'T LET THE FEARMONGERS LIE TO YOU

## Current Florida Law **Protects Women**, Amendment 4 Threatens Women's Safety

**Amendment 4** threatens to **expose** women and children to **health risks** which the Florida Legislature has spent years working to mitigate.

**Current Florida law** requires abortion providers to **work within** a **framework** designed to **protect** women from **dangerous** and **unsanitary conditions**.

**The framework** developed by the Florida government to regulate abortion **sets reasonable** and **common-sense guardrails** for medical professionals and their facilities.

## Some of these Laws & Regulations Include:

**Physician requirement: § 390.0111(2)**
Prohibits abortions from being performed at any time except by a **physician** as defined.

**Licensing & sanitation: § 390.012(3) and AHCA rules**
Restrict where abortions may be performed, impose **sanitization standards** for those facilities, and mandate annual agency inspections.

**Admitting privileges: § 390.012(2)**
Requires physicians who perform abortions to have **admitting privileges** at a hospital within reasonable proximity to the abortion clinic and requires abortion clinics to have a **written patient transfer agreement** with a hospital within reasonable proximity to the clinic.

**Regulation of abortion procedure: § 390.012(3)(e) and AHCA rules**
Require appropriate use of **general** and **local anesthesia**, appropriate precautions such as the establishment of **intravenous access**, and appropriate monitoring of **vital signs** throughout the abortion procedure.

**Regulation of recovery and follow-up care: § 390.012(3)(f-g) and AHCA rules**
Require abortion clinics to provide for **monitorization** by **medical professionals** capable of providing **basic cardiopulmonary resuscitation (CPR)**, instructions regarding access to medical care for complications, and a **postabortion medical visit** that includes a medical examination and a review of the **results** of laboratory tests and a urine pregnancy test.

# Amendment 4 Says

"No law shall prohibit, penalize, delay, or restrict abortion before viability or when necessary to protect the patient's health, as determined by the patient's healthcare provider. This amendment does not change the Legislature's constitutional authority to require notification to a parent or guardian before a minor has an abortion."

| VIABILITY | PATIENT HEALTH | HEALTHCARE PROVIDER | PARENTAL NOTIFICATION |

**Here's the _Truth:_** The Florida Legislature will lose the ability to protect basic, common-sense health care regulations due to these open-ended and arbitrary terms.

# Existing Florida Exceptions
## §390.0111

| LIFE OF THE MOTHER | RAPE |
| RISK OF PHYSICAL IMPAIRMENT | INCEST |
| FATAL FETAL ABNORMALITY | HUMAN TRAFFICKING |

# Impact of Amendment 4
## AMENDMENT 4 STATES:

*"No law shall prohibit, penalize, delay, or restrict abortion..."*

### Here's the **Truth:**

The language in Amendment 4, while well-intentioned, would benefit from greater clarity to ensure that the State can continue to uphold important health and safety standards for abortions. **Without clear guidelines, abortion in Florida could become less regulated, and impact safety.**



**Lead to Unregulated & Unsafe Abortions**



**No Definition of Viability**

*"...before viability..."*

### Here's the **Truth:**

The concept of "viability" is inherently flexible, as it varies with each pregnancy and depends on the unique health circumstances of the mother and child. **This flexibility makes it challenging to define a specific moment when abortions should or shouldn't be allowed, which creates uncertainty in decision-making.**

*"... or when necessary to protect the patient's health,..."*

### Here's the **Truth:**

The amendment aims to outline the government's role in regulating abortion after viability, with a focus on protecting the patient's health. However, the broad definition of "health" can be interpreted in ways that might allow for more exceptions than intended, potentially permitting abortion later in pregnancy



permitting abortion later in pregnancy under certain health-related circumstances. **Clarifying this would help ensure that the intended protections are effectively implemented.**

## No Definition of Patient's Health

*"...as determined by the patient's healthcare provider..."*

**❚** Here's the **Truth:**

Amendment 4 also introduces the term "healthcare provider" to describe who can make decisions about abortion. This broad term could include a wide range of professionals connected to healthcare, which might differ from the current requirement that these important decisions be made only by a physician. **Ensuring that those making critical decisions are appropriately qualified is important for maintaining high standards of care.**



## No Definition of Health Care Provider

*"...This amendment does not change the Legislature's constitutional authority to require notification to a parent or guardian before a minor has an abortion..."*

**❚** Here's the **Truth:**

While the amendment acknowledges the Legislature's authority, it may also open discussions about the role of parental involvement in a minor's decision to have an abortion. The current law requires parental consent before a minor can have an abortion. The amendment could lead to differing interpretations of this, which could affect the balance between expanding access to abortion and preserving parents' rights.



## Eliminates Parental Consent

# Additional Resources

FLORIDA ABORTION STATISTICS

# FLORIDA ABORTION STATISTICS

> We must keep Florida from becoming an **abortion tourism destination state**

**7,736** out-of-state residents received abortions in Florida in **2023**

## EACH YEAR IN FLORIDA...

**46,000 ABORTIONS**

Take place **BEFORE** a heartbeat is detected at 6 weeks. That equates to **54%.**

**83,000 ABORTIONS**

Are performed.

**37,000 ABORTIONS**

Take place **AFTER** a heartbeat is detected at 6 weeks. That equates to **46%.**

## Active Florida Laws & Rules At Risk:

**Heartbeat Protection Act:**
§ 390.0111(1)
**Parental consent:**
§ 390.01114
**Physician requirement:**
§ 390.0111(2)
**Licensing & sanitation:**
§ 390.012(3)
**Admitting privileges:**
§ 390.012(2)
**Medical screening:**
§ 390.012(3)(d)
**Waiting period:**
§ 390.0111(3)(a)1

**In-person counseling:**
§ 390.0111(3)(a)1.a
**Informed consent materials:**
§ 390.0111(3)(a)2
**Ultrasound requirements:**
§ 390.0111(3)(a)1.b
**Regulation of abortion procedure:**
§ 390.012(3)(e) and AHCA rules
**Regulation of abortion method:**
§ 390.0111(5); § 390.011(10)
**Disposal of fetal remains:**
§ 390.0111(7) and AHCA rules
**Regulation of recovery and follow-up care:**
§ 390.012(3)(f-g) and AHCA rules

**Failed abortions:**
§ 390.0111(12)
**Refusal to participate:**
§ 390.0111(8)
**Restriction on state funding and contracting:**
§ 390.0111(15)
**Medicaid reimbursement:**
Fla. Admin. Code R. 59G-1.045(6)
**ACA plan coverage:**
§ 627.6699(16)
**Recordkeeping & reporting:**
Fla. Admin. Code R. 59AER24-2

## Sponsors of Amendment 4 have Not Disputed it Would Allow:

Minors to obtain an abortion without their parents' knowledge

Abortion procedures through the third trimester or pregnancy

Non-obstetricians to prescribe and perform abortion procedures.

## Amendment 4 Financial Support

Floridians Protecting Freedom, Inc. has received over **$50 million** from self interested out of state groups including:
- Tides Foundation (California)
- American Civil Liberties Union (Florida, New York)
- Open Society (Washington DC, California, New Jersey, Florida, Illinois, Connecticut, Colorado, Oregon, Wisconsin, New York)
- Charles and Lynn Schusterman Family Foundation (Oklahoma)
- Advocacy Action Fund Inc. (California)
- The Fairness Project (Washington, DC)
- Sixteen Thirty Fund (Washington, DC)
- Think Big America (Illinois)

# Transparency Documents

# FLORIDA IS PROTECTING LIFE
# Myth vs Fact
## DON'T LET THE FEARMONGERS LIE TO YOU

**MYTH:** Women can no longer receive healthcare.

**FACT:** Florida does not restrict lifesaving care for women – it promotes it. Florida hospitals and health care providers deliver some of the highest quality prenatal care in the nation. Florida also provides additional maternal health care resources through the Florida Department of Health.

**MYTH:** Women will be jailed as a result of the law.

**FACT:** Florida's criminal abortion penalties do not apply to pregnant women. Florida works to ensure the health and safety of mothers and babies by continuing to hold medical providers accountable to the standards of their oath to protect and ensure the health and well-being of their patients.

**MYTH:** Women won't even know they're pregnant.

**FACT:** Pregnancy tests have evolved substantially over the years. Trace levels of hCG can now be detected as early as eight days after ovulation.

**MYTH:** Women will be forced to give birth even if their life or health is in jeopardy.

**FACT:** Florida law includes exceptions to save the pregnant woman's life or avert a serious risk of substantial and irreversible physical impairment of a major bodily function. Exceptions exist for pregnancies resulting from rape, incest, human trafficking, and for emergency medical procedures to save the life of the mother.

**MYTH:** Women in need of treatment for an ectopic pregnancy will not have access to care.

**FACT:** Treatment to remove an ectopic pregnancy is not prohibited under Florida law.

**MYTH:** Women who experience a premature rupture of membranes (PROM) will be sent home without care.

**FACT:** Florida law does not prohibit treatment for women who experience premature rupture of membranes (PROM) and as such, physicians in Florida should follow established standards of care regarding the most appropriate course of action for PROM. Florida law includes an exception to save the life of the mother or avert a serious risk of substantial and irreversible physical impairment of a major bodily function. In addition to this exception, the law does not prohibit saving the life of the mother in medical emergencies.

**MYTH:** Women who experience the tragic loss of a pregnancy, commonly known as a miscarriage, will be denied treatment.

**FACT:** Florida law does not prohibit the removal of the pregnancy for women who experience a miscarriage in any circumstance.



# FLORIDA

# Current Law vs. Amendment 4

**Limiting government interference with abortion: No law can ban, punish, delay, or limit abortions before the fetus can survive outside the womb, or when the abortion is needed to protect the patient's health, as decided by their healthcare provider.**

## Current Law

Abortions are generally banned after 6 weeks of pregnancy, with some exceptions.

*After 6 weeks*, abortions are only permitted in the following narrow circumstances:

(1) If two doctors confirm in writing that the abortion is needed to save the woman's life.

(2) If two doctors confirm in writing that the abortion is needed to prevent serious and permanent harm to a major bodily function, not including psychological issues.

(3) If, before the third trimester, two doctors confirm that the fetus has a condition that will result in death.

(4) If, before 15 weeks, a doctor determines that the pregnancy is due to rape, incest, or human trafficking, supported by relevant documents.

After viability (when the fetus can survive outside the womb), abortions are allowed if necessary to protect the patient's health, as decided by their healthcare provider.

## Amendment 4

Abortions are allowed without restrictions, delays, or penalties before viability, which is generally around 24 weeks of pregnancy.

After viability, abortions are allowed if needed to protect the patient's health, as determined by their healthcare provider.

| For each specific exception listed above, an abortion is allowed only if at least one doctor (or sometimes two) decides that the situation fits the exception. | For the general health exception, it can be decided by any healthcare provider, not just doctors. |
|---|---|
| Unless it's a medical emergency, an abortion can only happen if at least 24 hours have passed after the doctor gives the woman specific information. | Some will probably argue that…However, the rule against delaying abortions means this 24-hour waiting period might be seen as unconstitutional. |
| Only a doctor can perform an abortion or give out abortion pills. | Some people will argue…However, this rule might be seen as an unfair restriction on abortions, as it limits who can provide the procedure. |
| Abortion pills must be dispensed in person and may not be dispensed through the United States Postal Service or by any other courier or shipping service. | Some people will argue…However, this rule might be seen as an unfair restriction on abortions, since it prevents the use of telehealth for providing abortion pills. |
| Abortion pills must be given in person and can't be sent by mail or delivery service. | Some people will argue…This in-person requirement might be seen as an unfair restriction on abortions, as it limits how abortion pills can be provided. |
| An ultrasound is required to confirm how far along the pregnancy is. | Some people will argue…This requirement might be seen as an unfair restriction or delay in getting an abortion. |
| Partial-birth abortions are banned unless they are needed to save the mother's life when no other medical procedure will work. | Some people will argue…This ban might be seen as an unfair restriction on abortions. |
| Parents usually need to be notified and give consent before a minor can get an abortion. | Some people will argue…This requirement might be seen as an unfair restriction, delay, or barrier to getting an abortion. |
| Places that perform abortions, other than hospitals or doctors' offices not mainly used for abortions, need to be licensed by AHCA. | Some people will argue…This licensing requirement might be seen as an unfair restriction on getting an abortion. |
| Hospitals and individuals can't be held responsible if they refuse to participate in abortions. | Some people will argue…This rule might be seen as an unfair restriction on abortions. |

**Current Law**    **Amendment 4**

Copyright © 2024

# OUR MISSION

Our mission is "Better Health Care for All Floridians." As champions of that mission, we are responsible for the administration of the Florida Medicaid program, licensure and regulation of Florida's health facilities and providing information to Floridians about the quality of care they receive.

# QUICK LINKS

Home

Procedure Price

Prescriptions

Cancer

# CONTACT AHCA

## FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

📍 2727 Mahan Drive
Tallahassee, Florida 32308

📞 888-419-3456

📞 800-955-8771 Florida Relay Service

 

© 2024 Florida Agency for Health Care Administration

FAQ     Feedback     Site Map

# Exhibit B

**Caroline Kitchener, *Two Friends Were Denied Care After Florida Banned Abortion. One Almost Died,* WASH. POST (April 10, 2023), https://www.washingtonpost.com/politics/2023/04/10/pprom-florida-abortion-ban**

🕐 This article was published more than **1 year ago**

...ortion    Tracking abortion laws by state    Abortion on the ballot    Before Roe    Dobbs v. Jackson Women's Health

# Two friends were denied care after Florida banned abortion. One almost died.

New abortion restrictions have disrupted the standard of care for a pregnancy complication both women experienced late last year

🎧 23 min    ↗    🔖    💬 3090

 By Caroline Kitchener

Updated April 10, 2023 at 11:30 a.m. EDT    |    Published April 10, 2023 at 6:00 a.m. EDT

MIRAMAR, Fla. — Anya Cook did not want to push. But sitting on the toilet, legs splayed wide, she knew she didn't have a choice.

She was about to deliver her baby alone in the bathroom of a hair salon. On this Thursday afternoon in mid-December, about five months before her due date, she knew the baby would not be born alive.

Cook tried to tune out the easy chatter outside, happy women with working wombs catching up with their hairdresser. At 36, she'd already experienced a long line of miscarriages, but none of the pregnancies had been more than five weeks along. Now she had to deliver a nearly 16-week fetus — a daughter she'd planned to call Bunny.

She took a deep breath and closed her eyes.

As soon as the fetus hit the water, blood started flowing between her thighs. Blood splattered on the white toilet seat and across the floor. She panicked, her hands shaking as she picked up her phone to call her husband, Derick.

"Baby," she said, "I need you to come to the bathroom."

Over the course of the day, according to medical records, Cook would lose roughly half the blood in her body.

She had intended to deliver the fetus in a hospital, a doctor by her side. When her water broke the night before — at least six weeks ahead of when a fetus could survive on its own — she drove straight to the emergency room, where she said the doctor explained that she was experiencing pre-viability preterm prelabor rupture of the membranes (PPROM), which occurs in less than 1 percent of pregnancies. The condition can cause significant complications, including infection and hemorrhage, that can threaten the health or life of the mother, according to multiple studies.

At the hospital in Coral Springs, Fla., Cook received antibiotics, records show. Then she was sent home to wait.

Cook's experience reflects a new reality playing out in hospitals in antiabortion states across the country — where because of newly enacted abortion bans, people with potentially life-threatening pregnancy complications are being denied care that was readily available before the Supreme Court overturned *Roe v. Wade* in June.

When abortion was legal across the country, doctors in all states would typically offer to induce or perform a surgical procedure to end the pregnancy when faced with a pre-viability PPROM case — which is the standard of care, according to the American College of Obstetricians and Gynecologists (ACOG), and an option that many women choose. Especially before the 20-week mark, a fetus is extremely unlikely to survive without any amniotic fluid.

But in the 18 states where abortion is now banned before fetal viability, many hospitals have been turning away pre-viability PPROM patients as doctors and administrators fear the legal risk that could come with terminating even a pregnancy that could jeopardize the mother's well-being, according to 12 physicians practicing in antiabortion states.

The medical exceptions to protect the life of the mother that are included in abortion bans are often described in vague language that does not appear to cover pre-viability PPROM, doctors said. That's because the risks of the condition are often less clear-cut than other medical emergencies, such as an ectopic pregnancy, in which a fertilized egg grows outside of the uterus, dooming the fetus and posing an immediate danger to the mother's life.

A 2022 study on the impact of Texas's six-week abortion ban found that 57 percent of pre-viability PPROM patients in Texas who were not given the option to end their pregnancies experienced "a serious maternal morbidity," such as infection or hemorrhage, compared with 33 percent of PPROM patients who chose to terminate in states without abortion bans. According to 2018 ACOG guidance, "isolated maternal deaths due to infection" have been reported in early PPROM cases.

Florida's abortion law, enacted last year, bans the procedure after 15 weeks of pregnancy except when an abortion would either "save the pregnant woman's life" or "avert a serious risk of substantial and irreversible physical impairment of a major bodily function." The law includes another exception for a "fatal fetal anomaly," which generally would not apply in a pre-viability PPROM case, according to several doctors, because there is no fetal anomaly but a lack of amniotic fluid, which limits the fetus's chances of survival.

The state's Republican-led legislature is swiftly moving toward passing a far stricter law banning abortion after six weeks of pregnancy. The new measure — which passed the Florida Senate last week and is awaiting final passage in the House — adds exceptions for rape and incest but does not address PPROM.

One of the sponsors of Florida's 15-week abortion ban defended the current law as written, saying the existing exception should be sufficient to cover cases with serious health risks. An explicit exception for PPROM is not necessary, she added.

"The bottom line is we value life, and we would like to protect life," said former Florida state senator Kelli Stargel (R). "We don't want to give a gaping exception that anyone can claim."

Of all the pregnancy complications affected by abortion bans, pre-viability PPROM is one of the most widespread, according to doctors interviewed for this story. The condition is common enough that one day after Cook was turned away from the hospital, the same thing happened to one of her closest friends. Shanae Smith-Cunningham, 32, was 19 weeks into her pregnancy when her water broke.

This story of what happened to the two friends is based on over 200 pages of medical records provided by the patients and on internal hospital documents, as well as text messages, videos and social media posts. In addition to Cook and Smith-Cunningham, The Washington Post interviewed friends and family members who witnessed the events, and several of the doctors involved in the women's care.



About 15 minutes after Anya delivered the fetus, paramedics charged through the hair salon doors with a stretcher, she and her husband, Derick Cook, recalled. Paramedics slipped the fetal remains inside a red biohazard bag and rushed Anya to a nearby hospital.

When Hany Moustafa, the OB/GYN on call that day, started the procedure to clear remaining pregnancy tissue out of Anya's uterus, she was still bleeding profusely, he said, describing Anya's condition with her consent. She was "critically ill" and "mechanically ventilated," according to medical records.

The doctor stepped out into the waiting room to talk to Derick, who had followed his wife to the ER.

Moustafa told Derick that his wife could die in the operating room, both men recalled.

"I will do my very best," the doctor said. "But the rest is up to God."

F our months earlier, on a sweltering afternoon in mid-August, Anya told her husband to meet her at the park. She waited under her favorite tree, close enough to the playground that she could hear children laughing, with eight pink and blue balloons.

"How many do you see?" she asked as Derick walked toward her, while she filmed him on her phone.

"Four and four?"

"We have four boys and four girls," she said.

After so many miscarriages, Anya and Derick had finally decided to try in vitro fertilization. Now they had eight embryos, frozen in liquid nitrogen.

One of them was Bunny.

Anya wanted a baby more than anything. The miscarriages only made her more determined. She bought pregnancy tests in bulk on Amazon — the cheap, off-brand kind so she could use three or four a day.

"This is everything to me," she said she told friends and family members who asked, after several miscarriages, if she might consider adoption. "I deserve to have my own biological child."

By the time she started IVF last spring, Cook was developing a reputation as a mentor for other women in the Fort Lauderdale area struggling with fertility. She would spend hours answering questions on a local Facebook support group — consulting on the pros and cons of estrogen patches, and the most opportune days to have sex.

Cook met Smith-Cunningham in the summer of 2021, when Smith-Cunningham posted a question about a fertility drug she'd been considering. They messaged back and forth, slipping into an easy blend of English and Patois once they realized they were both from Jamaica.

When they got pregnant around the same time — Smith-Cunningham first, then Cook three weeks later — they started texting every day. They exchanged links for cribs they liked and debated the best color for a nursery. Cook put Smith-Cunningham's doctors appointments on her calendar so she would always remember to check in.

"2nd trimester!!!!!!!" Cook texted her friend at 4:03 a.m. on the day Smith-Cunningham entered her 13th week of pregnancy.

"I hope its good to me lol," Smith-Cunningham responded later that morning.

"I hope so too," Cook said.

Smith-Cunningham had moved to the United States from Jamaica to be with her husband in 2019. A plane ride away from her mother and all her friends, her husband working long hours, Smith-Cunningham had already experienced one miscarriage and was scared to go through another pregnancy alone.

"I don't have a sister," she said. "Anya was my safe place."

After so much disappointment, Cook and Smith-Cunningham agreed that they would help each other keep their expectations in check, pledging not to buy anything baby-related until they were both safely past the 20-week mark.

But then, one Sunday morning in mid-December, Derick suggested he and Anya check out Pottery Barn Kids — and Anya decided she didn't want to wait anymore.

In rhinestone sandals and biker shorts that showed off her bump, she strolled up and down the aisles with Derick on her arm, feeling the gaze of other women in the store. They went to Target next for a maternity swimsuit. Then to Yard House for a celebratory steak.

"I felt finally that I belonged," Anya said. "I felt like my body was no longer broken."

Anya's water broke the following Wednesday, just after 10 p.m., as she was walking out of a TGI Friday's.

She felt a rush of warm liquid on her legs, whipping around to see if someone had doused her with a glass of water. Then she put her hand in her underwear.

"Derick, look," she remembers saying, holding out her wet fingers. "Something's not right."

Anya spent an hour in the waiting room of the Broward Health hospital in Coral Springs, amniotic fluid dripping onto the floor, she and Derick recalled. When the doctor finally saw her, he delivered the distressing news, they said: Anya was experiencing PPROM — and because of the state's abortion law, he could not induce labor. She could not stay at the hospital, either, she said she was told.

Because she was so early in her pregnancy, she recalled the doctor saying, there was no chance her baby would survive.

Cook wanted to scream. There must be some kind of protocol for this situation, she thought — she couldn't possibly be the first woman in Florida to have this condition since *Roe v. Wade* was overturned. Was there a supervisor she could talk with? Anyone else who could help?

"You're not telling me anything," Anya recalled saying. "So, basically, I have no options."

The doctor at Broward told her to go home and "return immediately" if her symptoms worsened, according to medical records. A nurse offered some antibiotics to minimize the chance of infection, Anya recalled, then promised to pray for her.

Medical records from the visit, which Cook provided to The Post, show that Cook was "gushing amniotic fluid" when she arrived at the hospital, with no fluid present around the fetus. The records say that the fetus was showing cardiac activity, with a heart rate of 131 beats per minute.

The Post, with Cook's consent, read relevant portions of the records to four physicians, all of whom agreed that Cook had a clear case of pre-viability PPROM, making her high-risk for infection and hemorrhage.

A spokeswoman for Broward Health, Jennifer Smith, did not directly address PPROM, and declined to make the doctor who treated Cook available for an interview. But she said in an interview that Cook was "not at risk" when she left the hospital after her water broke.

"There was no indication she needed any interventional care," said Smith, the hospital's vice president for corporate communications and marketing.

Broward's policy on pregnancy termination, obtained through a public records request to the public hospital, mirrors the language in Florida's abortion law.

Cook "did not necessitate an abortion in the emergency department," Smith wrote in a statement. "Had her condition failed to improve or worsened to result in a threat to her life or irreversible physical impairment of a major bodily function, Ms. Cook would have been admitted for further care and treatment."

Cook had no idea how many women experienced PPROM until she got home from the hospital the night she was turned away. Lying in bed, she spent hours scrolling through a PPROM message board on Facebook. She allowed herself the smallest glimmer of hope, because a few of the women said their babies had survived.

She texted Smith-Cunningham a rundown of her situation just after 1 a.m. — only to delete the messages a few hours later.

She didn't want to scare her friend.

At the salon the next morning — while the stylist was still curling her hair — Cook got a message from Smith-Cunningham.

"Woke up this morning and feel my panty wet... My water break... my life feel like it end," wrote Smith-Cunningham, then about 19 weeks along, at least three weeks before a fetus can survive on its own.

"Me too," Cook texted from the salon chair at 11:01 a.m.

"What you mean... U too," Smith-Cunningham asked.

"My water broke," Cook wrote. "I was at the er last night."

Less than an hour later, Cook shut herself inside the bathroom.

W hen Smith-Cunningham's water broke, she was in St. Ann, Jamaica, visiting her mother for a few weeks before the baby came.

The nurse on call at the hospital that day explained that she was experiencing PPROM, Smith-Cunningham said, the same diagnosis her friend had received 600 miles away the night before. The baby was not going to make it.

As soon as possible, Smith-Cunningham said she was told, the doctors wanted to induce her.

Abortion is illegal in Jamaica, but the law includes exceptions to preserve a woman's physical and mental health.

Smith-Cunningham called her husband in Florida, worried about the level of medical care she might receive in Jamaica. For a procedure this important, they agreed, she should be at an American hospital they trusted, with her regular OB/GYN.

While they knew there was a chance she could deliver on the flight home, they decided it was worth the risk. Her husband flew to Jamaica, and together they booked the first flight back to the United States.

As Smith-Cunningham was preparing to fly home to Fort Lauderdale, unaware of the new abortion law that would prevent doctors from ending her pregnancy, Cook was in the operating room at Memorial Regional Hospital in Hollywood, Fla., where she had been rushed from the hair salon after passing the fetus in the bathroom.

Moustafa, the OB/GYN on call, said he quickly realized that Cook was losing too much blood.

Out in the waiting room, Moustafa laid out the situation for Derick, Cook's husband: The surest way to save Cook's life, he said, was to perform a hysterectomy, a procedure that removes the uterus, rendering a patient infertile.

Derick explained how hard they'd been trying for a baby.

"Please," he said, according to the two men. "Please try to save my wife and her uterus."

The last few hours had been some of the most difficult of Derick's life. When he got to the bathroom, Anya asked him to sever the umbilical cord dangling between her legs, Anya and Derick recalled. Derick thought he remembered seeing a doctor on TV cutting the cord with scissors. He didn't have scissors, so he pulled.

The cord broke apart, and his wife kept bleeding.

Back in the waiting room, Derick found a quiet corner, opened a Bible, and got down on his knees. His body went into a trance, he said. He pleaded with God loud enough that other people could hear him, offering up his job, his soul, even his life — anything.

By the time Cook's mother arrived 45 minutes later, the Bible was wet with Derick's tears.

Doctors can't say for sure what caused Cook's bleeding, according to medical records. Any pre-viability PPROM patient has a high risk of severe hemorrhage, said several doctors. Moustafa said he feels confident that Cook experienced placenta accreta, a separate condition where the placenta becomes embedded in the uterine wall and won't detach with the fetus.

Cook would have had placenta accreta even if she'd been induced at the hospital when she was diagnosed with PPROM, said several doctors familiar with the case, but her experience probably would have been considerably less traumatic. When the bleeding started, she would have already been surrounded by doctors ready to begin treatment.

"Once you start losing that much blood that quickly it becomes absolutely life-threatening," said Moustafa. "Every minute counts."

Cook was sedated for more than 12 hours, according to records, finally waking up the next morning. The doctors were able to preserve her uterus, Cook learned. However, the damage from the procedure that stopped the bleeding may have permanently affected the arteries that carry blood to the uterus, several doctors said, further reducing her chances of carrying a healthy pregnancy.

If Cook had placenta accreta, she most likely would have had to undergo the same procedure even if she had delivered the fetus at a hospital when she was diagnosed with PPROM, said several OB/GYNs.

As soon as she felt well enough to talk on the phone, Cook called Smith-Cunningham, eager to check in on her friend.

Smith-Cunningham was back in the United States and still pregnant — bedridden and waiting, after HCA Florida Northwest Hospital had sent her home after two visits.

The second time, Smith-Cunningham recalled, the doctor explicitly mentioned *Roe v. Wade*. The doctor held her hand, she said, and apologized that she couldn't do anything to help.

HCA Florida Northwest provides abortions in cases where a physician believes "a medical emergency exists or the fetus exhibits a fatal anomaly," Jennifer Guerrieri, the hospital's vice president of strategic communications, said in a statement.

"Our focus is on providing the best possible care for our patients. Our hospital policies and procedures align with state and federal regulatory requirements."

Smith-Cunningham told Cook she was terrified of bleeding out and getting infected.

"You need to keep going back to the hospital," said Cook, who stayed in the hospital for six days. "I don't want the same thing to happen to you."

Smith-Cunningham switched out her sanitary pad for the 10th time that day, hoping a fresh layer in her underwear would minimize her chance of infection.

Her best shot at avoiding complications, she thought, was to do as her friend had suggested. She tried Memorial Regional Hospital — this time with her cervix dilated four centimeters — pleading with the doctor to at least have her admitted.

To stay at the hospital, Smith-Cunningham said she was told, she had to be more dilated or actively miscarrying. Memorial Regional declined a request for comment.

"If no one induces me, I'm going to die," she said to her husband, thinking of her friend hemorrhaging in the ER.

Ivonne Reynolds, Smith-Cunningham's regular OB/GYN, suggested that she leave Florida. Reynolds tried to find a doctor that would treat her in New York, where Smith-Cunningham has family.

"We were trying to find a location where she could get a termination done without all this back-and-forth before she gets infected," Reynolds said in an interview.

Waiting to hear back from Reynolds, Smith-Cunningham spent Christmas Day in bed. She kept searching the same questions online: How do you know when a premature baby is coming? How can you tell when you're getting an infection? Can you have sepsis with a normal white blood count?

At 2 a.m., she sat on the toilet with a mirror pointed up at her vagina. She saw a dark spot she hadn't noticed before.

"I think it might be the baby," Smith-Cunningham told her husband.

By the time she got to the hospital, she was fully dilated. She delivered the fetus eight hours later.

Smith-Cunningham and Cook scheduled follow-up appointments with their fertility specialist for the same morning in early February. They both wanted an answer to the question that had been weighing on their minds since December.

After everything they'd been through, would either of them ever be able to have a baby?

They'd each talked with Daniel Christie, their fertility and IVF doctor, soon after their water broke, filling him in on how the new abortion law had affected their care.

At the February appointment, Cook went in first.

"You have gotten beaten up, young lady," Christie said as he pushed a saline solution through a catheter and into her uterus, studying the image on the ultrasound screen.

Cook knew this was the moment she would finally get the verdict, lying flat on the examination table, her eyes shut tight. Christie usually talked her through every little thing he saw on the screen, as he was looking, cheerfully reporting on the status of her uterus.

This time, he said nothing.

Once he removed the metal speculum, Christie informed Cook that she would have to undergo surgery to remove the remaining pieces of placenta — a procedure that he said could further reduce her chances of carrying to term.

"I'm not thrilled about it," he told her. "But we don't have a choice."

Cook stayed behind in the room to support Smith-Cunningham, holding her friend's hand as Christie delivered similar news: Smith-Cunningham — who also had retained pieces of placenta, a common outcome in PPROM pregnancies — would require the same surgery.

The surgery worked for Smith-Cunningham, but not for Cook.

On March 29, Christie informed Cook that she would require yet another operation to remove additional pregnancy tissue that remained in her uterus; the procedure could further limit her future fertility.

"I feel her sometimes still inside of me," Cook said through tears, back on the examination table for the third time in a month.

"It's just so much, Dr. Christie. It's just so much."

The next day in Tallahassee, a lawmaker Cook and Smith-Cunningham had never met shared their story on the Senate floor, as the six-week abortion ban moved closer to final passage.

"I have two constituents in my district who are living with the very real consequences of the bill that we passed not a year ago," said Florida state Sen. Lauren Book (D).

Although Book didn't know their names, she had heard about Cook and Smith-Cunningham from Christie a few months before.

"The woman is not at imminent risk ... and so women are being sent home in the state of Florida," said Book, pressing the bill's sponsor, Republican Sen. Erin Grall, on how doctors should respond under the law. "Is that the intention of the policy?"

Grall argued that these situations are covered by the bill's medical exception.

"If the mother is going to develop something in which will threaten her life because of the pregnancy, then they would be able to take the child," Grall said.

Grall added that doctors are playing "games and politics" in these situations, willfully misinterpreting Florida's abortion ban when it clearly allows them to perform an abortion.

Nikki Zite, an OB/GYN at the University of Tennessee and an ACOG spokeswoman, said the idea that physicians would put patients at risk for political gain is "upsetting and offensive."

"If lawmakers want pre-viable PPROM to be a situation where it is not controversial for physicians to act without fear of criminalization, then they need to clarify that," said Zite.

Florida's six-week abortion ban passed the Senate with a vote of 26 to 13, without a specific exception for PPROM.

In South Florida, Cook and Smith-Cunningham both plan to start trying to get pregnant again.

They worry the same thing will happen again — this time, with an even stricter abortion law in place.

"Getting pregnant now feels like a death sentence," said Cook.

"They are playing with people's lives with this law," said Smith-Cunningham.

At least, the friends agreed, they would go through it together.

*Story editing by Peter Wallsten. Photo editing by Natalia Jiménez-Stuard. Copy editing by Gilbert Dunkley.*